**RECEIPT**

Received $10,000.00 in cash from Fred Volkwein this 18th day of December, 2002.

_____

Jeffrey M. Siskind

This Money belong To ~~Phil Echo~~.
                    Fred Volkwein
Phil Echo was paid ff. June 20, 2003.



EXHIBIT

A

PLAINTIFF'S
TRIAL EXHIBIT
**T-01**

This Money
Belongs to
Phil Staut
Phil's Panel
PRU Feb 30, 2003

This is at
Jeff escrow fund

## Assignment of Proceeds of Mortgage and Interest Agreement

WHEREAS, a promissory note and mortgage were executed by Steven M. Wilkins and Karol M. Wilkins, his wife (collectively the "Borrowers"), to Jeffrey M. Siskind ("Siskind") in consideration for a loan to the Borrowers in the amount of Fifty Thousand Dollars ($50,000.00), copies of which are attached hereto, and

WHEREAS, said mortgage-based loan is a lien in first position against real property located in Mebane, North Carolina (the "Property") which serves as the primary residence of the Borrowers but is currently in default, and

WHEREAS, Siskind desires to assign sufficient proceeds of said mortgage loan to Fred Volkwein ("Volkwein") in consideration for a loan in the amount of Fifty Thousand Dollars, which loan shall accrue interest at the rate of twenty percent (20%) per annum until repaid in full,

NOW THEREFORE, the parties agree as follows:

(1)     Siskind does hereby assign the proceeds from said mortgage sufficient to repay Volkwein outstanding principal in the amount of $50,000.00 and interest which accrues at the rate of twenty percent (20%) per annum during the period of said loan.

(2)     Siskind warrants that the mortgage loan is a valid lien against the Property, and that there are no impediments to foreclosing upon same.

(3)     Siskind agrees to initiate foreclosure proceedings within thirty (30) days of the effective date of this agreement, and shall be responsible for advancing costs of same, whether or not recoverable through the foreclosure process.

(4)     Siskind does hereby individually guaranty repayment of principal and interest as set forth above to Volkwein.

(5)     This document shall suffice as a loan agreement evidencing the debt as described above from Siskind to Volkwein.

Date: June 26, 2006

Witness:

_____
Jeffrey M. Siskind

_____
Fred Volkwein

Rcvd ck 1017
6-26-06

EXHIBIT
B

SATISFACTION: The debt evidenced by
this Note has been satisfied in full this
_____ day of _____ 20____.
Signed: _____

# PROMISSORY NOTE

Hillsborough, North Carolina

$ 50,000.00                                                                                      May 6, 2005

FOR VALUE RECEIVED the undersigned, jointly and severally, promise to pay to ____Jeffrey M. Siskind____ or order, the principal sum of **FIFTY THOUSAND and No/100s DOLLARS** ($ 50,000.00 )), with interest from ___date___, at the rate of ___Eight___ per cent ( 8.00 %) per annum on the unpaid balance until paid or until default, both principal and interest payable in lawful money of the United States of America, at the office of ___Jeffrey M. Siskind, Trump Plaza Office Center, 525 South Flagler Drive, West Palm Beach, FL 33401___ or at such place as the legal holder hereof may designate in writing. It is understood and agreed that additional amounts may be advanced by the holder hereof as provided in the instruments, if any, securing this Note and such advances will be added to the principal of this Note and will accrue interest at the above specified rate of interest from the date of advance until paid. The principal and interest shall be due and payable as follows:

> Twelve equal monthly payments of THREE HUNDRED THIRTY-THREE and 33/100s DOLLARS ($ 333.33) commencing on June 6, 2005, and continuing on the Sixth day of each successive month, until May 6, 2006, when the entire principal balance and all accrued interest shall be due and payable in full. Payment in full is also due upon sale or transfer of the property.

If not sooner paid, the entire remaining indebtedness shall be due and payable on ___May 6, 2006.___

If payable in installments, each such installment shall, unless otherwise provided, be applied first to payment of interest then accrued and due on the unpaid principal balance, with the remainder applied to the unpaid principal.

Unless otherwise provided, this Note may be prepaid in full or in part at any time without penalty or premium. Partial prepayments shall be applied to installments due in reverse order of their maturity.

In the event of **(a)** default in payment of any installment of principal or interest hereof as the same becomes due and such default is not cured within ten (10) days from the due date, or **(b)** default under the terms of any instrument securing this Note, and such default is not cured within fifteen (15) days after written notice to maker, then in either such event the holder may without further notice, declare the remainder of the principal sum, together with all interest accrued thereon and, the prepayment premium, if any, at once due and payable. Failure to exercise this option shall not constitute a waiver of the right to exercise the same at any other time. The unpaid principal of this Note and any part thereof, accrued interest and all other sums due under this Note and the Deed of Trust, if any, shall bear interest at the rate of ___Ten___ per cent ( 10.00 %) per annum after default until paid. All parties to this Note, including maker and any sureties, endorsers, or guarantors hereby waive protest, presentment, notice of dishonor, and notice of acceleration of maturity and agree to continue to remain bound for the payment of principal, interest and all other sums due under this Note and the Deed of Trust notwithstanding any change or changes by way of release, surrender, exchange, modification or substitution of any security for this Note or by way of any extension or extensions of time for the payment of principal and interest; and all such parties waive all and every kind of notice of such change or changes and agree that the same may be made without notice or consent of any of them.

Upon default the holder of this Note may employ an attorney to enforce the holder's rights and remedies and the maker, principal, surety, guarantor and endorsers of this Note hereby agree to pay to the holder reasonable attorneys fees not exceeding a sum equal to fifteen percent (15%) of the outstanding balance owing on said Note, plus all other reasonable expenses incurred by the holder in exercising any of the holder's rights and remedies upon default. The rights and remedies of the holder as provided in this Note and any instrument securing this Note shall be cumulative and may be pursued singly, successively, or together against the property described in the Deed of Trust or any other funds, property or security held by the holder for payment or security, in the sole discretion of the holder. The failure to exercise any such right or remedy shall not be a waiver or release of such rights or remedies or the right to exercise any of them at another time.

This Note is to be governed and construed in accordance with the laws of the State of North Carolina..

This Note is given ___as evidence of a debt___, and is secured by a ___Deed of Trust secured by property known as 210 Richmond Road, Mebane, NC 27302 (PIN 9844-29-9515)___ which is a ___First___ lien upon the property therein described.

IN TESTIMONY WHEREOF, each individual maker has hereunto set her or his hand and adopted as his or her seal the word "SEAL" appearing beside his or her name, the day and year first above written.

_____ [SEAL]                    _____ [SEAL]
Steven M. Wilkins                                        Karol M. Wilkins

_____ [SEAL]                    _____ [SEAL]

_____ [SEAL]                    _____ [SEAL]

N.C. Bar Assoc. Form No.4 © 1976, Revised © 1985· Used with Permission of N. C. Bar Assoc.

2005050900315440000 0/T
BK:RB3740 Pg:89
05/09/2005 09:26:59PM  1/4

FILED   Joyce H. Pearson
Register of Deeds Orange COUNTY,NC
BY: 

# NORTH CAROLINA DEED OF TRUST

Prep by Judith M. Hauser, 127 W King Street, Hillsborough, NC 27278.                    Mail after recording to Beneficiary

THIS DEED of TRUST made    May    6   , 2005, by and between:

| GRANTOR | TRUSTEE | BENEFICIARY |
|---|---|---|
| Steven M. Wilkins and spouse Karol M. Wilkins  **210 Richmond Road Mebane, NC 27302** | J. M. Hauser | Jeffrey M. Siskind  Trump Plaza Office Center 525 South Flagler Drive, Suite 200 West Palm Beach, FL 33401 |

The designation Grantor, Trustee, and Beneficiary as used herein shall include said parties, their heirs, successors, and assigns, and shall include singular, plural, masculine, feminine or neuter as required by context.

WITNESSETH, That whereas the Grantor is indebted to the Beneficiary in the principal sum of   FIFTY THOUSAND AND NO/100S Dollars ($ 50,000.00), as evidenced by a Promissory Note of even date herewith, the terms of which are incorporated herein by reference. The final due date for payments of said Promissory Note, if not sooner paid, is   May 5, 2006.

NOW, THEREFORE, as security for said indebtedness, advancements and other sums expended by Beneficiary pursuant to this Deed of Trust and costs of collection (including attorneys fees as provided in the Promissory Note) and other valuable consideration, the receipt of which is hereby acknowledged, the Grantor has bargained, sold, given and conveyed and does by these presents bargain, sell, give, grant and convey to said Trustee, his heirs, or successors, and assigns, the parcel(s) of land situated in the City of _____ , Cheeks Township, Orange County, North Carolina, (the "Premises") and more particularly described as follows:

BEING all Lot 8, Section I of **Efland Estates** as shown by drawing recorded in the Office of the Register of Deeds for Orange County, North Carolina, in **Plat Book 19, Page 85,** to which plat reference is hereby made for a more particular description of the property conveyed.  Together with improvements located thereon, said property being located at 210 Richmond Road, Mebane, North Carolina.

PIN 9844-29-9515
TM 3.31A . . 8

TO HAVE AND TO HOLD said Premises with all privileges and appurtenances thereunto belonging, to said Trustee, his heirs, successors, and assigns forever, upon the trusts, terms and conditions, and for the uses hereinafter set forth.

