**From:** Jeffrey Siskind <jeffsiskind@msn.com>
**Sent:** Thursday, February 4, 2016 5:43 PM
**To:** jjbttrm@aol.com
**Subject:** FW: Salisbury Plant Funding
**Attachments:** Mortgage Loan Exec. Summary.docx; MaTech Appraisal.pdf; Ma-Tech Option Contract.pdf; Hebron Zoning Letter.pdf; CannaMed Business Plan.pdf; JMS Resume.pdf


Mr Butrum - I am forwarding the attached files at the behest of Mike Buckingham. Please feel free to call me on my mobile phone if I can be of assistance; 561-352-9166.

Mortgage Loan Summary
Appraisal
Option Purchase Contract
Zoning Approval Letter
Business Plan
JMS Resume



**PLAINTIFF'S**
TRIAL EXHIBIT
**T-55**

Executive Summary
Hebron, Maryland Manufacturing Plant Purchase
$700,000 First Secured Mortgage Sought


Sovereign Gaming & Entertainment, LLC ("SGE"), the option purchaser of a 46,000+ sq. ft. Hebron, Maryland state-of-the-art manufacturing plant located on 7.4 acres seeks a first secured mortgage loan in the amount of $700,000. The loan amount is 67.7% of the property's appraised value and 73.7% of the $950,000 contract purchase price.

In accordance with the terms of the option contract, SGE has paid $290,000 toward the purchase price, leaving a balance due of $660,000 plus interest as computed below in the amount of $30,537.49, for a total due at a March 1, 2016 closing of $690,537.49 plus closing costs.

| Date | Balance Due | Interest for Period |
|------|-------------|---------------------|
| 9/1/15 | 850,000 | 4,958.33 |
| 10/1/15 | 835,000 | 4,870.83 |
| 11/1/15 | 820,000 | 4,783.33 |
| 12/1/15 | 705,000 | 4,112.50 |
| 1/1/16 | 690,000 | 4,025.00 |
| 2/1/16 | 675,000 | 3,937.50 |
| 3/1/16 | 660,000 | 3,850.00 |
| TOTAL |  | 30,537.49 |

The property is appropriately zoned, with an added manufacturing exception, and is located in Wicomico County on Maryland's eastern shore just ten miles north of Salisbury. Its modern improvements boast approximately 40,000 sq. ft. of manufacturing space, in addition to 10,000 sq. ft. comprised of improved office and ancillary employee facilities. The County's zoning department has issued a letter approving CannaMed's intended use, and the purchaser commissioned and obtained plans and environmental reports.

SGE plans to lease the property to Cannamed Pharmaceuticals, LLC ("CannaMed"), a related Maryland limited liability company formed to apply for a license to operate one of fifteen licensed medical marijuana cultivation facilities, which license may be awarded in May, 2016. In the event that CannaMed is not successful in obtaining a Maryland medical marijuana cultivation center license, SGE plans to lease the property to another successful applicant.

SGE is operated by Jeffrey Siskind, a West Palm Beach, Florida real estate attorney whose resume accompanies this Executive Summary. Siskind is also licensed to practice law in Maryland, also has an ownership interest in CannaMed.

Attached are the following in addition to Mr. Siskind's resume; a recent appraisal, a site plan for the property, the SGE purchase option contract, zoning approval letter and CannaMed's confidential business plan. For further information, including copies of plans and environmental reports, please contact Jeffrey Siskind at (561) 352-9166.

# APPRAISAL REPORT OF
# REAL PROPERTY IDENTIFIED AS

MaTech
27120 Ocean Gateway
Hebron, Maryland 21830



**CC10583**

# APPRAISAL REPORT OF
# REAL PROPERTY IDENTIFIED AS

MaTech

27120 Ocean Gateway

Hebron, Maryland 21830

## PREPARED FOR

Jeffrey Siskind, Esq.

Siskind Legal Group

525 S. Flagler Drive

5th Floor

West Palm Beach, Florida 33401

## BY

W. R. McCain & Associates, Inc.

205 Executive Plaza

Salisbury, Maryland  21804

410-742-3201



**W.R. McCain**
& ASSOCIATES
REAL ESTATE VALUATION & CONSULTATION

205 Executive Plaza
Salisbury, MD 21804

410-742-3201
888-400-2766
Fax 410-860-5313

www.wrmccain.com

—

Delaware Office
Route 26
Atlantic Avenue
Ocean View, DE 19970



William R. McCain, MAI, MBA
*President / CEO*

—

Shelly Durham
Vice President
Residential Division

Ginger P. Williams, CCRA
VP/ Senior Analyst
Commercial Division

Pamela J. Bursler, R/W-AC
Senior Analyst
Manager - Right of Way Division

Lee Gosnell
Manager - Ag/Conservation Division

Lori Mrohs - Senior Analyst

Braxton Dees
Review/Valuation Analyst

Valuation Analysts
Clyde Marriner
Larry Chester
Gretchen Nichols
Kevin M. Brady
J. Warren Pitsenbarger
Karen Ranney
Corey J. Hoch
Bridget G. Peters
Benjamin Bauer
Corrine Bayline

Office Administration
Robin L. Donalds, Manager
Tami Harris, Receptionist
Sallie Magee, Controller

CELEBRATING

YEARS OF SERVICE

August 20, 2015

Jeffrey Siskind, Esq.
Siskind Legal Group
525 S. Flagler Drive 5th Floor
West Palm Beach, Florida 33401

RE:   MaTech
       27120 Ocean Gateway
       Hebron, Maryland 21830
       *CC10583*

Dear Mr. Siskind:

Pursuant to your request, the above referenced subject property has been inspected and investigated for the purpose of preparing an appraisal report, which establishes an opinion of its ***current fee simple value.*** The subject property is identified as MaTech, a manufacturing facility, located at 27120 Ocean Gateway in Hebron, Wicomico County, Maryland.

This ***Appraisal Report*** is subject to the limiting conditions and assumptions that are included in the introductory section of this report. It has been prepared in conformance with the Uniform Standards of Professional Appraisal Practice (USPAP) of the Appraisal Foundation and Title XI of the Financial Institutions Reform, Recovery and Enforcement Act of 1989 (FIRREA).

The Appraisal report presents summary discussions of the data, reasoning and analysis used in the appraisal process to develop the value opinion.

*The extent of this appraisal process includes the valuation of the real estate only and encompasses the Sales Comparison Approach only. Due to the age of the original improvements and lack of recent, similarly zoned, unimproved land sales within the subject's immediate marketing area, no Cost Approach has been applied. The omission of the Cost Approach under these circumstances, however, does not hinder obtaining a credible value conclusion. Additionally, since the property is not currently leased, no Income Approach was performed.*

As a result of the valuation procedure and analysis, it is the opinion of the appraisers that the **current as is fee simple value for the subject property, as of September 9, 2015**, is:

> **ONE MILLION THIRTY THOUSAND DOLLARS**
>
> **$1,030,000**

The supporting data, analyses and conclusions upon which this valuation is based are contained in the accompanying appraisal report and the work file. **This letter must remain attached to the report in order for the value opinion set forth to be considered valid.**

Respectfully Submitted,

_____
Gretchen M. Nichols
MD Certified General  # 04-32182
DE Certified General # X1-0000483
VA Certified General # 4001-015682

_____
William R. McCain, MAI, MBA
Maryland Certified General # 04-210
Delaware Certified General # X1-0000045
Virginia Certified General # 4001-001437

## CERTIFICATION

***CERTIFICATION: The appraisers certify and agree that, to the best of their knowledge and belief:***

1.      The statements of fact contained in this report are true and correct.

2.      The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are our personal, unbiased professional analyses, opinions, and conclusions.

3.      The appraisers have no present or prospective interest in the property that is the subject of this report, and have no personal interest or bias with respect to the parties involved.

4.      The appraisers have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

5.      The engagement in this assignment was not contingent upon developing or reporting predetermined results.

6.      The compensation of the appraisers is not contingent upon the developing or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

7.      Our analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice.

8.      William McCain inspected the property which is the subject of this report. Gretchen Nichols did not inspect the subject property.

9.      No one provided significant real property appraisal assistance to the persons signing this certification with the initial research and setup.

10.     The reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute.

11.     The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

12.     As of the date of this report, William R. McCain has completed the continuing education program for Designated Members of the Appraisal Institute.

*W. R. McCain & Associates, Inc.*

13.    I/We have not performed appraisal services, as appraisers, regarding the property that is the subject of this report, within the three-year period immediately preceding acceptance of this assignment. I/We have performed no other services in any other capacity regarding the property that is the subject of this report, within the three-year period immediately preceding acceptance of this assignment.

Respectfully Submitted,

_____
Gretchen M. Nichols
MD Certified General  # 04-32182
DE Certified General # X1-0000483
VA Certified General # 4001-015682

_____
William R. McCain, MAI, MBA
Maryland Certified General # 04-210
Delaware Certified General # X1-0000045
Virginia Certified General # 4001-001437

## ASSUMPTIONS AND LIMITING CONDITIONS

***This appraisal report has been made with the following general assumptions:***

1.     No responsibility is assumed for the legal description provided or for matters pertaining to legal or title considerations.  Title to the property is assumed to be good and marketable unless otherwise stated.

2.     The property is appraised free and clear of any or all liens or encumbrances unless otherwise stated.

3.     Responsible ownership and competent property management are assumed.

4.     The information furnished by others is believed to be reliable, but no warranty is given for its accuracy.

5.     All engineering studies are assumed to be correct.  The plot plans and illustrative material in this report are included only to help the reader visualize the property.

6.     It is assumed that there are no hidden or unapparent conditions of the property, subsoil, or structures that render it more or less valuable.  No responsibility is assumed for such conditions or for obtaining the engineering studies that may be required to discover them.

7.     It is assumed that the property is in full compliance with all applicable federal, state, and local environmental regulations and laws unless the lack of compliance is stated, described, and considered in the appraisal report.

8.     It is assumed that the property conforms to all applicable zoning and use regulations and restrictions unless a nonconformity has been identified, described and considered in the appraisal report.

9.     It is assumed that all required licenses, certificates of occupancy, consents, and other legislative or administrative authority from any local, state, or national government or private entity or organization have been or can be obtained or renewed for any use on which the value estimate contained in this report is based.

10.    It is assumed that the use of the land and improvements is confined within the boundaries or property lines of the property described and that there is no encroachment or trespass unless noted in the report.

11.    Unless otherwise stated in this report, the existence of hazardous materials, which may or may not be present on the property, was not observed by the appraiser.  The appraiser has no knowledge of the existence of such materials on or in the property. The presence of substances such as asbestos, urea-formaldehyde foam insulation, and other potentially hazardous materials may affect the value of the property. The value estimated is predicated on the assumption that there is no such material on or in the property that would cause a loss in value.  No responsibility is assumed for such conditions or for any expertise or

engineering knowledge required to discover them. No evidence of environmental contamination was observed.

12.     The appraisers have not made a specific compliance survey and analysis of the building and/or other improvements erected on the subject property to determine whether or not the property is in conformity with the various detailed requirements of the Americans with Disabilities Act (ADA). If the property does not comply with the ADA or these regulations, this fact could have a negative effect on the value or marketability of the property.


***This appraisal report has been made with the following general limiting conditions:***

1.     Any allocation of the total value estimated in this report between the land and the improvements applies only under the stated program of utilization.  The separate values allocated to the land and buildings must not be used in conjunction with any other appraisal and are invalid if so used.

2.     Possession of this report, or a copy thereof, does not carry with it the right of publication.

3.     The appraisers, by reason of this appraisal, are not required to give further consultation or testimony or to be in attendance in court with reference to the property in question unless arrangements have been previously made.  In the event appraiser is subpoenaed or otherwise required to give testimony or attend any public or private hearing as a result of this assignment, the summoning party agrees to compensate the appraiser at their corresponding hourly rate.

4.     Neither all nor any part of the contents of this report (especially any conclusions as to value, the identity of the appraiser, or the firm with which the appraiser is connected) shall be disseminated to the public through advertising, public relations, news, sales, or other media without the prior written consent and approval of the appraisers.

5.     The appraisal report is based on data and information available or made available at the time the assignment is in process.  Any Amendments, Addendums, and/or Modifications requested after the reports have been turned in, will be made as soon as reasonably possible, for an additional fee.

### SUBJECT PHOTOGRAPHS

| | | |
|:---:|:---:|:---:|
|  |  |  |
| *Front of Subject* | *Side View* | *Rear of Subject* |
|  |  |  |
| *Typical Office* | *Typical Office* | *Breakroom* |
|  |  |  |
| *Typical Bathroom* | *Manufacturing Area* | *Warehouse Area* |

*W. R. McCain & Associates, Inc.*

| SUBJECT PHOTOGRAPHS | | |
|:---:|:---:|:---:|
|  |  |  |
| *Loading Area* | *Street Scene* | *Street Scene* |

*W. R. McCain & Associates, Inc.*

**MAPS**



**Aerial View**



**Tax Map**



**Location Map**



**Flood Map**

*W. R. McCain & Associates, Inc.*

## SUMMARY OF IMPORTANT DATA AND CONCLUSIONS

| | |
|---|---|
| *REPORT TYPE:* | Appraisal Report<br>CC10583 |
| *REPORT DATE:* | August 20, 2015 |
| *LOCATION:* | 27120 Ocean Gateway<br>Hebron, Maryland<br>Map 19 Parcel 113 |
| *OWNER OF RECORD:* | Machining Technologies, Inc. |
| *LAND AREA:* | 7.40 +/- Acres |
| *IMPROVEMENTS:* | Office Warehouse<br>**47,000 +/- s.f. of Total Gross Building Area**<br>Average Condition & Average/Gd Quality |
| *ZONING:* | A-1 with Special Exception |
| *FLOOD MAP STATUS:* | Map: 24045C0095E  Dated: 8/17/2015<br>Zone X (Not Located in a Flood Zone) |
| *CENSUS TRACT:* | 0107.02 |
| *HIGHEST AND BEST USE IMPROVED:* | Consistent With Current Use |
| *PROPERTY RIGHTS APPRAISED:* | Fee Simple |
| *OPINION OF VALUE VIA* | |
| *COST APPROACH:* | N/A |
| *SALES COMPARISON APPROACH:* | $1,030,000 |
| *INCOME APPROACH:* | N/A |
| *AS-IS CURRENT FEE SIMPLE MARKET VALUE* | $1,030,000 |
| *EFFECTIVE DATE:* | September 9, 2015 |
| *APPRAISERS:* | Gretchen Nichols<br>William R. McCain, MAI, MBA |

## PURPOSE AND INTENDED USE OF APPRAISAL

The purpose of this Appraisal  is to provide an opinion of the current market value of the subject property.  The intended use of this report is to present the data and reasoning the appraisers have used to form the opinions of value so that the client (Siskind Legal Group) may use it as an aid for possible acquisition*.*

## DEFINITION OF MARKET VALUE

Market value is defined as "The most probable price in terms of money which a property will bring in a competitive and open market, under all conditions requisite to a fair sale, the buyer and seller each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer whereby:

1.     Buyer and seller are typically motivated;
2.     Both parties are well informed or well advised, and acting in what they consider their best interests;
3.     A reasonable time is allowed for exposure in the open market;
4.     Payment is made in terms of cash in United States dollars or in terms of financial arrangements comparable thereto; and
5.     The price represents the normal consideration for the property sold unaffected by creative financing or sales concessions granted by anyone associated with the sale."

Federal Register, Vol. 55, No. 163, Wednesday, August 22, 1990, Rules and Regulations.

## PROPERTY RIGHTS APPRAISED

The property rights appraised address the fee simple interest.

*Fee Simple* - "Absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat. "

## SCOPE OF WORK

An interior/exterior inspection of the subject property was performed on September 9, 2015. Assessment records provide the basis for the improvement's size. The site area was based on the information contained in the assessment records and Specprint data.

*The extent of this appraisal process includes the valuation of the real estate only and encompasses the Sales Comparison Approach only. Due to the age of the original improvements and lack of recent, similarly zoned, unimproved land sales within the subject's immediate marketing area, no Cost Approach has been applied. The omission of the Cost Approach under these circumstances, however, does not hinder obtaining a credible value conclusion. Additionally, since the property is not currently leased, no Income Approach was performed.*

The scope of this appraisal is limited to the valuation of the real estate only and includes a current "as is" value. No equipment or trade fixtures are included.  In formulating the approaches to value, the market data obtained was collected from office files, multiple list publications, other appraisers, Realtors, property owners and municipal offices in the subject area.

Information presented concerning regional and county data was based upon information obtained from the Town of Hebron, Wicomico County and the U.S. Census Bureau. Neighborhood details were based on a physical inspection of the area, local property owners and businessmen.

In estimating the highest and best use of the subject, an analysis was made of all the data pertaining to the property, neighborhood and region.  In addition, a study of the general commercial and residential property markets in the subject area was made in order to help determine the economic feasibility of the improvements. Upon assembling and analyzing the data defined in this scope of work, the final opinion of market value has been reached.

## TITLE DATA & SALES HISTORY

| | |
|---|---|
| **Owner:** | Machining Technologies, Inc. |
| **Recent Transfers:** | None within past 10 years |
| **Deed Reference:** | 1400/768 |
| **Current Contracts:** | The subject property is reportedly under contract. However, the client did not wish to disclose the sale price or the terms of the contract. |
| **Recent Listing History:** | The subject property was listed for sale on 9/11/2012 for $1,495,000. On 1/24/2014, the listing price was reduced to $1,100,000. |
| | |
| **Leases:** | None |
| | |
| **Supporting Documents in Addenda:** | Current Deed |

## IMPROVEMENTS ANALYSIS

The subject is a 47,000 +/- s.f. building that has been operating as a manufacturing facility since 1994. The property is situated on a 7.4 acre parcel (Parcel 113), which is located on the north side of Ocean Gateway (Route 50) in Hebron. The building is comprised of masonry construction, on a concrete slab, with a flat roof. An addition to the building in 1994 included what is currently the office area (the east end of the first floor and second floors). The finish is typical of office space with painted gypsum drywall, commercial grade carpet, and fluorescent lighting. This area has heating and air conditioning. The manufacturing area, built in 1969, has bare concrete floors and fluorescent lighting. The ceiling is of steel beam construction. This area was upgraded and remodeled in 1994 and has infrared gas heaters, but no air conditioning. There are three overhead doors for loading and unloading.

Additional exterior improvements include: a gravel parking lot (accommodating approximately 120 vehicles) and landscaping. A sign is located at the front of the property along Route 50.

Overall, the subject property is in average condition/quality with some signs of deferred maintenance consistent with it having been vacant for the last 2-3 years, including a roof leak that has caused ceiling tile damage and mold, etc. The facility is functional as a manufacturing facility and exhibits no unusual functional or economic obsolescence.

## REASONABLE EXPOSURE PERIOD

The exposure period is the time the subject property would have been exposed to the market, prior to a consummated sale as of the date of value. We estimate a reasonable exposure period of less than 12 - 24 months for the subject property assuming aggressive marketing by a competent professional at pricing consistent with the appraised value as reached in this report. This estimated exposure period is based upon statistics provided by the local Association of Realtors Multiple Listing Service and on a sample of commercial sales in the subject's marketing area.

## HIGHEST AND BEST USE

As defined in the International Valuation Standards, highest and best use is, *"The most probable use of a property, which is physically possible, appropriately justified, legally permissible, financially feasible, and which results in the highest value of the property being valued."*

An analysis of the highest and best use of a property is the most important part of the appraisal process, for it is in terms of highest and best use that market value is estimated. This study and selection of highest and best use is based upon the above mentioned criteria. Furthermore, since land use can be limited by the improvements upon it, highest and best use is determined for the site as if vacant and for the property as improved.

The subject is located in a mixed use area; along a divided highway; is zoned for agricultural and residential uses, but has an exception for a manufacturing facility, its present use. The current improvements appear to be structurally sound and provide substantial contributory value to the subject site.  There are no indications of an alternative use that would economically justify the removal of the existing improvements.  Hence it has been determined that the highest and best use of the subject property compares favorably with its current use.  Said use is physically possible, legally permitted, financially feasible, and results in the highest value of the property.

*W. R. McCain & Associates, Inc.*

## PROPERTY VALUE BY SALES COMPARISON APPROACH

The Sales Comparison Approach is a method of comparing similar properties to the subject for an indication of value.  Often called the market data approach, this method represents an interpretation of the reactions of typical purchasers in the market.  Basic to this approach is the principle of substitution, implying that a prudent person will pay no more to buy a property than it will cost to buy a comparable substitute property.

Application involves a comparative analysis of the important attributes of the sale properties to those of the subject under the general divisions of location, physical characteristics, conditions of sale and the change in the market over time.  Consideration of the dissimilarities in terms of their probable effect upon the sale price of the subject, gives an indication of market value.

Many improved commercial properties were investigated and analyzed for this direct comparison.  The comparables selected were considered to be the best available and are similar in terms of overall market appeal.  Following is the summary data for each sale, along with an adjustment grid. The most pertinent unit of comparison is the sale price per square foot of gross building area.  ***Copies of detailed comparable sale profiles are included in the addenda.***

*W. R. McCain & Associates, Inc.*

| Element | Subject | Sale 1 | Sale 2 | Sale 3 | Sale 4 | Sale 5 |
|---|---|---|---|---|---|---|
| **SALES COMPARISON GRID** | | | | | | |
| Saleprice | | **$2,750,000** | **$2,300,000** | **$1,700,000** | **$1,000,000** | **$915,000** |
| Property | MaTech | Standard Register | Gannett Building | Century Window Fashioning | KPAC | Industrial Facility |
| Price/S.F. | **$0.00** | **$26.23** | **$46.72** | **$28.33** | **$18.91** | **$15.25** |
| Prop Rights | Fee Simple | Fee Simple | Leased Fee | Fee Simple | Fee Simple | Fee Simple |
| Rights Adj | | -0- | -0- | -0- | -0- | -0- |
| Terms | | Conv Sale | Conv Sale | Conv Sale | Conv Sale | Conv Sale |
| Terms Adj | | -0- | -0- | -0- | -0- | -0- |
| Sale Date | 9     2015 | 10     2014 | 3     2012 | 5     2012 | 12     2012 | 12     2010 |
| Mkt Cond Adj | -6%/Year thru 12/2011 | 0.00% | 0.00% | 0.00% | 0.00% | -6.00% |
| Adj Pr/SF | | **$26.23** | **$46.72** | **$28.33** | **$18.91** | **$14.34** |
| Location | Ocean Gateway Hebron | Marvel Road Salisbury | Beam Street Salisbury | Nesbitt Drive Seaford | Caroline Drive Federalsburg | Mooose Lodge Road Cambridge |
| Loc Adj | | -10.00% | -10.00% | -10.00% | 10.00% | 10.00% |
| Site Size (Ac.) | 7.400 | 8.740 | 10.810 | 9.700 | 7.970 | 19.730 |
| Land to Bldg | 6.86 | 3.63 | 9.57 | 7.04 | 6.56 | 14.32 |
| Site Adj | | -0- | -0- | -0- | -0- | -0- |
| G.B.A. | 47,000 | 104,826 | 49,227 | 60,000 | 52,892 | 60,000 |
| Size Adj | | 20.00% | -0- | -0- | -0- | -0- |
| Condition | Average-Fair | Superior | Very Superior | Superior | Similar | Similar |
| Cond Adj | | -10.00% | -20.00% | -10.00% | -0- | -0- |
| Quality | Average | Similar | Superior | Similar | Similar | Inferior |
| Qual Adj | | -0- | -10.00% | -0- | -0- | 10.00% |
| Other | 2nd Floor | Typical | Typical | 2nd Floor | Typical | Typical |
| Other Adj | | -10.00% | -10.00% | -0- | -10.00% | -10.00% |
| Net Adj | | -10.00% | -50.00% | -20.00% | 0.00% | 10.00% |
| Adj Pr/Sf | | **$23.61** | **$23.36** | **$22.67** | **$18.91** | **$15.77** |
| | | Low | $15.77 | | | |
| | | High | $23.61 | | | |
| | | Mean | $20.86 | | | |
| | | Median | $22.67 | | | |

## SALES COMPARISON ANALYSIS/CONCLUSION



Adjustments have been applied for the major discernable differences having the most impact on value.  These are primarily outlined as follows:

- **Market Conditions:** As previously noted, because of a weakening commercial market, downward time adjustments have been applied in the Sales Analysis based on the rate shown.

- **Location:** These adjustments take into consideration the demographics of the area, the overall commercial exposure, and the ease of access. Sales 1-3 are considered superior in terms of location as they are located in industrial parks. These sales were adjusted downward. Sales 4 & 5 are considered inferior in terms of location since they are located in areas of lower property values.

- **Land to Building (site size):** Because the price per square foot is the unit of comparison, the site size is evaluated based on the land to building ratio.  A higher ratio can be an indication of surplus land for potential expansion, a more functional site, superior parking, etc.

- **Size:** Typically, the price per square foot varies inversely with the building size.  A smaller building / unit generates a higher per unit rate.  On this basis, size adjustments have been applied accordingly.

- **Condition:** The comparables have been evaluated based on the sources available, taking into consideration the building age and overall condition.

- **Quality:** This element looks at the overall construction type, the quality of materials, the degree of interior finish, and the overall functionality of the properties.

- **Other:** Any additional elements having a significant impact on value have been

addressed here. The subject has a second floor that diminishes functional utility slightly. The comparables that are all on one level were adjusted downward.