If the Grantor shall pay the Note secured hereby in accordance with its terms, together with interest thereon, and any renewals or extensions thereof in whole or in part, all other sums secured hereby and shall comply with all of the covenants, terms and conditions of this Deed of Trust, then this conveyance shall be null and void and may be canceled of record at the request and the expense of the Grantor. If, however, there shall be any default (a) in the payment of any sums due under the Note, this Deed of Trust or any other instrument securing the Note and such default is not cured within ten (10) days from the due date, or (b) if there shall be default in any of the other covenants, terms or conditions of the Note secured hereby, or any failure or neglect to comply with

SATISFACTION: The debt secured by the within Deed of Trust together with the note(s) secured thereby has been satisfied in full.
This the _____ day of _____, 20_____
Signed: _____
_____
_____

200505090001544D0 D/T
Bk:RB3740 Pg:90
05/09/2005 09:26:59AM  2/4

the covenants, terms or conditions contained in this Deed of Trust or any other instrument securing the Note and such default is not cured within fifteen (15) days after written notice, then and in any of such events, without further notice, it shall be lawful for and the duty of the Trustee, upon request of the Beneficiary, to sell the land herein conveyed at public auction for cash, after having first giving such notice of hearing as to commencement of foreclosure proceedings and obtained such findings or leave of court as may ~~then be required by law and giving such notice~~ and advertising the time and place of such sale in such manner as may be provided by law, and upon such and any resales and upon compliance with the law then relating to foreclosure proceedings under power of sale to convey title to the purchaser in as full and ample manner as the Trustee is empowered. The Trustee shall be authorized to retain an attorney to represent him in such proceedings.

The proceeds of the Sale after the Trustee retains his commission, together with reasonable attorneys fees incurred by the Trustee in such proceedings, be applied to the costs of sale, including, but not limited to, costs of collection, taxes, assessments, costs of recording, service fees and incidental expenditures, the amount due on the Note hereby secured and advancements and other sums expended by the Beneficiary according to the provisions hereof and otherwise as required by the then existing law relating to foreclosures. The Trustee's commission shall be five percent (5%) of the gross proceeds of the sale or the minimum sum of $750.00 whichever is greater, for a completed foreclosure. In the event foreclosure is commenced, but not completed, the Grantor shall pay all expenses incurred by Trustee, including reasonable attorneys fees, and a partial commission computed on five per cent (5%) of the outstanding indebtedness or the above stated minimum sum, whichever is greater, in accordance with the following schedule, to-wit: one-fourth (¼) thereof before the Trustee issues a notice of hearing on the right to foreclosure; one-half (½) thereof after issuance of said notice, three-fourths (¾) thereof after such hearing; and the greater of the full commission or minimum sum after the initial sale.

And the said Grantor does hereby covenant and agree with the Trustee as follows:

1. **INSURANCE.** Grantor shall keep all improvements on said land, now or hereafter erected, constantly insured for the benefit of the Beneficiary against loss by fire, windstorm and such other casualties and contingencies, in such manner and in such companies and for such amounts, not less than that amount necessary to pay the sum secured by this Deed of Trust, and as may be satisfactory to the Beneficiary. Grantor shall purchase such insurance, pay all premiums therefor, and shall deliver to Beneficiary such policies along with evidence of premium payments as long as the Note secured hereby remains unpaid. If Grantor fails to purchase such insurance, pay premiums therefor or deliver said policies along with evidence of payment of premiums thereon, then Beneficiary, at his option, may purchase such insurance. Such amounts paid by Beneficiary shall be added to the principal of the Note secured by this Deed of Trust, and shall be due and payable upon demand of Beneficiary. All proceeds from any insurance so maintained shall at the option of Beneficiary be applied to the debt secured hereby and if payable in installments, applied in the inverse order of maturity of such installments or to the repair or reconstruction of any improvements located upon the Property.

2. **TAXES, ASSESSMENTS, CHARGES.** Grantor shall pay all taxes, assessments and charges as may be lawfully levied against said Premises within thirty (30) days after the same shall become due. In the event that Grantor fails to so pay all taxes, assessments and charges as herein required, then Beneficiary, at his option, may pay the same and the amounts so paid shall be added to the principal of the Note secured by this Deed of Trust, and shall be due and payable upon demand of Beneficiary.

3. **ASSIGNMENTS OF RENTS AND PROFITS.** Grantor assigns to Beneficiary, in the event of default, all rents and profits from the land and any improvements thereon, and authorizes Beneficiary to enter upon and take possession of such land and improvements, to rent same, at any reasonable rate of rent determined by Beneficiary, and after deducting from any such rents the cost of reletting and collection, to apply the remainder to the debt secured hereby.

4. **PARTIAL RELEASE.** Grantor shall not be entitled to the partial release of any of the above described property unless a specific provision providing therefor is included in this Deed of Trust. In the event a partial release provision is included in this Deed of Trust, Grantor must strictly comply with the terms thereof. Notwithstanding anything herein contained, Grantor shall not be entitled to any release of property unless Grantor is not in default and is in full compliance with all of the terms and provisions of the Note, this Deed of Trust, and any other instrument that may be securing said Note.

5. **WASTE.** The Grantor covenants that he will keep the Premises herein conveyed in as good order, repair and condition as they are now, reasonable wear and tear excepted, and will comply with all governmental requirements respecting the Premises or their use, and that he will not commit or permit any waste.

6. **CONDEMNATION.** In the event that any or all of the Premises shall be condemned and taken under the power of eminent domain, Grantor shall give immediate written notice to Beneficiary and Beneficiary shall have the right to receive and collect all damages awarded by reason of such taking, and the right to such damages hereby is assigned to Beneficiary who shall have the discretion to apply the amount so received, or any part thereof, to the indebtedness due hereunder and if payable in installments, applied in the inverse order of maturity of such installments, or to any alteration, repair or restoration of the Premises by Grantor.

7. **WARRANTIES.** Grantor covenants with Trustee and Beneficiary that he is seized of the Premises in fee simple, has the right to convey the same in fee simple, that title is marketable and free and clear of all encumbrances, and that he will warrant and defend the title against the lawful claims of all persons whomsoever, except for the exceptions hereinafter stated. Title to the property hereinabove described is subject to the following exceptions:

8. **SUBSTITUTION OF TRUSTEE.** Grantor and Trustee covenant and agree to and with Beneficiary that in case the said Trustee, or any successor trustee, shall die, become incapable of acting, renounce his trust, or for any reason the holder of the Note desires to replace said Trustee, then the holder may appoint, in writing, a trustee to take the place of the Trustee; and upon the probate and registration of the same, the trustee thus appointed shall succeed to all rights, powers and duties of the Trustee.

| X | THE FOLLOWING PARAGRAPH, 9. SALE OF PREMISES, SHALL NOT APPLY UNLESS THE BLOCK TO THE LEFT OF THIS SENTENCE IS MARKED OR INITIALED. |
|---|---|

9. **SALE OF PREMISES.** Grantor agrees that if the Premises or any part thereof or interest therein is sold, assigned, transferred, conveyed or otherwise alienated by Grantor, whether voluntarily or involuntarily or by operation of law [other than: (i) the creation of a lien or other encumbrance subordinate to this Deed of Trust which does not relate to a transfer of rights of occupancy in the Premises; (ii) the creation of a purchase money security interest for household appliances; (iii) a transfer by devise, descent, or

2005050902015440B D/T
Bk:RB3740 Pg:91
05/09/2005 09:26:59AM  3/4

operation of law on the death of a joint tenant or tenant by the entirety; (iv) the grant of a leasehold interest of three (3) years or less not containing an option to purchase; (v) a transfer to a relative resulting from the death of a Grantor; (vi) a transfer where the spouse or children of the Grantor become the owner of the Premises; (vii) a transfer resulting from a decree of a dissolution of marriage, legal separation agreement, or from an incidental property settlement agreement, by which the spouse of the Grantor becomes an owner of the Premises; (viii) a transfer into an inter vivos trust in which the Grantor is and remains a beneficiary and which does not relate to a transfer of rights of occupancy in the Premises], without the prior written consent of Beneficiary, Beneficiary, at its own option, may declare the Note secured hereby and all other obligations hereunder to be forthwith due and payable. Any change in the legal or equitable title of the Premises or in the beneficial ownership of the Premises, including the sale, conveyance or disposition of a majority interest in the Grantor if a corporation or partnership, whether or not of record and whether or not for consideration, shall be deemed to be the transfer of an interest in the Premises.

**10. ADVANCEMENTS.** If Grantor shall fail to perform any of the covenants or obligations contained herein or in any other instrument given as additional security for the Note secured hereby, the Beneficiary may, but without obligation, make advances to perform such covenants or obligations, and all such sums so advanced shall be added to the principal sum, shall bear interest at the rate provided in the Note secured hereby for sums due after default and shall be due from Grantor on demand of the Beneficiary. No advancement or anything contained in this paragraph shall constitute a waiver by Beneficiary or prevent such failure to perform from constituting an event of default.

**11. INDEMNITY.** If any suit or proceeding be brought against the Trustee or Beneficiary or if any suit or proceeding be brought which may affect the value or title of the Premises, Grantor shall defend, indemnify and hold harmless and on demand reimburse Trustee or Beneficiary from any loss, cost, damage or expense and any sums expended by Trustee or Beneficiary shall bear interest as provided in the Note secured hereby for sums due after default and shall be due and payable on demand.

**12. WAIVERS.** Grantor waives all rights to require marshalling of assets by the Trustee or Beneficiary. No delay or omission of the Trustee or Beneficiary in the exercise of any right, power or remedy arising under the Note or this Deed of Trust shall be deemed a waiver of any default or acquiescence therein or shall impair or waive the exercise of such right, power or remedy by Trustee or Beneficiary at any other time.

**13. CIVIL ACTION.** In the event that the Trustee is named as a party to any civil action as Trustee in this Deed of Trust, the Trustee shall be entitled to employ an attorney at law, including himself if he is a licensed attorney, to represent him in said action and the reasonable attorney's fee of the Trustee in such action shall be paid by the Beneficiary and added to the principal of the Note secured by this Deed of Trust and bear interest at the rate provided in the Note for sums due after default.

**14. PRIOR LIENS.** Default under the terms of any instrument secured by a lien to which this Deed of Trust is subordinate shall constitute default hereunder.