The comparables have been adjusted as discussed.  Where possible, paired sales have been utilized to determine the specific numerical adjustment amounts. Otherwise, the actual adjustments were quantified by the appraisers, based on the opinions of market participants.  In considering the opinion of value through the Sales Comparison Approach, it is, as noted, necessary to consider the differences, as well as the similarities of the comparable properties. The sales included offer a relatively accurate view of the subject market and after adjustment, are indicative of current trends.  ***All five sales have been given consideration.***

After analyzing the results of the ***Sales Comparison Analysis***, it is the appraisers' opinion that the ***current fee simple market value of the subject property is as follows:***

| September 9, 2015 | | | |
|---|---|---|---|
| G.B.A. | Price/Unit | Value | Rounded |
| 47,000 | $22 | $1,034,000 | $1,030,000 |

*W. R. McCain & Associates, Inc.*

## <u>RECONCILIATION AND FINAL OPINION OF VALUE</u>

The value opinions by each approach, are as follows:

| | |
|---|---|
| **COST APPROACH** | **Not Analyzed** |
| **SALES COMPARISON APPROACH** | **$1,030,000** |
| **INCOME APPROACH** | **Not Analyzed** |

As a result of the valuation procedure and analysis, it is the opinion of the appraisers that the ***current as is fee simple value for the subject property, as of September 9, 2015***, is:

> ***ONE MILLION THIRTY THOUSAND DOLLARS***
>
> ***$1,030,000***

# ADDENDA

# Appraisal Qualifications for Gretchen M. Nichols

## LICENSE/DESIGNATIONS:

Certified General Real Estate Appraiser
 Maryland Real Estate Appraisers Commission  (#04-32182)

Certified General Real Estate Appraiser
 Delaware Real Estate Appraisers Commission (#X1-0000483)

Certified General Real Estate Appraiser
 Virginia Real Estate Appraisers Commission    (4001-015682)

Approved FHA Appraiser


## EDUCATION:

| | |
|---|---|
| Old Dominion University | 1988-1992 |
| Salisbury University | 1992-1994 |


## EXPERIENCE:

January 2003  to Present
Commercial/Residential Real Estate Appraiser
W. R. McCain & Associates, Inc.
Salisbury, Maryland

June 2000 to January 2003
Systems Associate
Xerox Corporation
Wilmington, Delaware

November 1994 to June 2000
Coordinator, Advertising & Literature
Dresser Industries
Salisbury, Maryland


## APPRAISAL COURSES:

Real Estate Principles of Appraising
Wor-Wic Community College
Salisbury, MD       3/2003

| | |
|---|---|
| Real Estate Practices of Appraising<br>Wor-Wic Community College<br>Salisbury, MD | 5/2003 |
| Real Estate Appraisal Standards & Ethics<br>MD Association of Appraisers, Inc | 3/2003 |
| Online Analyzing Operating Expenses<br>Appraisal Institute<br>Chicago, IL | 9/2005 |
| 7-Hour National USPAP Update<br>McKissock Inc. | 10/2005 |
| Appraising the Farm Property<br>MD Association of Appraisers, Inc. | 10/2005 |
| Residential Income Approach Course 205<br>MD Association of Appraisers, Inc. | 4/2006 |
| Residential Sales Comparison Course 203<br>MD Association of Appraisers, Inc. | 10/2007 |
| Condemnation Appraising: Basic Principles &<br>Applications Course SE 710<br>Appraisal Institute<br>Baltimore, MD | 11/2007 |
| General Sales Comparison Course 401G<br>Appraisal Institute<br>Chicago, IL | 11/2007 |
| 7-Hour National USPAP Update<br>Leslie Pruitt | 4/2009 |
| Delaware Law, Rules & Regulations<br>Loomis Appraisal School, Inc. | 9/2009 |
| 7-Hour National USPAP Update<br>Leslie Pruitt | 4/2011 |
| Delaware Law, Rules & Regulations<br>McKissock. | 10/2011 |
| Mastering Unique & Complex Property Appraisal<br>Wor-Wic Community College<br>Salisbury, MD | 10/2011 |

7-Hour National USPAP Update
Leslie Pruitt                                                   6/2013

Construction Details & Trends
McKissock                                                      3/2013

Appraising & Analyzing Retail Shopping
Centers for Mortgage Underwriting
McKissock                                                      3/2013

Land & Site Valuation
McKissock                                                      9/2013

Delaware Law, Rules & Regulations
McKissock.                                                     9/2013

# DLLR
Department of Labor, Licensing and Regulation

LICENSE * REGISTRATION * CERTIFICATION * PERMIT

Martin O'Malley
*Governor*

Anthony G. Brown
*Lt Governor*

Leonard J. Howie, III
*Secretary*

## STATE OF MARYLAND

# DEPARTMENT OF LABOR, LICENSING AND REGULATION

### COMMISSION OF RE APPRAISERS & HOME INSPECTORS
### CERTIFIES THAT:

GRETCHEN NICHOLS

IS AN AUTHORIZED: **04- CERTIFIED GENERAL**

| LIC/REG/CERT | EXPIRATION | EFFECTIVE | CONTROL NO |
|---|---|---|---|
| 32182 | 11-25-2017 | 11-25-2014 | 4630100 |

Signature of Bearer

Secretary DLLR

WHERE REQUIRED BY LAW THIS MUST BE CONSPICUOUSLY DISPLAYED IN OFFICE TO WHICH IT APPLIES

---

LICENSE NO.  **X1-0000483**

## STATE OF DELAWARE
### DIVISION OF PROFESSIONAL REGULATION
861 Silver Lake Blvd.
Cannon Building, Suite 203
Dover, DE 19904-2467

NOT TRANSFERABLE

PROFESSION:  **Certified General Real Property Appraiser**

EXPIRATION DATE      **10/31/2015**

ISSUED TO:   **Gretchen Moore Nichols**

MAILING ADDRESS
**Gretchen Moore Nichols**
**205 Executive Plaza**
**Salisbury MD 21804**

## PROFESSIONAL LICENSE

THIS CERTIFIES THAT THE PERSON NAMED IS HEREBY LICENSED TO
CONDUCT OR ENGAGE IN THE PROFESSION INDICATED ABOVE. THIS
DOCUMENT IS OULY ISSUED UNDER THE LAWS OF THE STATE OF DELAWARE.

LICENSEE SIGNATURE

**378490**

---

## DEPARTMENT OF PROFESSIONAL AND OCCUPATIONAL REGULATION
## COMMONWEALTH OF VIRGINIA
9960 Mayland Dr., Suite 400, Richmond, VA 23233
Telephone: (804) 367-8500

| EXPIRES ON | NUMBER |
|---|---|
| 09-30-2015 | 4001 015682 |

### REAL ESTATE APPRAISER BOARD
### CERTIFIED GENERAL REAL ESTATE APPRAISER

GRETCHEN MOORE NICHOLS
205 EXECUTIVE PLAZA

SALISBURY MD 21804

Gordon N. Dixon, Director

ALTERATION OF THIS DOCUMENT, USE AFTER EXPIRATION, OR USE BY PERSONS OR FIRMS OTHER
THAN THOSE NAMED MAY RESULT IN CRIMINAL PROSECUTION UNDER THE CODE OF VIRGINIA.

**REAL ESTATE QUALIFICATIONS OF WILLIAM R. MCCAIN**

**LICENSE/DESIGNATIONS:**

**CERTIFIED GENERAL REAL ESTATE APPRAISER -**
MARYLAND REAL ESTATE APPRAISERS COMMISSION (#04 210)
DELAWARE REAL ESTATE APPRAISERS COMMISSION (X1-0000045)
VIRGINIA REAL ESTATE APPRAISER BOARD (4001 001437)

**MAI** - MEMBER APPRAISAL INSTITUTE (#11847)

**LICENSED REAL ESTATE BROKER** - MD REAL ESTATE COM. (#84674)

**GRI -** Graduate, REALTOR Institute

**EDUCATION:**

**MASTER OF BUSINESS ADMINISTRATION - 1987**
THE FRANKLIN P. PERDUE SCHOOL OF BUSINESS
SALISBURY UNIVERSITY, Salisbury, MD

**BACHELOR OF ARTS - 1982**
WASHINGTON COLLEGE, Chestertown, MD
Majors:  Economics and Sociology

**APPRAISAL INSTITUTE COURSES & SEMINARS:**

Business Practices and Ethics - Online, 11/11
Appraisal Curriculum Overview - General, DE Chapter Appraisal Institute, 3/11
Litigation Appraising: Specialized Topics and Application, DC Chapter AI, 3/11
Green Residential Valuation, AI Webinar, 5/10
Residential Development Valuation Trends, Issues, & Challenges, AI Webinar, 10/09
Valuation for Financial Reporting, AI Webinar, 4/09
Delmarva Real Estate Outlook, Instructor, DE Chapter AI, 1/04 - 9/14
Uniform Appraisal Standards Federal Land Acquisitions, MD Chapter AI, 1/07
Course 420: Business Practices & Ethics 10/06
Appraisal of Manufactured Housing, MD Chapter Appraisal Institute, 5/06
Appraisal Scope of Work: Burden or Blessing, ABA/AI Telephone Briefing 4/06
Sussex County DE Economic Update, Instructor, DE Chapter Apprsl. Inst. 1/06
Professional Guide to URAR, MD Chapter Appraisal Institute, 6/05
Appraisal of Local Retail Properties, DE Chapter Appraisal Institute 3/04
Appraisal Independence, Appraisal Institute Teleconference 2/04
Complexities of Appraising Resort Real Estate, DE Chapter Appraisal Inst. 1/04
Appraisal Summit 2003, Washington, D.C., Appraisal Institute 9/03
HUD/FHA Update & Review, DE Chapter Appraisal Institute 5/03
Standards of Prof. Practice, parts A, B & C, DE Chapter, 3/93 (A&B) - PA Chap., 6/99
Business Enterprise Valuation, AI - Orlando, FL 6/99
Private Mortgage Insurance Cancellation, AI - Orlando, FL 6/99
Technology Forum, AI - Orlando, FL 6/99
Valuing Your Business, AI - Orlando, FL 6/99

Eminent Domain & Condemnation Appraising, AI-DE Chapter, 4/98
FHA and HUD Review, Appraisal Institute-Delaware Chapter, 3/97
Appraising for Fannie Mae, Appraisal Inst.-DE Chapter, 1/97
Advanced Demonstration Appraisal Report Workshop, Harrisburg, PA, 5/93
Report Writing & Valuation Analysis, University of North Carolina, Chapel Hill, NC, 7/92
Case Studies in Real Estate Valuation, American University, Washington, D.C., 10/91
Capitalization Theory and Techniques part B, Univer. of MD, College Park, MD, 7/90
Residential Valuation, Successful completion of examination 8-2, 9/89
Standards of Professional Practice, MD Chapter 26, Baltimore, MD, 5/88
Capitalization Theory & Techniques Part A, Successful completion of exam 1B-A, 3/88
Basic Valuation Procedures, Successful completion of examination 1A-2, 3/88
Real Estate Appraisal Principles, Dartmouth College, Hanover, NH, 8/87
FIRREA Compliance/Differences - Appraisal Institute

## APPRAISAL EDUCATION COURSES & SEMINARS:

Delaware Appraisal Laws & Regulations, McKissock, 9/07, 7/09, 8/11, 9/13
National USPAP Update, 1/04, 2/06, 3/07, 4/09, 4/11, 6/13
DelDot Appraisal Procedures, DelDot 1/12
Environmental Pollution & Mold, McKissock, 2/10
REO & Foreclosures, McKissock, 10/09
Fannie Mae Form 1004MC, HVCC & More, McKissock, 9/09
How to Value Real Estate in a Downward Market, WorWic Community College, 3/09
Freddie Mac & Fannie Mae Changes, Coastal Assoc of Realtors, 3/09
Effective Banker-Appraiser Communication, National Telephone Briefing, 8/07
USPAP Changes & Scope of Work, DE Council of Real Estate Appraisers, 10/06
Partial Acquisition Valuation/Eminent Domain, Loomis Real Estate School, 4/05
Ethics - It's Good For Business, Coastal Ass. of Realtors, 12/04
Appraising Rural Land & Conser. Easements, Virginia Ass. of Realtors, 4/03
Review of USPAP, Loomis Real Estate Appraising School, 2/03
Current Appraisal Issues, Loomis Real Estate Appraising School, 2/03
10th Annual Appraisal Seminar, DE Council on Real Estate Appraising, 9/02
Annual Seminar, DE Council on Real Estate Appr., 9/01
Virginia Appraiser Laws & Regulations, 4/01
Fair Housing Seminar & Leg. Update - Ed Smith R E School 4/01
Comprehensive Appraisal Workshop - Ted Witmer, 8/00
New FHA/HUD Guidelines & Procedures - 3/00
Eminent Domain Training, National Highway Inst., DelDOT, Dover, DE 2/99
GRI Series 200, 300, 400 MD Ass. of Realtors, 4/97, 10/97, 2/99
Residential Construction Loan Inspections, Crestar Bank, 3/98
USPAP: Update & Review, Instructor, Wor-Wic Community College, 7/94, 4/96
Appraising Complex Residential Properties, Wor-Wic Community College, 2/96
Perspectives On Appraisals, Value It, 6/95
Practical Overview of Evaluations and Other Limited Scope Assignments, 1/95
Appraising FHA Insured Properties, 10/94
Principles Of Farm, Ranch & Rural Appraising, Nat. Ass. of Independent Fee Appraisers, Salisbury, MD, 11/90
Valuing a Business - Salisbury State Univ., Small Bus. Inst.
Conventional Financing Seminar - Coastal Board of Realtors
CDA/MD Bond Program Seminar - Coastal Board of Realtors
Code of Ethics Seminar - Coastal Board of Realtors

EXPERIENCE:

**W. R. McCain & Associates, Inc.,** 1988 - Present
        **President/CEO**

Fee Appraisal Services for extensive list of Banks and Mortgage Companies

Appraisal Services for Maryland Department of General Services,
Maryland Department of Transportation, and Delaware DOT, FAA

Expert Testimony for District, Circuit and Federal Court, Bankruptcy,
        Tax Appeal and Zoning Hearings

Conservation Easement Appraisals for Conservation Fund, USFWS, NRCS, MET, ESLC,
Nature Conservancy, Rural Legacy, MALPF, Lower Shore Land Trust, Audubon Society,
USDA

Yellow Book Certified Appraisals for Federal Land Acquisitions

Approved HUD Roster Appraiser for MD, DE, and VA

Appraisal Services for local county and municipal Governments

Appraisals for Attorneys, Private Individuals, Businesses and Developers:
        -Residential, Commercial, Industrial, Special Use

Seminar Instructor for Delaware Chapter of Appraisal Institute 2004-11

Instructor:  Wor-Wic Community College 1986-2001
Appraising Techniques & Practices of Appraising
USPAP: Update and Review
Virginia Appraiser Board Law & Regulation Update

## *ASSOCIATIONS/AFFILIATIONS:*

*Appraisal Institute*
*Delaware Chapter of Appraisal Institute, President 2014-15*
*National Association of Realtors*
*Maryland Association of Realtors*
*Coastal Association of Realtors*
*Wicomico County Councilman, 2006 - 2010*
*Peninsula Regional Medical Center Board of Trustees - Chairman 2013-15*
*Wicomico Rotary Club, President 1996-97*
*District 7630 Rotary International, Ass. Distr. Gov. 1998-99*
*Trinity United Methodist Church Board of Trustees*
*Mid-Delmarva YMCA Board of Trustees*
*Greater Salisbury Committee*
*Salisbury Area Chamber of Commerce*



LICENSE · REGISTRATION · CERTIFICATION · PERMIT
## STATE OF MARYLAND
## DEPARTMENT OF LABOR, LICENSING AND REGULATION

Martin O'Malley
Governor

Anthony G. Brown
Lt. Governor

Leonard J. Howie, III
Secretary

### COMMISSION OF RE APPRAISERS & HOME INSPECTORS
### CERTIFIES THAT:

WILLIAM RALPH MCCAIN

IS AN AUTHORIZED: **04 - CERTIFIED GENERAL**

| LIC/REG/CERT | EXPIRATION | EFFECTIVE | CONTROL NO |
|---|---|---|---|
| 210 | 12-31-2015 | 12-03-2012 | 4336017 |

Signature of Bearer

Secretary DLLR

WHERE REQUIRED BY LAW THIS MUST BE CONSPICUOUSLY DISPLAYED IN OFFICE TO WHICH IT APPLIES

---

LICENSE NO. **X1-0000045**

### STATE OF DELAWARE
#### DIVISION OF PROFESSIONAL REGULATION
861 Silver Lake Blvd.
Cannon Building, Suite 203
Dover, DE 19904-2467

NOT TRANSFERABLE

PROFESSION: **Certified General Real Property Appraiser**

EXPIRATION DATE: **10/31/2015**

ISSUED TO: **William R. McCain**

MAILING ADDRESS
**William R. McCain
30111 Providence Drive
Salisbury MD 21804**



## PROFESSIONAL LICENSE

THIS CERTIFIES THAT THE PERSON NAMED IS HEREBY LICENSED TO
CONDUCT OR ENGAGE IN THE PROFESSION INDICATED ABOVE. THIS
DOCUMENT IS DULY ISSUED UNDER THE LAWS OF THE STATE OF DELAWARE.

LICENSEE SIGNATURE

**391426**

---

### DEPARTMENT OF PROFESSIONAL AND OCCUPATIONAL REGULATION
### COMMONWEALTH OF VIRGINIA

| EXPIRES ON |
|---|
| 02-29-2016 |

9960 Mayland Dr., Suite 400, Richmond, VA 23233
Telephone: (804) 367-8500

| NUMBER |
|---|
| 4001001437 |

### REAL ESTATE APPRAISER BOARD

### CERTIFIED GENERAL REAL ESTATE APPRAISER

WILLIAM R MCCAIN
5298 JAMES LANDING ROAD
SALISBURY, MD 21801-0000



Nick A. Christner, Interim Director

ALTERATION OF THIS DOCUMENT, USE AFTER EXPIRATION, OR USE BY PERSONS OR FIRMS OTHER
THAN THOSE NAMED MAY RESULT IN CRIMINAL PROSECUTION UNDER THE CODE OF VIRGINIA.

(SEE REVERSE SIDE FOR NAME AND/OR ADDRESS CHANGE)



**W.R. McCAIN**
& ASSOCIATES
REAL ESTATE VALUATION & CONSULTATION

Mailing Address

205 Executive Plaza
Salisbury, MD 21804

410-742-3201
888-400-2766
Fax 410-860-5313

www.wrmccain.com



William R. McCain, MAI, MBA
President / CEO

Ginger P. Williams, CCRA
VP/ Senior Analyst
Commercial Division

Shelly Durham
Vice President
Residential Division

Lee Gosnell
Manager - Ag/Conservation Division

Lori Mrohs - Senior Analyst

Braxton Dees
Review/Valuation Analyst

Valuation Analysts
Clyde Marriner
Gretchen Nichols
Kevin M. Brady
J. Warren Pitsenbarger
Karen Ranney
Corey J. Hoch
Bridget G. Peters
Benjamin Bauer
Corrine Bayline
Matthew Polly
Mary Ryan

Office Administration
Robin L. Donalds, Manager
Tami Harris, Receptionist
Sallie Magee, Controller

CELEBRATING

**25**

YEARS OF SERVICE

## CONTRACT FOR SERVICES

1. **PARTIES:** Sovereign Gaming and Equipment LLC, C/O Jeffrey M. Siskind, Esq., Siskind Legal Group, 525 S. Flagler Dr. 5th floor, West Palm Beach, Fl. 33401, hereby referred to as CLIENT, agrees to engage W.R. McCain & Associates, Inc., hereby referred to as APPRAISER, for appraisal services.

2. **ASSIGNMENT:** CLIENT requests an opinion of market value for Old MaTech at 27120 Ocean Gateway, Hebron, Md 21830. The purpose of this report is possible acquisition. APPRAISER agrees to complete the assignment in conformity with the requirements of all applicable licensing regulations, government agencies and professional organizations. APPRAISER agrees to provide the following product(s) per this engagement: A Restricted Use Appraisal Report.

3. **COMPLETION:** The APPRAISER estimates completion within **2-3 weeks** following receipt of signed contract and retainer, subject to unforseen circumstances or conditions beyond APPRAISER'S control. The number of copies per report to be provided per this engagement is: _2_.

4. **PAYMENT:** CLIENT agrees to pay APPRAISER a fee not to exceed **$750 for the appraisal report**. Furthermore, CLIENT agrees to pay APPRAISER a retainer of **$450**, with the balance, if any, being paid upon completion of the ASSIGNMENT prior to delivery. Any subsequent work pertaining to the appraisal assignment will be billed on a monthly basis.

5. **IF APPLICABLE:** An hourly rate of $295 for subsequent research, preparation, and for expert testimony by the firm's principals and an hourly rate of $190 for any subsequent research, preparation, and for expert testimony by the firm's associates. Travel time will be billed at an hourly rate of $125, plus reimbursements of travel and associated expenses.

6. **CANCELLATION:** In the event that CLIENT wishes to cancel the engagement prior to its completion, APPRAISER shall be compensated at an hourly rate as stated above for any work performed prior to the cancellation notice.

7. **LITIGATION:** APPRAISER shall not be required to provide testimony or attend any public or private hearing with reference to this PROPERTY as a result of this ASSIGNMENT unless otherwise stipulated or agreed to. In the event that APPRAISER volunteers, is subpoenaed, or otherwise required to give testimony or attend any public or private hearing as a result of this ASSIGNMENT, CLIENT agrees to compensate APPRAISER at an hourly rate of $295.

8. **PAYMENT:** Should payment, or additional cost due APPRAISER, become delinquent, CLIENT will pay interest thereon at the rate of 1.5% per month (One and a Half Percent Per Month) and further agrees to pay all costs of collection thereof, including reasonable attorney's fees, collection agency fees, court cost, etc.

9. **THIRD PARTIES:** In the event that CLIENT directs APPRAISER to secure payment from a third party, CLIENT shall assume all payment obligations outlined in this contract in the event of DELINQUENCY by said third party.

10. **WARRANTIES AND INDEMNITY:** CLIENT agrees to indemnify APPRAISER, his/her employees and independent contractors from all claims, suits and charges of any nature that may arise out of this agreement.

**CLIENT (Signature):**_____

**(Print Name):**_____

**DATE:** _____

**APPRAISER:**

**W.R. McCain & Associates, Inc.**

**DATE:**    August 20, 2015

P:\Commercial\MASTERS\Engagement Letters ARCHIVE\Engagement letter for Sovereign Gaming & Equipment LLC.wpd

# Comparable Land Sale



## Location Information

Harris Teeter Development Land
Marlboro Avenue & Brooks Drive
Easton, MD 21601
Talbot County
TM 0034 Grid 0003 Parcel 0021 Lot 3

## Sale Information

| | | | |
|---|---|---|---|
| **Sale Price:** | $3,700,000 | **Price Per Acre:** | $354,406 |
| **Sale Status:** | Closed | **Price Per SF:** | $8.14 |
| **Date:** | April 2014 | | |
| **Recorded:** | 2163/457 | | |
| **Rights Conveyed:** | Fee Simple | | |
| **Seller:** | Richard Bernstein Family | | |
| **Buyer:** | JDC Easton LLC | | |
| **Terms:** | Cash to Seller - Exact terms not available | | |
| **3 Year Sales History:** | None within prior 3 years | | |

## Land Information

| | | | |
|---|---|---|---|
| **Gross Land Area (Acres):** | 10.44 | **Utilities:** | Public |
| **Gross Land Area (SF):** | 454,766 | | |
| **Zoning:** | I-1 / PUD - Select Industrial w/PUD Overlay | | |
| **Verified:** | Tax Records, Tax Map, 3rd Party Appraiser, Plat (82/23-24), Deed, The Star Democrat | | |

## Remarks

This commercial parcel is situated just behind the Waterside Village project, anchored by Target, and is slated to be developed with a neighborhood shopping center to include a Harris Teeter (53,282 +- s.f. under a pad site lease) and 12,150 s.f. of in-line space. The facility construction is expected to be completed by the Spring of 2016. The site includes some wetland areas (1.34 +- acres) and a power line easement. These have been incorporated into the open space in laying out the site plan.

# Comparable Land Sale



## Location Information

Commercial Land
W/S Dupont Highway
Camden, DE 19934
Kent County
NM-02-09400-01-1500-000

## Sale Information

| | | | |
|---|---|---|---|
| **Sale Price:** | $920,000 | **Price Per Acre:** | $140,458 |
| **Sale Status:** | Closed | **Price Per SF:** | $3.22 |
| **Date:** | March 2014 | | |
| **Recorded:** | 7305/70 | | |
| **Rights Conveyed:** | Fee Simple | | |
| **Seller:** | Roberta B. Holt | | |
| **Buyer:** | Carl P. King Real Estate, LLC | | |
| **Terms:** | Cash to Seller - Exact terms not available | | |
| **3 Year Sales History:** | None Per Assessment Records | | |

## Land Information

| | | | |
|---|---|---|---|
| **Gross Land Area (Acres):** | 6.55 | **Utilities:** | Public |
| **Gross Land Area (SF):** | 285,318 | | |
| **Zoning:** | C-2 - Highway Commercial | | |
| **Verified:** | Tax Records, Tax Map, Deed, Broker, Previously Appraised by W.R. McCain and Associates, Inc. (CC9350) | | |

## Remarks

This commercially zoned property is located on the west side of Dupont Highway and the east side of East Street, within the town limits of Camden. The property was appraised by W.R. McCain and Associates, Inc. (CC9350). It went under contract in March, 2014 for $920,000. The realtor, Charlie Rodriguez of R & R Commercial Realty, reported that the property had been listed for 8 months at an asking price of $1,650,000; however, he felt the asking price was at the high end of the range. He stated the current sale price of $920,000 is closer to a more realistic market value. The realtor reported that there had been some interest in the property, but given the rather shallow depth of the property, the pool of potential buyers was somewhat limited. The buyer plans to assemble the parcel with a neighboring lot and commercially develop them or sell them in the future. Additionally, the buyer reported that DelDot confirmed that the parcel will be granted ingress/egress directly onto Route 13.

# Comparable Land Sale



| Location Information | |
| --- | --- |
| Commercial Land<br>401 Classic Drive/330 Auto Park Drive<br>Middletown, DE 19709<br>New Castle County<br>23-040.00-003, 23-042.00-003 & P/O 23-040.00-001 | |

| Sale Information | | | |
| --- | --- | --- | --- |
| Sale Price: | $11,592,250 | Price Per Acre: | $156,420 |
| Sale Status: | Closed | Price Per SF: | $3.59 |
| Date: | January 2012 | | |
| Recorded: | 201202100007850/201202100007851 | | |
| Rights Conveyed: | Fee Simple | | |
| Seller: | Mautom LLC & Cochran | | |
| Buyer: | Duke Realty LP | | |
| Terms: | Conventional | | |
| 3 Year Sales History: | Needs verification | | |

| Land Information | | | |
| --- | --- | --- | --- |
| Gross Land Area (Acres): | 74.11 | Utilities: | Public |
| Gross Land Area (SF): | 3,228,232 | | |
| Zoning: | C-3 and MI - Employment/Regional Retail & Manufacturing Industrial | | |
| Verified: | 3rd Party Appraiser, Tax Records, Tax Maps, Rick Watts | | |

| Remarks |
| --- |
| This sale involves two sellers. Mautom LLC is selling a 7.669 acre C-3 zoned parcel, plus a 51.291 acre MI zoned parcel for $8,842,250, or $149,970 per acre. The blended price originally reflected $175,000/acre absolute net to seller for the C-3 land (buyer pays all closing costs and any transportation recoupment fees), and $7,500,000 for the industrial tract ($146,224/acre). The Cochran family sold a 15.148 acre MI zoned parcel, that adjoins these lands to the south, to be subdivided from their farm/homestead, for $2,750,000 or $181,542/acre. This may be adjusted to reflect a price of $175,000 per acre as the original contract was for 16 +- acres. The buyer will be able to increase the acreage slightly as they will obtain 1.851 acres from an abandonment of a Classic Drive right of way, which is no longer needed, and .167 acres from an abandonment of a small corner of what used to be Merrimac Drive on the south side. They will construct a new distribution center for Amazon.com with 1,015,740 sf, plus a 237,600 sf office mezzanine. |

# Comparable Land Sale



## Location Information

Mircotel Inn
22297 Dupont Boulevard (Route 113)
Georgetown, DE 19947
Sussex County
135-19-63.01

## Sale Information

| | | | |
|---|---|---|---|
| **Sale Price:** | $552,000 | **Price Per Acre:** | $184,000 |
| **Sale Status:** | Closed | **Price Per SF:** | $4.22 |
| **Date:** | December 2013 | | |
| **Recorded:** | 4215 / 7 | | |
| **Rights Conveyed:** | Fee Simple | | |
| **Seller:** | Route 113 Associates, LLC | | |
| **Buyer:** | Beacon Hospitality II, LLC | | |
| **Terms:** | Conventional | | |
| **3 Year Sales History:** | None per assesment records. | | |

## Land Information

| | | | |
|---|---|---|---|
| **Gross Land Area (Acres):** | 3.00 | **Utilities:** | Public |
| **Gross Land Area (SF):** | 130,680 | | |
| **Zoning:** | HC - Highway Commercial District | | |
| **Verified:** | Tax Records, Deed | | |

## Remarks

This property is situated on Route 113, just within the corporate limits of the Town of Georgetown. Proposed site of Microtel Inn by Wyndham.