**15. OTHER TERMS.**

IN WITNESS WHEREOF, the Grantor has hereunto set his hand and seal, or if corporate, has caused this instrument to be signed in its corporate name by its duly authorized officers and its seal to be hereunto affixed by authority of its Board of Directors, the day and year first above written.

_____ (SEAL)         _____ (SEAL)
Steven M. Wilkins                                Karol M. Wilkins

SEAL-STAMP            **STATE OF NORTH CAROLINA, COUNTY OF** ___Orange___

ELIZABETH A HAYDEN        I, _Elizabeth A Hayden_____, the undersigned, a Notary Public of the
Notary Public             County and state aforesaid, certify that ___Steven M. Wilkins and Karol M. Wilkins___
Granville County, NC      Grantor, personally appeared before me this day and acknowledged the execution of the
                          foregoing instrument. Witness my hand and official stamp or seal, this _6_ day of
                          **May**, 2005.

My commission expires: .          _Elizabeth A Hayden_
10/27/2007                        Notary Public



Joyce H. Pearson
Register of Deeds
Orange County
North Carolina

**State of North Carolina, County of Orange**

The foregoing certificate(s) of ELIZABETH A HAYDEN, NOTARY PUBLIC for the Designated Governmental units is/are certified to be correct. See filing certificate herein.

This day May 9, 2005.

Joyce H. Pearson, Register of Deeds

BY

Deputy / Assistant Register of Deeds

---

Yellow probate sheet is a vital part of your recorded document. Please retain with original document and submit for recording.

DOCKSIDE CANVAS COMPANY                                        09917

**JEFF SISKIND**                          8/6/2007

25,000.00

I own Fred Valburn $25,000⁰⁰ plus interest @ 10%/year, due Nov. 6 - 2007

*Jeff Siskind*

**WACHOVIA**                                         25,000.00

DOCKSIDE CANVAS COMPANY                              09917

**JEFF SISKIND**                          8/6/2007

25,000.00

**WACHOVIA**                                         25,000.00

LMP12     M/P CHECK                                  51N311 (12/06) 54-1955

**EXHIBIT**

C

SUNTRUST BANK
P O BOX 622227
ORLANDO FL 32862-2227



# SUNTRUST™

Account
Statement

DOCKSIDE INC
... WEST PALM BEACH FL

Date 9/19/7                503

Pay to the order of _Jeff Sieglind_          $ 11,000.00

_Eleven Thousand and no  o/100_          Dollars

SUNTRUST

For _15,000 + 4,000 = 11,000_          F R Volkwein

⑇000503⑇ ⑇063 1024 2⑇0391 02 1565 101⑇ /00011000002/

Ck # 503          09/19     $11,000.00

**EXHIBIT
COMPOSITE
D**

347987

Member FDIC

Promissory Note

Additional Advance

Received an additional $1,500⁰⁰ Loan -$4,000⁰⁰ cash / $1,000 check to be repaid in accordance with previous Loan terms, on November 1, 2007

Date: 9/19/07

ALFRED SISKIND

SUNTRUST BANK
P O BOX 622227
ORLANDO FL 32862-2227

Page 3 of 3
36/E00/0175/0 /40
0391021565101
02/29/2008



# SunTrust

Account
Statement



Ck # 1019      02/11       $5,000.00

355518

Member FDIC



SUNTRUST BANK
P O BOX 622227
ORLANDO FL 32862-2227

Page 3 of 3
36/E00/0175/0 /40
0391021565101
06/30/2008

# SunTrust℠

## Account
## Statement

DOCKS/TSG INC
409 2474 ST
WEST PALM BEACH FL 33407 8491          504

Doc June 13 08  08-21/640

Pay to the order of  Cash                    $ 3,600.00

Thirty six hundred                                  00/100

SUNTRUST

For _____          PR Valbruens

Ck # 504        06/13        $3,600.00



EXHIBIT

F

358144

Member FDIC

**DOCKSIDE CANVAS COMPANY**    10392

JEFF SISKIND    8/11/2009

AUTO SEW MACHINE    10,000.00

*Rcvd $20,000 – total*

*= 10,000*
*from*
*Suntrust*

WACHOVIA    MACHINE    10,000.00

**DOCKSIDE CANVAS COMPANY**    **10392**

JEFF SISKIND    8/11/2009

AUTO SEW MACHINE    10,000.00

WACHOVIA    MACHINE    10,000.00

LMP12    M/P CHECK    51N311 (6/08) 565195



EXHIBIT
COMPOSITE
G.

Gmail - Saved by Fred                                                    Page 1 of



FRED VOLKWEIN <fenderhooks@gmail.com>

---

# Saved by Fred
4 messages

---

**Jeff Siskind <jeffsiskind@msn.com>**                    Thu, Aug 13, 2009 at 10:26 AM
To: fenderhooks@gmail.com

This should memorialize our agreement regarding prior funds owed to you and including the recent $15,000 and $20,000 advances.  Please let me know if I left anything out and I will promptly revise:

Prior amounts due to Fred Volkwein by Jeffrey Siskind total $55,000 plus accrued interest, and new amounts which were disbursed within the last two weeks total an additional $25,000, for a total loan value of $80,000 plus accrued interest.

In addition to repayment of these amounts, Fred Vokwein shall receive 5,000 shares (equal to 1% of the outstanding shares) of Collective Management Associates, LLC from Jeffrey Siskind.

Fred Volkwein may also convert the original $55,000 plus accrued interest due to him into shares at the original offering price of $3 per share anytime over the next six months.

Law Office - Jeffrey M. Siskind Trump Plaza Professional Building 525 South Flagler Drive, Suite 200 West Palm Beach, Florida 33401 Tel. (561) 832-7720 Fax (561) 832-7668

---

Get back to school stuff for them and cashback for you. Try Bing now.

---

**Jeff Siskind <jeffsiskind@msn.com>**                    Thu, Aug 13, 2009 at 5:51 PM
To: fenderhooks@gmail.com

In addition, at least $25,000 shall be repaid to Fred Volkwein on or before August 31, 2009.

Law Office - Jeffrey M. Siskind Trump Plaza Professional Building 525 South Flagler Drive, Suite 200 West Palm Beach, Florida 33401 Tel. (561) 832-7720 Fax (561) 832-7668

---

From: jeffsiskind@msn.com
To: fenderhooks@gmail.com
Subject: Saved by Fred
Date: Thu, 13 Aug 2009 10:26:12 -0400

[Quoted text hidden]

---

Get free photo software from Windows Live Click here.

---

**FRED VOLKWEIN <fenderhooks@gmail.com>**                Fri, Aug 14, 2009 at 9:00 AM
To: Jeff Siskind <jeffsiskind@msn.com>

Hi Jeff,  I am confused.  Recently I wrote checks for $15,000, $10,000, and $10,000 = $35,000.  When will the other $10,000 be repaid, or might that become a full share in the warrants?

---

[Quoted text hidden]

--

Regards,

Fred Volkwein

---

**Jeff Siskind <jeffsiskind@msn.com>**

To: fenderhooks@gmail.com

Fri, Aug 14, 2009 at 9:27 AM

Oops! My error.  Its $35,000.  But we can put it toward shares if you want.  But a 'full share?'  Let me think about that.

Law Office - Jeffrey M. Siskind Trump Plaza Professional Building 525 South Flagler Drive, Suite 200 West Palm Beach, Florida 33401 Tel. (561) 832-7720 Fax (561) 832-7668

---

Date: Fri, 14 Aug 2009 09:00:43 -0400
Subject: Re: FW: Saved by Fred
From: fenderhooks@gmail.com
To: jeffsiskind@msn.com

[Quoted text hidden]

---

Windows Live™: Keep your life in sync. Check it out.

1537

FENDERHOOKS, LLC

    JEFFEREY SISKIND ESQ.                                       12/23/2009
Licenses and Permits:LEGAL        TRADE MARK SEARCH              12,000.00

*I owe Fred Vollmein @ 12,000.00 on or before Jan 16, 2010.*

Checking/Operating    TRADE MARK SEARCH                      12,000.00

**FENDERHOOKS, LLC**                                                    **1537**

    JEFFEREY SISKIND ESQ.                                         12/23/2009
Licenses and Permits:LEGAL        TRADE MARK SEARCH              12,000.00

Checking/Operating    TRADE MARK SEARCH                      12,000.00

LMP12    M/P CHECK

51N312 (6/07) 552145


EXHIBIT

H

**PNC Bank, N.A.**
Return Items Dept F6-F166-03-3
Date: Jan 29, 2010    Advice D-651947

2010 02010003

Acct:    0017 1200609907

Items which you deposited have been
returned unpaid.  Items redeposited are
indicated with an asterisk (*).  Please
direct inquiries to Client Services.

| REASON | ACCOUNT | DEP DATE | ITEM AMOUNT |
|---|---|---|---|
| SEE CK | 0001000094033254 | 01/26/2010 | 12,000.00 |

*************************************************
FENDERHOOKS LLC
FREDERICK VOLKWEIN
409 24TH ST
WEST PALM BEACH, FL 33407-5401

1 Item charged totaling $12,000.00

Advice Total $12,000.00 (OD)

⑈402431119⑈    00000 1200609907⑈    ⑈000065 1947⑈

*031000053*
01/29/2010
010563
This is a LEGAL COPY of your
check. You can use it the same
way you would use the original
check.



| Siskind Legal Services, LLC | Suntrust Bank | 1012 |
|---|---|---|
| Special Purpose Escrow IOLTA | 501 S. Flagler Drive | |
| 525 S. Flagler Dr Ste 500 | West Palm Beach, FL 33401 | |
| West Palm Beach | 561-838-6110 | |
| | 63-215 / 631 | |

DATE    01/25/2010

PAY TO THE
ORDER OF    Fenderhooks    $ **12,000.00

TWELVE THOUSAND  AND 00/100*************************** DOLLARS

Fenderhooks

RETURN REFER TO MAKER
NON SUFFICIENT FUNDS

MEMO

⑈063102152⑈ 000094033254⑈ 1012

⑈063102152⑈ 000094033254⑈ 1012 ⑈0001200000⑈



EXHIBIT
I

10535

**DOCKSIDE CANVAS COMPANY**

SISKIND LEGAL                                    12/31/2009

3,000.00

Agrees to Pay back
$3000 plus bonus
by Jan 6 2010.