# Comparable Land Sale



## Location Information

Commercial Land
9758 S. Dupont Highway
Felton, DE 19943
Kent County
SM-00-12901-01-6000

## Sale Information

| | | | |
|---|---|---|---|
| **Sale Price:** | $975,000 | **Price Per Acre:** | $118,902 |
| **Sale Status:** | Active | **Price Per SF:** | $2.73 |
| **Date:** | Active Listing | | |
| **Recorded:** | TBD | | |
| **Rights Conveyed:** | Fee Simple | | |
| **Seller:** | Kenneth Ralph Steele | | |
| **Buyer:** | Active Listing | | |
| **Terms:** | TBD | | |
| **3 Year Sales History:** | None within 3 years | | |

## Land Information

| | | | |
|---|---|---|---|
| **Gross Land Area (Acres):** | 8.20 | **Utilities:** | Public |
| **Gross Land Area (SF):** | 357,192 | | |
| **Zoning:** | BG - General Business | | |
| **Verified:** | Tax Records, Kent County Mapping System, Deed, MLS#6102406 | | |

## Remarks

This property had once been home to the Diamond State Drive-In, originally opened in 1949. It operated as a drive-in movie theater until 1986. In 1995, the drive-in was refurbished and re-opened, only to close for good in 2008. The parcel was originally listed for sale in August of 2012 for $1,500,000; the price was reduced to $975,000 in June of 2014. It has a somewhat irregular shape, but ample road frontage.

## ARTICLE IV
## ZONING DISTRICTS

### Part I  Zoning Districts Established

### Section 225-26. Districts Established.

In order to fulfill the purpose of this Chapter, the unincorporated areas of Wicomico County shall be divided into the following base zoning districts:

A.    Resource Conservation Districts

    (1)    "A-1" Agriculture-Rural; and
    (2)    "V-C" Village Conservation.

B.    Residential Districts

    (1)    "R-8" Residential;
    (2)    "R-15" Residential;
    (3)    "R-20" Residential;
    (4)    "R-30" Residential;
    (5)    "REC" Residential; and
    (6)    "TT" Town Transition.

C.    Commercial Districts

    (1)    "C-1" Select Commercial;
    (2)    "C-2" General Commercial; and
    (3)    "C-3" Regional Commercial.

D.    Institutional, Business and Industrial Districts

    (1)    "LB-1" Light Business and Institutional;
    (2)    "LB-2" Light Business and Residential;
    (3)    "AB" Airport Business;
    (4)    "I-1" Light Industrial; and
    (5)    "I-2" Heavy Industrial.

### Part II Resource Conservation Districts

### Section 225-27.  A-1 Agriculture-Rural District.

A.    Purpose.  The purpose of the A-1 Agriculture-Rural District is to preserve areas of the County that are predominantly agricultural and to maintain the land base necessary for sustainable agricultural activity.

    (1)    This district is designed to protect agriculture from incompatible residential, commercial and industrial development.
    (2)    Where low-intensity residential development is allowed in the Agriculture-Rural District, density and design standards shall ensure natural resource protection and preservation of rural character.

(3)     This district shall be characterized by a mix of agricultural activities, farms and farmland, forests, open spaces and low intensity residential development or small cluster developments with significant associated open spaces.

B.     Permitted Uses.

The permitted uses shall be those specified in the Table of Permitted Uses, Section 225-67.

C.     Development Options.   An A-1 Cluster Development is available by approval of a Development Plan.

D.     General Requirements

(1)     Accessory buildings and structures shall be provided for all uses in accordance with the requirements of Section 225-59 and the general requirements of Article VI.
(2)     Bulk regulations, including lot area, setback requirements, and height limitations, shall be provided for all uses in accordance general requirements of Article VII.
(3)     Lighting shall be provided for all uses in accordance with the requirements of section 225-73.
(4)     Signage shall be provided for all uses in accordance with the general requirements of Article IX.
(5)     Parking shall be provided for all uses in accordance with the general requirements of Article X.
(6)     Landscaping shall be provided for all uses in accordance with the general requirements of Article XI.

## Section 225-28.  V-C Village Conservation District.

A.     Purpose.   The purpose of the V-C Village Conservation District is to protect the character of the County's historic and traditional unincorporated village centers and facilitate continued investment in infill and connecting residential, institutional and compatible business revitalization and development.

(1)     The district recognizes that the preservation of property values and vitality within the villages requires the ability to develop additional parcels of land along village streets and edges.
(2)     V-C Village Conservation district standards permit low-density residential development, and neighborhood commercial uses, and include incentives for innovative, mixed-use development compatible with the character and scale of the village centers.

B.     Permitted Uses.

The permitted uses shall be those specified in the Table of Permitted Uses, Section 225-67.

C.     Development Options.

A Planned Village Conservation Development (PVCD) option is available by special

768

LIBER 1400 FOLIO 768

THIS DEED, Made this 30TH day of
Juey          , in the year Nineteen Hundred and Ninety-
Four, by **FIVE STAR FARMS, INC., a body corporate of the
State of Maryland,** hereinafter referred to as "Grantor",
witnesseth:

THAT FOR AND IN CONSIDERATION of the sum of TEN
DOLLARS ($10.00) and other good, valuable and sufficient
considerations in hand paid, receipt of which is hereby
acknowledged, the said Grantor does hereby grant and
convey unto **MACHINING TECHNOLOGIES, INC.,** hereinafter
referred to as "Grantee",its successors and assigns, all
the following described property:

ALL that lot, tract or parcel of land situate,
lying and being in Hebron Election District, of Wicomico
County and State of Maryland, and on the Northeasterly
side of and binding upon U.S. Route 50 leading from
Salisbury to Cambridge and more particularly described as
follows:  Beginning for the same at a point on the
Northeasterly right of way line of U.S. Route 50, said
point of beginning being at Maryland State Roads
Commission Station 146+25 as shown and designated on plat
entitled "Five Star Farms" made by P.J. Hannon
Associates, dated June 3, 1969 and recorded among the
Land Records of Wicomico County, Maryland in Liber
J.W.T.S. No. 678, Folio 85, said point of beginning being
also designated by the letter "A" as shown on said plat,
(1) thence by and with the Northeasterly right of way
line of U.S. Route 50 aforesaid, South 24 degrees 28
minutes 55 seconds East 394 feet, (2) thence North 65
degrees 31 minutes 5 seconds East 200 feet, (3) thence
South 24 degrees 28 minutes 55 seconds East 325 feet,
(4) thence North 35 degrees 27 minutes 5 seconds
East 703.40 feet to the center line of Rewastico Creek, (5)

LAW OFFICES
LONG, HUGHES & BADGER
124 EAST MAIN STREET
P.O. BOX 359
SALISBURY, MARYLAND
21803-0259
(410) 749-2356
FAX (410) 749-8731

WICOMICO COUNTY CIRCUIT COURT (Land Records) MSB 1400, p. 0768, MSA_CE100_1374, Date available 12/15/2004, Printed 08/24/2015.

WICOMICO COUNTY CIRCUIT COURT (Land Records) MSB 1400, p. 0769, MSA_CE100_1374. Date available 12/15/2004. Printed 08/24/2015.

LIBER 1400 FOLIO 769

thence by and with the center line of said Rewastico Creek the following four courses: (a) North 78 degrees 6 minutes 55 seconds West 552.14 feet, (b) North 81 degrees 50 minutes 55 seconds West 48.80 feet, (c) South 83 degrees 13 minutes 5 seconds West 108.21 feet, (d) South 65 degrees 31 minutes 5 seconds West 208 feet to a point on the Northeasterly right of way line of said U.S. Route 50, (6) thence South 24 degrees 28 minutes 55 seconds East a distance of 20 feet, (7) thence South 65 degrees 31 minutes 5 seconds West a distance of 12 feet to the place of beginning, containing 7.4 acres, more or less, and being more particularly shown and designated on the aforesaid plat; AND BEING all and the same land conveyed unto Five Star Farms, Inc. by H. Milton Hearne and Ida B. Hearne, his wife, by Deed dated June 13, 1969 and recorded among the aforesaid Land Records in Liber J.W.T.S. No. 696, Folio 103.

REFERENCE to said deeds, plat and to preceding deeds of the property hereby conveyed, and to the references contained therein, is hereby made a part hereof as if herein fully set forth.

TOGETHER with the improvements thereon and all the rights, ways, roads, privileges, appurtenances and advantages thereto belonging or in any wise appertaining and together with an easement over a road 20 feet in width, extending the entire length of the fourth course above described, said easement area to be used for the purpose of backing and turning motor vehicles, it being the Grantors intention that no easement or right of way is intended to be granted over that portion of said 20 foot road way other than the portion that is immediately adjacent to the fourth course above referred to.

TO HAVE AND TO HOLD the above granted property unto the said Grantee, its successors and assigns, forever in fee simple, SUBJECT to the easement more particularly shown on

LAW OFFICES
LONG, HUCKEE & BADGER
124 EAST MAIN STREET
P.O. BOX 259
SALISBURY, MARYLAND
21803-0259
(410) 749-2356
FAX (410) 749-9731

770

LIBER 1400 FOLIO 770

State Road Commission of Maryland Plat No. 8282, recorded in
State Road Commission Plat Book No. 1, Folio 195.

AND the said Grantor does hereby covenant that it
will warrant specially the property hereby conveyed and that
it will execute such other and further assurances of the land
as may be requisite and necessary.

AS WITNESS my hand and seal the day and year first
above written.

ATTEST:                          FIVE STAR FARMS, INC.

_William T. Guy_              BY _John A. Hochmuth_ (SEAL)

LAW OFFICES
LONG, HUGHES & BADGER
124 EAST MAIN STREET
P.O. BOX 259
SALISBURY, MARYLAND
21803-0259
(410) 749-2356
FAX (410) 749-8731

WICOMICO COUNTY CIRCUIT COURT (Land Records) WSB 1400, p. 0770, MSA_CE100_1374. Date available 12/15/2004. Printed 08/24/2015.

771

LIBER I 4 0 0 FOLIO 7 7 I

STATE OF MARYLAND, COUNTY OF WICOMICO:

I HEREBY CERTIFY, that on this _20th_ day of

_July_____, 1994, before me, the undersigned officer,

personally appeared _John A Hochmuth_           , who

acknowledged himself to be the _____ President of the Grantor

Corporation, and that he as such _____ President, being

authorized to do so, executed the foregoing instrument for the

purposes therein contained, by signing, in my presence, the

name of the said corporation by himself as _____ President,

and certified that this conveyance is not part of a

transaction in which there is a sale, lease, exchange or other

transfer of all or substantially all of the property and

assets of the Grantor Corporation.  He further certified that

the consideration paid for this property is in the amount of

$ _195,000.00_ .

AS WITNESS my hand and seal, the day and year first above

written.

My commission expires:
November 1, 1996 _Jan. 1, 1996_
JEB\bg 4-3410

The undersigned hereby certifies that this Deed was
prepared by or under the supervision of an attorney admitted
to practice before the Court of Appeals of Maryland.

_LH+B_
                                        Attorney at Law

DATE: _7-20-94_

AGRICULTURAL TRANSFER TAX
$ _N/A_
By _DS_         _7/21/94_
         Date

RECEIVED FOR TRANSFER
State Department of
Assessments & Taxation
for Wicomico County
By _DS_         _7/21/94_
                  Date

I HEREBY CERTIFY THAT TAXES ARE PAID ON
THE PROPERTY COVERED BY THIS DEED AS
WELL AS ANY OTHER TAXES WHICH SHOULD
BE COLLECTED BEFORE TRANSFER OF SAME
PURSUANT TO SECTION 14 ARTICLE 21 OF THE
ANNOTATED CODE OF MARYLAND
C. JOSEPH SCHILLER
DIRECTOR OF FINANCE _7/21/94_

LAW OFFICES
LONG, HUGHES & BADGER
124 EAST MAIN STREET
P.O. BOX 259
SALISBURY, MARYLAND
21803-0259
(410) 749-2356
FAX (410) 749-8731

Received for Record JUL 21 1994 and recorded in the
Land Records of Wicomico County, Maryland in Liber M.S.B.
No. _1400_ Folios _768 - 771_

_Mark S. Bowen_ Clerk

_Ex & D LH+B, Atty. 8/16/94_

WICOMICO COUNTY CIRCUIT COURT (Land Records) MSB 1400, p. 0771, MSA_CE100_1374. Date available 12/15/2004. Printed 08/24/2015.

772

LIBER 1 4 0 0 FOLIO 772

# DEED OF TRUST

**THIS PURCHASE MONEY DEED OF TRUST** is made this _____20th_____ day of __July__ 19 _94_ ,
among the Grantor, __MACHINING TECHNOLOGIES, INC., a body corporate of the State of Maryland__
_____ (herein "Borrower"), __TONY BRUCE AND WILLIAM T.__
__STURGIS__ _____ (herein "Trustee"), and the Beneficiary,
__PENINSULA BANK__ _____ , a corporation organized and existing under the laws of
__MARYLAND__ , whose address is __P.O. BOX 219, PRINCESS ANNE, MD. 21853__ (herein "Lender").

BORROWER, in consideration of the indebtedness herein recited and the trust herein created, irrevocably grants and con-
veys to Trustee, in trust, with power of sale, the following described property located in the __Hebron Election District__
of __Wicomico County__ , State of Maryland:

SEE SCHEDULE A-PROPERTY DESCRIPTION ATTACHED HERETO.

A violation or breach of the covenants contained in the Construction Agreement
executed simultaneously herewith shall constitute a default under the terms of this
Deed of Trust and entitle Mortgagee to exercise all of its foreclosure rights and
privileges as contained herein.

The funds advanced herein shall be placed in escrow under the terms of the
Trust Agreement executed simultaneously herewith.

This loan is made for business purposes only and is made pursuant to Section
12-103(e) of the Commercial Law Article of the Annotated Code of Maryland.

The undersigned hereby certifies that this instrument was prepared by or under
the supervision of an attorney admitted to practice before the Court of Appeals of
Maryland.

Date: _7-20-94_                          _____
                                          Jeffrey E. Badger, Attorney at Law

which has the address of _(Street)_ Route 50 _____ , _(City)_ Hebron _____ ,
_(State and Zip Code)_ Maryland 21830 _____ (herein "Property Address");
The aforesaid property having been purchased in whole or in part with the sums secured hereby.

TOGETHER with all the improvements now or hereafter erected on the property, and all easements, rights, appurtenances,
rents (subject however to the rights and authorities given herein to Lender to collect and apply such rents), royalties, mineral,
oil and gas rights and profits, water, water rights, and water stock, and all fixtures now or hereafter attached to the property,
all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the property covered by
this Deed of Trust; and all of the foregoing, together with said property (or the leasehold estate if this Deed of Trust is on a
leasehold) are herein referred to as the "Property";

TO SECURE to Lender (a) the repayment of the indebtedness evidenced by Borrower's note dated __July 20, 1994__
_____ (herein "Note"), in the principal sum of __EIGHT HUNDRED THOUSAND__
_____($800,000.00)_____ Dollars, with interest thereon, providing for monthly installments
of principal and interest, with the balance of the indebtedness, if not sooner paid, due and payable on __July 20, 1997__
_____; the payment of all other sums, with interest thereon, advanced
in accordance herewith to protect the security of this Deed of Trust; and the performance of the covenants and agreements of
Borrower herein contained; and (b) the repayment of any future advances, with interest thereon, made to Borrower by Lender
pursuant to paragraph 21 hereof (herein "Future Advances").

Borrower covenants that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the
Property, that the Property is unencumbered, and that Borrower will warrant and defend specially the title to the Property
against all claims and demands, subject to any declarations, easements or restrictions listed in a schedule of exceptions to
coverage in any title insurance policy insuring Lender's interest in the Property.

**MARYLAND—1 to 4 Family—8/82—FNMA/FHLMC UNIFORM INSTRUMENT**

444353

WICOMICO COUNTY CIRCUIT COURT (Land Records) MSB 1400_p.0772, MSA_CE100_1374, Date available 12/15/2004, Printed 08/24/2015

LIBER 1400 FOLIO 73

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal and Interest.** Borrower shall promptly pay when due the principal of and interest on the indebtedness evidenced by the Note, prepayment and late charges as provided in the Note, and the principal of and interest on any Future Advances secured by this Deed of Trust.

**2. Funds for Taxes and Insurance.** Subject to applicable law or to a written waiver by Lender, Borrower shall pay to Lender on the day monthly installments of principal and interest are payable under the Note, until the Note is paid in full, a sum (herein "Funds") equal to one-twelfth of the yearly taxes and assessments which may attain priority over this Deed of Trust, and ground rents on the Property, if any, plus one-twelfth of yearly premium installments for hazard insurance, plus one-twelfth of yearly premium installments for mortgage insurance, if any, all as reasonably estimated initially and from time to time by Lender on the basis of assessments and bills and reasonable estimates thereof.

The Funds shall be held in an institution the deposits or accounts of which are insured or guaranteed by a Federal or state agency (including Lender if Lender is such an institution). Lender shall apply the Funds to pay said taxes, assessments, insurance premiums and ground rents. Lender may not charge for so holding and applying the Funds, analyzing said account or verifying and compiling said assessments and bills, unless Lender pays Borrower interest on the Funds and applicable law permits Lender to make such a charge. Borrower and Lender may agree in writing at the time of execution of this Deed of Trust that interest on the Funds shall be paid to Borrower, and unless such agreement is made or applicable law requires such interest to be paid, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds showing credits and debits to the Funds and the purpose for which each debit to the Funds was made. The Funds are pledged as additional security for the sums secured by this Deed of Trust.

If the amount of the Funds held by Lender, together with the future monthly installments of Funds payable prior to the due dates of taxes, assessments, insurance premiums and ground rents, shall exceed the amount required to pay said taxes, assessments, insurance premiums and ground rents as they fall due, such excess shall be, at Borrower's option, either promptly repaid to Borrower or credited to Borrower on monthly installments of Funds. If the amount of the Funds held by Lender shall not be sufficient to pay taxes, assessments, insurance premiums and ground rents as they fall due, Borrower shall pay to Lender any amount necessary to make up the deficiency within 30 days from the date notice is mailed by Lender to Borrower requesting payment thereof.

Upon payment in full of all sums secured by this Deed of Trust, Lender shall promptly refund to Borrower any Funds held by Lender. If under paragraph 18 hereof the Property is sold or the Property is otherwise acquired by Lender, Lender shall apply, no later than immediately prior to the sale of the Property or its acquisition by Lender, any Funds held by Lender at the time of application as a credit against the sums secured by this Deed of Trust.

**3. Application of Payments.** Unless applicable law provides otherwise, all payments received by Lender under the Note and paragraphs 1 and 2 hereof shall be applied by Lender first in payment of amounts payable to Lender by Borrower under paragraph 2 hereof, then to interest payable on the Note, then to the principal of the Note, and then to interest and principal on any Future Advances.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments and other charges, fines and impositions attributable to the Property which may attain a priority over this Deed of Trust, and leasehold payments or ground rents, if any, in the manner provided under paragraph 2 hereof or, if not paid in such a manner, by Borrower making payment, when due, directly to the payee thereof. Borrower shall promptly furnish to Lender all notices of amounts due under this paragraph, and in the event Borrower shall make payment directly, Borrower shall promptly furnish to Lender receipts evidencing such payments. Borrower shall promptly discharge any lien which has priority over this Deed of Trust; provided, that Borrower shall not be required to discharge any such lien so long as Borrower shall agree in writing to the payment of the obligation secured by such lien in a manner acceptable to Lender, or shall in good faith contest such lien by, or defend enforcement of such lien in, legal proceedings which operate to prevent the enforcement of the line or forfeiture of the Property or any part thereof.

**5. Hazard Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage", and such other hazards as Lender may require and in such amounts and for such periods as Lender may require; provided, that Lender shall not require that the amount of such coverage exceed that amount of coverage required to pay the sums secured by this Deed of Trust.

The insurance carrier providing the insurance shall be chosen by Borrower subject to approval by Lender; provided, that such approval shall not be unreasonably withheld. All premiums on insurance policies shall be paid in the manner provided under paragraph 2 hereof or, if not paid in such manner, by Borrower making payment, when due, directly to the insurance carrier.

All insurance policies and renewals thereof shall be in form acceptable to Lender and shall include a standard mortgage clause in favor of and in form acceptable to Lender. Lender shall have the right to hold the policies and renewals thereof, and Borrower shall promptly furnish to Lender all renewal notices and all receipts of paid premiums. In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower.

Unless Lender and Borrower otherwise agree in writing, insurance proceeds shall be applied to restoration or repair of the Property damaged, provided such restoration or repair is economically feasible and the security of this Deed of Trust is not thereby impaired. If such restoration or repair is not economically feasible or if the security of this Deed of Trust would be impaired, the insurance proceeds shall be applied to the sums secured by this Deed of Trust, with the excess, if any, paid to Borrower. If the Property is abandoned by Borrower, or if Borrower fails to respond to Lender within 30 days from the date notice is mailed by Lender to Borrower that the insurance carrier offers to settle a claim for insurance benefits, Lender is authorized to collect and apply the insurance proceeds at Lender's option either to restoration or repair of the Property or to the sums secured by this Deed of Trust.

Unless Lender and Borrower otherwise agree in writing, any such application of proceeds to principal shall not extend or postpone the due date of the monthly installments referred to in paragraphs 1 and 2 hereof or change the amount of such installments. If under paragraph 18 hereof the Property is acquired by Lender, all right, title and interest of Borrower in and to any insurance policies and in and to the proceeds thereof resulting from damage to the Property prior to the sale or acquisition shall pass to Lender to the extent of the sums secured by this Deed of Trust immediately prior to such sale or acquisition.

**6. Preservation and Maintenance of Property; Leaseholds; Condominiums; Planned Unit Developments.** Borrower shall keep the Property in good repair and shall not commit waste or permit impairment or deterioration of the Property and shall comply with the provisions of any lease if this Deed of Trust is on a leasehold. If this Deed of Trust is on a unit in a condominium or a planned unit development, Borrower shall perform all of Borrower's obligations under the declaration or covenants creating or governing the condominium or planned unit development, the by-laws and regulations of the condominium or planned unit development, and constituent documents. If a condominium or planned unit development rider is executed by Borrower and recorded together with this Deed of Trust, the covenants and agreements of such rider shall be incorporated into and shall amend and supplement the covenants of this Deed of Trust as if the rider were a part hereof.

**7. Protection of Lender's Security.** If Borrower fails to perform the covenants and agreements contained in this Deed of Trust, or if any action or proceeding is commenced which materially affects Lender's interest in the Property, including, but not limited to, eminent domain, insolvency, code enforcement, or arrangements or proceedings involving a bankrupt or decedent, then Lender at Lender's option, upon notice to Borrower, may make such appearances, disburse such sums and take such action as is necessary to protect Lender's interest, including, but not limited to, disbursement of reasonable attorney's fees and entry upon the Property to make repairs. If Lender required mortgage insurance as a condition of making the loan secured by this Deed of Trust, Borrower shall pay the premiums required to maintain such insurance in effect until such time as the requirement for such insurance terminates in accordance with Borrower's and Lender's written agreement or applicable law. Borrower shall pay the amount of all mortgage insurance premiums in the manner provided under paragraph 2 hereof.

Any amounts disbursed by Lender pursuant to this paragraph 7, with interest thereon, shall become additional indebtedness of Borrower secured by this Deed of Trust. Unless Borrower and Lender agree to other terms of payment, such amounts shall be payable upon notice from Lender to Borrower requesting payment thereof, and shall bear interest from the date of disbursement at the rate payable from time to time on outstanding principal under the Note unless payment of interest at such rate would be contrary to applicable law, in which event such amounts shall bear interest at the highest rate permissible under applicable law. Nothing contained in this paragraph 7 shall require Lender to incur any expense or take any action hereunder.

**8. Inspection.** Lender may make or cause to be made reasonable entries upon and inspections of the Property, provided that Lender shall give Borrower notice prior to any such inspection specifying reasonable cause therefor related to Lender's interest in the Property.

WICOMICO COUNTY CIRCUIT COURT (Land Records) MSB 1400, p. 0773, MSA_CE100_1374, Date available 12/15/2004, Printed 08/24/2015.

774

LIBER 1 4 0 0 FOLIO 7 74

**9. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of the Property, or part thereof, or for conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender.

In the event of a total taking of the Property, the proceeds shall be applied to the sums secured by this Deed of Trust, with the excess, if any, paid to Borrower. In the event of a partial taking of the Property, unless Borrower and Lender otherwise agree in writing, there shall be applied to the sums secured by this Deed of Trust such proportion of the proceeds as is equal to that proportion which the amount of the sums secured by this Deed of Trust immediately prior to the date of taking bears to the fair market value of the Property immediately prior to the date of taking, with the balance of the proceeds paid to Borrower.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the condemnor offers to make an award or settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date such notice is mailed, Lender is authorized to collect and apply the proceeds, at Lender's option, either to restoration or repair of the Property or to the sums secured by this Deed of Trust.

Unless Lender and Borrower otherwise agree in writing, any such application of proceeds to principal shall not extend or postpone the due date of the monthly installments referred to in paragraphs 1 and 2 hereof or change the amount of such installments.

**10. Borrower Not Released.** Extension of the time for payment or modification of amortization of the sums secured by this Deed of Trust granted by Lender to any successor in interest of Borrower shall not operate to release, in any manner, the liability of the original Borrower and Borrower's successors in interest. Lender shall not be required to commence proceedings against such successor or refuse to extend time for payment or otherwise modify amortization of the sums secured by this Deed of Trust by any reason of any demand made by the original Borrower and Borrower's successors in interest.

**11. Forbearance by Lender Not a Waiver.** Any forbearance by Lender in exercising any right or remedy hereunder, or otherwise afforded by applicable law, shall not be a waiver of or preclude the exercise of any such right or remedy. The procurement of insurance or the payment of taxes or other liens or charges by Lender shall not be a waiver of Lender's right to accelerate the maturity of the indebtedness secured by this Deed of Trust.

**12. Remedies Cumulative.** All remedies provided in this Deed of Trust are distinct and cumulative to any other right or remedy under this Deed of Trust or afforded by law or equity, and may be exercised concurrently, independently or successively.

**13. Successors and Assigns Bound; Joint and Several Liability; Captions.** The covenants and agreements herein contained shall bind, and the rights hereunder shall inure to, the respective successors and assigns of Lender and Borrower, subject to the provisions of paragraph 17 hereof. All covenants and agreements of Borrower shall be joint and several. The captions and headings of the paragraphs of this Deed of Trust are for convenience only and are not to be used to interpret or define the provisions hereof.