FRU as per J.S.
by phone.

WACHOVIA                                         3,000.00

**DOCKSIDE CANVAS COMPANY**                       **10535**

SISKIND LEGAL                                    12/31/2009

3,000.00

**SunTrust**          *Thank you for banking with SunTrust*
For Account Information call 800.SunTrust (800.786.8787)

Jeff Siskind          1 0.
 repay Jan 6        120    CHECK DEPOSIT          *
                     XXXXXXXXXX9840   Bus. Date 31Dec.2009 AM
                         249 TELL OVR
                     40039102 118729 3    3,000.00 TOTAL
                     Transaction Date: 31Dec.2009  15:57:31

This is your receipt showing bank, date, time, type of account and amount.
All deposits are credited to your account subject to verification and final payment.

WACHOVIA   101829 (5/07)                          3,000.00

LMP12    M/P CHECK                                51N311/39287 (9-08) 385743


**EXHIBIT**
**J**

**DOCKSIDE CANVAS COMPANY**                                                            10587

JEFFREY M SISKIND                                                    4/16/2010

                                                                            10,000.00

WACHOVIA                                                                     10,000.00

**DOCKSIDE CANVAS COMPANY**                                                            10587

JEFFREY M SISKIND                                              4/16/2010

                                                                            10,000.00

2 wks

WACHOVIA                                                                     10,000.00

LMP12     W/P CHECK                                              51N311/39287



2-3-11

I owe Fred Urlbswein
$2500.00

This is short term loan
Payable on/before Feb 10, 2011

Jeff Siskind.

2/3/11
Date

EXHIBIT

L

FREDERICK R. VOLKWEIN
402 24TH ST.
WEST PALM BEACH, FL 33407-6401

1049

Date 12-10-12

Pay to the
Order of    Siskind Legel                                    $ 10,000.00

Ten Thousand and 00/00                                      Dollars

USAA FEDERAL SAVINGS BANK
10750 MCDERMOTT FWY
SAN ANTONIO, TEXAS 78288-0544
(210) 531-8000  1-800-431-5294

For    Addl out. Loaned                    F R Volkwein

⑆314074269⑆ ⑈418⑈1748⑈5⑈ 1049

**Check:    1049                    Amount:10,000.00**


EXHIBIT
M

## LOAN AGREEMENT, PROMISSORY NOTE AND SECURTY AGREEMENT

AGREEMENT made this _28th_ day of November, 2012 by and between Fred Volkwein ("LENDER") and Jeffrey M. Siskind ("BORROWER") as follows:

Amount Financed: $50,000.00

Description of Collateral: YR: 1973 MAKE: Jaguar  MODEL: XKE V-12 Convertible

VIN: UD1S21587

1.    BORROWER promises to pay to LENDER in cash (USD), certified check, or money order the Amount Financed to LENDER when due in accordance with the attached _Promissory Note_ Payment Schedule until the Amount Financed together with accrued and unpaid interest has been fully repaid. All sums due hereunder shall be paid without prior demand, notice or claim of set off. BORROWER, without penalty, has the right to prepay the Amount Financed, or any portion thereof, at any time prior to maturity.

2.   To secure the BORROWER's obligations under this Agreement, BORROWER hereby grants to LENDER a security interest in the collateral described above ("Motor Vehicle"), all accessories and accessions to the Motor Vehicle, and all proceeds related thereto, including all insurance proceeds or refunds of insurance premiums related to the Motor Vehicle (all such property referred to as "Collateral").

3.    BORROWER's Representations and Warranties. BORROWER represents and warrants that BORROWER has the right to enter into this Agreement, and is at least 18 years of age. BORROWER represents and warrants that the Motor Vehicle is not stolen, has no liens or encumbrances against it, that BORROWER will not attempt to transfer any interest in the Motor Vehicle until all obligations under this Agreement have been paid in full, and that the Motor Vehicle will not be moved from the BORROWER's state of residence.  BORROWER further warrants that until such time all amounts due hereunder are fully repaid, BORROWER shall keep the Motor Vehicle insured for at least the amount of the loan and will not attempt to seek a duplicate title to the Motor Vehicle.

4.   The following constitute events of default under this Agreement: (a) BORROWER does not pay the full amount of any payment when due; (b) BORROWER fails to keep any of BORROWER's promises under this Agreement; or (c) any representation or information given to the LENDER by BORROWER is false or misleading.

5.    Upon the occurrence of any event of default, the LENDER may at its option, and without notice or demand, do any one or more of the following: (a) declare the whole outstanding balance due under this Agreement due and payable at once and proceed to collect it; (b) foreclose upon its lien, including repossession and liquidation of any Collateral securing this Agreement according to law; (c) exercise all other rights, powers and remedies given by law; and (d) recover from BORROWER all charges, costs and expenses, including all collection costs and reasonable attorney's fees incurred or paid by the LENDER in exercising any right, power or remedy provided by this Agreement or by law, together with interest on such collection costs and fees at a rate equal to the Annual Percentage Rate. In the event of monetary or non-monetary default, the finance charge shall continue to accrue until the Amount Financed, together with all accrued and unpaid finance charges and costs, is fully repaid.

6.   If LENDER repossesses the motor vehicle pursuant to paragraph 5, BORROWER shall have the right, at any time prior to LENDER disposing of such motor vehicle, to redeem the motor vehicle by tendering to LENDER the remaining principal due hereunder together with any and all accrued and unpaid interest, plus any costs incurred by LENDER in foreclosing upon its lien.

tabbies®
EXHIBIT
COMPOSITE
N

7.  Any notice that LENDER is required to provide under this Agreement or applicable law will be declared reasonable if sent to BORROWER via regular mail at the following address: 525 South Flagler Drive, Suite 500, West Palm Beach, FL. 33401.

8.  Additional Terms:

(a)  BORROWER agrees to pay the maximum amount allowed by law plus any actual expenses incurred in connection with any check given to LENDER which is not honored for any reason.

(b)  BORROWER shall bear the entire risk of loss or damage to the Motor Vehicle while it is in BORROWER's possession and agrees to indemnify and hold LENDER harmless from any and all claims for property damages or personal injuries arising from the operation of the Motor Vehicle, including but not limited to, all judgments, attorney's fees, court costs and any incurred expenses.

(c)  If more than one BORROWER executes this Agreement, each BORROWER will be jointly and severally liable hereunder.

(d)  Time is of the essence of this Agreement; and (e) this Agreement constitutes the entire Agreement between the parties and no other agreements, representations or warranties other than those stated herein shall be binding unless reduced in writing and signed by both parties.

9.  Governing Law; Enforceability. This Agreement shall be construed, applied and governed by the internal laws of the State of Florida. The unenforceability or invalidity of any portion of this Agreement shall not render unenforceable or invalid the remaining portions hereof.

10.  Arbitration and Waiver of Jury Trial. BORROWER and LENDER agree that the transactions contemplated by, and occurring under, this Agreement involve "commerce" under the Federal Arbitration Act ("FAA")( §U.S.C. §§1 et. seq.).  Any and all disputes, controversies or claims (collectively, "claims" or "claim"), whether preexisting, present or future, between the BORROWER and LENDER, its officers, directors, employees, agents or affiliates, arising out of this Agreement (save and except the LENDER's right to enforce the BORROWER's payment obligations in the event of default, by judicial or other process, including self-help repossession) shall be decided by binding arbitration under the FAA. Any and all claims subject to arbitration hereunder, asserted by any party, will be resolved by an arbitration proceeding which shall be administered by the American Arbitration Association under its Commercial Arbitration Rules (the "Arbitration Rules"), as presently published and existing.  However, in the event that BORROWER initiates arbitration, BORROWER shall pay the filing fee and any deposit required by the Arbitration Rule,. In the event LENDER initiates arbitration, LENDER shall pay the entire amount of the filing fee and any required deposit. The parties agree to be bound by the decision of the arbitrator(s). Any issue as to whether this Agreement is subject to arbitration shall be determined by the arbitrator. This agreement to arbitrate will survive the termination of this Agreement.

IN WITNESS WHEREOF, the parties have hereunto set forth their hands and seals on the date stated above.