**14. Notice.** Except for any notice required under applicable law to be given in another manner, (a) any notice to Borrower provided for in this Deed of Trust shall be given by mailing such notice by certified mail addressed to Borrower at the Property Address or at such other address as Borrower may designate by notice to Lender as provided herein, and (b) any notice to Lender shall be given by certified mail, return receipt requested, to Lender's address stated herein or to such other address as Lender may designate by notice to Borrower as provided herein. Any notice provided for in this Deed of Trust shall be deemed to have been given to Borrower or Lender when given in the manner designated herein.

**15. Uniform Deed of Trust; Governing Law; Severability.** This form of deed of trust combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property. This Deed of Trust shall be governed by the law of the jurisdiction in which the Property is located. In the event that any provision or clause of this Deed of Trust or the Note conflicts with applicable law, such conflict shall not affect other provisions of this Deed of Trust or the Note which can be given effect without the conflicting provision, and to this end the provisions of this Deed of Trust and the Note are declared to be severable.

**16. Borrower's Copy.** Borrower shall be furnished a conformed copy of the Note and of this Deed of Trust at the time of execution or after recordation hereof.

**17. Transfer of the Property; Assumption.** If all or any part of the Property or an interest therein is sold or transferred by Borrower without Lender's prior written consent, excluding (a) the creation of a lien or encumbrance subordinate to this Deed of Trust, (b) the creation of a purchase money security interest for household appliances, (c) a transfer by devise, descent or by operation of law upon the death of a joint tenant or (d) the grant of any leasehold interest of three years or less not containing an option to purchase, Lender may, at Lender's option, declare all the sums secured by this Deed of Trust to be immediately due and payable. Lender shall have waived such option to accelerate if, prior to the sale or transfer, Lender and the person to whom the Property is to be sold or transferred reach agreement in writing that the credit of such person is satisfactory to Lender and that the interest payable on the sums secured by this Deed of Trust shall be at such rate as Lender shall request. If Lender has waived the option to accelerate provided in this paragraph 17, and if Borrower's successor in interest has executed a written assumption agreement accepted in writing by Lender, Lender shall release Borrower from all obligations under this Deed of Trust and the Note.

If Lender exercises such option to accelerate, Lender shall mail Borrower notice of acceleration in accordance with paragraph 14 hereof. Such notice shall provide a period of not less than 30 days from the date the notice is mailed within which Borrower may pay the sums declared due. If Borrower fails to pay such sums prior to the expiration of such period, Lender may, without further notice or demand on Borrower, invoke any remedies permitted by paragraph 18 hereof.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**18. Acceleration; Remedies.** Except as provided in paragraph 17 hereof, upon Borrower's breach of any covenant or agreement of Borrower in this Deed of Trust, including the covenants to pay when due any sums secured by this Deed of Trust, Lender prior to acceleration shall mail notice to Borrower as provided in paragraph 14 hereof specifying: (1) the breach; (2) the action required to cure such breach; (3) a date, not less than 30 days from the date the notice is mailed to Borrower, by which such breach must be cured; and (4) that failure to cure such breach on or before the date specified in the notice may result in acceleration of the sums secured by this Deed of Trust and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and sale. If the breach is not cured on or before the date specified in the notice, Lender at Lender's option may declare all of the sums secured by this Deed of Trust to be immediately due and payable without further demand and may invoke the power of sale and any other remedies permitted by applicable law. Lender shall be entitled to collect all reasonable costs and expenses incurred in pursuing the remedies provided in this paragraph 18, including, but not limited to, reasonable attorney's fees.

If Lender invokes the power of sale, Lender shall mail or cause Trustee to mail written notice of sale to Borrower in the manner prescribed by applicable law. Trustee shall give notice of sale by public advertisement for the time and in the manner prescribed by applicable law. Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in such order as Trustee may determine. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender, or Lender's designee, may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property so sold without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all costs and expenses of the sale, including, but not limited to, Trustee's fees of 5 % of the gross sale price, reasonable attorney's fees and costs of title evidence; (b) to all sums secured by this Deed of Trust; and (c) the excess, if any, to the person or persons legally entitled thereto.

**19. Borrower's Right to Reinstate.** Notwithstanding Lender's acceleration of the sums secured by this Deed of Trust, Borrower shall have the right to have any proceedings begun by Lender to enforce this Deed of Trust discontinued at any time prior to the earlier to occur of (i) the fifth day before sale of the Property pursuant to the power of sale contained in this Deed of Trust or (ii) entry of a judgment enforcing this Deed of Trust if: (a) Borrower pays Lender all sums which would be then due under this Deed of Trust, the Note and notes securing Future Advances, if any, had no acceleration occurred; (b) Borrower cures all breaches of any other covenants or agreements of Borrower contained in this Deed of Trust; (c) Borrower pays all reasonable expenses incurred by Lender and Trustee in enforcing the covenants and agreements of Borrower contained in this Deed of Trust and in enforcing Lender's and Trustee's remedies as provided in paragraph 18 hereof, including, but not limited to, reasonable attorney's fees; and (d) Borrower takes such action as Lender may reasonably require to assure that the lien of this Deed of Trust, Lender's interest in the Property and Borrower's obligation to pay the sums secured by this Deed of Trust shall continue unimpaired. Upon such payment and cure by Borrower, this Deed of Trust and the obligations secured hereby shall remain in full force and effect as if no acceleration had occurred.

LIBER 1400 FOLIO 775

**20. Assignment of Rents; Appointment of Receiver.** As additional security hereunder, Borrower hereby assigns to Lender the rents of the Property, provided that Borrower shall, prior to acceleration under paragraph 18 hereof or abandonment of the Property, have the right to collect and retain such rents as they become due and payable.

Upon acceleration under paragraph 18 hereof or abandonment of the Property, Lender shall be entitled to have a receiver appointed by a court to enter upon, take possession of and manage the Property and to collect the rents of the Property, including those past due. All rents collected by the receiver shall be applied first to payment of the costs of management of the Property and collection of rents, including, but not limited to, receiver's fees, premiums on receiver's bonds and reasonable attorney's fees, and then to the sums secured by this Deed of Trust. The receiver shall be liable to account only for those rents actually received.

**21. Future Advances.** Upon request of Borrower, Lender, at Lender's option prior to release of this Deed of Trust, may make Future Advances to Borrower. Such Future Advances, with interest thereon, shall be secured by this Deed of Trust when evidenced by promissory notes stating that said notes are secured hereby. At no time shall the principal amount of the indebtedness secured by this Deed of Trust, not including sums advanced in accordance herewith to protect the security of this Deed of Trust, exceed the original amount of the Note.

**22. Release.** Upon payment of all sums secured by this Deed of Trust, Lender or Trustee shall release this Deed of Trust without charge to Borrower. Borrower shall pay all costs of recordation, if any.

**23. Substitute Trustee.** Lender at Lender's option may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder by an instrument recorded in the city or county in which this Deed of Trust is recorded. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon the Trustee herein and by applicable law.

IN WITNESS WHEREOF, Borrower has executed this Deed of Trust.

MACHINING TECHNOLOGIES, INC.

BY _____ (Seal)
       Rafael Correa            —BORROWER

_____ (Seal)
                              —BORROWER

STATE OF MARYLAND,  WICOMICO  County ss:

I Hereby Certify, That on this ___20th___ day of ___July___ 19 94, before me, the subscriber, a Notary Public of the State of Maryland, in and for the ___ County aforesaid personally appeared ___Rafael Correa, President of Machining Technologies, Inc.___ known to me or satisfactorily proven to be the person(s) whose name(s) ___is___ subscribed to the within instrument and acknowledge that . . he . . executed the same for the purposes therein contained.

AS WITNESS: my hand and notarial seal.

My Commission expires:           _Beverly A Gordy_
11/1/96                            NOTARY PUBLIC

STATE OF ___MARYLAND, WICOMICO___ County ss:

I Hereby Certify, That on this ___20th___ day of ___July___ 19___, before me, the subscriber, a Notary Public of the State of ___Maryland___ and for the ___ County aforesaid _____, personally appeared ___Jeffrey E. Badger___ , the agent of the party secured by the foregoing Deed of Trust, and made oath in due form of law that the consideration recited in said Deed of Trust is true and bona fide as therein set forth and that the actual sum of money advanced at the closing transaction by the secured party was disbursed by the party or parties secured to the Borrower or to the person responsible for the disbursement of funds in the closing transaction or their respective agent at a time no later than the execution and delivery by the Borrower of this Deed of Trust; and also made oath that he is the agent of the party or parties secured and is duly authorized to make this affidavit.

AS WITNESS: my hand and notarial seal.

My commission expires: 11/1/96           _Beverly A Gordy_
                                           NOTARY PUBLIC

## DEED OF TRUST

FROM

MACHINING TECHNOLOGIES, INC.

TO

TONY BRUCE

WILLIAM T. STURGIS    TRUSTEES

Received for Record _____ 19__
at _____ o'clock, _____ M. Same day recorded
in Liber _____ No. _____ Folio _____
etc., one of the Land Records of
and examined per _____

_____ Clerk

Cost of Record, $ _____

RECORDING OFFICER: PLEASE RETURN TO
LONG, HUGHES & BADGER
124 EAST MAIN STREET
SALISBURY, MD 21801

JEB/bg 4-3410

WICOMICO COUNTY CIRCUIT COURT (Land Records) MSB 1400, p. 0775, MSA_CE100_1374. Date available 12/15/2004. Printed 08/24/2015.

WICOMICO COUNTY CIRCUIT COURT (Land Records) MSB-1400, p.0776; MSA_CE108_1374; Date available 12/15/2004. Printed 08/24/2015.

SCHEDULE A – PROPERTY DESCRIPTION

LIBER 1 4 0 0 FOLIO 7 7 6

ALL that lot, tract or parcel of land situate, lying and being in Hebron Election District, of Wicomico County and State of Maryland, and on the Northeasterly side of and binding upon U.S. Route 50 leading from Salisbury to Cambridge and more particularly described as follows: Beginning for the same at a point on the Northeasterly right of way line of U.S. Route 50, said point of beginning being at Maryland State Roads Commission Station 146+25 as shown and designated on plat entitled "Five Star Farms" made by P.J. Hannon Associates, dated June 3, 1969 and recorded among the Land Records of Wicomico County, Maryland in Liber J.W.T.S. No. 678, Folio 85, said point of beginning being also designated by the letter "A" as shown on said plat, (1) thence by and with the Northeasterly right of way line of U.S. Route 50 aforesaid, South 24 degrees 28 minutes 55 seconds East 394 feet, (2) thence North 65 degrees 31 minutes 5 seconds East 200 feet, (3) thence South 24 degrees 28 minutes 55 seconds East 325 feet, (4) thence North 35 degrees 27 minutes 5 seconds East 703.40 feet to the center line of Rewastico Creek, (5) thence by and with the center line of said Rewastico Creek the following four courses: (a) North 78 degrees 6 minutes 55 seconds West 552.14 feet, (b) North 81 degrees 50 minutes 55 seconds West 48.80 feet, (c) South 83 degrees 13 minutes 5 seconds West 108.21 feet, (d) South 65 degrees 31 minutes 5 seconds West 208 feet to a point on the Northeasterly right of way line of said U.S. Route 50, (6) thence South 24 degrees 28 minutes 55 seconds East a distance of 20 feet, (7) thence South 65 degrees 31 minutes 5 seconds West a distance of 12 feet to the place of beginning, containing 7.4 acres, more or less, and being more particularly shown and designated on the aforesaid plat; AND BEING all and the same land conveyed unto Machining Technologies, Inc. by Five Star Farms, Inc. by Deed of even date herewith and intended to be recorded prior hereto.

FOR MODIFICATION & EXTENSION AGREEMENT SEE LIBER M.S.B. NO. 1551, FOLIO 406.

FOR CONTINUANCE SEE LIBER _1609_, FOLIO _865_.

Received for Record JUL 21 1994 and recorded in the
Land Records of Wicomico County, Maryland in Liber M.S.B
No. _1400_ Folios _770-776_

Mark S. Bowen Clerk

Ex # D L H # B, Attys 8/16/94

## PURCHASE OPTION AGREEMENT

THIS PURCHASE OPTION AGREEMENT (the "Agreement") dated 8/28/2015, 2015, is given by MACHINING TECHNOLOGIES, INC., whose address is 510 Naylor Mill Road, Salisbury, Maryland 21801 ("Seller") to SOVEREIGN GAMING & ENTERTAINMENT, LLC, a limited liability company formed under the laws of the state of Florida, whose address is 525 South Flagler Drive, West Palm Beach, Florida 33401 ("Buyer").

WHEREAS, the Seller is the owner of the real property together with the improvements thereon located in Wicomico County, Maryland, which is more particularly described on Exhibit A attached as a part of this Agreement (the "Property").

WHEREAS, Seller and Buyer had entered into an Improved Commercial Sales Contract dated on or about June 11, 2015, under which Buyer did not proceed to settlement in accordance with the terms of such contract; and

WHEREAS, the parties have now agreed to enter into this Agreement;

NOW THEREFORE, the parties agree as follows:

1.   *Grant of Option.* The Seller offers to sell and convey to the Buyer and hereby grants to the Buyer the exclusive and irrevocable option to purchase the Property, together with the improvements thereon, and all the rights, ways, privileges, and appurtenances belonging or in anywise appertaining thereto, more particularly described on Exhibit A, subject to the terms and conditions set forth below and in the contract of sale which is attached as a part of this Agreement and is designated as Exhibit B (the "Contract of Sale").

2.   *Purchase-Price for Option; Operating Expenses.*

   a.     Buyer shall pay Seller for this option to purchase the sum of Two Hundred and Ninety Thousand Dollars ($290,000.00) (a portion of which shall be applied as a reduction in the purchase price as provided in section 2 of Exhibit B attached hereto), which shall be payable as follows:

| | |
|---|---|
| Upon execution of this option: | $100,000.00 |
| On or before September 1, 2015: | $ 15,000.00 |
| On or before October 1, 2015: | $ 15,000.00 |
| On or before November 1, 2015: | $115,000.00 |
| On or before December 1, 2015: | $ 15,000.00 |
| On or before January 1, 2016: | $ 15,000.00 |
| On or before February 1, 2016: | $ 15,000.00 |

   b.     In addition to the amounts payable in Section 2.a above, Buyer shall also pay the estimated operating costs of the Seller for its insurance, property taxes, electric, and grass cutting and snow removal, less offset for the rent paid under the Sharpgas, Inc. lease. Buyer shall pay,

concurrently with each payment provided for in Section 2.a beginning on and after September 1, 2015, the sum of Two Thousand Three Hundred Eighty Three Dollars ($2,383.00) per payment (for a total of $14,298.00 through February 28, 2015). In the event that Buyer exercises this option, then the parties will adjust the amounts paid hereunder to the actual operating expenses incurred (less the Sharpgas, Inc. rent), between the date of this Agreement and settlement, with any annual or monthly expenses or rent being prorated for that period.

      c.    If any payment provided for hereunder is not made within five days after it is due, then, at the option of Seller, this option may be terminated upon written notice to Buyer and Buyer's failure to cure such nonpayment within five days after such notice is given.

      d.    Any payment made pursuant to this option is non-refundable.

    3.    *Time for Exercise.* The Buyer's option to purchase the Property must be exercised by the Buyer on or before February 28, 2016. If the option to purchase is not exercised on or before that date, then the option granted herein shall automatically cease and terminate and Buyer shall have no further rights hereunder, at law or in equity.

    4.    *Manner of Exercise.* The Buyer's option to purchase shall be exercised by the timely delivery, within the time provided in Section 3 above, to the Seller at the Seller's address set forth below of two copies of the Contract of Sale duly executed by the Buyer. Provided that Buyer is not in breach of this Agreement, then promptly upon receiving the same the Seller shall execute both copies of the Contract of Sale and return one fully executed copy to the Buyer. Provided that Buyer is not in breach under this Agreement, the failure of the Seller to execute and return a fully executed copy of the Contract of Sale to the Buyer shall not affect its enforceability and the Contract of Sale shall be binding upon and enforceable against the Seller in the same manner as if it had been executed by the Seller and returned to the Buyer.

    5.    *Rights and Obligations of the Parties if the Option is Exercised.* In the event that Buyer exercises the option to purchase within the time and in the manner hereinbefore provided and is not in breach of this Agreement, then the parties shall proceed to settlement as set forth therein; provided however, that Buyer shall continue to make to Seller any payment due under this Purchase Option Agreement which comes due prior to the date of settlement.

    6.    *Changes in Condition of Property.* Buyer assumes the risk of all changes in the condition of the Property after the date hereof. Buyer acknowledges that Seller shall have no obligation to maintain, repair or replace the Property or any improvements thereon. The Property and any improvements will be sold "AS IS", with all faults.

    7.    *Seller's Address.* The address of the Seller is as follows: 510 Naylor Mill Road, Salisbury, Maryland 21801, Attention Gary Gaskill.

    8.    *Time of the Essence.* Time shall be of the essence of this Option Agreement and all obligations of the parties hereunder.

    9.    *Termination of Prior Contract.* The Buyer's rights, if any, under the Improved

2

Commercial Sales Contract referred to above are hereby terminated.

10.     *Access.*  A key will be provided to Seller's real estate agent John McClellan, who will provide to Buyer or his designees access to the Property upon reasonable notice.  Buyer may not perform any alterations, modifications or cause any damage to the Property without the Seller's advance written consent, and, if Seller so required as a condition of its approval then Buyer shall thereafter at its expense restore the Property to its former condition unless Buyer proceeds to settlement under the Contract of Sale; provided however, that Buyer may inspect and clean all or a portion of the Property; and further provided that Buyer may  maintain, repair, and paint all or a portion of the Property provided that the same are approved by Seller in advance in writing and Buyer may store supplies related to such maintenance, repair and painting provided they are removed within 5 days after termination or expiration of this option (after which time they will be considered abandoned and may be retained, removed or disposed of by Seller at Buyer's expense and without accounting to Buyer therefore).  Any alterations, inspections, cleaning, maintenance, repair, painting or other improvements shall be at Buyer's sole expense, be made in compliance with all laws, and, unless Seller required their removal by Buyer as a condition of its approval, shall remain with the Property with no reimbursement or compensation to Buyer if Buyer does not exercise the option hereunder and timely proceed to settlement as provided herein. Further, if Buyer does not exercise the option hereunder and timely proceed to settlement as provided herein, then Buyer shall leave the Property in all respects in at least as good a condition as it was before Buyer undertaking any such alterations, inspections, cleaning, maintenance, repair, painting or other improvements. Buyer agrees to hold Seller harmless (including any costs or expenses incurred by Seller in investigating, dealing with or defending any claim, including but not limited to attorney's fees, expert costs, and litigation costs) from any personal injury or property damage caused by Buyer or its agents employees, representatives, contractors and subcontractors while on or with respect to the Property, which indemnification shall survive settlement or any termination or expiration of this Agreement.

11.     *Use of sign.*  Buyer may utilize the existing street sign on the Property for the announcement of Buyer's intended use of the Property if, and only if, the Buyer has exercised the right to purchase the Property under this Agreement, that Buyer has made to Seller all payments due through November 1, 2015 under this Agreement; that Buyer has obtained all necessary available licenses required for the operation of its intended use of the Property, and the Buyer is not in breach of this Agreement or the Contract of Sale.

12.     *Notices.*  Except as otherwise provided herein, all notices, demands, requests, consents, approvals or other communications (for the purpose of this Section collectively called "Notices") required or permitted to be given hereunder or which are given with respect to this Agreement shall be valid only if in writing and hand delivered, sent by registered or certified United States mail, return receipt requested, postage prepaid, or delivered by Federal Express or UPS courier service, addressed as follows:

To Buyer:

                Sovereign Gaming & Entertainment, LLC
                525 S. Flagler Drive, Suite 500
                West Palm Beach, FL  33401
                Attention:  William Siskind
                E-mail:  jeffsiskind@msn.com

To Seller:      Machining Technologies, Inc.
510 Naylor Mill Road
Salisbury, Maryland
Attention: Gary Gaskill
E-mail: ggaskill@lwroi.com

or such other address as such party shall hereafter have specified by Notice given by the same means. Any Notice shall be deemed given upon delivery or refusal. E-mail transmittal of a Notice to a party at the above e-mail address is also valid, but only if receipt thereof is acknowledged by the recipient.

      IN WITNESS WHEREOF the parties have duly executed this Agreement and affixed their seals as of the date set forth above.

ATTEST/WITNESS:

_____ 8/28/15

SELLER:
MACHINING TECHNOLOGIES, INC.

By: _____ (SEAL)
    Name: _GARY GASKILL_
    Title: _V. P._

BUYER:
SOVEREIGN GAMING &
ENTERTAINMENT, LLC

By: _____ (SEAL)
    Name: _WILLIAM C. SECHNY_
    Title: _MGR/MEMBER_

4

EXHIBIT A

ALL that lot, tract or parcel of land situate, lying and being in Hebron Election District of Wicomico County and State of Maryland, and on the Northeasterly side of and binding upon U. S. Route 50 leading from Salisbury to Cambridge and more particularly described as follows: BEGINNING for the same at a point on the Northeasterly right-of-way line of U. S. Route 50, said point of beginning being at Maryland State Roads Commission Station 146+25 as shown and designated on plat entitled AFive Star Farms,@ made by P. J. Hannon Associates, dated June 3, 1969, and recorded among the Land Records of Wicomico County, Maryland, in Liber J.W.T.S. No. 678, Folio 85, said point of beginning being also designated by the letter AA@ as shown on said plat, (1) thence by and with the Northeasterly right-of-way line of U. S. Route 50 aforesaid, South 24 degrees 28 minutes 55 seconds East 394 feet, (2) thence North 65 degrees 31 minutes 5 seconds East 200 feet, (3) thence South 24 degrees 28 minutes 55 seconds East 325 feet, (4) thence North 35 degrees 27 minutes 5 seconds East 703.40 feet to the center line of Rewastico Creek, (5) thence by and with the center line of said Rewastico Creek the following four courses: (a) North 78 degrees 6 minutes 55 seconds West 552.14 feet, (b) North 81 degrees 50 minutes 55 seconds West 48.80 feet, (c) South 83 degrees 13 minutes 5 seconds West 108.21 feet, (d) South 65 degrees 31 minutes 5 seconds West 208 feet to a point on the Northeasterly right-of-way line of said U. S. Route 50, (6) thence South 24 degrees 28 minutes 55 seconds East a distance of 20 feet, (7) thence South 65 degrees 31 minutes 5 seconds West a distance of 12 feet to the place of beginning, containing 7.4 acres, more or less, and being more particularly shown and designated on the aforesaid plat.

*EXHIBIT B*

## IMPROVED COMMERCIAL SALES CONTRACT

**1. THIS AGREEMENT OF SALE,** made this ___ day of _____, 2015, by and between <u>Machining Technologies Inc.,</u> 510 Naylor Mill Road, Salisbury, Maryland 21801, hereinafter referred to as **SELLER,** <u>Sovereign     Gaming     &     Entertainment,     LLC,</u> _____ hereinafter referred to as **BUYER,**

WITNESS, that the Seller does hereby bargain and sell unto the said Buyer and latter does hereby purchase from the former, the following described property in fee simple

27120 Ocean Gateway
Hebron, MD 21830

improved by a 43,948 +/- SF building situated on 7.4 +/- acres being the same property described in a deed to Seller recorded at Liber 1400, Folio 768 in the Land Records of <u>Wicomico County Maryland</u>, a legal description of which is attached hereto as <u>**Exhibit A**</u> (the "Property").

**2. PURCHASE PRICE AND METHOD OF PAYMENT:** The purchase price shall be as follows: The sum of Nine Hundred Fifty Thousand Dollars ($950,000.00) plus interest of seven percent (7%) per annum from the date of _____, 2015, through the date of settlement hereunder; less amounts paid to Seller pursuant to Section 2.a. of that Purchase Option Agreement by and between Seller and Buyer dated August ___, 2015. The purchase price shall be paid in cash, certified funds or wire transfer at settlement.

**3.** The property conveyed hereunder is sold "AS IS", with all faults.

**4. SETTLEMENT ATTORNEY/TITLE COMPANY.** Buyer shall have the option of selecting his own Title Insurance Company or Title Attorney.

**5. SETTLEMENT DATE:** Settlement shall be made on or before <u>**30 days**</u> after Buyer's exercise of the option to purchase as set forth in the Purchase Option Agreement.

**6. BROKER:** The Seller Recognizes <u>**Sperry Van Ness – Miller Commercial Real Estate**</u> as the Broker negotiating this contact and agrees to pay said Broker a Brokerage Fee for services rendered. It is also agreed and understood the fee for services is earned upon settlement of the property at which time the settling attorney will deduct said fee from the proceeds and distribute same directly to the aforesaid Broker.

**7. RESPONSIBILITY FOR PHYSICAL CONDITION:** It is understood and agreed to by the parties hereto that neither <u>**Sperry Van Ness – Miller Commercial Real Estate**</u>, nor its agents, assume any

Initials
Seller | Buyer

responsibility for the physical condition of the property and all improvements thereon, nor any responsibility for the performance of this agreement by the parties hereto. The herein described Property is to be held at the risk of the Seller until legal title has passed or possession given.

**8. CONVEYANCING:** Buyer has already conducted a title search in connection with the Property in connection with the Improved Commercial Sales Contract dated on or about June 11, 2015, previously entered into by Buyer and Seller, and is satisfied with the title of the Property. Without limiting the generality of the foregoing, Buyer acknowledges that it is aware of the list of title exceptions attached hereto as **Exhibit B** and accepts the same, and Buyer accepts any use and occupancy restrictions of public record which are generally applicable to properties in the immediate neighborhood or the subdivision in which the Property is located, publicly recorded easements for public utilities, and other easements which may be observed by inspection of the Property. At settlement, Seller shall execute an assignment to Buyer of that certain lease agreement entered into between Seller and Sharpgas, Inc. dated October 14, 2013, in a form reasonably acceptable to Seller and Buyer. Notwithstanding the foregoing, Seller shall cause sufficient funds to be paid to The Farmers Bank of Willards at or pursuant to settlement in order to obtain release of that certain mortgage from Machining Technologies, Inc. to The Farmers Bank of Willards, dated September 7, 2010, and recorded among the Land Records of Wicomico County, Maryland, in Liber 3226, Folio 178.

Buyer expressly assumes the risk that restrictive covenants, zoning laws or other recorded documents may restrict or prohibit the use of the Property for the purpose(s) intended by Buyer.

In the event the title becomes subject to additional liens or defects in title after the execution of this contract, with Buyer unable as a result of such liens or defects to obtain title insurance through a Maryland licensed title insurer with Buyer paying not more than the standard rate as filed with the Maryland Insurance Commissioner, then Seller, at Seller's expense, shall have the option of curing any such lien or defect or, if Buyer is willing to accept title without said defect being cured, paying any special premium on behalf of Buyer to obtain title insurance on the Property to the benefit of Buyer. In the event Seller elects to cure any liens or defects in title, then this Contract shall continue to remain in full force and effect; and the date of settlement shall be extended for a period not to exceed fourteen (14) additional days. If Seller is unable or unwilling to cure such lien or title defect(s) and is unable or unwilling to obtain a policy of title insurance on the Property to the benefit of Buyer from a Maryland licensed title insurer, then Buyer shall have the option of taking such title as Seller can give, or terminating this Contract and being reimbursed by Seller for (a) cost of searching title as may have been incurred not to exceed 1/2 of 1% of the purchase price, plus (b) the amounts paid pursuant to Section 2.a. of the Purchase Option Agreement other than the initial payment upon execution of that agreement, which shall be Buyer's sole remedies. In the latter event, there shall be no further liability or obligation on either of the parties pursuant to the Purchase Option Agreement and this Contract. In no event shall Broker(s) or their agent(s) have any liability for any defect in Seller's title.