Lender:

Borrower:



FREDERICK R. VOLKWEIN
409 24TH ST.
WEST PALM BEACH, FL 33407-5401

1048

30-7428/3140

Date: 11-28-112

Pay to the
Order of    JEFFREY M SIEWIN f. Trust Acct    $ 50,000.00

Fifty Thousand only    Dollars

USAA
USAA FEDERAL SAVINGS BANK
10750 McDERMOTT FWY
SAN ANTONIO, TEXAS 78288-0544
(210) 456-6000 1-800-632-3724

For    Loan agreement

⑆314074274⑆ ⑈41⑈174⑈6⑈ 1048

Mail Lien Satisfaction to: Dept of Highway Safety and Motor Vehicles, Neil Kirkman Building, Tallahassee, FL 32399-0500

T# 746296762
B# 1010934

| Identification Number | Year | Make | Body | WT-L-BHP | Vessel Regis. No. | Title Number |
|---|---|---|---|---|---|---|
| UD1S21587 | 1973 | JAGU | 2D | 3700 | | 81940009 |

**Date of Issue**     07/08/2008

Lien Release
Interest in the described vehicle is hereby released
By _____
Title _____
Date _____

Registered Owner
ENTERPRISE TRUST
525 S FLAGLER DR STE 500
WEST PALM BEACH, FL 33401-5938

Mail To:
ENTERPRISE TRUST
525 S FLAGLER DR STE 500
WEST PALM BEACH, FL 33401-5938

**IMPORTANT INFORMATION**
1. When ownership of the vehicle described herein is transferred, the seller MUST complete in full the Transfer of Title by Seller section at the bottom of the certificate of title.
2. Upon sale of this vehicle, the seller must complete the notice of sale on the reverse side of this form.
3. Remove your license plate from the vehicle.
4. See the web address below for more information and the appropriate forms required for the purchaser to title and register the vehicle, mobile home or vessel: http://www.hsmv.state.fl.us/html/titlinf.html

## CERTIFICATE OF TITLE

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| UD1S21587 | 1973 | JAGU | 2D | 3700 | | 81940009 | | |

| Prev. State | Color | MHU | Primary Brand | Secondary Brand | No. of Brands | | Prev Issue Date |
|---|---|---|---|---|---|---|---|
| FL | | | | | | PRIVATE | 07/08/2008 |

| Odometer Status or Vessel Manufacturer of OH use | | Hull Material | Prop | Date of Issue |
|---|---|---|---|---|
| EXEMPT | | | | 07/08/2008 |

DUPLICATE

Registered Owner
ENTERPRISE TRUST
525 S FLAGLER DR STE 500
WEST PALM BEACH, FL 33401-5938

1st Lienholder
ELECTRONIC TITLE PRIOR TO 03/12/2013

DIVISION OF MOTORIST SERVICES        TALLAHASSEE        FLORIDA        DEPARTMENT OF HIGHWAY SAFETY AND MOTOR VEHICLES

Boyd Walden
Director

Julie L. Jones
Executive Director

**100049176**

Control Number        6 / 1    100049176

**TRANSFER OF TITLE BY SELLER** (This section must be completed at the time of sale.)
Federal and/or state law require that the seller state the mileage, purchaser's name, selling price and date sold in connection with the transfer of ownership. Failure to complete or providing a false statement may result in fines and/or imprisonment.
This title is warranted to be free from any liens except as noted on the face of the certificate and the motor vehicle or vessel described is hereby transferred to:

Seller Must Enter Purchaser's Name _____        Address _____

Seller Must Enter Selling Price _____        Seller Must Enter Date Sold _____

I/We state that this _____ 5 or _____ 6 digit odometer now reads _____ (no tenths) miles, date read _____ and I hereby certify that to the best of my knowledge the odometer reading
_____ X (no tenths) miles, date read _____
☐ 1 reflects ACTUAL MILEAGE    ☐ 2 is IN EXCESS OF ITS MECHANICAL LIMITS    ☐ 3 is NOT THE ACTUAL MILEAGE

UNDER PENALTIES OF PERJURY, I DECLARE THAT I HAVE READ THE FOREGOING DOCUMENT AND THAT THE FACTS STATED IN IT ARE TRUE.

SELLER Must Sign Here _____        CO-SELLER Must Sign Here _____
Print Here _____        Print Here _____

Selling Dealer License Number _____        Tax No. _____        License Number _____        Tax Collected _____
Auction Name _____

PURCHASER Must Sign Here _____        CO-PURCHASER Must Sign Here _____
Print Here _____

NOTICE: PENALTIES AS REQUIRED BY LAW IF NOT SUBMITTED FOR TRANSFER WITHIN 30 DAYS AFTER DATE OF PURCHASE

HSMV 82250 (REV 04/08)

## STATE OF FLORIDA

02/29/2012

**American Bankers Insurance Company of Florida**
A Stock Insurance Company
Send all correspondence to American Collectors Insurance, Inc.
PO Box 8343, Cherry Hill NJ 08002-0343 (866) 540-2336

Page 1 of 2

**Antique and Collectible Vehicle Policy**

### Policy Declaration Page

| | |
|---|---|
| **Producer** | **Policy Number** AVP 2316983 |
| American Collectors Insurance, Inc. | **State** FL |
| PO Box 8343 | Geico Ins. Agency, Inc. |
| Cherry Hill NJ 08002-0343 | |
| (866) 540-2336 | **Policy Period** 01/12/2012 - 01/12/2013 |
| | 12:01 am Standard Time |
| **Named Insured** | **Transaction** Renewal Term |
| | |
| Jeffrey Siskind & Enterprise Trust | |
| 525 S Flagler Dr Ste 500 | |
| West Palm Beach, FL 33401-5938 | |

This Declaration Page with policy provisions completes this policy.

### Collector Vehicles

| # | Year | Make | Body | Model | Identification # | Agreed Value | Mileage Tier |
|---|------|------|------|-------|------------------|--------------|--------------|
| 1 | 1973 | Jaguar | CONV | XKEV12 | UD1S21587 | $25,500 | 2,500 |
| 2 | 1988 | Rolls-Royce | 2DR | | SEAZS02AXJCX24244 | $12,500 | 7,500 |

### Selected Coverages

| Coverage (Limit) [Deductible] | Vehicle 1 | Vehicle 2 |
|---|---|---|
| A Bodily Injury + Property Damage Liability (10,000/20,000/10,000) | $3.00 | $31.00 |
| B Personal Injury Protection Deductible / Named Insured (Basic Full Covg) | $2.00 | $13.00 |
| C Uninsured / Underinsured Motorist Non-stacked (10,000/20,000) | $4.00 | $13.00 |
| Comprehensive | ( $0 Ded) $94.35 | ($1000 Ded) $141.25 |
| Collision | ( $0 Ded) $61.20 | ($1000 Ded) $126.25 |
| Towing and Labor for Collectors (TLC) Plan - Platinum | $34.95 | Included |
| Spare Parts ($500) | Included | Included |
| **Vehicle Premium** | **$199.50** | **$324.50** |

| **Endorsements Made A Part Of This Policy** | | | | **Annual Premium** | |
|---|---|---|---|---|---|
| AJ9898JPC-0808 | AF9932ORR-0108 | AJ9982EPC-0209 | PP00010105 | Premium Total: | $569.55 |
| AJ8233ERR-1007 | PP03260694 | PP13011299 | PP02511205 | Florida Hurricane Catastrophe Fund: | $7.40 |
| M2765-0596 | N1906-0806 | PP05540105 | N1756-0806 | **Policy Total:** | **$576.95** |
| AF9279ERR-0108 | PP04060698 | NOTI10120610 | AJ9983EPC-0209 | **THIS IS NOT A BILL** | |
| AL8298EPC-0609 | | | | | |

Countersigned by _____

AJ9472DPC-0108

## LOAN AGREEMENT

AGREEMENT made this 5th day of April, between Avaitat, LLC ("Aviatat"), a Florida limited liability company and Scupper Enterprises Limited Partnership ("Scupper") as follows:

In consideration for the sum of $25,000 loaned on this date by Scupper to Aviatat, Aviatat shall place a first secured lien on behalf of Scupper against a Beechcraft Baron model C-55, serial no. TE-411, registered as N208GS, to secure repayment of said loan as follows; Aviatat shall repay same in full in 60 days, and in addition thereto shall provide Scupper with tickets to Event64, which tickets shall have a net value of $25,000, and which Aviatat agrees to sell to third parties on behalf of Scupper.

In the event that Avaitat fails to repay said loan asset forth above, Aviatat agrees not to contest any civil action brought by Scupper to foreclose its lien against said collateral.

Aviatat, LLC

By: _____
Jeffrey M. Siskind, Managing Member



Branch Wire Transfer                                                                 Page 1 of 2

## PNC

(*) asterisks indicate required fields

| | | |
|---|---|---|
| **Account Title*** | SCUPPER ENTERPRISES LIMITED | **TIN# (Last 4-digits)** 9728 |
| **Addr Line 1*** | 409 24TH STREET | **Addr Line 2** |
| **City*** | WEST PALM BEACH | **State*** FL **Zip*** 33407 |
| **ID#*** | V425256421350 | **ID Type*** State Drivers License **Exp*** 04152018 |
| **Phone*** | 561 / 832 - 3434 Ext. | **Alt Phone** / - Ext. |

**Name of client initiating wire*** FREDERICK VOLKWEIN

**Branch Representative Name*** CHAULINE WALKER     **Branch Phone*** 561 / 848 - 5577 Ext.

**Market*** BRANCH     **Initiating Branch Market/Bank Id*** 001     **Initiating Branch Cost Center*** 0010745

**Wire Amount*** 25000.00     **Currency*** USD – US DOLLAR

Note: If Foreign Currency amount is greater than $250,000.00 US equivalent, you must complete the manual wire form and fax to DRU Branch Internal Control for proces
Do not initiate foreign currency wires after 5:00 p.m. est and future date. If initiated after 5:00 p.m. est the wire will be cancelled

**Rate***

**Date** **Send**

Note: If after 5:00 PM EST, wires will be processed the following business day.

### Debit Information     D-DDA/Savings     **Account#*** 1201797858

SCUPPER ENTERPRISES LIMITED

409 24TH ST

WEST PALM BEACH          FL 33407

### Beneficiary Information     Not On Us     **Account#*** 0051001993

**Beneficiary Name*** MICHAEL B. MANES, P.A., IOTA ACCOUN
**Address1*** 950 S. PINE ISLAND RD., A-150
**Address2*** -
**City,State/City,Country*** PLANTATION, FL 33324

### Beneficiary's Bank     A-ABA     **ABA/SWIFT*** 265270413

**Bank Name*** IBERIABANK
**Address** LAFAYETTE, LA
**City**
**State/Country***

---

**Not for Branch Use-Back Office Only**          **Additional Information /Further Credit To**
REMITTER: AVIATAT, LLC

**Purpose of Wire**
LOAN TO AVIATAT

| Client Signature*: | Branch Rep Sign: | Reference Number: | 4/5/2013 3:30 P.M. |

SCUPPER ENTERPRISES LIMITED/PARTNERSHIP

2452

Cash
1221 · AVIATAT                    EVENT 64                    4/5/2013                    25,000.00

PNC Checking            LOAN TO AVIATAT                                          25,000.00

SCUPPER ENTERPRISES LIMITED/PARTNERSHIP

2452

Cash
1221 · AVIATAT                    EVENT 64                    4/5/2013                    25,000.00

PNC Checking            LOAN TO AVIATAT                                          25,000.00

LMP12        M/P CHECK                                          51N315 (11/08) 572525

*314074269*
11/15/2013
18197625

This is a LEGAL COPY of your
check. You can use it the
same way you would use the
original check.