Initials
Seller | Buyer

9. INTENTIONALLY OMITTED.

10. **CASUALTY INSURANCE:** It is agreed that the Seller shall cause the Fire and Casualty Insurance Policies now in force on the above described Property to be endorsed at once so as to protect all parties hereto, as their interests may appear and continue said insurance in force during the life of this contract. As provided in section 15 below, the herein described Property is to be held at the risk of the Buyer until legal title has passed. Buyer may require additional insurance if he wishes.

11. **OTHER CONDITIONS:**

 1. Seller shall remove all personal property that is not attached to the building prior to settlement.
 2. Buyer hereby acknowledges the existing land lease to Sharpgas, Inc. for a bulk propane storage tank at the rate of $625 per month.  Seller has provided Buyer with a copy of said lease and will assign said lease at settlement.

12. **ADJUSTMENTS AND POSSESSION:** Rent, water rent, taxes, sewer and water charges and all other public charges shall be apportioned as of the date of settlement, at which time possession shall be given, unless otherwise agreed upon herein. In the event Seller fails to give possession at time of settlement, it shall become and be thereafter a tenant by sufferance of the Buyer and hereby waives all notices to quit, as provided by Maryland Law. Costs of all documentary stamps required by law, recordation tax, and transfer tax shall be split equally between the Buyer and Seller.

13. **DEED:**  Upon payment of the purchase price, a deed for the Property containing covenants of special warranty and further assurances (except in the case of transfer by personal representative of an estate), shall be executed at Buyer's expense by Seller and shall convey the Property to Buyer.

14. **CONDITION OF PROPERTY AND POSSESSION:** At settlement, Seller shall deliver possession of the Property and shall deliver the Property vacant, clear of trash and debris, and broom clean.  Buyer acknowledges that it assumes the risk of all changes in the condition of the Property until the date of settlement, and that Seller shall have no obligation to maintain, repair, or replace the Property or any improvements or other property.  THE PROPERTY IS SOLD "AS IS" WITH ALL FAULTS.

15. **RISK OF LOSS RESPONSIBILITY:**  The Property is to be held at the risk of Buyer. If, prior to the time legal title has passed or possession has been given to Buyer, all or a substantial part of the Property is destroyed or damaged by casualty, without fault of Buyer, then Buyer shall be entitled to the proceeds payable under the insurance policy maintained by Seller in connection with such loss.

Initials
Seller | Buyer

**16.  LEASES:**   Seller may neither negotiate new leases nor renew existing leases for the Property which extend beyond settlement or possession date without Buyer's written consent.

**17.  DEFAULT:**  Buyer and Seller are required and agree to make full settlement in accordance with the terms of this Contract and acknowledge that failure to do so constitutes a breach hereof. If Buyer fails to make full settlement or is in breach due to Buyer's failure to comply with the terms, covenants and conditions of this Contract, then Seller shall be entitled to pursue all legal and equitable remedies.  If Seller fails to make full settlement or is in breach due to Seller's failure to comply with the terms, covenants and conditions of this Contract, Buyer shall be entitled to pursue such rights and remedies as may be available, at law or in equity, including, without limitation, an action for specific performance of this Contract and/or monetary damages.

**18.  MEDIATION OF DISPUTES:** Mediation is a process by which the parties attempt to resolve a dispute or claim with the assistance of a neutral mediator who is authorized to facilitate the resolution of the dispute. The mediator has no authority to make an award, to impose a resolution of the dispute or claim upon the parties or to require the parties to continue mediation if the parties do not desire to do so. Buyer and Seller agree that any dispute or claim arising out of or from this Contract or the transaction which is the subject of this Contract shall be mediated through the Maryland Association of REALTORS®, Inc. or its member local boards/associations in accordance with the established Mediation Rules and Guidelines of the Association or through such other mediator or mediation service as mutually agreed upon by Buyer and Seller, in writing. Unless otherwise agreed in writing by the parties, mediation fees, costs and expenses shall be divided and paid equally by the parties to the mediation. If either party elects to have an attorney present that party shall pay his or her own attorney's fees.

Buyer and Seller further agree that the obligation of Buyer and Seller to mediate as herein provided shall apply to all disputes or claims arising whether prior to, during or within one (1) year following the actual contract settlement date or when settlement should have occurred. Provided that the mediation concludes within two months after demand therefore, the Buyer and Seller agree that neither party shall commence any action in any court regarding a dispute or claim arising out of or from this Contract or the transaction which is the subject of this Contract, without first mediating the dispute or claim, unless the right to pursue such action or the ability to protect an interest or pursue a remedy as provided in this Contract, would be precluded by the delay of the mediation. In the event the right to pursue such action, or the ability to protect an interest or pursue a remedy would be precluded by the delay, Buyer or Seller may commence the action only if the initial pleading or document commencing such action is accompanied by a request to stay the proceeding pending the conclusion of the mediation. If a party initiates or commences an action in violation of this provision, the party agrees to pay all costs and expenses, including reasonable attorneys' fees, incurred by the other party to enforce the obligation as provided herein. The provisions of this paragraph shall

Initials
Seller | Buyer

survive closing and shall not be deemed to have been extinguished by merger.  Buyer and Seller may agree to waive mediation.

**19. ATTORNEY'S FEES:**  In any action or proceeding between Buyer and Seller based, in whole or in part, upon the performance or non-performance of the terms and conditions of this Contract, including, but not limited to, breach of contract, negligence, misrepresentation or fraud, the prevailing party in such action or proceeding shall be entitled to receive reasonable attorney's fees from the other party as determined by the court or arbitrator.

**20. NOTICE OF BUYER'S RIGHT TO SELECT SETTLEMENT SERVICE PROVIDERS:** Buyer has the right to select Buyer's own title insurance company, title lawyer, settlement company, escrow company, mortgage lender or financial institution as defined in the Financial Institutions Article, Annotated Code of Maryland. Buyer acknowledges that Seller may not be prohibited from offering owner financing as a condition of settlement.

**21.  NOTICE TO BUYER CONCERNING THE CHESAPEAKE AND ATLANTIC COASTAL BAYS CRITICAL AREA:** Buyer is advised that all or a portion of the property may be located in the "Critical Area" of the Chesapeake and Atlantic Coastal Bays, and that additional zoning, land use, and resource protection regulations apply in this area. The "Critical Area" generally consists of all land and water areas within 1,000 feet beyond the landward boundaries of state or private wetlands, the Chesapeake Bay, the Atlantic Coastal Bays, and all of their tidal tributaries. The "Critical Area" also includes the waters of and lands under the Chesapeake Bay, the Atlantic Coastal Bays and all of their tidal tributaries to the head of tide. For information as to whether the property is located within the Critical Area, Buyer may contact the local Department of Planning and Zoning, which maintains maps showing the extent of the Critical Area in the jurisdiction. Allegany, Carroll, Frederick, Garrett, Howard, Montgomery and Washington Counties do not include land located in the Critical Area.

**22. WETLANDS NOTICE:** Buyer is advised that if all or a portion of the Property being purchased is wetlands, the approval of the U.S. Army Corps of Engineers will be necessary before a building permit can be issued for the Property. Additionally, the future use of existing buildings may be restricted due to wetlands. The Corps has adopted a broad definition of wetlands which encompasses a large portion of the Chesapeake Bay Region. Other portions of the State may also be considered wetlands. For information as to whether the Property includes wetlands, Buyer may contact the Baltimore District of the U.S. Army Corps of Engineers. Buyer may also elect, at Buyer's expense, to engage the services of a qualified specialist to inspect the Property for the presence of wetlands prior to submitting a written offer to purchase the Property; or Buyer may include in Buyer's written offer a clause making Buyer's purchase of the Property contingent upon a satisfactory wetlands inspection.

Initials
Seller | Buyer

**23.  NON-ASSIGNABILITY:** This Contract may not be assigned without the written consent of Buyer and Seller. If Buyer and Seller agree in writing to an assignment of this Contract, the original parties to this Contract remain obligated hereunder until settlement.

**24.  PARAGRAPH HEADINGS:** The Paragraph headings of this Contract are for convenience and reference only, and in no way define or limit the intent, rights or obligations of the parties.

**25.  COMPUTATION OF DAYS:** As used in this Contract, and in any addendum or addenda to this Contract, the term "days" shall mean consecutive calendar days, including Saturdays, Sundays, and holidays, whether federal, state, local or religious. A day shall be measured from 12:00:01 a.m. to and including 11:59:59 p.m. E.S.T. For the purposes of calculating days, the count of "days" shall begin on the day following the day upon which any act or notice as provided in this Contract, or any addendum or addenda to this Contract, was required to be performed or made.

**26.  TIME IS OF THE ESSENCE:** Time is of the essence of this Contract. The failure of Seller or Buyer to perform any act as provided in this Contract by a prescribed date or within a prescribed time period shall be a default under this Contract.

**27.  ENTIRE AGREEMENT:** This Contract and any addenda thereto contain the final and entire agreement between the parties, and neither they nor their agents shall be bound by any terms, conditions, statements, warranties or representations, oral or written, not herein contained. The parties to this Contract mutually agree that it is binding upon them, their heirs, executors, administrators, personal representatives, successors and, if permitted as herein provided, assigns. Once signed, the terms of this Contract can only be changed by a document executed by all parties. This Contract shall be interpreted and construed in accordance with the laws of the State of Maryland. It is further agreed that this Contract may be executed in counterparts, each of which when considered together shall constitute the original Contract.

**28.  ELECTRONIC DELIVERY:**  The parties agree that this Contract offer shall be deemed validly executed and delivered by a party if a party executes this Contract and delivers a copy of the executed Contract to the other party by telefax or telecopier transmittal, or delivers a digital image of the executed document by email transmittal.

**29.  MISCELLANEOUS:** The parties hereto agree that this Agreement shall be binding upon their respective heirs and personal representatives. **ALSO THE PARTIES RECOGNIZE THAT THIS AGREEMENT IS LEGALLY ENFORCEABLE AND ARE HEREBY ADVISED TO SEEK LEGAL ADVICE IF NOT UNDERSTOOD. BUYER MAY SELECT HIS OWN TITLE INSURANCE, SETTLEMENT OR ESCROW COMPANY OR TITLE ATTORNEY. NOTICE.** You may be entitled to receive compensation from the real estate guaranty fund of the Maryland Real Estate Commission, an amount not to exceed $50,000.00, for any loss arising out of the transaction resulting from the unlawful act of a real estate licensee.

| Initials | |
| --- | --- |
| Seller | Buyer |

**30. WITNESS** the hands and seals of the parties hereto, the day and year first above written.

**Witness:**                                          **Buyer:  Sovereign Gaming & Entertainment LLC**

_____                _____
Witness Buyer's Signature

                                                Name: _____

                                                Title:_____

                                                Date:_____

**Witness**                                          **Seller: Machining Technologies, Inc.**

_____                _____
Witness Seller's Signature

                                                Name:_____

                                                Title:_____

                                                Date:_____

Date of Contract Acceptance:_____

## EXHIBIT A

ALL that lot, tract or parcel of land situate, lying and being in Hebron Election District of Wicomico County and State of Maryland, and on the Northeasterly side of and binding upon U. S. Route 50 leading from Salisbury to Cambridge and more particularly described as follows: BEGINNING for the same at a point on the Northeasterly right-of-way line of U. S. Route 50, said point of beginning being at Maryland State Roads Commission Station 146+25 as shown and designated on plat entitled AFive Star Farms,@ made by P. J. Hannon Associates, dated June 3, 1969, and recorded among the Land Records of Wicomico County, Maryland, in Liber J.W.T.S. No. 678, Folio 85, said point of beginning being also designated by the letter AA@ as shown on said plat, (1) thence by and with the Northeasterly right-of-way line of U. S. Route 50 aforesaid, South 24 degrees 28 minutes 55 seconds East 394 feet, (2) thence North 65 degrees 31 minutes 5 seconds East 200 feet, (3) thence South 24 degrees 28 minutes 55 seconds East 325 feet, (4) thence North 35 degrees 27 minutes 5 seconds East 703.40 feet to the center line of Rewastico Creek, (5) thence by and with the center line of said Rewastico Creek the following four courses: (a) North 78 degrees 6 minutes 55 seconds West 552.14 feet, (b) North 81 degrees 50 minutes 55 seconds West 48.80 feet, (c) South 83 degrees 13 minutes 5 seconds West 108.21 feet, (d) South 65 degrees 31 minutes 5 seconds West 208 feet to a point on the Northeasterly right-of-way line of said U. S. Route 50, (6) thence South 24 degrees 28 minutes 55 seconds East a distance of 20 feet, (7) thence South 65 degrees 31 minutes 5 seconds West a distance of 12 feet to the place of beginning, containing 7.4 acres, more or less, and being more particularly shown and designated on the aforesaid plat.

| Initials | |
|---|---|
| Seller | Buyer |

**EXHIBIT B**

1. Subject to the terms and conditions set forth in a Deed of Easement by and between the Chesapeake and Potomac Telephone Company of Maryland and H. Milton Hearn and wife, dated April 4, 1979, and recorded among the aforesaid Land Records in Liber A.J.S. No. 930, Folio 90.

2. Subject to the terms and conditions set forth in a Right-of-Way to Delmarva Power & Light Company of Maryland, from H. Milton Hearne and wife, dated July 18, 1969, and recorded among the aforesaid Land Records in Liber J.W.T.S. No. 663, Folio 431.

3. Subject to Easement shown on Property Survey for Five Star Farms, made by P. J. Hannon Associates, dated June 3, 1969, and recorded among the aforesaid Land Records in Liber J.W.T.S. No. 678, Folio 85.

4. Subject to the terms and conditions set forth in Deeds to the State of Maryland to the use of the State Roads Commission of Maryland from H. Milton Hearne, et ux., dated May 18, 1966, and recorded among the aforesaid Land Records in Liber J.W.T.S. No.630, Folio 109; June 8, 1951, and recorded in Liber J.W.T.S. No. 295, Folio 389; dated June 23, 1950, and recorded in Liber J.W.T.S. No. 295, Folio 336; dated June 23, 1950, and recorded in Liber J.W.T.S. No. 295, Folio 337, and subject to the easement more particularly shown on State Roads Commission of Maryland Plat No. 8282, recorded in the State Road Commission Plat Book No. 1, Folio 195.

5. Subject to the terms and conditions set forth in a Right-of-Way to The Eastern Shore Public Service Co. of Maryland, and The C & P Telephone Company of Maryland, from H. Milton Hearne, et ux., dated June 22, 1965, and recorded among the aforesaid Land Records in Liber J.W.T.S. No. 542, Folio 505.

6. Subject to the terms and conditions set forth in a Right-of-Way to The Eastern Shore Public Service Co. of Maryland, from H. Milton Hearne, et ux., dated December 31, 1953, and recorded among the aforesaid Land Records in Liber J.W.T.S. No. 358, Folio 273.

7. Subject to the terms and conditions set forth in a Right-of-Way to The Eastern Shore Public Service Co. of Maryland, from H. Milton Hearne, et ux., dated August 25, 1952, and recorded among the aforesaid Land Records in Liber J.W.T.S. No. 331, Folio 447.

Initials
Seller | Buyer

8. Subject to the terms and conditions set forth in a Right-of-Way to The Eastern Shore Public Service Co. of Maryland, from H. Milton Hearne, et ux., dated August 9, 1948, and recorded among the aforesaid Land Records in Liber J.W.T.S. No. 303, Folio 37.

9. Subject to the terms and conditions set forth in a Quitclaim Deed to the Vestry of Spring Hill Church from H. Milton Hearne, et ux., dated March 9, 1964, and recorded among the aforesaid Land Records in Liber J.W.T.S. No. 580, Folio 123.

10. Subject to the terms and conditions set forth in a Deed of Easement to the County Commissioners of Wicomico County from H. Milton Hearne, et al., dated October 31, 1935, and recorded among the aforesaid Land Records in Liber I.D.T. No. 193, Folio 457, for Rewastico Ditch.

11. Subject to ingress, egress and regress Right-of-Way contained in the Deed to James A. Waller, et al., from Ebenezer White, et ux., dated January 4, 1910, and recorded among the aforesaid Land Records in Liber E.A.T. No. 67, Folio 309.

12. Subject to the following matters:

(a) that portion of land or improvements included within the bounds of the land described in Schedule A and lying seaward of any bulkhead line established by the Army Corps of Engineers and that comprises filled land, accretions thereto, or improvements into the bed of navigable waters (to include land created by the deposit of dredge spoil and improvements thereto) being subject to the navigational servitude and regulatory power of the U.S. government, including the power to cause removal of such filled land and/or improvements without payment of compensation;

(b) any portion of said land filled subsequent to July 1, 1970, or lying below the mean high water line on or after said date being subject to the regulatory power of the State of Maryland over wetlands, including the power, in the event that a violation of state law is found to exist, to require restoration of said land to its former condition without payment of compensation;

(c) public rights to use so much of the land described in Schedule A as lies between the mean natural high water line and the mean natural low water line of any tidal waters located adjacent to or within said land; and

(d) title to so much of the land described in Schedule A as may have been created by the deposit of dredge spoil by the United State of America, any agency or instrumentality thereof or any political subdivision.

Initials
Seller | Buyer

13. Subject to the terms and conditions set forth in a Maintenance and Inspection Agreement of Private Stormwater Management Facilities dated July 6, 1994, between Machining Technologies, Incorporated and Wicomico County, Maryland, and recorded among the aforesaid Land Records in Liber No. 1399, Folio 667.

14. Subject to a Lease Agreement between Machining Technologies, Inc. and Sharpgas, Inc. dated October 14, 2013.

C:\Users\Donna\Documents\WP51\DBD\MATECH\Sale of Hebron Property 2015\Sovereign Contract rev8-18-15.doc

Initials
Seller | Buyer



**CITY OF SALISBURY - WICOMICO COUNTY
DEPARTMENT OF PLANNING, ZONING
AND COMMUNITY DEVELOPMENT**



Tel: 410-548-4860

Fax: 410-548-4955

Planning & Zoning Commission
Historic District Commission
Metropolitan Planning Organization

Wicomico County Board of Appeals
Salisbury Board of Zoning Appeals
Agricultural Land Preservation Advisory Board

15 October 2015

Jeffrey M. Siskind, Esq.
Siskind Legal Group
525 S. Flagler Drive, 5th Floor
West Palm Beach, FL 33401

RE:     **Zoning Authorization
        27120 Ocean Gateway
        Hebron, MD 21830
        M-19, G-13, P-113 / A-1 (Agricultural-Rural) Zoning District**

Mr. Siskind

As shown on the Wicomico County Zoning Map, the referenced property is located within the A-1 (Agricultural-Rural) zoning district. The proposed use of the referenced property as a facility for the cultivation and processing of medical marijuana/cannabis - including related accessory uses, structures and activities - is in accordance with the terms and conditions of the Wicomico County Zoning Code for an allowable use in the identified district.

This letter regards local zoning authorization only. There may be other county and/or State of Maryland regulations and requirements that are applicable regarding the establishment of the proposed use.

If you have any questions or need additional information, please feel free to call me at 410-548-4860.

Sincerely,

*Clark P. Meadows*

Clark P. Meadows
Zoning Administrator

## COMPANY BUSINESS PLAN

### 1.0    Executive Summary

### 1.1    Overview

In response to the Natalie LaPrade Medical Cannabis Commission's request for applications for a medical cannabis grower premises, CannaMED Pharmaceuticals, LLC ("CannaMED"), a Maryland limited liability company, presents its Business Plan formulated to address CannaMED's mission, which is to provide medical cannabis in a safe and effective manner.   To achieve its mission, CannaMED will focus its efforts on achieving optimal growing practices, which will rest on the 'people, procedures, and place' obtained and organized to in order to successfully execute its mission.

The **PEOPLE** assembled to achieve CannaMED's mission include a woman whose credibility in the pharmaceutical industry is unmatched, an attorney who has been a member in good standing of the Maryland Court of Appeals since 1997, a highly skilled and experienced grower with over 17 years of legal cannabis growing experience, and a Maryland resident whose accomplishments include the 2009 start-up and operation of a successful California cannabis collective, a security professional whose prior service included protecting our homeland's security, a safety and compliance specialist with significant large-scale facility experience, all of whom will together oversee the efforts of CannaMED's unique cultivation and research undertaking.

The **PROCEDURES** adopted to facilitate CannaMED's mission of providing medical cannabis in a safe and effective manner are consistent with the level of protections observable in the pharmaceutical industry, and include stringent organic hydroponic growing protocols, strict security and transportation protocols, strict inventory and storage controls, compliance with modern 'seed to sale' tracking requirements, transparency of operations to allow close regulatory oversight, efficient natural resource utilization and coordination and feedback mechanisms with licensed processors and dispensaries which will enhance useful supply of medicine to patients.

The **PLACE** selected by CannaMED to house its growing facility is a 7.4-acre site located on Maryland's lower eastern shore, in Hebron, Maryland.  Mostly surrounded by large oak trees and well Situated some 250 feet off of the primary access roadway is a secluded 47,000 sq. ft. modern production warehouse, comprised of approximately 30,000 sq. ft. of actual indoor agricultural production space supplied by more than 2,000 amps of three phase electrical power, more than 14 offices, ample paved parking and elaborate employee facilities.  CannaMED possesses [an option/lease/purchase…] this uniquely suitable site.  Site selection was partly motivated by the significant security attributes of this former manufacturing plant, and by the properties successful environmental (Phase I and Phase II) tests.

Also unique to CannaMED is its focus on the science of medical cannabis which CannaMED intends to incorporate in its business program.  Recognizing that in 1988, after several weeks of extensive hearings, Francis L. Young, then Chief Administrative Law Judge for the United States Drug Enforcement Agency, ruled that, "Marijuana, in its natural form, is one of the safest therapeutically active substances known... It would be unreasonable, arbitrary and capricious for the DEA to continue to stand between those sufferers and the benefits of this substance..."

Still, largely because of the categorization of cannabis as a Schedule 1 Controlled substance, public sentiments and the lack of significant federal funding, little formal research has been conducted on the potential attributes of the plant.  CannaMED, however, will devote 5,000 sq. ft. of its Maryland growing facility and funding in excess of $1 million annually to advancing the science of cannabis, by hosting scientific endeavor in collaboration with existing research institutions.

Because of its assembled team, its intended operating practices, and the site/facility selected for its operation, CannaMED is confident of reaching its goal of supplying medical cannabis in a safe and effective manner.  But CannaMED's approach is also designed to be a trustworthy and comprehensive program, of which the State of Maryland can be proud, and which can serve as a model for facilities in other states in the emerging field of medical cannabis.

## 1.2 Objectives

During the first year, CannaMED's business goals are to:

(1) Complete and open the facility consistent with representations made to the Commission, and by first utilizing a preliminary 'fast start' which will permit bringing product to harvest within 5.5 months of licensure.
(2) Obtain and train employees who can work in a regulatory environment, and are happy and motivated.
(3) Develop and launch a distribution program which permits ample feedback from licensed medical cannabis processors and dispensaries, and based upon recommendations from a Business Board of Advisors.
(4) Devote 5,000 sq. ft. of the facility (on the second floor) and adequate funding to initiate a medical science component, including collaboration with a Scientific Board of Advisors.

## 1.3 Mission

CannaMED Pharmaceutical, LLC will provide licensed medical cannabis processors and dispensaries with safe, affordable medical cannabis of consistent and pharmaceutical-grade, while utilizing the skill sets of its experienced staff to comply strictly with Maryland regulations in a facility and in accordance with operating procedures which will serve as a reliable and trustworthy model.

## 1.4 Vision

CannaMED Pharmaceutical, LLC envisions its role as being a model cultivation resource for Maryland's licensed processors and dispensaries, and commitment to be part of a larger effort to provide patients with safe and affordable medical cannabis.

Our Commitments:

(1) Adhere faithfully to all state and local ordinances.
(2) Maintain transparency and a close working relationship with government authorities, including law enforcement, the Commission and the Maryland Department of Health and Human Hygiene.
(3) Adhere to generally accepted accounting principles in order that the Company operates in a manner that can meet its stated objectives, namely to provide safe and affordable medical cannabis of consistent high quality.
(4) Maintain a working environment which fosters cooperation and respect among employees.
(5) Serve the community by being a good neighbor and by becoming involved in charitable programs and events.

## 1.5 Core Values

CannaMED's Core Values are:

(1) To provide consistent high quality products which comport with Maryland regulatory requirements.
(2) To exceed the basic requirements when possible.
(3) To be responsive in dealings with processors, dispensaries, regulators and law enforcement.
(4) To establish standard operating procedures which comport with best practices and Maryland regulatory requirements, and to train employees in understanding our standard operating procedures.
(5) To conserve natural resources.
(6) To educate the community on the important role which medical cannabis can play in helping patients.
(7) To be a remarkably good neighbor in order to best provide support to Maryland's medical cannabis initiative.

## 1.6 Keys to Success

CannaMED recognizes that important keys to success are:

(1) Recognition of its core mission and stated vision.
(2) Development of cooperative relationships with processors, dispensaries, and civic, business and regulatory counterparts.
(3) Positioning the Company as a trustworthy participant in Maryland's medical cannabis initiative.
(4) Maintaining accurate accounting and distribution records.

## 2.0 Organizational Summary

**2.1 Legal Entity**

CannaMED Pharmaceuticals, LLC is a Maryland limited liability company formed in June of 2015 for the specific purpose of building and operating as a licensed medical cannabis grower, consistent with the requirements as promulgated by the Maryland legislature and overseen by the Natalie LaPrade Medical Cannabis Commission.

**2.2 Startup Summary**

Following are some of the milestones with CannaMED Pharmaceuticals, LLC has already accomplished:

(1)  Secured an appropriately zoned (agricultural) turnkey site.
(2)  Acquire a qualified team to operate the Company, including a Chief Executive Officer, an experienced and credentialed Chief Security Officer, security professionals, a qualified Master Grower, an experienced Safety & Compliance Officer, and knowledgeable Advisory Board members.
(3) Authored a comprehensive business plan on which the Company can rely to fund and operate a legally compliant, sustainable organization which can fully deliver on its mission.

**2.3 Start-Up Funding**

The Company has obtained sufficient funding to accomplish its mission, as follows:

CannaMED Pharmaceuticals, LLC has secured the building and lands which it intends to utilize by means of a related company purchase for the sum of $950,000.  Chance & Anthem, LLC (C&A), a Florida limited liability company which is solely owned by the Maryland Cannabis Commission grower applicant's Managing Director, Jeffrey M. Siskind, is the assignee of a Purchase Option Agreement which was entered into by Sovereign Gaming & Entertainment, LLC (SG&E), a Florida limited liability company controlled by the Siskind family.