RETURN REASON-A
NOT SUFFICIENT FUNDS

NSF - Not Sufficient Funds

1007

Jeffrey M. Siskind, Trust Agent
525 S. Flagler Drive
Ste. 500
West Palm Beach, FL 33401

Mercantile Commercebank
6272 Lantana Road
Lake Worth, FL 33463

DATE    10/30/2013

PAY TO THE
ORDER OF    **FRED VOLKWEIN                                    $    **25,000.00

TWENTY-FIVE-THOUSAND AND 00/100******************************************    DOLLARS

FRED VOLKWEIN

MEMO _____

⑈067010509⑈  1818000511⑈06 1007

⑈067010509⑈  1818000511⑈06 1007  ⑈0002500000⑈

Jeff Siskind

Loan of
$1,000 due ~~1/28/13~~ 7/7/13

EXHIBIT

P

# ARTICLES OF ORGANIZATION
## FOR
## SOVEREIGN CONSULTING, LLC

The undersigned organizers of a limited liability company under the Oklahoma Limited Liability Company Act adopt the following Articles of organization:

1.      <u>Name</u>. The name of the limited liability company is SOVEREIGN CONSULTING, LLC, a Limited Liability Company.

2.      <u>Duration</u>. The period of duration for this limited liability company is from the date of filing of the articles of Organization with the state and shall have perpetual existence unless sooner dissolved by the members or as provided by state law.

3.      <u>Purpose</u>. The purpose for which this limited liability company is organized is to perform any lawful purpose except that of banking and insurance.

4.      <u>Principal Place of Business</u>. The street address of its principal place of business and offices where notices can be sent is: Suite 800, 101 N. Charles Street, Baltimore, Maryland 21201.

5.      <u>Registered Agent and Office</u>. The name of the limited liability company's registered agent, whose Consent to Appointment as Registered Agent is included with these articles, is William L. Siskind and the address of the registered office within this state is c/o Busey Law Group, 2800 N.W. 36th, Oklahoma City, Oklahoma 73112.

6.      <u>Capitalization</u>. The total initial capital contribution by the members of this limited liability company has an agreed value of $4,000,000. One Hundred (100) shares at $40,000 per share. Additional shares increasing the capital contribution may be issued upon a vote of 51%, or more, of the members.

7.      <u>Additional Capital Contribution of Members</u>. Additional capital contributions shall not be required, unless by vote of 51% of the members.

8.      <u>Admission of Additional Members</u>. Additional members may be admitted to this limited liability company only upon such terms as are agreed to by 51% of the members in the Operating Agreement.

1



EXHIBIT
Q

9.    <u>Continuation</u>. The remaining members of the limited liability company by a 75% vote may exercise the right to continue the business upon the death, retirement, resignation, expulsion, bankruptcy or dissolution of a member or occurrence of any other event which terminates the continued membership of a member in this limited liability company. Members cannot enter a business continuation agreement among themselves.

10.    <u>Management</u>. The business of the limited liability company shall be conducted under the exclusive management of its members who shall vote according to their proportionate interest in the company in all matters. Members by unanimous vote may enter into a business dissolution consent agreement. The names and addresses of the members of the limited liability company are:

Enterprise Trust, c/o Jeffrey Siskind, Suite 800, 101 N. Charles Street, Baltimore, Maryland 21201;

Aubrey W. Stueck, 3207 Pierson Drive, Deerfield Beach, Florida;

William Russell, c/o 101 N. Charles Street, Suite 800, Baltimore, Maryland 21201;

Yuri Garcia, c/o 101 N. Charles Street, Suite 800, Baltimore, Maryland 21201;

John Khorozian, 28 Buckingham Drive, Alpine, New Jersey 07620 for Belmar Winds, Inc.

11.    <u>Organizer</u>, The name and address of each organizer of this limited liability company is: William L. Siskind, Suite 800, 101 N. Charles Street, Baltimore, Maryland 21201.

12.    <u>Liability</u>. The members shall not be liable for the debts and obligations of the limited liability company.

IN WITNESS WHEREOF, these articles have been subscribed this 2nd day of October, 2003 by the undersigned who affirms that the statements made herein are true under the penalties of perjury.

William L. Siskind
Organizer and Resident Agent

2

## OPERATING AGREEMENT
## FOR
## SOVEREIGN CONSULTING, LLC

THE UNDERSIGNED, as members of the Company do hereby enter into this Operating Agreement for the above-named Limited Liability Company, hereinafter referred to as the "Company."

### I. CONTRACT

This Operating Agreement is a contract between its parties and is enforceable by the company against any member who violates its terms. All members, past, present and future must sign this Operating Agreement as a condition of membership.

### II. OFFICE

The principal office of the Company is located at Suite 800, 101 N. Charles Street, Baltimore, Maryland 21201. The Company may have such other offices, either within or without the state as the members may designate or as the business of the Company may require. The registered office of the company required by the laws of the State of Oklahoma to be maintained in the state may be, but need not be, identical with the principal office, and may be changed from time to time by the members.

### III. PURPOSE

The purpose for which the company is organized is the conduct of all lawful business purposes except that of banking or insurance.

### IV. DURATION OF THE COMPANY

The Company shall commence immediately, upon the signing of this Operating Agreement, and shall continue pursuant to the term specified in the documents filed with the state unless terminated sooner by operation of law or by agreement among the members.

1

## V. CAPITAL CONTRIBUTIONS

THE UNDERSIGNED members agree to share in all post-formation capital contributions, profits, and surplus of the Company according to the percentage of their membership. Each member now owns an undivided interest, in the percentages below, of the present issued and authorized shares of the Company:

| Member | Percentage Membership |
|---|---|
| Enterprise Trust c/o Jeffrey Siskind | 51% |
| Belmar Winds, Inc. c/o John Khorozian | 5% |
| Aubrey W. Stueck | 12.5% |
| William Russell | 12.5% |
| Yuri Garcia | 5% |
| Remaining held by Company | 14% |

## VI. ADDITIONAL CAPITAL CONTRIBUTIONS

The members may contribute in proportionate amounts any additional capital deemed necessary for the operation of the Company, provided, however, that in the event that any member deems it advisable to refuse or fails to contribute such member's share of any or all of the additional capital, then the other members or any one of them may contribute the additional capital not paid in by such refusing member and shall receive therefor an increase in the entire Company in direct proportion to the said additional capital contributed. Unless otherwise agreed, the right to make up additional capital contributions of a refusing member shall be available in the same order as the right to purchase in the case of withdrawal or death of a member, as set forth in paragraphs XV and XVI.

## VII. DIVISION OF PROFITS AND LOSSES

Each of the members shall own an interest in the Company as set forth in paragraph V, entitled "Capital Contributions," except as the same may hereafter vary or change as provided in paragraph VI, entitled "Additional Capital Contributions." All profits of the Company enterprise shall be shared by each of said members according to the percentage of interest each member owns. A separate capital account shall be maintained for each member. No member shall make any withdrawals from capital without prior approval of the Company. If the capital account of the

2

member becomes impaired, his or her share of subsequent company profits shall be first credited to his or her capital account until that account has been restored.

## VIII.  RIGHTS AND DUTIES OF THE PARTIES

The entity is to be member managed.  Company decisions and actions shall be decided by a majority in the interest of its members, at meetings regularly called with notice to all members. For purposes of determining a "majority in interest," a member's interest will be such member's interest in profits and losses as set forth in paragraphs V and VI, and a majority will mean more than fifty percent (50%).

## IX.  COSTS AND EXPENSES

With the majority consent of members any member may be separately compensated on a salaried basis for service performed in carrying out the operation of the Company.  No salaries or individual compensation shall be otherwise payable, without consent of a majority of members, for the normal management, and the Company may from time to time employ one or more managers or other representatives at a designated salary.

## X.  MANAGEMENT DUTIES AND RESTRICTIONS

No member shall, without the consent of the other members, endorse any note or act as an accommodation party, or otherwise become surety for any person in any transaction involved in the Company.  Without the consent of a majority of members, no member shall on behalf of the Company borrow or lend money, or make, deliver or accept any commercial paper, or execute any mortgage, security agreement, bond or lease, or purchase or contract to purchase, or sell or contract to sell any property for or of the Company.  No member shall, except with the consent of a majority of the members, mortgage, grant a security interest in its share in the Company capital assets or property, or do any act detrimental to the best interests of the company or which would make it impossible to carry on the ordinary purpose of the Company.

## XI. BANKING

All funds of the Company shall be deposited in its name in such checking account or accounts as shall be designated by the President. All withdrawals therefrom are to be made upon checks which must be signed by the person authorized by the members.

## XII. BOOKS

The Company books shall be maintained at the Company offices, to be retained by the entity, and each member shall have access thereto. The books shall be kept on a calendar year basis, and shall be closed and balanced at the end of each fiscal year. Each of the parties to this Operating Agreement hereby covenants and agrees to cause all known business transactions pertaining to the purpose of the Company, to be entered properly and completely into said book. The Company will furnish annual financial statements to the members, and prepare tax returns in a timely manner.

## XIII. INSURANCE

The Company shall carry liability insurance in such amounts as are deemed appropriate by the members.