SG&E has funded $245,000 toward the purchase to date.  C&A is obtaining additional capital in the amount of $750,000 by obtaining a financing against real property located in Florida which is expected to close on November 6, 2015, in order to enable completion of the purchase of the building and lands which the Company intends to utilize in Wicomico County.

Additional funds needed to underwrite the initial specific purpose build-out of the facility and projected working capital needed during the ramp up period of operation, which are estimated to total approximately $1,000,000, are being made available to Mr. Siskind by means of a loan to Mr. Siskind based upon a client and business associate's open line of credit.

Also, to provide reserve funding, Mr. Siskind anticipates being able to obtain an additional $550,000 by securing additional financing against the Florida property (which amount, together with the originally obtained financing, brings the financed 'loan to value' to approximately 50% of the property's appraised value). Mr. Siskind is thus prepared to fund the Company with an additional $1,550,000, for total available funding of $2.5 million.

The attached proforma information demonstrates that the above funding is sufficient to meet the Company's cash needs at start-up and throughout the ramp-up period of operation. Additional funding required to build out and equip the remainder of the facility will be obtained by means of reinvested earnings.

Attachments to this application include the appraisal on the Florida property which indicates a value in excess of $2.6 million, a loan commitment for the approximately $750,000 net funding loan expected to close on November 6, 2015, together with a fee sheet which indicates the net available funding, a bank statement from Mr. Siskind's client which indicates that just over $1 million is available by means of the line of credit, and the SG&E Purchase Option Agreement.

Additional funding required to build out and equip the remainder of the facility will be obtained by means of reinvested earnings. A timeline which shows how projected revenues are utilized to fund remaining capital improvements are attached at Section 7.5.

## 2.4 Long-Term Viability

CannaMED Pharmaceuticals, LLC will assure its long-term viability by staying true to its mission while observing proven financial constraint. The Company's mission will serve as a yardstick by which the Company can measure its performance. The Company will elicit ongoing feedback from employees by means of periodic surveys and open meetings. Employees will thus be provided with ample opportunity to shape the future and direction of the Company.

In addition, the Company is committed to providing medical cannabis at fair market value and to reinvesting its surplus profits by improving its facility and investing in research and development. To insure best use of funds, the Company's Financial Advisory Board, along with qualified independent advisors (reputable local certified public accountants and legal counsel), will help insure prudent financial management.

## 3.0 Products and Services

## 3.1 Product and Service Philosophy

CannaMED Pharmaceuticals, LLC will constantly strive to raise the bar by providing consistently safe, pharmaceutical-grade condition specific medical cannabis. The Company will conduct in-house laboratory testing to control possible contaminants and to achieve standard potencies for its various cultivated strains in order that processors and dispensaries which

purchase the Company's products are assured of receiving consistently pharmaceutical-grade medicine.  The Company will not sell any product for which testing exhibits potential anomalies.

## 3.2 Product Line

CannaMED Pharmaceuticals, LLC will initially offer 15 strains of medical cannabis, which were selected based upon their demonstrated ability to address ascertainable medical symptoms; shown are the Medical Cannabis Varieties, together with Symptoms or Specific Diseases or Conditions, %  CBD, % CBDA, % CBN, % THC, and % THCA:

1.  Sour Diesel - Appetite stimulation, pain relief, anti-nausea.
 <0.2, <0.2, <0.2, <0.2, 28.0

2.  Chemdog - -Good daytime medication, very cerebral effect, effective for social anxiety.
<0.2, <0.2, <0.2, 1.07, 26.6

3.  NYC Diesel - Headache relief, eye strain relief, anxiety and pain relief.
<0.2, <0.2, <0.2, .233, 28.4

4.  SFV OG Kush - Appetite stimulant, anti-emetic, body ache relief, joint pain relief.
<0.2, <0.2, <0.2, 2.44, 20.92

5.  Original Diesel - Headache relief, muscle tremors, anti-spasticity.
<0.2, <0.2, <0.2, <0.2, 14.2

6.  Headband - Migraine/Cluster headaches, anti-anxiety, appetite stimulation.
<0.2, <0.2, <0.2, 2.45, 27.28

7.  Super Lemon Haze - Excellent for cognitive issues in patients with MS, anti-emetic, appetite stimulation. Good daytime medication.
<0.2, <0.2, <0.2, .803, 20.3

8.  Afghan Kush 47 - Stress relief, pain relief, good for nerve pain.
<0.2, <0.2, <0.2, 0289, 12.1

9.  LA Confidential Insomnia, anti-emetic, appetite stimulation, pain relief
<0.2, <0.2, <0.2, .414, 18.9

10.  Blue Dream - Migraine/Cluster headaches, anti-anxiety relief, pain relief.
<0.2, <0.2, <0.2, .226, 11.6

11.  Burmese Kush - Pain relief, sedation, insomnia, appetite stimulation.
<0.2, 0.400, <0.2, 0.249, 15.3

12. UK Cheese - Good for appetite stimulation, pain relief, sleep aid.
<0.2, <0.2, <0.2, .383, 20.7

13. CBD Yummy - CBD rich strain effective as an anti- seizure and anti-spasticity treatment.
<0.2, 9.56, <0.2, <0.2, 4.85

14. AC/DC-A - CBD rich strain with a rare 10:1 CBD to THC ratio. Excellent anti-seizure and anti-spasticity medicine. No psychoactive effect. Reduces inflammation of the nervous system, effective neuro-protectant.
 <0.2, 11.62 <0.2, <0.2, 1.03

15. Medicine Man - CBD rich strain with a 2:1 CBD to THC ratio. Effective anti-inflammatory and neuro-protectant.
<0.2, 6.58, <0.2, <0.2, 3.11

## 3.3 Affordable Access

CannaMED Pharmaceuticals, LLC recognizes the need to provide medical cannabis to patients who cannot pay fair market prices due to financial constraints.  The Company will work with licensed dispensaries to provide medicine to these individuals in accordance with the following schedule:
20% Discount for Patients with Incomes up to 100% of the Federal Poverty Level,
15% Discount for Patients with Incomes between 101% and 100% of the Federal Poverty Level,
10% Discount for Patients with Incomes between 201% and 300% of the Federal Poverty Level.
In addition, the Company will also provide free medical cannabis up to a limit of 10% of its total distributable product for patients diagnosed with terminal illness.

## 4.0 Market Considerations

## 4.1 Market Assessment

CannaMED Pharmaceuticals, LLC will market its medical cannabis exclusively to licensed processors and dispensaries in Maryland.  The degree to which the Company will achieve its revenue projections will depend in large part on the speed with which processors and dispensaries are brought on line, and the speed with which qualified patients are afforded access to medical cannabis.  The Company believes its projections to be accurate and will maintain a contingency fund in order to cover expenses in the event that the market for its products does not develop as quickly as expected.

## 4.2 Market Segmentation / Customer Profile

A significant challenge to CannaMED Pharmaceuticals, LLC's quantification of the market for its products will a result of patient privacy concerns and HIPPA requirements which must be observed.  In addition, although Maryland's licensed dispensaries will be primarily concerned with marketing, the Company must be responsive to their needs and thus must remain keenly interested in feedback from dispensaries in order to best provide for their qualified patients.  The Company recognizes that dispensary studies in other states where the sale of medical cannabis is permitted indicate that:

  (1) 2 out of 3 patients are male
  (2) Patient median age is 37 years
  (3) Most patients are employed or self-employed
  (4) Chronic pain is the reason that most seek relief by means of medical cannabis, although sleeplessness, anxiety and arthritis also rank high among reasons for medication.
  (5) More than a third of patients visit a dispensary each month, and two thirds of all patients visit a dispensary each 90 days.

## 5.0 Strategy and Implementation Summary

## 5.1 SWOT Analysis

A "SWOT" Analysis is a means with which CannaMED Pharmaceuticals, LLC can examine its internal strengths and weaknesses, and examine external opportunities and potential threats to successful operation.

### 5.1.1 Strengths ("S")

The Company will conduct its business in reliance upon the following elements:

  (1) A qualified, professional management team with backgrounds in the pharmaceutical, safety, security, business, management and law.
  (2) A patient-responsive approach emphasizing health and wellness, with a focus on obtaining constant, accurate feedback from processors and dispensaries which purchase the Company's products.
  (3) A well-trained support staff.
  (4) Maintenance of ties with the community.
  (5) Astute recordkeeping and accounting practices.
  (6) Informative labelling and packaging.
  (7) Sophisticated "seed to sale" and inventory tracking.
  (8) A carefully designed sanitary cultivation facility.
  (9) Strong boards of advisors whose input will assist with fulfillment of the Company's objectives.
  (10) Transparency of operations with local law enforcement and regulators.
  (11) Sufficient capitalization.

### 5.1.2 Weaknesses ("W")

The Company recognizes that the following factors are challenges which need to be addressed for its operation to be successful:

(1) Hiring positive, interested staff.
(2) Helping advance medical cannabis as a recognizable medical solution.

### 5.1.3 Opportunities ("O")

CannaMED Pharmaceuticals, LLC recognizes the following opportunities which can be leveraged for a successful operation:

(1) Increasing acceptance of medical cannabis as a means with which to obtain relief from various medical conditions.
(2) Maryland's well-conceived model for regulating its medical cannabis industry.
(3) Federal policies prohibiting states' approval of medical cannabis are retreating.
(4) Maryland presents a new and dynamic market for medical cannabis.
(5) The intended proportion of dispensaries to growers will permit patients to be best served while permitting growers to achieve financial success.

### 5.1.4 Threats ("T")

CannaMED Pharmaceuticals, LLC recognizes the following factors represent threats to be addressed in order for the Company to succeed.

(1) Federal/state tensions are not fully resolved; the best defense is transparent operation conducted in full compliance with Maryland regulations.
(2) Periodic crop failures; best prevented by diligent proactive growing practices and sufficient personnel, security, safety and fire safeguards.
(3) Irresponsible cannabis use which could negatively affect perceptions of the industry.
(4) General economic conditions.

### 5.2 Marketing and Sales

### 5.2.1 Branding and Positioning

CannaMED Pharmaceuticals, LLC's focus is on the healing aspects of medical cannabis, together with advancing the science associated with improving effectiveness and uses of the medicine. Our brand will reflect the Company's wellness-based approach to the use of medical cannabis. At all times, our staff will be professional in appearance, and will be trained to envision themselves as an integral part of the industry and community as opposed to a non-mainstream culture. Our facility will be modern, clean safe and professionally managed.

### 5.2.2 Competition

While CannaMED Pharmaceuticals, LLC expects to gain a sizeable advantage over competitors because of its pre-licensure site acquisition and 'fast start' cultivation plan, competition among licensed growers is expected to be well served by the mandated proportion of growers to dispensaries and the general geographical distribution of growers. The Company believes that 'black market' sales activity can be best addressed by licensed growers which strive to provide

high quality product at reasonable prices to dispensaries which emphases customer service at points of sale.

### 5.3.3 Pricing Strategy

CannaMED Pharmaceuticals, LLC plans to price product at level which permit patients to obtain affordable access to medicine, while remaining fully compliant and conducting its operations in a manner which is at all times consistent with Maryland's regulatory requirements.  Full compliance means better-than-adequate measures for security, recordkeeping, personnel oversight, product and staff safety, and diversion control.  To that end, the Company may consider working with dispensaries to achieve pricing strategies which may prevent diversion.

### 5.2.4 Marketing Objectives

CannaMED Pharmaceuticals, LLC has adopted the following marketing objectives in order to guide the Company's operations over the first 24 months of operation:

(1) Construct an efficient and sanitary medical cannabis production facility.
(2) Institute sufficient controls to enable full compliance with Maryland regulatory requirements.
(3) Train employees fully on duties, expectations and responsibilities required of participants in an industry involving controlled substances.
(4) Produce consistently safe and affordable medical cannabis for distribution to licensed processors and dispensaries.
(5) Become a good neighbor and community contributor.
(6) Increase general and brand awareness in order to educate the public and earn loyalty.
(7) Advance the science of medical cannabis by underwriting efforts aimed at learning more about effective uses of medical cannabis.

### 5.2.5 Sales Strategy

CannaMED Pharmaceuticals, LLC will only sell its products, consisting of various strains of medical cannabis, to licensed Maryland processors and dispensaries in order that they be resold to patients.  In order that the Company's products, each of which are best suited to address the medical needs of discrete users, be properly recommended by dispensary agents, the Company will articulate a packaging program which will supply pertinent information about each specific strain, together with recommendations for use, and which will coordinate with information located on the Company's website.

Questions regarding specific strains can also be brought to the attention of company employees by dispensaries and patients by means of an online Company-managed blog, instant email on the website and telephone inquiries.  The open lines of communication will foster a means of obtaining feedback which will be helpful to the Company's product research and development efforts.

The Company will always endeavor to maintain close contact with processors which utilize our products, dispensaries which sell our products, and patients who medicate with our products, in

an ongoing effort to improve our products and the medical cannabis industry.  To that end, emails will always be answered and calls will always be returned within 24 hours.

### 5.3 Operations

### 5.3.1 Operations Manual

CannaMED Pharmaceuticals, LLC's operations manual will reflect our mission, branding and positioning within the industry, which will reflect the Company's:

(1)   Focus on Healing – our emphasis on health and well-being, and working with processors and dispensaries to assist patients in achieving the highest quality of life.

(2)   Service Orientation – our reliance upon a well-trained and intellectually involved staff who are committed to providing and constantly improving a high quality product.

(3)   Organic Growing Methods – our standard operating procedures will include organic growth processes, insured by rigid in-house testing procedures.

(4)   Empathetic Merchandizing – our commitment to working with processors and dispensaries to constantly improve the manner in which the industry addresses patients' needs

(5)   Technological Strength – our utilization of state-of-the-art transaction software which permits transparent 'seed-to-sale' inventory tracking in order to comply with regulatory concerns and to ultimately better serve medical cannabis patients.

### 5.3.2  Cultivation Program Standard Operatng Procedures (SOPs)

CannaMED Pharmaceuticals, LLC has adopted Standard Operating Procedures to insure the implementation of a successful medical cannabis cultivation Program.  Specific SOPs are contained within a proprietary Cultivation Handbook which was developed by he Company's Master Grower, and are summarized below:

The Company's SOPs address all aspects of safety and security, including fire evacuation, chemical spill containment and evacuation, building threat evacuation, location and usage of panic buttons and fire alarms, notification of a manager of any incident, meaning of a secure building, rules pertaining to visitors, plant and employee health, proper personal protective equipment/apparel (PPE), various levels of PPE/apparel depending on specific duties, proper handling of medical cannabis, both live plants and finished product, medical cannabis growth including an overview of cannabis plant characteristics, traits and benefits, hydroponic growing characteristics, traits and benefits, different phases of plant growth, photoperiods and the importance of light and dark, nutrients to be used, equipment to be used, the seed/cloning room and the purposes it serves, proper use of equipment in the seed/clone room, proper handling of seeds and clones prior to planting, proper planting of medical cannabis seeds and clones in order to ensure successful growth, care and feeding of seedlings, care and cleaning of equipment in the seed/clone room, proper sanitary measures to keep the seed/clone room clean, an introduction to the characteristics of vegetative medical cannabis plants including an overview of equipment used in vegetative growth, the importance of the light cycle in vegetative growth, proper record keeping for daily growth cycle, nutrients used in vegetative growth including acceptable nutrient levels for optimum medical cannabis growth, an introduction to the characteristics of flowering plants including an overview of equipment used in flowering growth, nutrients and supplements used in flowering growth, how to identify male and female plants, proper manicure of plants for optimum medical cannabis growth, how to identify finished plants, harvesting of plants, proper

handling procedures of finished plants including gloves, eye protection, proper clothing, masks and hair nets, proper protocol for harvesting, drying and curing, protocol for product that does not meet standards, has been tainted in some manner, or otherwise not suitable for human consumption, seed-to-sale tracking software (BioTrackTHC) including an introduction to BioTrackTHC software which tracks plants during every level of the growth process from cultivation to distribution, and introduction to the law pertaining to seed-to-sale tracking, an overview of BioTrackTHC equipment and hardware including methods of plant tagging, tracking and inventory procedures in BioTrackTHC.

The Company's SOPs also address pest and fungus identification and control, including an introduction to known pests and fungus that are common in medical cannabis gardens, examples of known pests and fungus and their effect on medical cannabis gardens, approved pesticides and fungicides, health and safety training regarding the usage and exposure to pesticides and fungicides, proper application of pesticides and fungicides, record keeping including an introduction and explanation of daily record keeping of growth conditions, environment, nutrients, and other necessary information, an overview of waste tracking and reporting.

Although CannaMED Pharmaceuticals, LLC does not intend to grow strictly organic cannabis, the Company plans to supply the Maryland Department of Agriculture with 'Organic Product Profiles' in order to obtain certification of some of its products as organic, and to submit an Organic Handler application.

In order to supply such certified organic product and assure that the Company's cultivation procedures comport with industry norms, CannaMED Pharmaceuticals, LLC will submit a Maryland Department of Agriculture Certified Organic Handler Application which will detail the Company's processing and handling of its products.  The Company will abide by two of the mainstays of organic licensure, which are (1) an outside-monitored quality assurance program which includes finished product testing and testing during production, and (2) an adequate product recall system.

Licensure as an Organic Handler assures organic product integrity by means of a competent "Organic Control Point Program' which identifies contamination risk sources and points in production, packaging and transportation of the Company's products, such as appropriate water and air quality, and means of storing product.  The program requires testing and prohibits use of non-approved additives and fertilizers.

In addition, licensure requires that documentation be maintained for all incoming products, including test results for components such as growing medium, in process reports to assure sanitation and quality assurance, finished product inventory and storage reports, and outgoing product audits, sales summaries, phytosanitary and organic certificates, matched to sales orders, invoices and shipping logs.

The Company's sanitation standards will assure that appropriate sanitation practices are used throughout the Company's facility, including use of only materials approved by the Maryland Department of Agriculture, and that all surfaces which come into contact with the Company's product shall be food-grade and shall be tested for cleaner/sanitizer residues.

A comprehensive pest management program administered by a responsible third party with experience in pest eradication (insects and rodents) and proper use and storage of chemicals utilized in pest eradication will be implemented in order to assure that the Company's premises

remain sanitary and free of pests. In addition, a comprehensive nutrition management plan will be obtained from a certified consultant.

### 5.3.3  Site Security

CannaMED will operate a two system process to prevent unauthorized entry into the CannaMED facility:

(1)CannaMED will install and maintain a premises wide intrusion detection system. The designated security contractor will install and maintain the system, licensed with The Maryland State Police as a security systems agency, and have been operating for more than 5 years.

All alarm equipment will be UL listed and installed using the UL standards. The intrusion detection system will cover all perimeter entry points and portals including but not limited to: doors, windows, roof hatches, exhaust vents, and crawl space entries.  This will be done by using a combination of wired and wireless alarm sensor capable of monitoring for intrusion and sensor tampering. Motion detectors and glass break detectors will also be installed for redundancy. All emergency doors not authorized for normal entry/exit will sound the alarm sirens upon opening.

(2) CannaMED will install a comfortable, temperature controlled, guard booth at the main entrance of the facility with armed security personnel.  The security personnel will be on duty 24/7 and monitor the access control system from within the guard booth. The IRONCLAD Perimeter Alarm System that controls the main entrance gate, the facility perimeter security fence and the Rt. 50 gate will also be monitored by the video surveillance system, all in control of the security guards in the guard booth.

The gate entrance at Rt. 50 will be locked at all times and electronically controlled by the external guards in the booth. This is not only to prevent any unauthorized entry, but also allow quick entry for emergency vehicles

CannaMED will install and maintain an IP-based video surveillance system designed to surveille the entire perimeter of the area of cultivation, all portions of the security fence and all gates, and adhere to the surveillance requirements of this chapter.  The security contractor will install and maintain the system, licensed with The Maryland State Police as a security systems agency, and have been operating for more than 5 years.

The system is motion-activated, high quality, and high resolution; cameras will be 2 megapixel resolutions (1600 X 1200) or better.  It will be designed to run 24-hours a day, 365 days a year without interruptions and provide a date and time stamp for every recorded frame. The system will have uninterruptable power supply with battery backup to address power surges and provide auxiliary power in power outages.

Surveillance cameras will be located and configured; adequate signage will be posted to notify visitors of the video surveillance:

- ▪ To capture each exit from the premises;
- ▪ Located and configured to capture activity at each entrance to the areas where medical cannabis is grown, tested, cured, manufactured, and processed or stored;

- ▪ Placed on the exterior to capture any activity outside the premises and the security fence;
- ▪ Installed to capture all incoming and outgoing motorized vehicle traffic as well as the designated employee parking lot.

All recorded video will be stored both on and off site for a minimum of 30 days. Video recordings will be retained for 30 calendar days before hard drive space is recycled. Any recording of security video surveillance shall be made available to the Commission or law enforcement agency for just-cause, as requested.

### 5.3.4  Information Security

The on-site storage of the video surveillance storage will be in the system's network video recorder (NVR). The NVR will be in a locked, fire-resistant, equipment cabinet. In addition, recordings can only be accessed using an administrative username/password. As a failsafe, if someone logs into the system using an administrative username/password and forgets to logout, the system will be configured to automatically log them out after 5 minutes of system inactivity.

The NVR equipment cabinet will be secured by a monitored security alarm that is independent of the main premises security alarm system. This alarm will have dual path communications utilizing both broadband and cellular transmission paths. The alarm will have a door contact on the cabinet to alert of unauthorized entry and a sensor that will sense tilting or movement of the equipment cabinet.

The recorded video will be in a format that can easily be accessed for investigational purposes. The recordings will have digital watermark authentication to prevent video altercation. When videos are downloaded from the system, the files will include a video player to play the files exactly as they are seen on the main system. We will also have the option to provide video files in AVI format which can be viewed by most personal computers with Windows Media Player installed.

Video recordings will be retained for 30 calendar days before hard drive space is recycled. To do this, our system will have 45 terabytes of video storage.

Off-site video storage facility is protected by an alarm system and a video surveillance system and retained for 30 calendar days before hard drive space is recycled. Recording of security video surveillance shall be made available to the Commission or law enforcement agency for just-cause, as requested.

### 5.4  Location/Facility

## AERIAL VIEW VINCITY MAP
## LOCATION OF GROWER FACILITY

CannaMED has secured a site for the operation of its grower facility

at:

## 27120 Ocean Gateway Hebron, Maryland 21803



**Color Coded Vicinity Map**

1. Pink line represents 10 foot high chain link motion sensitive Ironclad Fence
2. Blue line represents property line
3. Orange circle represents 1000 foot radius from center
4. Red line locates the main entrance
5. Lime line locates a commercially zoned three bay auto repair garage
6. Light gray line locates a residential zoned single-family house

**5.4.1 Site Selection**

In determining an ideal site for its growing facility, CannaMED Pharmaceuticals, LLC searched for accessible but secluded improvements located on an appropriately agricultural zoned parcel which would allow for expansion, in a county whose agricultural community represents a large sector of the economy. Secondary considerations were that be a pool of prospective employees who reside with a 15-minute drive of the facility, and that no residential neighborhoods or

school(s) be located nearby, nor any business whose operations would be interfered with by the Company's cultivation of medical cannabis.

Wicomico County on Maryland's lower eastern shore, with its agricultural sector, and the town of Salisbury, with its population acclimated to agricultural business quickly became the focus of the Company's search efforts.  A tour of the former Ma-Tech manufacturing facility was eye-opening; it appeared that the facility was in fact designed for exactly what the Company wanted to do.

The next step undertaken by the Company was to test for environmental hazards.  The Company hired Hillis Carnes Engineering Associates, Inc., a geotechnical engineering company located in Delmar, Maryland, to conduct both Phase I and Phase II environmental studies, which included initial water quality analysis.  The Company also hired Peninsula Water Conditioning to conduct a more in-depth water quality analysis, and to propose a water quality treatment installation. Happily, the property was determined to be hazard-free and water quality poses no obstacle.

A final review of the suitability of the property dealt with its ability to meet criteria pertaining to nutrient management and waste/wastewater disposal imposed by the Maryland Department of Agriculture and the Maryland Department of the Environment.  The property possesses an adequate working septic field which does not impact the watershed.

### 5.4.2 Site Design

In order to produce the highest quality medical cannabis on a consistent year-round basis CannaMED Pharmaceuticals, LLC determined that a weather-insulated, fire-resistant, secure facility was necessary.  The former manufacturing plant which is now controlled by the Company affords all of the above mentioned requisites.  The building is secure, spacious and secluded, but accessible by means of a major roadway.

On the following pages, please find a site plan which depicts the location of the building on the property, together with 1st and 2nd floor plans.  Note that all partitioning has been constructed, with the exception of grow room screening which the Company plans to construct from fire resistant anti-microbial vinyl fabric secured in place in accordance with a proprietary system designed by the Company, which system is available for inspection.  Please note also that areas on the second floor plan which are within the building perimeter but are not shown as partitioned are spaces with two-story (approximately 19 ft.) ceiling heights.



Engineers/Architects
1942 Northwood Drive
Salisbury, MD 21801—7824
(410) 742—7299

| CANNAMED PHARMACEUTICALS, HEBRON, MD | | | |
|---|---|---|---|
| JOB NAME | | | SITE PLAN |
| JOB NUMBER | 151002 | FILE | --- |
| DRAWN BY | BMD | DATE | 03 NOV 15 |
| SHEET NO. | 1 | OF | 3 | SCALE | 1"=100' |



SITE PLAN
1"=100'

GRAPHIC SCALE
0    50'    100'    200'



**Engineers/Architects**
1942 Northwood Drive
Salisbury, MD 21801-7824
(410) 742-7299

| | | | | |
|---|---|---|---|---|
| JOB NAME | CANNAMED PHARMACEUTICALS, HEBRON, MD | | | |
| | SCHEMATIC FLOOR PLAN - 1ST FLOOR | | | |
| JOB NUMBER | 151002 | | FILE | --- |
| DRAWN BY | DMD | | DATE | 03 NOV 15 |
| SHEET NO. | 2 | OF | 3 | SCALE 1"=1/32" |





**AWB** ENGINEERS

Engineers/Architects
1942 Northwood Drive
Salisbury, MD 21801-7824
(410) 742-7299

CANNAMED PHARMACEUTICALS, HEBRON, MD
JOB NAME: SCHEMATIC FLOOR PLAN - 2ND FLOOR

| | | | |
|---|---|---|---|
| JOB NAME: | | FILE | --- |
| JOB NUMBER | 151002 | | |
| DRAWN BY | CMD | DATE | 03 NOV 15 |
| SHEET NO. | 3 | OF | 3 | SCALE | 1"=1/32" |



### 5.4.3 Site Build Out

In order to ascertain an appropriate build-out, the Company consulted at length with Matt Hoffman, a veteran cannabis grower with more than 17 years of legal growing experience, before Matt joined the CannaMED Pharmaceuticals, LLC team.

To oversee the planning and turn-key build-out of its facility, the Company has hired the services of Consolidated Engineering Company, a commercial general contractor headquartered in Maryland since 1911, and which is known for constructing most of the original Johns Hopkins Hospital campus, the original University of Maryland Hospital at Baltimore, Anne Arundel County Hospital in Annapolis, the National Institutes of Health in Bethesda, Maryland and he Maryland Science Center in Baltimore.