## XIV. VOLUNTARY TERMINATION

If the Company is dissolved, the members shall proceed with reasonable promptness to liquidate the Company. The assets of the company shall be distributed in the following order:

A.    To pay or provide for the payment of all Company liabilities to creditors other than members, and liquidating expenses and obligations;

B.    To pay debts owing to members other than for capital and profits;

C.    To pay debts owing to members in respect to capital; and

D.    To pay debts owing to members in respect to profits.

## XV.  WITHDRAWAL OF MEMBER BY SALE

Any member who shall be desirous of selling their share and interest in the Company shall give the Company the right of first refusal to purchase said share and interest at the same price as being offered by a bona fide and qualified buyer.

All members electing to purchase (other than the selling member), and having the right to purchase, may purchase that percentage of share(s) being sold.  The number of shares that can be purchased is calculated by dividing the member's respective percentage of the company by the total percentage of shares of all members electing to purchase.

The  consent of a majority of members is required for a member to sell their share to a non-member or for an assignee of a member's share to a person or entity becoming a member.

## XVI.  DEATH OF A MEMBER

In the event of the death of a member, then the deceased's heir or heirs shall be entitled to succeed to the economic share and interest of the deceased member.  This provision however, is subject to the controlling statute(s) and/or Court rule(s) of the specific state's treatment of an heir's succeeding to the economic share and interest in a professional organization of the deceased member.  The Company may, upon consent of 51% of the remaining members, as soon as practicable, provide a document by which the remaining members personally affirm and accept all the terms, conditions and provisions of this Operating Agreement binding themselves to continue the same business in writing.

## XVII.  DISTRIBUTION

Prior to dissolution and at least annually as income has been received by the company, accounts determined and tax returns filed, the members shall determine funds available for distribution.  Upon liquidation, a reasonable reserve as mutually determined in amount shall be established to cover follow-on or subsequent complaint and warranty requirements, if any. Liquidation of the Company need not be delayed provided that such amounts are properly escrowed and arrangements made for performance of such services as may be required in the interest of the

5

company. Escrows, reserves or liquidating accounts may be established as escrows or otherwise, which activity need not unduly delay the termination of the Company for all other purposes.

## XVIII. CAPITAL ACCOUNTS - INCOME AND CREDITS OF MEMBER

The Company is required to maintain for each member a capital account which reflects that member's separate distributive share, whether or not distributed, of each class or item of Company income, gain, loss, deduction, or credit described in IRS Sections 702 and 704. If it is determined that a member's allocation of income, gain, loss deduction, or credit does not have substantial economic effect then that member's distributive share of such income, gain, loss, deduction, or credit shall be determined in accordance with that member's interest in the entity. Any special allocations of income, gain, loss or deduction for each member are to be specified in an exhibit to this Operating Agreement. Upon liquidation, members must restore any deficits in offset provisions of the IRS Code that specifically allocates later income to members with negative capital accounts.

## XIX. AMENDMENT OF OPERATING AGREEMENT

This Operating Agreement may be altered, amended or repealed and a new Operating Agreement may be adopted only by a 51% vote of the membership at any annual, regular or special meeting of the members.

## XX. VIOLATION OF THIS OPERATING AGREEMENT

Any member who shall violate any of the terms, conditions, and provisions of this Operating Agreement shall keep and save harmless the Company property and shall also indemnify the other members from any and all claims, demands and actions of every kind and nature whatsoever which may arise out of or by reason of such violation of any terms and conditions of this Operating Agreement.

6

## XXI. COUNTERPARTS

This Operating Agreement may be executed with counterparts, all of which shall be deemed to be one and the same instrument, and it shall be sufficient for each party to have executed at least one, but not necessarily the same, counterpart.

IN WITNESS WHEREOF, the parties have hereunto set their hands effective this 2nd day of October, 2003.

SIGNED:

_____
William L. Siskind, Organizer & Resident Agent

_____
Jeffrey Siskind for Enterprise Trust, Member

_____
Aubrey W. Stueck, Member

_____
William Russell, Member

_____
Yuri Garcia, Member

_____
Belmar Winds, Inc. By John Khorozian, Member

7

3/23/04:

Received $10,000⁰⁰ from Fred Volkwein toward purchase of 1 share of Sovereign Consulting LLC Stock; $30,000⁰⁰ paid to date; $10,000⁰⁰ due.

Jeffrey M. Siskind President



**EXHIBIT**

T



DOCKSIDE CANVAS COMPANY
PHONE (561) 832-5400
409 24TH STREET
WEST PALM BEACH, FL 33407

8471

FIRST UNION NATIONAL BANK
OF FLORIDA
WEST PALM BEACH, FL
63-643/670

PAY TO THE
ORDER OF: JEFFERY M SISKIND TRUST ACCOUNT

4/16/2004

$ **5,000.00

Five Thousand and 00/100**********************************************

JEFFERY M SISKIND TRUST ACCOUNT

DOLLARS

MEMO

AUTHORIZED SIGNATURE

MP

Security Features Included 🔒 Details on Back.

MP12    ENVER QUENV CENV61 107637

⑆008471⑆ ⑆067006431⑆ 285500978341⑆

*received $5,000
for Palson
4/20/04
RW*



EXHIBIT
U



NUMBER

THE UNITS IS

FORMED UNDER THE LAWS OF

THE STATE OF
OKLAHOMA

SOVEREIGN CONSULTING, LLC.

This Certifies that

the owner of ___ One (1) share ___

FRED ___ VOLKWEIN ___ of the above named
Limited Liability Company transferable only on the books of the Limited Liability Company by
the holder hereof in person or by duly authorized Attorney upon surrender of this Certificate properly
endorsed. The transfer of this Limited Liability Company interest is subject to restrictions
set forth on the Limited Liability Company Operating Agreement; and the transfer of the related
membership rights may be effected only upon the unanimous consent of members or compliance
with any provisions provided in the Operating Agreement.

In Witness Whereof, the said Limited Liability Company has caused this Certificate to be
executed on its behalf by its duly authorized manager(s), member(s), officer(s) or agents
this ___ 6th ___ day of ___ May ___ 2004 ___

President

Secretary

- 1999 ALL STATE LEGAL® A DIVISION OF ALL-STATE INTERNATIONAL, INC.  www.aslegal.com   800.222.0510   LLC-1

EXHIBIT
Y
tabbies



NUMBER 14

FORMED UNDER THE LAWS OF

THE STATE OF OKLAHOMA

SHARES 1

## SOVEREIGN CONSULTING, LLC

This Certifies that FRED VOLKWEIN is the owner of One (1) share of the above named Limited Liability Company transferable only on the books of the Limited Liability Company by the holder hereof in person or by duly authorized Attorney upon surrender of this Certificate properly endorsed. This transfer of this Limited Liability Company interest is subject to restrictions set forth on the Limited Liability Company Operating Agreement, and the transfer of the related membership rights may be effected only upon the unanimous consent of members or compliance with any procedure provided in the Operating Agreement.

In Witness Whereof, the said Limited Liability Company has caused this Certificate to be executed on its behalf by its duly authorized managers, members, officials, or agents this 7th day of February, 2006.

_____
President

_____
Secretary

© 1999 ALL STATE LEGAL® A DIVISION OF ALL STATE INTERNATIONAL, INC.  www.aslegal.com  800.222.0510   LLC-1

EXHIBIT
W
7502bb9d

FEB-20-2007 16:16 From:SISKIND LAW OFFICE   5618327668        To:561 832-5400        P.2/6

LAW OFFICE
## Jeffrey M. Siskind, Esquire
*PRIVATE PRACTICE DIVISION OF SISKIND LEGAL SERVICES, L.L.C.*
Florida - Maryland - New Mexico - District of Columbia - U.S. Virgin Islands
Trump Plaza Professional Building   525 South Flagler Drive, Suite 200   West Palm Beach, Florida 33401
Telephone (561) 832-7720   Facsimile (561) 832-7668   E-mail: jeffsiskind@msn.com

February 7, 2007

Mr. Kerry Hulton
President
Delaware Nation
State Road 281; 2 Miles North of Anadarko
Anadarko, OK  73005

VIA FEDERAL EXPRESS

          RE:    Sovereign Consulting
                 Biscuit Hill Casino

Dear  Kerry:

          I hope all is well with you and that you are successfully braving the Oklahoma weather. As you can imagine, it has been quite some time since we spoke and I am hoping to learn if we will have a follow-up meeting which will include other members of the Council.

          I am attaching for your review and consideration a letter which was sent to the Tribe's lawyer, Steve Sandven, in April, 2006 because it presents a useful summary of the tasks which Sovereign accomplished in furtherance of development of Biscuit Hill, our joint objective.

          It is truly a pity that we are placed in the situation which we find ourselves in, when so much appears to be at stake in the face of great opportunity to resolve of our company/tribal differences.

          Let's hope that reasonable minds will prevail, and that we can move forward in the spirit of friendship and shared objective.

Sincerely,

Jeffrey M. Siskind



FEB-20-2007 16:16 From:SISKIND LAW OFFICE    5618327668    To:561 832 5400    P.3/6

LAW OFFICES OF

## SISKIND, GRADY, ROSEN & HOOVER, P.A.

Suite 2000

One N. Charles Street

BALTIMORE, MD 21201

TELEPHONE

(410) 539-XXXX, BALTIMORE, MD

TELEFAX NO. (410) 539-7101

April 7, 2006

Steven D. Sandven Esquire
300 Building, Third Floor
Suite 516
300 N. Dakota Avenue
Sioux Falls, SD 57104

Dear Steve:

Are you seriously telling me that Sovereign did not sign an MOA to develop Biscuit Hill followed by a 28 page Contract unanimously passed by the Executive Committee and then we were taken to a meeting of the Council where we presented and explained the contract terms to the Council, receiving no adverse comment at the Council meeting? Sovereign continued to work on all preliminary matters, including the requirements of the BIA for an acceptable Application for Trust status which was finally approved by the BIA as a complete Application with the recommendation that it be taken into Trust. Although achieving Trust status as a requirement for gaining is the responsibility of the Tribe, Sovereign expended over $450,000 to accomplish Trust status and performing its other numerous obligations under the contract knowing that it could not develop the Casino without doing this work.