CEC will work in partnership with AWB Engineers (AWB) in Salisbury, Maryland, which produced the original floor plans in consultation with the Company's master grower, security and safety/compliance staff, resulting in a plan which emphasizes security and safety.

### 5.4.4 Site Financing

CannaMED Pharmaceuticals, LLC is the third party beneficiary of Chance & Anthem, LLC (C&A)'s assignment of a Purchase Option Contract which was entered into by Sovereign Gaming & Entertainment, LLC (SG&E), a Florida limited liability company controlled by the family of the Company's Managing Director.  While SG&E has funded $245,000 toward the purchase to date, C&A is obtaining additional capital in the amount of $750,000 by obtaining a financing against real property located in Florida.

Additional funds needed are estimated to total approximately $1,000,000, and are being made available to Mr. Siskind by means of a loan to Mr. Siskind based upon a client and business associate's open line of credit.  To provide reserve funding, Mr. Siskind will provide an additional $550,000 by securing additional financing against the Florida property, for total available funding of $2.5 million.

### 6.0 Management and Organization

### 6.1 Governance

As evidenced in the Company's Operating Agreement, CannaMED Pharmaceuticals, LLC is governed by a Chief Executive Officer (CEO), pursuant to advice obtained from a managing Director after consultation from A Business Advisory Board and Scientific Advisory Board.  The CEO is supported by Chief Operations Officer and a hierarchical management team as shown by the Company's organizational Chart contained within this document.

### 6.2 Executive Leadership

**Angeline Nanni, MBA,MS**
**Chief Executive Officer/President**

Angeline Nanni is the Chief Executive Officer/President of CannaMED Pharmaceutical, LLC. Ms. Nanni has over 15 years of experience in the pharmaceutical industry in global market access strategies for life-saving interventions throughout the world. Recently, Ms. Nanni was the Director of Global Access at Aeras, in Rockville Maryland, a non-profit biotech company working in research and development for new tuberculosis vaccines; she led the effort to ensure access of tuberculosis vaccines from research and development to worldwide markets for maximum public health impact. Ms. Nanni holds a Master of Business Administration degree and received a Master of Science degree in Applied Behavioral Science from Johns Hopkins University Carey School of Business.

Ms. Nanni has excellent coalition building skills to communicate and work effectively with a variety of internal and external stakeholders.  As a public health consultant, Ms. Nanni worked closely with the Bill & Melinda Gates Foundation in policy and finance, developing a private sector strategy and a roadmap to identify barriers to access to medicines. Throughout her career, she has managed large scale projects and engaged in comprehensive consultations with 18 of the leading global vaccine manufacturers, and all of the US-based global vaccine manufacturers, visiting over 40 countries world-wide to facilitate financing and vaccine supply.

Ms. Nanni has also held a position in global strategic marketing with Baxter International, a pharmaceutical company, working extensively throughout Latin America.

As a long-standing Maryland resident, Ms. Nanni hopes to take CannaMED Pharmaceuticals, LLC into the top tier of medical cannabis programs in the country, leading the way on research and cultivation.

**Jeffrey Marc Siskind Esq.**
**Managing Director/General Counsel**

Jeffrey M. Siskind is the Managing Director of CannaMED Pharmaceuticals, LLC, and is a practicing attorney with offices in Maryland and Florida. Mr. Siskind was co-founder and compliance officer of Riverside Collective and also Collective Management Associates, both not-for-profit medical cannabis organizations regulated by the State of California. In professional practice, Mr. Siskind provides specialized business development and banking services to private clients, corporations and associations. He is involved with the American Bar Association (ABA), serving on the International Business Law Committee and the Securitization and Structured Finance Committee.

Mr. Siskind is a member of the United States Supreme Court Bar, the District Court of Maryland, the District Court of the Northern, Middle and Southern Districts of Florida, The District of Columbia Bar, The Florida Bar, the United States Virgin Islands Bar, the Federal Bar Association, the Palm Beach County Bar Association and the Bankruptcy bar Association of the Southern District of Florida.

Mr. Siskind chairs the William O. Douglas Inn of Court's Pro Bono Committee, is a contributing member of the Palm Beach County Bar Association's Bankruptcy Continuing Education Committee and the Committee for Judicial Relations, as well as the Technology Sub-committee.

Mr. Siskind also serves on the American Bar Association's Banking Law Committee and Gaming Law Committee.

Mr. Siskind is an avid pilot, has been married for 26 years, and has three children.

**Bruce Irwin Lowe**
**Chief Operating Officer**

Mr. Bruce I. Lowe helped found CannaMED Pharmaceuticals, LLC and will serve as Chief Operating Officer, responsible for directing day-to-day operations. Mr. Lowe has owned and operated a number of successful State-licensed and bonded wholesale and retail automobile businesses throughout Maryland for over 27 years, including the Bruce Lowe, Inc.'s wholesale vehicle sales division, which re-sold over 16,000 units during its tenure.

(a) In 2009, Mr. Lowe was recruited by Collective Management Associates, LLC, to manage the build-out and operation of an indoor hydroponic medical cannabis cultivation facility in Los Angeles County, California. Under Mr. Lowe's leadership and direction, this 10,000 ft.² high yield facility operated 14 grow-rooms, and quickly gained recognition as one of Los Angeles's most respected medical cannabis cultivation facilities. As director of operations, Mr. Lowe managed all aspects of cultivation, including implementation of security protocols, strain selection and breeding, with a focus  on CBD rich strains, human resources and training, organic, top feed, hydroponic cultivation methods,  plant topping, seed-to-sale inventory management, quality control and packaging. He also managed product line, product safekeeping, distribution, financial reporting, marketing, public relations and bookkeeping.

Mr. Lowe serves as vice president and treasurer of Sympatico Equine Rescue, Inc., a 501(c)(3) charitable organization which underwrites programs that help pair retired ponies with special needs children, People-Helping-Horses-Helping-Children™ .

**6.2.1 Key Management Team**

**Matt Brandon Hoffman**
**Master Grower**

Matthew Hoffman is the Master Grower for CannaMED Pharmaceuticals LLC, and possesses 17 years of regulated cannabis growing experience. An industry pioneer, Mr. Hoffman has been involved in the production of medical cannabis since its approval in California in 1999, and has acquired knowledge and expertise that few other growers possess. California instituted it's Compassionate Use Act in 1996.

In 2010, Mr. Hoffman became involved in the production of medical cannabis in Colorado, where he served as Master Grower, facility manager and compliance officer, and was responsible for creating all standard operating procedures for the Colorado facility, as well as training employees in their effective application. This facility included:

- 7 flowering rooms, each with 40 to 50 strains. The production schedule allowed for each room to be harvested every 10 days, producing 70 to 75 pounds of finished product.

- An 18,000 ft.² greenhouse with over 1,000 plants producing 40-45lbs of finished product every 10 days.

Working together with the Mills Nutrient Company of Holland, Mr. Hoffman developed a medical cannabis feeding program and proprietary record-keeping system that ensures optimal growth, quality and potency. Mr. Hoffman collaborated with the Colorado Marijuana Enforcement Division (MED) to develop new compliance policies and procedures, and to implement a MED-approved, seed-to-sale tracking system that tracks every gram of medical cannabis in real-time and effectively prevents diversion. Mr. Hoffman has also developed a proprietary perpetual growth and harvest schedule to ensure maximum production for CannaMED.

Having grown over 50,000 medical marijuana plants in his 5 plus years in Colorado alone, Mr. Hoffman has full knowledge and experience of the most effective cannabis strains and the medical benefits they provide. The catalog at his former facility consisted of over 200 strains. Mr. Hoffman's system for cloning medical cannabis plants ensures each plant is an exact genetic duplicate of its mother plant, and promotes strain consistency, while ensuring that any degradation in genetics can easily be addressed with genetic clones from the available mother plants.

Mr. Hoffman has extensive experience working with pesticides and fungicides and is well-versed in Federal and State Laws governing their safe application. He also possesses expertise in the safe handling of medical cannabis.

Mr. Hoffman plans to relocate to the surrounding area of Hebron, Maryland in 2016 with his wife and children.

**Jesse Delnor Parker Jr.**
**Chief Security Officer**

Jesse D. Parker Jr. is the Chief of Security for CannaMED Pharmaceutical, LLC. A Maryland resident, Mr. Parker has over 25 years of law enforcement experience and will direct security efforts across the company, including daily operations, ongoing risk assessment, development and implementation of policies and procedures, monitoring program compliance, incident investigation and reporting.

As a former member of the U.S. Air Force Security Police his experience includes safeguarding aircraft, weapons and priority resource storage areas. Mr. Parker was NCO in charge of the Security Police armory, Unit Safety NCO and Emergency Services Team (SWAT) member and a mortar man on the USAFE Heavy Weapons team. His final assignment was as Air Base Ground Defense Instructor and Anti-Terrorism/Force Protection Instructor at the U.S. Air Force's European Regional Training Center. Deployments include: Riga, Latvia, Seville, Spain, Saudi Arabia, and Tirana, Albania.

After retiring from active duty Mr. Parker served as security supervisor at Cape Canaveral Air Station/Kennedy Space Center. After September 11, 2001 he applied for and accepted employment as a Federal Air Marshal with the U.S. Transportation Security Administration

(TSA). In 2002, he left the TSA to deploy to Iraq as a Personal Security Detail Team Leader. He quickly progressed to Security Manager, Site Manager, Project Manager, Site Program Manager and General Manager.

**Matthew James Burroughs**
**Safety/Compliance Manager, Quality Control (QC) Manager**

Matthew James Burroughs has been a resident of the Eastern Shore of Maryland for nearly all of his life. Matthew relocated back to Salisbury in 2008 after receiving an Associate Degree from the University of Northwestern Ohio located in Lima, Ohio.

In 2009 Matthew joined the Sherwin Williams Company as a direct labor associate, quickly moving up to become Production Supervisor of paint applicator products. Matthew led and coordinated a cross functional team of direct and indirect labor associates with a specialization in standard work procedures in a multi-shift environment. Matthew also focused on employee engagement in regard to safety hazard recognition and prevention.

During his time with Sherwin Williams, Matthew coordinated worksite training efforts in regards to associate and facility safety, quality, and productivity. Matthew also oversaw initial new hire employee training to ensure all associates were meeting and exceeding safety, quality, and productivity standards. During this time Matthew continued his education with planned completion of a Bachelor of Science Degree in Operations and Project Management from Southern New Hampshire University.

Matthew, a resident of Salisbury, Maryland with his fiancée Kristi is an avid sports fan, his greatest passion being stock car auto racing. His hobbies include: spending time with family and friends, sim-racing, and travel.

### 6.4.1 General Philosophy

Because of the Federal Government's classification of cannabis as a Schedule I Controlled Substance, scientific assessment of the possible medical benefits to be obtained from the plant have been largely inhibited for years.  As indicated elsewhere herein, the Company recognizes the need to advance the science underlying medical cannabis a priority and an integral part of is mission.

### 6.4 Scientific Advisory Board

CanaMED Pharmaceuticals, LLC plans to create a research Center of Excellence in partnership with Maryland Universities and biotech companies and provide pilot funding to further the science of cannabis. A Scientific Advisory Board is in development with Maryland experts in pain management, drug research and development including clinical trial design in the hope of answering some of the difficult and unanswered scientific questions concerning the medical benefits of cannabis.  As new and more effective strains are made available, the Company will obtain those strains and make them available to licensed processors and dispensaries. The

availability of high-CBD medical cannabis strains is limited at the present time due to high demand. The Company will therefore make every effort to research and obtain high-CBD strains as they become available.

The following individuals are being considered to serve on the Company's initial Scientific Advisory Board; Dr. Jahan Marcu, Chief Auditor for Patient Focused Certification (PFC) Program and Lead Scientist for Americans for Safe Access (ASA); Kristin Nevedal, Program Director for PFC; Steph Sherer, Executive Director for ASA; Rikin Mehta, Senior Deputy Director, Health Regulation and Licensing Director, District of Columbia Department of Health; and Dawn Marie Merrill, LPN, member of Maryland's Chapter of ASA.

### 6.3 Business Advisory Board

In addition to regularly scheduled meetings with the Company's employees, a Business Advisory Board constituted of leading businesspeople from the Salisbury area will be consulted in order to best advise the Managing Director as to matters which ought to be considered in making decisions on conducting the business of the Company and to strengthen the Company's ties with the local community.  After consulting with the Wicomico County Chamber of Commerce, the following individuals from the Salisbury, Maryland area are being considered to serve on the Company's initial Business Advisory Board; Mr. John T. Cannon, Cannon Management; Mr. Robert Culver, Wicomico County Executive; Ms. Barbara Duncan, Salisbury Chief of Police; Sheriff Michael Lewis, Salisbury, Maryland; and Mr. Wayne Strausberg, Wicomico County Director of Administration.

### 6.4.2 Employee Handbook

Attached is CannaMED Pharmaceuticals, LLC's Employee Handbook.  Topics contained therein relate to the following Table of Contents.
Section 1.
      1.1, Introduction
      1.2, Changes in policy
      1.3, Employment applications
      1.4, Employment relationship
Section 2
      2.1, Definitions of employees status
         a) Employees defined
         b) Exempt
         c) Non-exempt
         d) Regular full-time
         e) Regular part-time
         f) Temporary (full-time or part-time)
      2.2, Probationary period for new employees
Section 3
      3.1, Employment policies
         a) Non-discrimination
      3.2, Non-disclosure/confidentiality
      3.3, New employee orientation

a) Probationary period

3.4, Office hours

3.5, Lunch periods

3.6, Break periods

3.7, Personnel files

    a) Personal data changes

3.8, Inclement weather/emergency closings

3.9, Employee performance review and planning sessions

3.10, Outside employment

3.11, Corrective action

3.12, Termination

3.13, Safety

3.14, Health-related issues

3.15, Employee requiring medical attention

3.16, Building security

3.17, Insurance on personal effects

3.18, Supplies; expenditures; obligating the company

3.19, Expense reimbursement

3.20, Parking

3.21, Visitors in the workplace

3.22, Immigration law compliance

Section 4

4.1, Standards of conduct

    a) Attendance/punctuality

    b) Absence without notice

    c) Harassment, including sexual harassment

    d) Substance abuse

    e) Drug Testing

    f) Tobacco products

    g) Use of company equipment and Internet

Section 5

5.1, Wage and salary policies

    a) Wage or salary increases

    b) Timekeeping

    c) Overtime

    d) Paydays

Section 6

6.1, Benefits and services

    a) Group insurance

6.2, Health insurance

    a) Cobra benefits

    b) Social security/medicare

    c) Vacation

    d) Record keeping

    e) Holidays

    f) Jury duty/military leave

Section 7
    7.1, Employee communications
        a) Staff meetings
        b) Bulletin boards
        c) Suggestion box
    7.3, Procedure for handling internal complaints
Section 8
    8.1, Human resources & employee security policies
        a) Responsibility
Section 9
    9.1, Workplace violence
    9.2, Workplace searches
    9.3, No weapons in the workplace
Section 10
    10.1, Medical cannabis transport team
        a) Guard / driver & transport handler
Section 11
    11.1, Safety department
        a) Operations manual overview
        b) Daily Log

### 6.4.3 Training Programs

All Company grower agents will attend regularly scheduled mandatory training sessions consisting of both classroom and hands-on practical instruction within the first three weeks of employment.  In addition, Continuing Education sessions (CEs), will be conducted at periodic intervals, at least every three months, so that employees keep abreast of the evolution of the medical cannabis environment. Training will be conducted in Modules, and will be accomplished initially by the Chief Operating Officer, Master Grower, Chief Security Officer, and Safety-Compliance Manager.

Training to familiarize each employee with the equipment and operational protocols in the facility will occur using the following manuals and programs; a Company Employee Manual containing policies, procedures, working conditions, and behavioral expectations to guide employee actions in the workplace, which will also include information about employee compensation and benefits, and additional terms and conditions of employment, and (2) a Company Training Program Manual which will contain a Formal Training Program on Federal and State medical cannabis laws and regulations, laws and regulations pertinent to grower agent responsibilities, including security and safety in all manners of work and facility management.

The Company's Training Manual and classroom training will foster the Company's training objectives. The Training Manual will assure consistency in the presentation of the Company's training programs, where all training information on skills, processes, and other information necessary to perform an employee's tasks is available together in one place. Training on Federal and State medical cannabis laws and regulations will be conducted by the Chief Security Officer and the Safety/Compliance Manager.  In addition, the Company will elicit the services of the Maryland State Police, local law enforcement officers, legal counsel, and other experts on Federal and State medical cannabis laws and regulations to complement the training program.

The Safety/Compliance Manager will be responsible for assuring that all registered grower agents are fully and properly trained during initial training and by means of continuing education. Each training module contained in the training manual will be followed by a written test in which each employee must demonstrate 100% knowledge of all Federal and State laws regarding the cultivation of medical cannabis. Additionally, each employee will be given a hands-on test to demonstrate knowledge of the Company's standard operating procedures.

Training Modules for Federal and State medical cannabis laws and regulations will consist of the following components: Laws and Regulations, Federal Laws with regards to medical cannabis cultivation, Maryland State Laws with regards to medical cannabis cultivation, MMCC laws and regulations regarding medical cannabis cultivation Company polices and rules regarding medical cannabis cultivation, how to spot and report any diversion of medical cannabis, and, penalties for infractions.

**Cannabis Handling Training**

All employees will attend hands-on training by means of Company training courses in order to produce high quality medical cannabis, and will need to prove 100% competency in all areas in order to be allowed to care for medical cannabis plants. The following subject areas will be tested: Knowledge and proficiency in usage and care of all equipment including: Use, calibration and care of Ph/ECM meters; use, calibration and care of Sentinel full room monitor; use, calibration and care of all pumps and pumping equipment; use and care of equipment including Ez-clone machine and all attached equipment; procedures for planting seeds and entering each seed into tracking software; feeding and caring for seeds and seedlings; cleaning and sterilization all equipment; use and care of all vegetative equipment including pumps, pumping accessories, water tanks and buckets; cleaning and sterilization of all equipment, procedures for daily inspection of medical cannabis plants and equipment; procedures for transplanting seeds to vegetative buckets; techniques and procedures of plant care to optimize medical cannabis growth to include techniques for stripping plants of unwanted plant material; techniques for staking plants to prevent plants from falling; techniques for super cropping plants to increase yield and health, plant tagging and placement of tags on plants/buckets, and procedures for proper record keeping.

Additional hands-on training will include pest and fungus identification and treatment protocols, protocols for identifying medical cannabis plants that have reached maturity, techniques for inspecting medical cannabis plants for evidence of insect damage; techniques for inspecting medical cannabis plants for evidence of fungus damage; protocols for reporting pests or fungus on medical cannabis plants, treatment protocols, approved pesticides and fungicides to be used on medical cannabis plants, personal protection required for pesticide and fungicide treatment, re-entry intervals to be posted and observed by all employees, green waste disposal and recording including definition of green waste and why it must be treated differently than regular waste, location and usage of all green waste in the facility, procedures for bagging, weighing and making all green waste unfit for human consumption, weighing and recording in facility disposal documents retained on-site, procedures to insure that all green waste is placed in a secure dumpster and removed on a daily basis. Also stressed during training will be the importance of personal hygiene including regular hand washing and refraining from reporting to work when sick, the importance of medical cannabis plant hygiene, PPE when working near plants including

use of eye protection, hair covering, surgical masks, gloves and protective suits, shoe coverings, uniforms and clothing in other areas.

## Incident Reporting

Training for all employees on incident reporting procedures for both medical emergencies and all relevant safety incidents including subsequent incident reporting forms, root cause analysis, 'what & why,' etc.

## Fire Emergency

All growing agents will be trained in standard emergency procedures for fire emergencies including: (a) Activation of alarms and means of contacting outside assistance, including security personnel for situations regarding outside assistance coming on premises, (b) Training for identified employees on procedures for isolating fires including activation of fire doors etc. as needed, (c) Training from start of employment on proper fire exit procedures including reference points in each facility area for fire exit maps complete with primary and secondary exit procedures, and including "rally points" for various team members and rostering for headcount purposes, and (d) Training of fire extinguisher locations by work area and proper fire extinguisher utilization procedures including the PASS technique, and ensuring a fire extinguisher before use is fully charged.

## Chemical Spill

All growing agents will be trained in standard emergency procedures for chemical spills including: (a) Recognizing potential spills, and how to activate safety/facility staff for immediate response, and deactivation of any powered equipment in the area of the spill, (b) Activation of first aid/first responders for spills involving human contact with spilled chemicals including required PPE for chemical interaction, emergency eye wash station location and activation, MSDS consultation for treatment as needed, and further intervention as needed, (c) Training of location and use of spill containment materials, including PPE of spill responders, as well as identification of the spill area to team members in the work area, in order to isolate a chemical spill to prevent and/or minimize contact with ground water or such relevant circumstances unique to the situation, (d) Training of growing agents and departmental leadership to recognize spills which would require facility evacuation, following standard evacuation procedures including activation of security personnel for situations regarding outside assistance coming on premises, and (e) Training for reporting of incidents involving chemical spills both for internal prevention and correction as well as to meet OSHA and/or local standards as needed to include root cause analysis, 'what & why,' etc.

## Safety Procedure Training Specifics

Safety training to be conducted by the Safety-Compliance Manager on site, in a classroom setting with the opportunity to conduct some training topics at the site specific areas in relation to specific issues i.e. fire exits, first aid locations. 2. Any and all meetings with staff members from day-one of employment including daily, weekly, and/or departmental meetings will be required to start with a "safety grabber" or "toolbox topic" initiated by the relevant meeting facilitator. The safety grabber gives the opportunity for engagement with the staff on hot button safety

issues, and ensures safety is the first priority. 3. Initial induction safety training to require no more than 8-10 hours in a classroom setting on site. Safety training can be melded with operational training as needed to ensure knowledge retention and engagement of work force. The induction training will include the introduction of the safety training matrix which each agent will be expected to meet or exceed as they enter their operational job roles. Initial safety training will also give agents all relevant paperwork in regards to hazard communication, identification, and prevention. 4. Training follow-up: The safety manager will be in contact with newly-hired employees on a daily and weekly basis to ensure they are retaining and engaging in safety best practices from their initial training, while applying this knowledge in their required job roles. Each employee will have a safety training matrix developed and maintained by the safety manager with milestones in the areas of basic and advanced safety procedures and expectations including basic safety requirements as well as ensuring employee is properly engaged in hazard identification and prevention, and is engaged in the team interest of safety.

**Safety Training Matrix**

The Company will adhere to a safety training matrix which will include a 6-8 week set of training topic milestones, safety observation goals and engagement requirements, and which will insure that growing agents are continuing to work in a safe manner. The safety matrix will be facilitated and retained by the safety manager in cooperation with operations leaders to give corrective feedback as needed. The safety training matrix does not require additional classroom training, but provides opportunities for one-on-one discussion with growing agents and safety and/or operations management allowing for elimination of information gaps by means of obtaining needed feedback.

**Safety Training on how to handle threatening events**

All new hire personnel will receive Initial/New hire Security training as part of their new hire orientation. Training will be conducted via a PowerPoint presentation supplemented with training booklets and class participation-type training.

Security Training will re-occur monthly during an employee's first six months of employment and quarterly thereafter. Courses will include but are not limited to: (1) Security Familiarization, including facility security measures, i.e. key control, opening, closing and using the office area during off hours, alarms and emergency and exits, visitor escort procedures, dealing with trespassers and/or difficult people (2) Anti-Theft, including identifying theft, characters of theft, how to react to theft both during and after an identified event, theft prevention techniques, identifying suspects and statement writing, anti-theft quick reaction checklist familiarization, and (3) Active shooter training including profiling an active shooter, how to respond when an active shooter is nearby, how to respond when law enforcement arrives, ways to prepare for an active shooter situation, managing active shooter situations, and recognizing potential workplace violence.

**Examining the Effectiveness of Training**

In blocks of instruction without written testing, growing agents will be graded in a 'Task Condition Standard' format, where the Company will provide a block of instruction on a specific task.  For example, in 'Reporting suspected theft to law enforcement or #911':

TASK: Report theft, and provide height, hair and eye color of suspect(s).

CONDITION: You have just witnessed theft and have made many observations regarding suspect identity, vehicle, etc. and must provide detailed information to authorities.

STANDARD: Submit your report to law enforcement and include hair and eye color, and height within 2 inches.

The Company will also examine the effectiveness of its training programs by means of periodic "in-house" security, anti-theft and active shooter exercises. Exercises will be scheduled and conducted monthly. There will also be spot, on-the-job (OJT), training occurring at least quarterly.  Upon completion of training, the Safety/Compliance Officer will complete an After Action Report which will be permanently filed in the Company's training log to enable use as "lessons learned" for future training.  Information to be documented and placed in the Company's Training Log will contain training date and time, block(s) of instruction taught, and identification of instructors(s) and personnel in attendance.

**Particularized Grow Room SOP Training:**

The Master Grower will also hold monthly training update classes with the grow team in order to keep all growing staff up-to-date on the Company's standard operating procedures, and will maintain written records of all training which will include: (a) employees in attendance, (b) material covered, (c) syllabus and length of training course module, (d) method of testing employees on comprehension of training.

**Zero Tolerance On-Site Identification and Drug and Alcohol Policy**

The Company maintains strict adherence to a Zero Tolerance Drug and Alcohol Policy, which provides for severe sanctions in he event of a violation. Positive identification must be displayed by every on-site employee at all times, in accordance with the Company's corresponding commitment to providing a safe and productive workplace for its employees.

In keeping with this commitment, the Company shall carefully screen the backgrounds of prospective hires and will administer a "zero tolerance policy" with regard to alcohol and drug use in the work place, and shall take stringent measures to avoid and prevent violations of this policy, including new hire screening and random periodic testing of all employees.

While on Company property or while engaged in Company business, employees are strictly prohibited from manufacturing, purchasing, soliciting, using or possessing (unless legally prescribed by a doctor in treatment of a legitimate known medical condition), storing, transporting or distributing any substance listed in Schedules i-v of Section 202 of the Controlled Substances Act, as amended, or any paraphernalia, equipment, accessories, products or materials used or intended for administering, consuming, ingesting smoking, injecting or otherwise introducing into the human body any substance listed in the above mentioned act.

Upon being hired, each employee shall declare in writing that he or she will adhere to the State alcohol and drug-free workplace p[policy articulated in COMAR 21.11.08.03

An employee who attends, visits, enters or remains on Company property while under the influence of alcohol, controlled substances or drugs other than legitimate medication prescribed by a physician and for which use in the workplace is approved as safe and has been authorized by the company is subject to immediate termination.  IN addition, the Company shall report any transgressions to regulatory authorities if required to do so by state or Federal law.

The Company will conduct drug and/or alcohol tests as follows: Random testing - employees may be selected for drug and/or alcohol testing at any time during their employment.

For-cause testing - an employee may be asked to submit to a drug and/or alcohol test if circumstances make it appear that the employee may be under the influence of drugs or alcohol, including evidence of drugs or alcohol on or about the employee's person or in the employee's vicinity, unusual conduct on the employee's part that suggests impairment or influence of drugs or alcohol, negative performance patterns, or excessive and unexplained absenteeism or tardiness.