In the over 2-1/2 years since signing the MOA, Sovereign cleared the title to the Biscuit Hill property by procuring and recording a correction deed from the Sellers to the Tribe as the Deed to the Tribe some nine years ago was flawed. Sovereign also paid for the release of a lien encumbering the property in order to obtain the title policy and insurance policy, needed to obtain BIA approval to accept a Fee to Trust Deed. Sovereign, in reliance upon its agreement signed by the President (who was given the authority by Resolution passed by the Executive Committee), purchased the steel and air conditioning equipment for the Casino; retained an architect to produce preliminary plans which were presented and approved by the Executive Committee; obtained a no objection letter from the Mayor of Hinton, which was sent ...

Steven D. Sandven Esquire
April 7, 2006
Page 2.

to the BIA; did the sewer designs in a manner such that no portion of the sewer was required to go through private property; produced all the necessary surveys and descriptions done by a registered land surveyor; paid all the costs and expenses necessary for this work and myriads of other work necessary, all being beyond the requirements of its contract which Sovereign believed to be the pre-construction work that would enable it to construct the Casino as soon as the Biscuit Hill property was accepted into Trust by the BIA.

Sovereign also employed the interior design architectural firm chosen by the Tribe who developed 3 themes which were presented to the Executive Committee and the Committee chose the sports theme and preliminary drawings were produced following this theme.

Regardless, you now tell us that the Tribe stood by while Sovereign went forward to accomplish all that was required of it, knowing that its own regulations required it to go to the next step to authenticate the actions of the Executive Committee and neither the Tribe's attorney nor anyone in the Tribal Administration ever notified Sovereign that the Tribe had not completed its in-house work of approval. Do you think for one moment that Sovereign would expend over $450,000 in reliance upon its contract with the Delaware Nation together with its representation of the authority of the Executive Committee, if it had any inkling that the Tribe had not accomplished everything necessary to make this contract binding? I fail to believe the officers and attorney of Sovereign would be this foolish, yet you are taking the position that Sovereign is charged with the knowledge of the Articles the Tribe is operating under and more specifically Article VI, Section 2 and have the responsibility to monitor all the steps that the Tribe must take. I do not think after only some of the reliance described above, the law will allow such an unfair, self interest position to survive.

I still do not believe, despite your legal conclusions, that Sovereign should suffer for the omission of the Tribe. If the President of Sovereign had been extended the courtesy of meeting with the Executive Committee, it would not ascribe to your unfair position that it did not have a contract for the development of Biscuit Hill and I venture to say that the Administration and members of the Tribe were convinced during the entire 2-1/2 years that Sovereign was faithfully performing its obligations under a fully executed and valid contract, which included meeting a deadline set for approval of the preliminary plans and the Letter of Intent for financing the entire project. The technicality you put forth at this eleventh hour can only be devised by persons with a special interest in seeing that Biscuit Hill development is sabotaged as I believe that if the Tribal Council and Tribal members were fully acquainted with all these facts, they would not support such an unfair, self-serving and injurious position.

Steven D. Sandven Esquire
April 7, 2006
Page 3.

Finally, I take offense at your demand that I not communicate with the officials of the Delaware Nation. I was asked to communicate with you and in my attempt to comply was faced with your ignoring my telephone calls and failing to pay any attention to my letters, faxes and e-mails, all being truly unprofessional conduct on your part, as a practicing attorney.

Yours truly,

William L. Siskind

**Kerry Holton** (lenapendn@gmail.com) +Add contact
To:
jeffsiskind@msn.com

Subject:
Hopes will be realized

Jeffrey,

I hope all is well with you and that the awful storms in Florida did not have any adverse effects on you and your family. I have been well, trying to stay out of the ice and snow that has blanketed the area in the previous weeks. One of the reasons that no progress has been made here is due to these extenuating circumstances. The ice will probably be my downfall, who would have ever thought that an ice storm in the midwest could bring down a Nations Leader. Really, it may have stalled all the momentum I had, but I can recover from a stall, prevent the spin and regain that momentum with a quickness. That is pretty much what I have been doing for the past month.

Things are looking up in Feb. though, my Tribal Admin. gave me a letter addressed to him that was meant for me. I have read the correspondence and understand your Fathers frustration. In your cover letter you have some hopes. I will tell you that you will relize those hopes very soon. Your case had lost traction due to the weather, I have not had any opportunities to speak with anyone familiar with the situation since I've been in office. Next week that changes.

In the coming weeks, I have a lot on my plate, but rest assured that these company/tribal relations are going to be coming to some realizations. That is all I will say about that for now, I have to guard myself unfortunately and I hope that you will help my guard.

I look forward to a better day when we can have a good glass of Crown XR and put this all behind us. I have the Crown....

Sincerly,

## SOVEREIGN CONSULTING, LLC

## FREQUENCY OF MEMBER PAYMENTS

Initial Member Profit Share Payments will be made 100 days from the opening day of the Casino, and every 90 days thereafter, over a period of seven (7) years, unless the majority of LLC member shares vote to sell the business to the Tribe or others, which sale would be made at fair market value.

## DETERMINING MEMBERSHIP PROFIT SHARE

In order to determine profit share for each point (1%) of member ownership of the LLC, divide the Pro Forma Annual Return by 100. Therefore, as an example, an annual return of $4,000,000 will afford each point share a $40,000 return.

## PRESENT STATUS OF DELAWARE TRIBE LITIGATION
### Updated October 8, 2007

Sovereign Consulting, LLC ("Sovereign") experienced numerous delays in breaking ground on the casino it will build pursuant to a contract with the Delaware Nation of Oklahoma (the "Tribe"), ostensibly because of continued maneuvering by various factions within the Tribe which has impeded the Tribe's progress in responding to BIA requests for supplemental information needed to obtain trust status for casino site.

Sovereign initially believed that the appropriate response to delays first experienced after Sovereign had already spent several years assisting the Tribe, was to adopt a 'wait and see' posture for more than a year to permit the Tribal government to validate its contract. However, factions within the Tribe persisted, despite the promise of substantial revenue from gaming operations.

In order to protect its interest pursuant to its contract, Sovereign eventually filed suit against the Tribe in Oklahoma state court, for breach of its contract and the remedies of specific performance and damages.

Sovereign's damages because of the numerous delays as follows: (1) Sovereign incurred attorney fees and additional overhead costs attributable to the litigation, and (2) Sovereign will incur additional construction costs resulting from increased construction materials and labor costs, including storage of structural steel and HVAC equipment which Sovereign purchased in anticipation of construction.

The Tribe's response to Sovereign's claims has been to assert a challenge based upon Sovereign Immunity, and to undertake tactics designed in large measure to delay the progress of the litigation.

The Tribe first moved the trial judge to dismiss based upon the defense of Sovereign Immunity. The motion was denied by the trial court, inasmuch as the Tribe explicitly waives Sovereign Immunity in Sovereign's contract. This is probably seen by the Tribe to be a necessary challenge, or simply a delaying tactic.

**EXHIBIT**
Y-1

The Tribe then filed a motion demanding that the trial judge issue an interlocutory order which would permit the decision on Sovereign Immunity to be immediately appealable. That motion was denied, but unfortunately again delayed the progress of our lawsuit by several more months.

The Tribe next filed an application for mandamus directly with the Oklahoma Supreme Court to have the Supreme Court accept original jurisdiction over the case in order to have the Sovereign Immunity issue decided in an attempt to prevent Sovereign's case from proceeding. The Supreme Court issued a unanimous per curium (without comment) opinion denying the Tribe's motion. However, once more the progress of Sovereign's lawsuit was delayed by several months.

Sovereign issued discovery requests on August 27, 2007, consisting of Requests for Answers to Admissions, Interrogatories and Production of Documents. The Tribe responded to the request for Admissions at the last possible date in order to avoid having them being admitted as a matter of procedure, but has not responded to the Requests for Answers to Interrogatories and Production of Documents.

The Tribe's responses to Sovereign's Request for Admissions contains many inaccurate statements, which will be addressed by scheduling and taking the depositions of Tribal and BIA officials acquainted with Sovereign's contract and the progress of the Application for Trust Status.

Sovereign moved to compel responses to its unanswered discovery requests, and for sanctions, during the first week of October 2, 2007. During the period within which Sovereign attempted to settle the litigation, the Tribe issued discovery requests, to which Sovereign provided responses.

Sovereign was informed that the Tribe's government recently dismissed its counsel, and that their counsel has refused to return the litigation files to the Tribe, stating as a reason that it cannot determine which of the several factions fighting for control has the right to obtain them. Further information obtained indicates that said counsel inappropriately represented a competing faction within the Tribe opposed to the Tribal government's authority.

Until now, the continued fight for control of the Tribal government has prevented any meaningful settlement discussions, despite Sovereign's offer to rely upon the Tribe's initial share of profits from casino operation to obtain its damages, or to permit the Tribe to buy out its contract for $5,000,000.

Recently, however, Sovereign was informed that its contract with the Tribe will be upheld, and was also informed that challenging factions within the Tribe were enjoined by an Oklahoma Tribal Court from inappropriately influencing or interfering with Tribal government, which positive movement is believed to be partly due to the developing friendship between Sovereign and the Tribe's new president.

In addition to the success Sovereign continues to experience in pursuing its litigation, Sovereign is confident that it will be successful in maintaining jurisdiction over its contract before the Oklahoma Court over the duration of its contract in order to assure that all future profits are paid and received in accordance with its terms.

- 2 -