Post-accident testing - any employee involved in an on-the-job accident or injury under circumstances that suggest possible use or influence of drugs or alcohol in the accident or injury event may be asked to submit to a drug and/or alcohol test; "involved in an on-the- job accident or injury" means not only the one who was or could have been injured, but also any employee who potentially contributed to the accident or injury event in any way.

If an employee is tested for drugs or alcohol outside of the employment context and the results indicate a violation of this policy, or if an employee refuses a request to submit to testing under this policy, the employee may be subject to appropriate disciplinary action, up to and including discharge from employment. In such a case, the employee will be given an opportunity to explain the circumstances prior to any final employment action becoming effective.

**Storage of Training and other Company Records**

All training records will be permanently stored in a fire-resistant, locked cabinet in the Safety-Compliance Manager's office and made available for review by Company leadership and upon request by law enforcement and the Maryland Medical Cannabis Commission.  Said records shall also be permanently stored off-site in digital format, and as required by the Maryland Medical Cannabis Commission.  Likewise, all Company records including product laboratory testing records, financial records and records relating to distribution and sales will be stored on- and off-property in accordance with rules established by the Maryland Medical Cannabis Commission.  The Commission and law enforcement will have ready access to all such records.

**6.4.4 Organizational Chart**

The following chart depicts the hierarchical structure of CannaMED Pharmaceuticals, LLC's policymaking and upper level management team:



### 6.4.5 Recruitment

CannaMED Pharmaceuticals, LLC has set about hiring the best and the brightest in order to comprise a team of dedicated staff.  The Company has addressed this task by advertising positions widely and by offering salaries and benefits in excess of those which are offered by potential competitors.  This strategy has resulted in the Company being able to choose from a field of highly qualified candidates bringing together highly qualified experienced personnel possessing diverse skill sets.

## 7.0 Financial Plan

### 7.1 Important Assumptions

The following assumptions were relied upon in

 (1) Projected Expenses are based upon actual incurred expenses in the build-out of the Riverside Collective installation in Los Angeles, California.

 (2)  Projected Revenue is computed using an estimated $2,000 per pound sale price, which is believed to be conservative.

 (3)  Construction/Build-Out Costs were estimated by Consolidated Engineering Company, which has operated in Maryland as a commercial general building contractor since 1911 and whose projects include numerous hospitals and complex commercial developments.

 (4) Working Capital Requirements were estimated based upon ascertainable costs and base wages which included 'burden.'

 (5)  The Company's Plan to provide affordable medication to those less fortunate is based upon similar programs which exist in states where medical cannabis is supplied at a discount to the needy.

### 7.2 Projected Profits

Three independent projected profit and loss proformas are presented here which respond to three phases of Company operation corresponding to different levels of phased facility build-out, the first of which is a 2,500 sq. ft. 'Fast Start' buildout designed to best serve the medical cannabis marketplace over the immediate short term.

The staged Phase 1, 2, and 3 build-outs were conceptualized in order to best utilize the Company's resources while continuing to meet the objective of efficiently providing safe medical cannabis to licensed processors and dispensaries, and is believed to be practical in light of what the Company envisions will be expanding levels of patient demand upon processors and dispensaries over the Company's first three years of operation.

Note that build-out of Phases 1 and 2 has been combined to take advantage of economies of scale in  construction.  Also, although the phased operational levels are presented on an annualized basis, the Company already possesses sufficient available funding to conduct the buildout of Phases 1 and 2, in addition to funding its operations while maintaining an adequate operating reserve.

### 7.3  Projected Build-Out Costs – Phased

Attached immediately hereafter are the three build-out which correspond to anticipated phased levels of operation.  Please note that these numbers are presented as independent projections; additional build-out costs attributable to subsequent phases are derived by deducting amounts expended on earlier phase(s).

Please refer to Sections 7.3.1, 7.3.2 and 7.3.3 attached hereto.

## 7.4 Projected Operational Costs – Phased

Attached immediately following the three build-out cost projections are operational proformas which correspond to the phased levels of build-out.

Please refer to Sections 7.4.1, 7.4.2 and 7.4.3 attached hereto.

### 7.3.1  PROJECTED 'FAST START' BUILD-OUT COSTS

General Building Improvements:

| | | |
|---|---|---|
| Roof Repairs | | 30,000.00 |
| Driveway & Parking Lot resealing | | 22,000.00 |
| HVAC Repairs | | 10,500.00 |
| Interior Painting | | 35,000.00 |
| Exterior Painting | | 42,000.00 |
| Office Interior Ceilings | | 18,000.00 |
| Office Interior Flooring | | 20,000.00 |
| Furnishings | | 14,400.00 |
| TOTAL GENERAL BUILDING IMPROVEMENTS | | 191,900.00 |

Cultivation Space:

| | | |
|---|---|---|
| Lighting Equipment (LE) | 1 light/50 sq ft @ $300 | 15,000.00 |
| LE Installation | $75/light | 3,750.00 |
| Hydroponic Equipment (HE) | $4/sq ft | 10,000.00 |
| HE Installation | $.75/sq ft | 1,875.00 |
| Water Quality Equipment | Includes Installation | 3,000.00 |
| Air Quality Equipment (AQ) | $1.25/sq ft | 3,125.00 |
| AQ Installation | $.25/sq ft | 625.00 |
| Grow Room Partitioning | | 0.00 |
| General Electrical | $2.50/sq ft | 4,750.00 |
| General Plumbing | $.50/sq ft | 2,500.00 |
| TOTAL CULTIVATION SPACE COSTS | | 44,625.00 |

Trimming & Packaging:

| | | |
|---|---|---|
| Furnishings | | 1,500.00 |
| Trimming Equipment | Trim Machine & Hand Tools | 2,500.00 |
| Packaging Equipment | Computerized Labelling & Inventory | 6,500.00 |
| General Electrical | $.1/sq ft | 250.00 |
| General Plumbing | Sanitary Sink, Cleanup Area | 250.00 |
| Initial Packaging Inventory | Containers, Labels, Etc. | 1,500.00 |
| TOTAL TRIMMING & PACKING COSTS | | 12,500.00 |

Extraction Department:

| | | |
|---|---|---|
| Extraction Machines | | 0.00 |

| | | |
|---|---|---|
| Installation and Training | | 0.00 |
| Misc. Equipment | Carts, Trays, Locking Cabinets | 750.00 |
| TOTAL EXTRACTION DEPT. | | 750.00 |
| | | |
| Laboratory/Quality Control: | | |
| Laboratory Furnishings | Workstations & Misc. Furniture | 0.00 |
| Laboratory Equipment | | 0.00 |
| Laboratory Inventory | | 0.00 |
| Equipment Installation & Training | | 0.00 |
| TOTAL LABORATORY | | 0.00 |
| | | |
| Security Department: | | |
| Gatehouse Construction | | 0.00 |
| Gatehouse Utilities | Electric, Phone, Internet | 0.00 |
| Automated Entrance Gate | | 10,500.00 |
| Perimeter Fencing | | 48,000.00 |
| Command Center Equipment | Furnishings & Misc. Equipment | 11,000.00 |
| Video Surveillance System - Interior | $1/sq ft | 2,200.00 |
| Video Surveillance System - Exterior | Building & Grounds | 20,000.00 |
| Uniforms & Supplies | | 1,000.00 |
| TOTAL SECURITY DEPARTMENT | | 92,700.00 |
| | | |
| Total Projected Build-out Costs | | |
| | | |
| Contractor Overhead & Profit | 15.5% on construction items only | 42,191.00 |
| Owner construction Representative | 2.5 months @ $1,100/wk | 11,825.00 |
| Contingency | 7% of total costs | 27,754.37 |
| | | |
| TOTAL ANTICIPATED BUILD-OUT COSTS | | 424,245.37 |

## 7.3.2  PROJECTED PHASE 1&2 BUILD-OUT COSTS

General Building Improvements:

| | | |
|---|---|---|
| Roof Repairs | | 30,000.00 |
| Driveway & Parking Lot resealing | | 22,000.00 |
| HVAC Repairs | | 10,500.00 |
| Interior Painting | | 35,000.00 |
| Exterior Painting | | 42,000.00 |
| Office Interior Ceilings | | 18,000.00 |
| Office Interior Flooring | | 20,000.00 |
| Furnishings | | 14,400.00 |
| TOTAL GENERAL BUILDING IMPROVEMENTS | | 191,900.00 |

Cultivation Space:

| | | |
|---|---|---|
| Lighting Equipment (LE) | 1 light/100 sq ft @ $300 | 37,500.00 |
| LE Installation | $75/light | 18,750.00 |
| Hydroponic Equipment (HE) | $4/sq ft | 50,000.00 |
| HE Installation | $.75/sq ft | 9,375.00 |
| Water Quality Equipment | Includes Installation | 45,000.00 |
| Air Quality Equipment (AQ) | $1.25/sq ft | 15,625.00 |
| AQ Installation | $.25/sq ft | 3,125.00 |
| Grow Room Partitioning | 5 @ 2,500 sq ft | 18,750.00 |
| General Electrical | $2.50/sq ft | 31,250.00 |
| General Plumbing | $.50/sq ft | 6,250.00 |
| TOTAL CULTIVATION SPACE COSTS | | 235,625.00 |

Trimming & Packaging:

| | | |
|---|---|---|
| Furnishings | | 3,750.00 |
| Trimming Equipment | 2 Trim Machines & Hand Tools | 6,250.00 |
| Packaging Equipment | Computerized Labelling & Inventory | 9,500.00 |
| General Electrical | $1/sq ft | 1,250.00 |
| General Plumbing | Sanitary Sink, Cleanup Area | 750.00 |
| Initial Packaging Inventory | Containers, Labels, Etc. | 4,500.00 |
| TOTAL TRIMMING & PACKING COSTS | | 26,000.00 |

Extraction Department:

| | | |
|---|---|---|
| Extraction Machines | | 0.00 |
| Installation and Training | | 0.00 |
| Misc. Equipment | Carts, Trays, Locking Cabinets | 3,250.00 |

| | | |
|---|---|---|
| TOTAL EXTRACTION DEPT. | | 3,250.00 |
| | | |
| Laboratory/Quality Control: | | |
| Laboratory Furnishings | Workstations & Misc. Furniture | 12,000.00 |
| Laboratory Equipment | | 75,000.00 |
| Laboratory Inventory | | 7,500.00 |
| Equipment Installation & Training | | 3,500.00 |
| TOTAL LABORATORY | | 98,000.00 |
| | | |
| Security Department: | | |
| Gatehouse Construction | | 125,000.00 |
| Gatehouse Utilities | Electric, Phone, Internet | 4,500.00 |
| Automated Entrance Gate | | 10,500.00 |
| Perimeter Fencing | | 48,000.00 |
| Command Center Equipment | Furnishings & Misc. Equipment | 11,000.00 |
| Video Surveillance System - Interior | $1/sq ft | 32,500.00 |
| Video Surveillance System - Exterior | Building & Grounds | 20,000.00 |
| Uniforms & Supplies | | 5,000.00 |
| TOTAL SECURITY DEPARTMENT | | 256,500.00 |
| | | |
| Total Projected Build-out Costs | | |
| | | |
| Contractor Overhead & Profit | 15.5% on construction items only | 78,662.50 |
| Owner construction Representative | 6.5 months @ $1,100/wk | 30,745.00 |
| Contingency | 7% of total costs | 64,447.78 |
| | | |
| TOTAL ANTICIPATED BUILD-OUT COSTS | | 985,130.28 |

### 7.3.3  PROJECTED FULL BUILD-OUT COSTS

General Building Improvements:

| | | |
|---|---|---:|
| Roof Repairs | | 30,000.00 |
| Driveway & Parking Lot resealing | | 22,000.00 |
| HVAC Repairs | | 10,500.00 |
| Interior Painting | | 35,000.00 |
| Exterior Painting | | 42,000.00 |
| Office Interior Ceilings | | 18,000.00 |
| Office Interior Flooring | | 20,000.00 |
| Furnishings | | 14,400.00 |
| TOTAL GENERAL BUILDING IMPROVEMENTS | | 191,900.00 |

Cultivation Space:

| | | |
|---|---|---:|
| Lighting Equipment (LE) | 1 light/100 sq ft @ $300 | 75,000.00 |
| LE Installation | $75/light | 18,750.00 |
| Hydroponic Equipment (HE) | $4/sq ft | 100,000.00 |
| HE Installation | $.75/sq ft | 18,750.00 |
| Water Quality Equipment | Includes Installation | 45,000.00 |
| Air Quality Equipment (AQ) | $1.25/sq ft | 31,250.00 |
| AQ Installation | $.25/sq ft | 6,250.00 |
| Grow Room Partitioning | Ten @ 2,500 sq ft | 37,500.00 |
| General Electrical | $2.50/sq ft | 62,500.00 |
| General Plumbing | $.50/sq ft | 12,500.00 |
| TOTAL CULTIVATION SPACE COSTS | | 407,500.00 |

Trimming & Packaging:

| | | |
|---|---|---:|
| Furnishings | | 7,500.00 |
| Trimming Equipment | Four Trim Machines & Hand Tools | 11,000.00 |
| Packaging Equipment | Computerized Labelling & Inventory | 12,500.00 |
| General Electrical | $1/sq ft | 2,500.00 |
| General Plumbing | Sanitary Sink, Cleanup Area | 1,000.00 |
| Initial Packaging Inventory | Containers, Labels, Etc. | 6,000.00 |
| TOTAL TRIMMING & PACKING COSTS | | 40,500.00 |

Extraction Department:

| | | |
|---|---|---:|
| Extraction Machines | Three @ $115,000 | 345,000.00 |
| Installation and Training | $4,000/machine | 12,000.00 |
| Misc. Equipment | Carts, Trays, Locking Cabinets | 5,000.00 |
| TOTAL EXTRACTION DEPT. | | 362,000.00 |

Laboratory/Quality Control:

| | | |
|---|---|---|
| Laboratory Furnishings | Workstations & Misc. Furniture | 25,000.00 |
| Laboratory Equipment | | 125,000.00 |
| Laboratory Inventory | | 10,500.00 |
| Equipment Installation & Training | | 6,000.00 |
| TOTAL LABORATORY | | 166,500.00 |

Security Department:

| | | |
|---|---|---|
| Gatehouse Construction | | 125,000.00 |
| Gatehouse Utilities | Electric, Phone, Internet | 4,500.00 |
| Automated Entrance Gate | | 10,500.00 |
| Perimeter Fencing | | 48,000.00 |
| Command Center Equipment | Furnishings & Misc. Equipment | 11,000.00 |
| Video Surveillance System - Interior | $1/sq ft | 46,500.00 |
| Video Surveillance System - Exterior | Building & Grounds | 20,000.00 |
| Uniforms & Supplies | | 5,000.00 |
| TOTAL SECURITY DEPARTMENT | | 270,500.00 |

Total Projected Build-out Costs

| | | |
|---|---|---|
| Contractor Overhead & Profit | 15.5% on construction items only | 91,721.25 |
| Owner construction Representative | 8.5 months @ $1,100/wk | 40,205.00 |
| Contingency | 7% of total costs | 109,957.84 |

| | | |
|---|---|---|
| TOTAL ANTICIPATED BUILD-OUT COSTS | | 1,680,784.09 |

### 7.4.1  Grower Facility - Fast Start Phase - Operation P&L

Revenues - Cultivation

| | | |
|---|---|---|
| 2,500 sq ft. @ 0.35 lbs./sq.ft/yr @ $2,200 | | 1,925,000.00 |
| Net after Sales taxes (projected) | | 1,828,750.00 |

Expenses:

General
| | | |
|---|---|---|
| Facility Manager | | 200,000.00 |
| Assistant Manager | | 75,000.00 |
| Bookkeeper | | 45,000.00 |
| Clerical Assistant | | 45,000.00 |
| Receptionist | | 40,000.00 |

Cultivation
| | | |
|---|---|---|
| Master Cultivator | | 175,000.00 |
| Assistant Cultivators | | 0.00 |
| Attendants | | 0.00 |

Trimming & Curing
| | | |
|---|---|---|
| Trimming Supervisor | | 60,000.00 |
| Trimming Assistants | 3 @ $35,000 | 105,000.00 |

Quality Control
| | | |
|---|---|---|
| Chief Lab Technician | | 90,000.00 |
| Laboratory Assistant | | 0.00 |
| Laboratory Attendant | | 0.00 |

Security
| | | |
|---|---|---|
| Director of Security | | 125,000.00 |
| Security Officers | 2 @ $38,000 | 76,000.00 |

Maintenance
| | | |
|---|---|---|
| Director of Maintenance | Part-time | 20,000.00 |
| Maintenance Personnel | | 0.00 |

Third Party Providers
| | | |
|---|---|---|
| Legal & Accounting | | 35,000.00 |
| Community Relations | | 25,000.00 |
| Computer, Phones, Internet | | 8,500.00 |

| | | |
|---|---|---|
| Supplies | | |
| Supplies - Office | | 4,000.00 |
| Supplies - Building & Grounds | $3/4,500 sq.ft | 13,500.00 |
| Supplies - Cultivation | $3/sq/ft, 3.5 cycles, 2,500 sq. ft. | 26,250.00 |
| | | |
| Utilities | | |
| Electric - Ambient | | 7,500.00 |
| Electric - Cultivation | | 30,000.00 |
| Propane - Ambient | | 1,620.00 |
| Propane - Cultivation | | 1,000.00 |
| | | |
| Licenses | | |
| Maryland Grower License | Annual Fee | 125,000.00 |
| Maryland Processor License | Annual Fee | 0.00 |
| | | |
| Building Costs | | |
| Building Rental | $15,000/month | 180,000.00 |
| Building Maintenance | $.25/sq.ft./mo., 46,500 sq. ft. | 139,500.00 |
| | | |
| Unusual Expenses | | |
| Science Dept Expense Contribution | | 0.00 |
| Low Income Program | | 0.00 |
| | | |
| Insurance | | |
| Insurance - Property & Casualty | Includes Business Interruption | 4,500.00 |
| Insurance - Automobile | 1 vehicle | 1,650.00 |
| | | |
| Bonuses & Incentives | | 0.00 |
| | | |
| TOTAL EXPENSES | | 1,659,020.00 |
| | | |
| NET PROFIT BEFORE CONTINGENCY | | 169,730.00 |
| | | |
| CONTINGENCY | 5% of Total Expenses | 82,951.00 |
| | | |
| NET PROFIT | | 86,779.00 |
| | | |
| Net Profit as a percentage of gross revenues | | 4.75% |

**7.4.2  Cultivation Facility - Phase 1 & 2 Operation P&L**

Revenues        -  Cultivation

| | | |
|---|---|---:|
| 12,500 sq ft. @ 0.35 lbs./sq.ft/yr @ $2,200 | | 9,625,000.00 |
| Net after Sales taxes (projected) | | 9,143,750.00 |

Expenses:

| | | |
|---|---|---:|
| **General** | | |
| Facility Manager | | 200,000.00 |
| Assistant Manager | | 75,000.00 |
| Bookkeeper | | 45,000.00 |
| Clerical Assistant | | 45,000.00 |
| Receptionist | | 40,000.00 |
| | | |
| **Cultivation** | | |
| Master Cultivator | | 175,000.00 |
| Assistant Cultivators | 2 @ $ $50,000 | 100,000.00 |
| Attendants | 2 @ $38,000 | 76,000.00 |
| | | |
| **Trimming & Curing** | | |
| Trimming Supervisor | | 60,000.00 |
| Trimming Assistants | 6 @ $35,000 | 210,000.00 |
| | | |
| **Quality Control** | | |
| Chief Lab Technician | | 90,000.00 |
| Laboratory Assistant | | 44,000.00 |
| Laboratory Attendant | | 0.00 |
| | | |
| **Security** | | |
| Director of Security | | 125,000.00 |
| Security Officers | 4 @ $38,000 | 152,000.00 |
| | | |
| **Maintenance** | | |
| Director of Maintenance | | 75,000.00 |
| Maintenance Personnel | 1 @ $42,000 | 42,000.00 |
| | | |
| **Third Party Providers** | | |
| Legal & Accounting | | 75,000.00 |
| Community Relations | | 50,000.00 |

| | | |
|---|---|---:|
| Computer, Phones, Internet | | 12,500.00 |
| | | |
| Supplies | | |
| Supplies - Office | | 9,000.00 |
| Supplies - Building & Grounds | $3/28,500 sq.ft | 85,500.00 |
| Supplies - Cultivation | $3/sq/ft, 3.5 cycles, 25,000 sq. ft. | 131,250.00 |
| | | |
| Utilities | | |
| Electric - Ambient | | 24,000.00 |
| Electric - Cultivation | | 165,000.00 |
| Propane - Ambient | | 11,250.00 |
| Propane - Cultivation | | 2,800.00 |
| | | |
| Licenses | | |
| Maryland Grower License | Annual Fee | 125,000.00 |
| Maryland Processor License | Annual Fee | 0.00 |
| | | |
| Building Costs | | |
| Building Rental | $15,000/month | 180,000.00 |
| Building Maintenance | $.25/sq.ft./mo., 28,500 sq. ft. | 85,500.00 |
| | | |
| Unusual Expenses | | |
| Science Dept Expense Contribution | 7.5% of Revenues | 685,781.25 |
| Low Income Program | 7.5% of Revenues | 685,781.25 |
| | | |
| Insurance | | |
| Insurance - Property & Casualty | Includes Business Interruption | 32,000.00 |
| Insurance - Automobile | 2 vehicles | 3,300.00 |
| | | |
| Bonuses & Incentives | 10% of Net Distribution | 914,375.00 |
| | | |
| TOTAL EXPENSES | | 4,832,037.50 |
| | | |
| NET PROFIT BEFORE CONTINGENCY | | 4,311,712.50 |
| | | |
| CONTINGENCY | 5% of Total Expenses | 241,601.88 |
| | | |
| NET PROFIT | | 4,070,110.63 |
| | | |
| Net Profit as a percentage of gross revenues | | 44.51% |

### 7.4.3  Grower Facility - Full Operation P&L

Revenues - Cultivation

| | | |
|---|---|---|
| 25,000 sq ft. @ 0.35 lbs./sq.ft/yr @ $2,200 | | 19,250,000.00 |
| Net after Sales taxes (projected) | | 18,287,500.00 |

Expenses:

General

| | | |
|---|---|---|
| Facility Manager | | 200,000.00 |
| Assistant Manager | | 75,000.00 |
| Bookkeeper | | 45,000.00 |
| Clerical Assistant | | 45,000.00 |
| Receptionist | | 40,000.00 |

Cultivation

| | | |
|---|---|---|
| Master Cultivator | | 175,000.00 |
| Assistant Cultivators | 5 @ $ $50,000 | 250,000.00 |
| Attendants | 5 @ $38,000 | 190,000.00 |

Trimming & Curing

| | | |
|---|---|---|
| Trimming Supervisor | | 60,000.00 |
| Trimming Assistants | 15 @ $35,000 | 525,000.00 |

Quality Control

| | | |
|---|---|---|
| Chief Lab Technician | | 90,000.00 |
| Laboratory Assistant | | 44,000.00 |
| Laboratory Attendant | | 35,000.00 |

Security

| | | |
|---|---|---|
| Director of Security | | 125,000.00 |
| Security Officers | 5 @ $38,000 | 190,000.00 |

Maintenance

| | | |
|---|---|---|
| Director of Maintenance | | 75,000.00 |
| Maintenance Personnel | 2 @ $42,000 | 84,000.00 |

Third Party Providers

| | | |
|---|---|---|
| Legal & Accounting | | 150,000.00 |
| Community Relations | | 75,000.00 |
| Computer, Phones, Internet | | 25,500.00 |

| | | |
|---|---|---:|
| **Supplies** | | |
| Supplies - Office | | 18,000.00 |
| Supplies - Building & Grounds | $3/46,500 sq.ft | 139,500.00 |
| Supplies - Cultivation | $3/sq/ft, 3.5 cycles, 25,000 sq. ft. | 262,500.00 |
| | | |
| **Utilities** | | |
| Electric - Ambient | | 36,000.00 |
| Electric - Cultivation | | 300,000.00 |
| Propane - Ambient | | 16,200.00 |
| Propane - Cultivation | | 5,400.00 |
| | | |
| **Licenses** | | |
| Maryland Grower License | Annual Fee | 125,000.00 |
| Maryland Processor License | Annual Fee | 40,000.00 |
| | | |
| **Building Costs** | | |
| Building Rental | $15,000/month | 180,000.00 |
| Building Maintenance | $.25/sq.ft./mo., 46,500 sq. ft. | 139,500.00 |
| | | |
| **Unusual Expenses** | | |
| Science Dept Expense Contribution | 7.5% of Revenues | 1,371,562.50 |
| Low Income Program | 7.5% of Revenues | 1,371,562.50 |
| | | |
| **Insurance** | | |
| Insurance - Property & Casualty | Includes Business Interruption | 32,000.00 |
| Insurance - Automobile | 2 vehicles | 3,300.00 |
| | | |
| Bonuses & Incentives | 10% of Net Distribution | 1,828,750.00 |
| | | |
| **TOTAL EXPENSES** | | 8,367,775.00 |
| | | |
| **NET PROFIT BEFORE CONTINGENCY** | | 9,919,725.00 |
| | | |
| CONTINGENCY | 5% of Total Expenses | 418,388.75 |
| | | |
| **NET PROFIT** | | 9,501,336.25 |
| | | |
| Net Profit as a percentage of gross revenues | | 51.96% |

**<u>END</u>**

<u>RESUME (DTD 1-14-2015)</u>

**JEFFREY MARC SISKIND, ESQUIRE**

525 South Flagler Drive, Suite 500  West Palm Beach, Florida  33401
TEL (561) 832-7720 FAX (561) 832-7668  email: jeffsiskind@msn.com

Age 60, married with 3 children ages 9, 12 and 16, resides in Wellington, Florida since 2001

Attorney; member of Florida, Maryland, District of Columbia and US Virgin Islands bars, Florida's Northern, Middle and Southern District (Federal) bars, Maryland District Court (Federal) bar, and United States Supreme Court Bar. Practice is primarily focused on business and real estate development, banking, bankruptcy, construction; located atop Trump Plaza Office Center since 2005.

<u>Current Civic & Business:</u>
Director - Sympatico Equine Rescue, a 501(c)(3) not-for-profit which funds horse rescue operations employing hippotherapy
Director - Consolidated Engineering Company; commercial construction company operating since 1911, most widely known for hospital construction including original Johns Hopkins Hospital complex in Baltimore, Maryland
Director - JurisMortgage; offering law practice loan origination resources
Director - Florida Association of Community Banks & Credit Unions, a trade association representing local banking institutions
President - Chance & Anthem; real property holding and development company
President - CannaMED Pharmaceuticals; applicant, Maryland medical cannabis research and production

<u>Association Memberships & Committees:</u>
Director – William O. Douglas Inn of Court
Chair – Pro Bono Committee Member - Federal Bar Association
Member – International Law Section
Member - American Bar Association
Member – Banking Law and Gaming Law Committees
Member – Palm Beach County Bar Association
Member – Continuing Education & Judicial Relations Committees & Technology Subcommittee
Member - Southern District of Florida Bankruptcy Bar Association

<u>Education:</u>
Bachelor of Liberal Arts, Harvard University, 1982
Master of Liberal Arts, Harvard University, 1983
Juris Doctor, Southwestern University, 1996