Page 1

1              UNITED STATES BANKRUPTCY COURT
                SOUTHERN DISTRICT OF FLORIDA
2                 WEST PALM BEACH DIVISION

3

4                               CASE NO. 18-16248-BKC-MAM

5

6    IN RE:

7

     CHANCE & ANTHEM, LLC,
8              Debtors.
     _____/

9

10

11

12

13

14                       FURR & COHEN
                    2255 Glades Rd., 301E
15                   Boca Raton, Fl 33431
                     September 5, 2018
16                 10:00 a.m. to 4:00 p.m.

17

18

19                    2004 EXAMINATION

20                          OF

21                 JEFFREY M. SISKIND

22

23                     Reported By:
          Anna M. Meagher, Stenographic Reporter
24
                                        **PLAINTIFF'S**
25                                      **TRIAL EXHIBIT**
                                        **T-106**

Page 2

```
 1                    APPEARANCES:

 2

                   GENOVESE JOBLOVE & BATTISTA, by
 3                     JESUS M. SUAREZ, ESQUIRE
                     On behalf of Robert C. Furr,
 4                       Chapter 7 Trustee
                       Jsuarez@gjb-law.com
 5

 6                   JEFFREY M. SISKIND, ESQUIRE
                   On behalf of Jeffrey M. Siskind.
 7                     Jeffsiskind@msn.com

 8

                     ZARETSKY LAW GROUP, by
 9                  RICHARD P. ZARETSKY, ESQUIRE
                  On behalf of Frederick Volkwein,
10                   Sarenil Associates, et al.

11

                        - - - - - - -
12

13                          INDEX

14   WITNESS            DIRECT   CROSS   REDIRECT  RE-CROSS

15   JEFFREY M. SISKIND
        By Mr. Suarez        4              --
16      By Mr. Zaretsky    167              --

17

18

19

20

21

22

23

24

25
```

Page 3

1              EXHIBITS MARKED FOR IDENTIFICATION
2

         Number                                Page
3

            1, Voluntary petition              7
4           2, Declaration and schedules      24
            3, Amended schedules              58
5           4, Commercial lease              76
            5, Settlement statement          79
6           7, Motion for reconsideration    83
            7B, Complaint for damages        87
7          16, Quitclaim deed                99
           19, Indemnity mortgage           102
8          13, Proof of claim               105
           18, Assignment of mortgage       110
9         18B, Notice of lis pendens        112
           19, Indemnity mortgage           114
10         20, Deed in lieu                 116
           21, Assignment of second mortgage 117
11         22, Mortgage                     120
           23, Assignment of mortgage       122
12         25, Special warranty deed        135
           26, Mortgage                     136
13         27, Mortgage                     137
           28, Complaint                    138
14         32, Mortgage deed                144
           33, Mortgage modification agreement 145
15         34, Mortgage modification agreement 146
           35, Mortgage modification agreement 147
16         39, Assignment of mortgage       149
          39B, Notice of lis pendens        151
17         40, Verified complaint           151
           41, Assignment of mortgage       152
18         15, Promissory note              153
           50, Notice of filing             157
19         51, Chase Bank documents         158
           52, Chase Bank documents         159
20         53, Chase Bank documents         161
           54, Chase Bank documents         162
21
22
23
24
25

Page 4

1    Thereupon,

2                          JEFFREY M. SISKIND,

3    having been first duly sworn, was examined and testified

4    under oath as follows:

5                          DIRECT EXAMINATION

6    BY MR. SUAREZ:

7         Q.   Sir, what is your name?

8         A.   Jeffrey Siskind.

9         Q.   And what is your address?

10        A.   3465 Santa Barbara Drive, Wellington, Florida

11   33414.

12        Q.   And what is your relation to the debtor, Chance &

13   Anthem, if any?

14        A.   I was the managing member.

15        Q.   And are you here today in your capacity as the

16   former managing member and prepetition counsel of the

17   debtor?

18        A.   As -- correct.

19        Q.   Now, Mr. Siskind there were two individuals that

20   showed up to the deposition that you asked us to exclude.

21             Can you identify those individuals?

22        A.   Yes.  Robert Gibson, who is not a creditor, and

23   John George, who is not a creditor.

24        Q.   And why have you asked us to exclude them from

25   today's deposition?

1          A.   Because they don't belong in this deposition,

2    because they are not creditors, and because of the animosity

3    between me and those two individuals, which would have

4    precluded my sitting here calmly.

5          Q.   How would their presence preclude you from sitting

6    here and testifying calmly?

7          A.   I've already explained, they're not creditors.

8    They haven't crossed their appearance as did Mr. Zaretsky.

9    They have no business being here.

10         Q.   Any other reasons?

11         A.   There are other reasons, which I prefer not to put

12    on the record.

13         Q.   Can you please put them on the record?

14         A.   No.

15         Q.   Are you refusing to answer the question?

16         A.   Yep.

17              MR. SUAREZ:  Please certify the question.

18    BY MR. SUAREZ:

19         Q.   Mr. Siskind, how long have you been a practicing

20    lawyer?

21         A.   Twenty plus years.

22         Q.   And are you a member of the Florida Bar?

23         A.   Yes.

24         Q.   Are you a member of the Florida Bar in good

25    standing?

1      A.    Yes.

2      Q.    Are there currently any disciplinary proceedings

3  filed against you?

4      A.    Not relevant.  That's not really relevant, is it?

5  That's not --

6      Q.    Mr. Siskind --

7      A.    -- relevant.  I refuse to answer.

8      Q.    -- are there currently any bar proceedings pending

9  against your license?

10      A.    It's not relevant.

11      Q.    Mr. Siskind, are you on any medications that would

12  preclude you from testifying truthfully and accurately here

13  today?

14      A.    No.

15      Q.    Mr. Siskind, are there any other reasons or

16  circumstances that would preclude you from testifying

17  accurately here today?

18      A.    Other than the dustup, which just occurred when

19  you tried to admit those two individuals into the

20  deposition, no.

21      Q.    And how will your, quote unquote, "dustup" affect

22  your ability to testify truthfully here today?

23      A.    Well, right now I have a splitting headache

24  because of it, and as you can tell, I'm upset about it.

25      Q.    Would you like a glass of water?

1      A.    No, I have a cup of coffee.  Thank you.

2            MR. SUAREZ:  We'll mark trustee's Exhibit 1, then,

3      please.

4            (Exhibit 1, Voluntary Petition, was marked for

5      identification.)

6      BY MR. SUAREZ:

7      Q.    Mr. Siskind, prior to the petition date, what was

8      the business of the debtor?

9      A.    Real estate development and development of a

10     cannabis operation in Maryland.

11     Q.    What do you mean by real estate development?

12     A.    Chance & Anthem had purchased and was renovating a

13     house in Wellington, Florida.

14     Q.    What is the address of that house?

15     A.    3445 Santa Barbara Drive, Wellington, Florida

16     33414.

17     Q.    Was Chance & Anthem involved in any other business

18     development?

19     A.    The position that it had in the cannabis project

20     in Maryland.

21     Q.    Let's set the project in Maryland aside for a

22     second, I want to focus.  You said the debtor was in real

23     estate development and had a position in a cannabis

24     operation in Maryland.  With respect to the first prong,

25     real estate development, you've identified the house, the

1    Santa Barbara house.

2             What other real estate interests, if any, did the

3    debtor have?

4         A.    The only one that could possibly fit that

5    description is a mortgage which Chance & Anthem owned for a

6    period of time on a condominium in West Palm Beach.

7         Q.    When was Chance & Anthem organized?

8         A.    I don't remember.  Look at the public record on

9    Sun Biz.

10        Q.    Why was Chance & Anthem organized?

11        A.    I just explained what it did.

12        Q.    I understand your explanation as to what it did.

13             My question is why was Chance & Anthem organized?

14        A.    That question has been answered.

15        Q.    Was Chance & Anthem organized to participated in

16   any particular transaction?

17        A.    I don't understand that question.

18        Q.    What caused you to organize Chance & Anthem?

19        A.    I don't remember.  I believe I organized it to

20   undertake those development opportunities.

21        Q.    Did Chance & Anthem have any other positions in

22   any other real estate?

23        A.    Not that I can remember, no.

24        Q.    Let's discuss the cannabis business, what is

25   Chance & Anthem's interest in the cannabis business as you

Page 9

1   described?

2        A.   As I told you in the 341, and also when I came

3   here for an informal meeting with you and Robert Furr, the

4   company owned 70 percent of CannaMED Pharmaceuticals, LLC.

5        Q.   How is the company's interest in CannaMED

6   Pharmaceuticals evidenced?

7        A.   There was a certificate in the files, and also I

8   provided you with the funding letter, which I promised to

9   get for you at the 341.  Other than that I can't think of

10  anything that would be relevant.

11       Q.   I would like to ask you not to make determinations

12  of relevance and please just answer questions fully to the

13  best of your knowledge and recollection.

14            Who prepared the certificate that you've described

15  in your prior answer?

16       A.   I did.

17       Q.   How was that certificate prepared?

18       A.   On a printer.

19       Q.   Was that certificate prepared on a computer?

20       A.   Yes.

21       Q.   And on what computer was that certificate

22  prepared?

23       A.   I believe it was on my computer.

24       Q.   Did you personally prepare it, or did one of your

25  assistants prepare it?

1      A.   I did it.

2      Q.   And where was the computer that you prepared that

3  certificate located?

4      A.   It was in my office.

5      Q.   Where was your office located?

6      A.   525 South Flagler Drive, Fifth Floor, West Palm

7  Beach, Florida 33401.

8      Q.   Where is that computer located now?

9      A.   That computer is gone.

10     Q.   What happened to that computer?

11     A.   It aged out.  I got a new one.

12     Q.   What happened to the files on that computer?

13     A.   The ones that were needed were either transferred

14 to my computer or were sitting on a hard drive that we put

15 in the filing cabinet -- the filing room, in a file cabinet

16 in the filing room.

17     Q.   And what happened to the file that you created to

18 prepare the certificate evidencing Chance & Anthem's

19 interest in CannaMED?

20     A.   I have no idea.

21     Q.   Do you still have that file?

22     A.   Are you talking about a digital file or the actual

23 paper file?

24     Q.   A digital file.

25     A.   I haven't seen it since I did that, so I would

1  have to say no.

2       Q.   What file storage program did you use at the time

3  that certificate was created?

4       A.   Word.

5       Q.   And on the computer, how did you store that file?

6       A.   I don't know that I stored that file.  When I made

7  up the certificates, I would pull up the certificate on Word

8  and fill in the lines that needed to be filled in, print the

9  certificate and then close it.  I wouldn't save it.

10       Q.   And what did you do with the printed certificate?

11       A.   It was in my files.

12       Q.   And where is that certificate today?

13       A.   I have no idea.  As you know and as I stated in

14  the 341, all my files were taken.

15       Q.   Who took your files?

16       A.   I believe that Robert Gibson took my files.

17       Q.   What evidence do you have of that?

18       A.   Albeit circumstantial, Mr. Gibson hired his own

19  truck, when we were moving out of the offices to remove

20  files.  I gave Mr. Gibson permission to take all of the

21  files that were no longer active.  Let's call those the

22  "dead" files.  He said he was taking them home, and he would

23  store them in his garage.  The reason for that is, I was

24  going to, at the time, just throw them out.  I didn't figure

25  we needed them anymore.  But I said fine.  I think he

1    probably said to me that he thought there were pleadings in

2    those files that he could reuse, you know, why redo them

3    when he could pull something from a file.

4            I really didn't care.  We had too much going on

5    that -- on that day that we were moving out when he asked me

6    if he could do that.

7       Q.    Is Mr. Gibson a lawyer?

8       A.    No.  He thinks he is though.

9       Q.    The dead files that you described, did that

10   include any of your client files?

11      A.    Only old dead client files, which he had access to

12   in the office as my paralegal and case manager.

13      Q.    How do you define a dead client file?

14      A.    One that's no longer active for years.

15      Q.    Did you receive consent from your former clients

16   before turning over their files to Mr. Gibson?

17      A.    Well, I didn't turn over their files to

18   Mr. Gibson, and yes every client knew that Mr. Gibson worked

19   for me as a paralegal and knew that he had complete access

20   to their files.  In fact, all those files were kept in the

21   area of the office where he worked.

22      Q.    More specifically, when you gave those files to

23   Mr. Gibson, did you obtain the consent of your clients prior

24   to giving him the files?

25      A.    How is that relevant to my acting as counsel for

Page 13

1    Chance & Anthem and as its former managing member?  What are

2    you trying to do?

3        Q.   Sir, one of the files that you gave to Mr. Gibson

4    appears to have been files that belong to Chance & Anthem, a

5    former client of yours.

6        A.   No, there's where you're dead wrong.  I didn't

7    give him that file.  My position is that he took all the

8    files, when he has only permitted to take what we referred

9    to as the dead files.

10        Q.   So Mr. Gibson was only allowed to take the files

11    of your former clients, not the files of your current

12    clients; is that correct?

13        A.   Correct.

14        Q.   All right.

15        A.   For -- and let's be clear, for the purposes of

16    storing those files.

17        Q.   Did you ever make any effort to get them back?

18        A.   Yes.

19        Q.   What effort did you make to get them back?

20        A.   I e-mailed him, and he never responded.

21            And by the way, let's be clear, he also, somehow,

22    stopped my access to our online cloud database, which had

23    files, retainer agreements, payment information, and

24    anything else that we were trying to go, you know, paperless

25    and put on the cloud.

Page 14

1      Q.    What e-mail address did you use to e-mail

2  Mr. Gibson about your files?

3      A.    Jeffsiskind@msn.com.

4      Q.    Okay.

5      A.    As I told you in the 341, that's the e-mail

6  address I used for everything.

7      Q.    What's this cloud based software that you've just

8  described?

9      A.    It's called CaseFox.

10     Q.    And how did Mr. Siskind lock you out of CaseFox?

11     A.    I'm Mr. Siskind.  Do you mean Mr. Gibson?

12     Q.    Yes, sir.

13     A.    I don't know.

14     Q.    Did you have a user name and password for CaseFox?

15     A.    I don't have one that I know about.  There may

16  have been one in my computer that loaded automatically.

17     Q.    And how did you pay for CaseFox?

18     A.    I didn't.  He paid for it.  So he either could

19  have stopped paying for it or just closed it or just

20  excluded me.  I can't think any other way he would have done

21  that.

22     Q.    Were there any other records of Chance & Anthem on

23  CaseFox?

24     A.    I don't think so.

25     Q.    Were your trust account ledgers on CaseFox?

Page 15

1       A.    No, never.

2       Q.    Where were your trust account ledgers?

3       A.    Client ledgers were in the client files.

4       Q.    Did you maintain a ledger for the actual trust

5   account?

6       A.    Yeah, I don't know where he kept that.

7       Q.    Where who kept that?

8       A.    Well, Gibson oversaw the trust account balances.

9       Q.    Were you --

10      A.    He did not have access to the trust account

11  itself.

12      Q.    I just want to be clear.

13            Mr. Gibson was the only individual responsible for

14  overseeing the trust account records?

15      A.    No, I oversaw them by overseeing him.

16      Q.    And how did you oversee him?

17      A.    I would ask him regularly as to the condition of

18  the trust account.

19      Q.    Did you review the records regularly?

20      A.    Yes, but not so much toward the end, when I

21  discovered that he was beginning to undertake conduct that

22  would qualify as acting as an attorney, which is ultimately

23  why I had to dismiss him.

24      Q.    What do you mean by conduct -- undertaking conduct

25  of that of an attorney?

Page 16

1      A.    Okay.  Now, here again, we're getting into things

2  that really don't have to do with Chance & Anthem or my

3  working for them as their counsel, so I don't understand why

4  you're going there.  It's not really something that we ought

5  to be talking about today.

6      Q.    Sir, Chance & Anthem was a former client of your

7  firm.  Mr. Siskind was a former employee of your firm.

8      A.    I am Mr. Siskind --

9      Q.    I'm sorry --

10     A.    -- you're talking about --

11     Q.    -- Mr. Gibson.  I keep getting you both confused.

12     A.    I wish you wouldn't do that --

13     Q.    I'm sorry.

14     A.    -- we're entirely different types of people.

15     Q.    If you say so.

16           Remind me what activities of counsel Mr. Gibson

17  was conducting that upset you?

18     A.    I would find out -- no.  That's not relevant.  I

19  mean, I could spend the day talking about that.  Just

20  suffice it to say that he was doing things that were an

21  attorney's role as opposed to that of a paralegal.

22     Q.    You determined then, sir, that Mr. Gibson was

23  acting outside the scope of his employment as a paralegal in

24  our office?

25     A.    Yes.

1    Q.   Did any of these activities relate to the work

2  that you performed for Chance & Anthem?

3    A.   No.

4    Q.   Why is it, then, that when Mr. Siskind started

5  acting -- I'm sorry, I'm going to have a problem with this

6  today.  Let me restart.

7         Why is it, then, sir, that when Mr. Gibson started

8  acting outside the scope of his employment, you stopped

9  reviewing the trust account records?

10   A.   Well, at that point I don't think there was really

11 any activity in the trust account.

12   Q.   What point was that?

13   A.   I don't remember.

14   Q.   Are there any documents that you could review to

15 refresh your recollection?

16   A.   Not that I can think of.  What recollection are

17 you referring to exactly?

18   Q.   The point in time that you stopped supervising

19 Mr. Gibson's maintenance of your trust account records.

20   A.   No, not exactly.

21   Q.   Where is your trust account ledger?

22   A.   Right, I don't know.

23   Q.   What happened to your trust account ledger?

24   A.   How is this relevant to my duties for Chance &

25 Anthem?

Page 18

1      Q.   Sir, what happened to your trust account ledger?

2      A.   Once again, how is this relevant to my duties for

3   Chance & Anthem?

4      Q.   Chance & Anthem was a client of your law firm,

5   sir.  I would like to know where your trust account records

6   are.

7      A.   At this point I can't recall.

8      Q.   Can you recall at any point where your trust

9   account records were?

10      A.   Well, sure, they were in the office until we moved

11   out.

12      Q.   Where in the office?

13      A.   They were in a file, locked file, that was

14   positioned near the front desk, the secretary's desk.

15      Q.   And what happened to that locked file?

16      A.   It was somehow removed.

17      Q.   How was it somehow removed?

18      A.   Now, let me be clear, the file cabinet itself came

19   out with the other five cabinets to the project house.

20      Q.   Okay.

21      A.   But the contents were removed before that.

22           In fact, I remember Mr. Gibson making a big deal

23   that the file containing all of the copies of checks that

24   were paid by clients was missing.

25      Q.   Who removed them?

1    A.    I don't remember.

2    Q.    Did Mr. Gibson remove them?

3    A.    I didn't see him do that, so I can't say.

4          But there were movers that removed all of the

5    files that were in the remainder of those five or six file

6    cabinets, most of which were my father's files.

7    Q.    When you lost your trust account records, did you

8    notify the Florida Bar?

9    A.    No, I didn't say I lost them.

10   Q.    I'm sorry, do you know where they are?

11   A.    Well, as I told you before, I have certain beliefs

12   as to where they are.

13   Q.    Have you notified the Florida Bar that you're no

14   longer in possession of your trust account records?

15   A.    No.  And I don't understand how that's relative to

16   what's going on here today.

17   Q.    Have you notified the police department that your

18   trust account records are missing?

19   A.    No.  You asked me that during the 341, and I

20   explained to you that I didn't believe that that would be

21   availing because I had given Mr. Gibson permission to take

22   what we referred to as the dead files.  So I'm sure that the

23   police would have said, "Well, seems to be a civil matter to

24   us, since you gave him permission to take some of the files

25   and looks to us like he just went outside the scope of his

Page 20

1    authority, which would not be a criminal matter."

2        Q.    I'm sorry, I'm confused.

3              Did Mr. Gibson have authority to store your, quote

4    unquote, "dead files" or did he have authority to take them?

5        A.    No, to store them.

6        Q.    All right.

7        A.    For our use later.

8        Q.    And when you asked Mr. Gibson to return those dead

9    files to you, he was unable to do so --

10       A.    He --

11       Q.    -- or refused?

12       A.    -- didn't respond at all.

13       Q.    And at that point you didn't notify the

14   authorities?

15       A.    Correct.

16       Q.    Or the bar?

17       A.    My opinion at that time was that it would have

18   been unavailing because Mr. Gibson would make sure that

19   those files weren't recoverable if he thought that he was

20   being placed in jeopardy.

21       Q.    Did you notify your former clients that those

22   files had been stolen?

23       A.    How is that relevant?

24       Q.    Did you notify any of your former clients whether

25   your files had been stolen?

1    A.   How is that relevant to today?

2    Q.   I'm going to ask the questions today, Mr. Siskind.

3    A.   I'm not going to answer --

4    Q.   You can --

5    A.   -- that question.

6    Q.   -- either object or not answer.

7    A.   I object to that, and I'm not going to answer it,

8  because it's not relevant to what we're here for today.

9        MR. SUAREZ:  Please certified the question.

10 BY MR. SUAREZ:

11   Q.   Mr. Siskind, Mr. Furr, as the party that has

12 succeeded Chance & Anthem's attorney/client relationship

13 with your office, would like to know where the files of

14 Chance & Anthem are.

15       Now, you've told us that some of these files were

16 given to Mr. Gibson for storage and --

17   A.   No --

18   Q.   -- others may have been taken.

19   A.   -- (inaudible) --

20   Q.   I'm just trying to understand whether we've got --

21   A.   Well, you're mixing it up.

22   Q.   Do we have any --

23   A.   I told you --

24   Q.   -- recourse against Mr. Gibson?

25   A.   I don't know.

1          Q.    Okay.

2          A.    I'm telling you that I authorized Mr. Gibson to

3    take what we referred to as the dead files.  I believe he

4    took all of them.

5          Q.    Including the Chance & Anthem files?

6          A.    All of my business and client files, which I

7    thought had come out to the project house and which don't

8    appear to have been delivered there.  And they could only

9    have gone one other place in my, you know, belief.

10         Q.    Excuse me, I need to stop for a second.  It's my

11   mother's caretaker.

12               (A brief recess was taken.)

13               MR. SUAREZ:  Back on the record.  I apologize.

14   BY MR. SUAREZ:

15         Q.    Mr. Siskind, if you'll please turn to page 4 of

16   this document.  Is that your signature?

17         A.    Why don't you identify the document for the

18   record?

19         Q.    Exhibit 1 that I've marked.

20         A.    Which is the petition filed on behalf of Chance &

21   Anthem.  That is my signature on page 4.

22         Q.    Both as counsel and as the managing member?

23         A.    Correct.

24         Q.    What records did you review to prepare this

25   petition?

Page 23

1          A.    None.

2          Q.    You prepared this petition from memory; is that

3    your testimony?

4          A.    Yes.

5          Q.    Okay.

6          A.    Oh, I may have looked at Sunbiz.org to discern

7    what the federal EIN number was.  I would not have

8    remembered that.

9          Q.    In section 4 you list 27120 Ocean Gateway in

10   Hebron, Maryland in Wicomico County as the debtor's former

11   place of business; is that correct?

12         A.    Yes.

13         Q.    When did that location cease to be the debtor's

14   place of business?

15         A.    I don't remember.  But I gave you the file on the

16   property which included the court paperwork for the eviction

17   proceeding, which is the date, I guess, that -- that would

18   disclose the date on which we were no longer using the

19   building.

20         Q.    It was certainly prior to January 29, 2018; is

21   that correct?

22         A.    Yes.

23         Q.    And on January 29, 2018, is that a date before or

24   after your testimony about Mr. Gibson absconding with your

25   client files?

Page 24

1        A.   I don't remember.

2        Q.   When did you close down your office in Palm Beach?

3        A.   I don't remember.

4        Q.   Okay.

5        A.   I believe it was at the end of 2016, but I'm not

6   sure.

7        Q.   So it was before 2018?

8        A.   Oh, yes.

9        Q.   All right.  So by 2018 you were no longer in

10  possession of your former client files; is that correct?

11       A.   Yeah -- ah, yes.

12            (Exhibit 2, declaration and schedules, was marked

13  for identification.)

14            MR. SUAREZ:  I've marked as Exhibit 2, Docket

15  Entry 11 in the debtor's bankruptcy case.  I've got an extra

16  copy.  I'll pass this down to you, Mr. Zaretsky and

17  Mr. Barbee.

18            MR. ZARETSKY:  Thank you.

19  BY MR. SUAREZ:

20       Q.   Sir, is that your signature at the bottom of the

21  page?

22       A.   At the bottom of page 1, yes.

23       Q.   Are you admitted to practice in the United States

24  Bankruptcy Court?

25       A.   Yes.

Page 25

1      Q.   Are you admitted to practice in the United States

2  Bankruptcy Court for the Southern District of Florida, more

3  precisely?

4      A.   Yes.

5      Q.   How long have you been admitted?

6      A.   I don't remember.

7      Q.   Are you qualified to practice in the Bankruptcy

8  Court?

9      A.   Yes.

10      Q.   You're familiar with the Bankruptcy Code?

11      A.   Certainly.

12      Q.   The bankruptcy rules?

13      A.   Yes.

14      Q.   The local rules of the Southern District of

15  Florida?

16      A.   Yes.  I forget them from time to time, but I can

17  easily read up on them when I am reminded that I've

18  forgotten one or two of them.

19      Q.   There's a lot of them.

20           Did you prepare this declaration filed at Docket

21  Entry 11?

22      A.   Yes.

23      Q.   Did anybody assist you in preparing this

24  declaration?

25      A.   No.

1          Q.    What document did you review to prepare this

2    declaration?

3          A.    I don't remember.

4          Q.    What documents would have existed that you might

5    have reviewed in connection with preparing this declaration?

6          A.    Invoices, primarily, in my payables file, but not

7    all of them, because only the invoices that would have come

8    in, you know, in the last couple months.

9          Q.    Okay.

10         A.    And then also my recollection.

11         Q.    And where are those invoices located?

12         A.    They were in my payables file at some point, but I

13   don't believe I have them anymore.

14         Q.    What happened to those invoices?

15         A.    I have no idea.

16         Q.    Now, those invoices aren't part of the files that

17   you claim Mr. Gibson took, correct?

18         A.    He took all the files, I think, but invoices may

19   have come in after I moved out of the office, which he would

20   not have received.

21         Q.    So where would those invoices be located?

22         A.    I haven't seen them lately, so that's why I have

23   to answer to you, I believe I may have looked at some of

24   those invoices.

25         Q.    Where were those invoices located when you may

1   have looked at them?

2        A.   At that point, the ones I had would have been at

3   my house.

4        Q.   Have you disposed of any of those invoices?

5        A.   I probably have.

6        Q.   Since filing the petition?

7        A.   If I used them to prepare the petition, it would

8   have been afterward.

9             But now that I'm looking through the actual

10  schedules of creditors, it looks like all of these were

11  prepared from memory.

12       Q.   All right.

13       A.   There isn't one of them that's an exact invoice

14  amount.

15       Q.   In page 1 --

16       A.   So let me correct my answer.  I probably did not

17  have any paper invoices that I was looking at.  These

18  numbers are rounded, so these would have been to the best of

19  my recollection at the time.

20       Q.   In part 1 at page 1 -- and granted there are

21  several page ones, but it's page 3 of 13.

22       A.   Three of 33?

23            MR. SUAREZ:  Excuse me, I'm so sorry.

24            (A brief recess was taken.)

25

Page 28

1    BY MR. SUAREZ:

2         Q.    In part one at page 3 of 33, you identify JP

3    Morgan Chase checking account as belonging to the debtor; is

4    that correct?

5         A.    Correct.

6         Q.    Did the debtor ever have any other bank accounts?

7         A.    There was another Chance & Anthem account, yes.

8         Q.    And where was the Chance & Anthem account located?

9         A.    I believe it was at SunTrust.

10        Q.    What happened to the $48.96 in the debtor's

11   account on the petition date?

12        A.    I don't remember.

13        Q.    Did you use them?

14        A.    Well, I don't think it belonged to the debtor.  I

15   think it was my money that just happened to be in that

16   account.

17        Q.    All right.

18        A.    If you remember, Jesus, there was a $400 --

19   approximately $400 shortfall in that account when I called

20   you and said, "Do you want me to close it?"  And you said,

21   "Yes, please close it," and I said I'd take care of the

22   shortfall, which I did.

23              Do you remember that?

24        Q.    What happened to the $48.96 in the account, did

25   you withdraw them after the petition date?

1          A.    I don't know.

2          Q.    Okay.  On page 2, at page 4 of 33, you've listed

3     the debtor's value in CannaMED Pharmaceuticals as an

4     estimate of $1,000?

5          A.    Right.

6          Q.    How did you arrive at that estimate?

7          A.    I just put down a nominal number at that point.

8          Q.    What did you base that nominal number off?

9          A.    What I -- I think I addressed this at the 341.

10    Just what I thought somebody would come in and give me for

11    what was left of CannaMED.

12         Q.    And that's a thousand dollars?

13         A.    It was a nominal number.

14         Q.    Am I reading the number correctly, is that a --

15         A.    You are.

16         Q.    -- thousand dollars?  Okay.

17               On part 7, at page 6 of 33, you've identified a

18    computer, a screen, and a printer as belonging to the debtor

19    for $150.  What happened to that property?

20         A.    I have no idea what happened to that.

21         Q.    And where was it on the date that you prepared

22    this petition?

23         A.    I have no idea where it was on the date I prepared

24    the petition.

25         Q.    Where was it when you last saw it?

Page 30

1      A.   It was at -- as I explained at the 341 -- the

2   building in Hebron.

3      Q.   That the debtor no longer occupied on the petition

4   date; is that correct?

5      A.   Correct.

6      Q.   Yet it still owned a computer, a screen, and a

7   printer that was in that building?

8      A.   I think it was important to disclose that there

9   was a computer there.

10     Q.   Did you think it was important to safeguard that

11  property?

12     A.   I don't understand that question.

13     Q.   Sure.  You listed a computer, a screen, and a

14  printer as belonging to the debtor on the petition date, but

15  you don't seem to recall what happened to it.

16          And you're, I believe, unable to turn it over to

17  the trustee; is that correct?

18     A.   It's my understand that it's no longer in the

19  building.

20     Q.   How did you reach that understanding?

21     A.   I spoke to somebody who had been in the building

22  after I was there.

23     Q.   Who is that "somebody"?

24     A.   I can't remember.

25     Q.   And what did that person tell you about the

Page 31

1    disposition of the computer, the screen, or the printer?

2         A.   That they hadn't seen it.  That anything that was

3    within the building had been removed.

4         Q.   So you thought it was important to disclose in the

5    schedules that the debtor owned a computer, a screen, and a

6    printer, but you didn't think it was important to protect

7    that property to turn it over to the trustee; is that

8    correct?

9         A.   No.

10        Q.   So why are you unable to turn it over to the

11   trustee?

12        A.   Like I said, I don't know where it is.  That

13   doesn't mean I wouldn't have protected it when I filed the

14   bankruptcy on behalf of Chance & Anthem if I had it or if I

15   had the ability to get it.

16        Q.   And what was on the computer?

17        A.   Correspondence and records.

18        Q.   What kind of records?

19        A.   Probably time sheets for the employees that worked

20   up there.

21        Q.   Employees that worked for Chance & Anthem?

22        A.   Yes.

23        Q.   How were those employees compensated?

24        A.   They were paid by checks.

25        Q.   From what account?

1      A.    Primarily, I believe, the Chase account, Chance &

2   Anthem's account at Chase Bank.

3      Q.    And who were these employees?

4      A.    By name?

5      Q.    Yes, sir.

6      A.    Let's think, Bob Sauve, S-A-U-V-E, Matt Hoffman,

7   Bruce Lowe.  I cannot remember the name of our security man.

8   Just a minute, there are more.  I can't remember the name of

9   our public relations liaison either.  Oh, Hal -- Harold

10  Saylor, S-A-Y-L-O-R, and then we had a construction crew in

11  there also.  I think it was a three-man crew.  May have been

12  a four-man crew, and then various third-party vendors.

13     Q.    All right.  And what were the job responsibilities

14  of these individuals?

15     A.    Well, Harold Saylor was our public relations

16  liaison.  We had originally hired him for security, but he

17  was very good with the public, so we switched his role.

18     Q.    What did he do for the public?

19           What part of Chance & Anthem's business did these

20  people work for?

21     A.    Well, those people were included on our

22  application to the State of Maryland as our staff, and then

23  when the application process was delayed from an award in

24  either December or January of 2015, 2016, to August of 2016,

25  we -- the company employed them as workers, rehabilitating

Page 33

1      the building, so we wouldn't lose them.

2           Q.   All right.  You say "our" application, was that

3      Chance & Anthem's application?

4           A.   No.  CannaMED's application.

5           Q.   Did these folks provide services to Chance &

6      Anthem, to CannaMED, or both?

7           A.   Chance & Anthem.

8           Q.   They did no work for CannaMED?

9           A.   No.  CannaMED never really got started.

10          Q.   Okay.  But you just said they worked in connection

11     with the application.

12          A.   They were included in the application as our

13     staff, when we put all our bios in, because we thought that

14     would be a strong point of our application.  But CannaMED

15     never entered into business.  All it did was submit that

16     application.

17          Q.   And these individuals were never employed by

18     CannaMED?

19          A.   Correct.  They were employed by Chance & Anthem,

20     which had the lease option on the building, and we figured

21     that while we were waiting, so as not to lose these people

22     to other opportunities and risk the state saying, "Well, are

23     you still able to meet the requirements of your application;

24     do you have your staff," we employed them to do things in

25     the building.  So they all became temporary construction

Page 34

1  workers.

2       Q.   Why was Chance & Anthem the tenant of that

3  building?

4       A.   I don't remember.  You asked me that at the 341.

5  I didn't remember then.

6       Q.   I'm curious to know, because I believe your

7  testimony is that that building was for CannaMED's

8  operation, but Chance & Anthem was the tenant; is that

9  correct?

10      A.   Chance & Anthem had a lease purchase, so it would

11 have owned the building.

12      Q.   Did Chance & Anthem sublet to CannaMED?

13      A.   I don't remember whether we ever had a written

14 agreement, but that, of course, would have been the

15 intention.  CannaMED would have run the business operations,

16 while Chance & Anthem would have owned the building.

17      Q.   All right.  I'd like to turn your attention to

18 page 3 of 13.

19      A.   Thirty-three?

20      Q.   Thirteen of 33.  Numbers, names, I know it's

21 difficult for a lawyer, right?

22      A.   All right.  These are the unsecured creditors.

23      Q.   These are the unsecured creditors.

24      A.   Right.

25      Q.   Bay Area Disposal --

Page 35

1       A.   Right.

2       Q.   -- $280?

3       A.   That's what I thought it was.

4       Q.   Waste services?

5       A.   Right.

6       Q.   And you came up with that number based on your

7  recollection?

8       A.   Yeah.

9       Q.   You didn't look at an invoice?

10      A.   No.

11      Q.   Same thing for Apostle Construction, $5,000 for a

12  roof repair?

13      A.   Correct.

14      Q.   That was for a roof repair in the Hebron property?

15      A.   Right.  I think that was half the amount we owed

16  them.

17      Q.   T.E. Smith & Son, HVAC maintenance, $450?

18      A.   Again, from memory.  I don't know if that's --

19      Q.   Purely from memory?

20      A.   Yeah.

21      Q.   Beaver Tree Service, $3,950?

22      A.   Correct.  Now, I think that's an accurate number.

23      Q.   The others are inaccurate?

24      A.   I think they may have e-mailed me an invoice.

25      Q.   To your MSN address?

1      A.    Yeah.

2      Q.    Let's talk about item 3.5, Frederick Volkwein,

3   $500,000?

4      A.    Right.

5      Q.    Money loaned or invested?

6      A.    Correct.

7      Q.    To whom was that money loaned?

8      A.    That was money that I used, from Fred's net

9   proceeds from the sale of a couple properties that I handled

10  the closing on, toward the operation of the company.

11     Q.    What were the terms of that loan or investment?

12     A.    Well, as I explained to you before, Fred is a

13  longtime friend of mine, and I had had a grant of authority

14  from Fred, I think it was pursuant to a power of attorney

15  actually, to utilize a portion of the net proceeds of his

16  property sale toward this and other ventures.

17     Q.    Okay.  Was that documented in any way?

18     A.    I have the power of attorney, and I furnished him

19  with a -- a ledger, more or less, I guess you could call it

20  a ledger of the disposition of his funds a couple years ago.

21  I looked for that the other day, and I can't find it.  I'm

22  sure he has it.

23     Q.    How about the power of attorney, where is that

24  located?

25     A.    I haven't seen that in a while, but I do have a

Page 37

1    file on Fred, which I think related to a case I worked on

2    for him, and it may be in there.

3         Q.    Is that part of the files taken by Mr. Gibson, or

4    is that another file?

5         A.    No, no.  That's a file I've seen since.

6         Q.    Okay.  And where is that file, where have you seen

7    that file since?

8         A.    I saw it in my house.

9         Q.    In what room in your house?

10        A.    Oh, I don't remember what room.

11        Q.    Do you keep all of your --

12        A.    I think it was in the garage.

13        Q.    In the garage?

14        A.    Yes.

15        Q.    Do you have an office at home?

16        A.    Yes.

17        Q.    Do you keep client files in there?

18        A.    In where?

19        Q.    In your home office.

20        A.    No, not in the office per se.  There's a closet

21    nearby where I have some files.

22        Q.    Are there any Chance & Anthem files in that

23    closet?

24        A.    There were.  I gave you what I had.

25        Q.    Just that one file relating to the lease?

1      A.    Yeah.

2      Q.    And you've identified this claim as unliquidated

3  but not contingent; is that correct?

4      A.    Right.  I think Fred put in a proof of claim for a

5  different amount.

6      Q.    And you indicated here that it's not subject to

7  any offset?

8      A.    No, it's not subject to an offset.

9      Q.    How about Richard Neff in the amount of $526,000,

10  what were the terms of that loan or investment?

11      A.    I think that number is wrong.  I think I

12  remembered it, for some reason, as five-twenty-six, but it's

13  five-twenty-five he told me.

14      Q.    Okay.

15      A.    That money went into the -- 500,000 of it went

16  directly into the property rehab job in Wellington.

17      Q.    What do you mean by the "property rehab job" in

18  Wellington?

19      A.    3445 Santa Barbara.

20      Q.    And when you say it "went directly into it," what

21  do you mean by it went directly --

22      A.    We used it for the purchase of the property.  At

23  least that's what I remember.

24      Q.    Where would those funds have originated?

25      A.    I'm pretty sure that Richard put that 500 into the

1   Chase account that Chance & Anthem had.

2        Q.    Directly into Chase?

3        A.    Yeah.

4        Q.    From his own account, not your trust account?

5        A.    No, no.  He never used the trust account.

6        Q.    ABK South Properties, care of --

7        A.    Now, wait a minute, I didn't finish explaining

8   that.  Then the other 25 he funded later.  When I had gone

9   out-of-pocket for so much for the expenses related to the

10  house, and we were looking at having to do the roof, I asked

11  him for another 25,000, which he gave me.

12       Q.    And where was that 25,000 deposited?

13       A.    In Chase.  I think his account was at Chase, so it

14  was easy for him to do that.

15       Q.    When you say you went "out-of-pocket" on the

16  house, how did you go out-of-pocket on the house?

17       A.    Well, I was spending my money and getting down to

18  a point at which I didn't have any funds, so I think I might

19  have asked him at that point.

20       Q.    Where was that money coming from?

21       A.    What money?

22       Q.    Your money that you were spending on the house.

23       A.    I don't remember.  It was coming from whatever

24  sources were available, I suppose.

25       Q.    Was it coming from your own personal account?

Page 40

1      A.   I don't remember.

2      Q.   You just said it was "your" money.

3           Was it your, Jeffrey Siskind's, individual money?

4      A.   I didn't say that.

5      Q.   Okay.  So if it wasn't your individual money, who

6  did the money belong to?

7      A.   I don't understand the question.

8      Q.   You've testified that you were putting your money

9  into the project house.

10     A.   Right, I was using some of my funds --

11     Q.   Okay.

12     A.   -- toward the project house, which were depleting

13  my funds, as I remember.

14     Q.   As you remember?

15     A.   To the best of my recollection, I was utilizing my

16  own funds and that had placed me in a situation where I

17  didn't have any money to pay my own bills.

18     Q.   When you say "my funds," I'm trying to confirm, it

19  was your individual money.

20     A.   I believe that's correct.  That's what "my funds"

21  means.

22     Q.   And where would "my funds" have come from during

23  this period of time?

24     A.   I don't remember that.

25     Q.   Was this during the period of time that you were a

Page 41

1   Chapter 11 debtor?

2       A.   It would have -- I don't know.  Yeah, it would

3   have had to have been.

4       Q.   So in theory we would see those transactions in

5   your monthly DIP reports?

6       A.   You should, yes.

7       Q.   And how would I be able to identify what funds

8   from those DIP reports you spent on the Santa Barbara house?

9       A.   I don't really know that I can answer that in any

10  way that would not be pure conjecture.  Perhaps you'll see

11  payments to Chance & Anthem.  I haven't looked at my debtor

12  reports in a long time.  But you may, if you review them,

13  see disbursements to Chance & Anthem.

14      Q.   Is there anywhere else that your own personal

15  funds would have come from during that period?

16      A.   Not that I can think of, no.

17      Q.   ABK South Properties, LLC, how are they a creditor

18  of Chance & Anthem?

19      A.   APK (sic) provided a hundred thousand dollars to

20  utilize for the cannabis project and about 160,000 to

21  utilize for construction of the project house.  I think I

22  misstated that during the 341, so check that, but the answer

23  I just gave you is accurate.

24      Q.   What were the terms of that investment?

25      A.   I don't remember, but there was a document that --

Page 42

1    that memorialized the terms, so if you look for that, you

2    can probably get that from APK.

3         Q.   Would that document be anywhere in the debtor's

4    books and records?

5         A.   Sure, should be.

6         Q.   All right.

7         A.   I remember putting it in the file.

8         Q.   And where is that file?

9         A.   You keep asking me the same question, Jesus, and I

10   keep giving you the same answer.

11        Q.   Well, are those part of files that Gibson, you

12   say, took?

13        A.   Those are the files that left the office, which I

14   believe Robert Gibson took.

15        Q.   How about 3 Gen VC, LLC?

16        A.   Right.  They put a hundred thousand dollars up for

17   funding for the cannabis project.

18        Q.   When you say they "put up" a hundred thousand

19   dollars for the funding of the cannabis project, what do you

20   mean by that?

21        A.   Well, I don't remember how that was done, but I

22   remember -- this is a longtime friend of mine also from

23   Baltimore who provided a hundred thousand dollars to become

24   involved in the cannabis project.

25        Q.   Was that a loan or an equity investment?

Page 43

1      A.    I don't remember what we did.

2      Q.    And how was that --

3      A.    It could have been both.

4      Q.    I'm sorry, it could have been both?

5      A.    Could have been both.

6      Q.    How would it have been both?

7      A.    Well, these were deals that I don't remember, but

8  there had to have been paperwork on that one too.

9      Q.    And where would that paperwork be?

10     A.    It would have been in the file for Chance &

11  Anthem.  I don't think I kept a separate file for that

12  transaction.

13     Q.    How about Richard Bell?

14     A.    Richard was an investors from Delaware.

15     Q.    And, again, these were all sums that you came up

16  with from your recollection?

17     A.    Well, no, I remember the -- yes, yes, yes, they

18  are.  But I'm certain of the numbers for 3 Gen VC and

19  Richard Bell.

20     Q.    All right.  But there are no documents that you

21  used to assist you in preparing these schedules?

22     A.    Correct.

23     Q.    Nothing on the computer?

24     A.    I didn't look at anything, but I did go looking

25  for these addresses.

Page 44

1      Q.   And how did you do that?

2      A.   I don't remember.  I remember -- I do remember

3 going to find the address for the power company, because I

4 remember I couldn't discern which address they had listed on

5 their website to use.  Wellington 3445, LP, I know that

6 address by heart.  Haynes Scaffolding I looked up on the

7 Internet.

8      Q.   How about All Pro Pool Service?

9      A.   Yes.

10      Q.   That was pool maintenance on the Santa Barbara

11 project house?

12      A.   Yes.

13      Q.   PTM Electric, was that work on the Santa Barbara

14 project house as well?

15      A.   Yes.

16      Q.   Did 3 Gen ever receive any repayment on its

17 investment?

18      A.   No.

19      Q.   Were you ever the lawyer for 3 Gen --

20      A.   No.

21      Q.   -- in any transaction?

22      A.   Not that I can think of, no.

23      Q.   Did you ever engage in any other dealings with

24 them?

25      A.   I don't recall ever engaging in another dealing

Page 45

1    with that entity, no.

2        Q.    What's Wellington 3445, LP?

3        A.    That's an entity owned by Frank Zokaites.

4        Q.    And how is that entity a creditor of Chance &

5    Anthem?

6        A.    That entity bought the mortgage on the project

7    house and foreclosed on it, and the number there is my

8    estimate of what the deficiency was between the foreclosure

9    judgment amount and the sale price.

10        Q.    Do you have any ongoing role with the project

11    house?

12        A.    No.  And I've told you all that at the 341.

13              So are you going to ask it again just for grins,

14    or why go over it again, Jesus?

15        Q.    When was the last time you were at the project

16    house?

17        A.    Today.

18        Q.    And what were you doing at the project house

19    today?

20        A.    Looking at it.

21        Q.    On the property?

22        A.    I just pulled into the driveway on the apron to

23    see what they were doing.

24        Q.    Are you doing work for Wellington 3445?

25        A.    No.  Not that I can think of, no.

Page 46

1      Q.   Have you ever been employed by Wellington 3445?

2      A.   I don't know.  I don't think I was ever paid by

3  Wellington 3445, but I can't answer that question because I

4  don't know.

5      Q.   You don't know if you ever did any work for

6  Wellington 3445?

7      A.   Correct.  I don't know if I did any work for that

8  entity, per se.  I've done work for Frank Zokaites.

9      Q.   Have you done any work for Frank Zokaites relevant

10  to the Santa Barbara project house?

11      A.   Sure.

12      Q.   What work have you done for Frank Zokaites --

13      A.   I don't remember.

14      Q.   -- relative to the Santa Barbara project house?

15      A.   I don't remember.  I just remember being

16  reimbursed.

17      Q.   Reimbursed for what?

18      A.   For expenditures for the Santa Barbara house.

19      Q.   What kind of expenditures?

20      A.   I don't remember.

21      Q.   Were these expenditures of a professional kind or

22  a labor kind or an asset kind?

23      A.   I don't remember doing any professional work.  I

24  remember buying things that needed to be utilized there and

25  being reimbursed for them.  I don't think I was ever paid

Page 47

1  for any labor there, no.

2      Q.   Who is David Fiore?

3      A.   David owns the -- oh, God, I can't think of the

4  name of it, the strip club on Military, a couple blocks

5  south of Southern Boulevard.

6      Q.   Has David Fiore ever been your client?

7      A.   Sure.

8      Q.   Why have you listed David Fiore, et al. as a

9  creditor of Chance & Anthem in the amount of $2.8 million?

10     A.   Which number is he?  Oh, I see it.

11     Q.   It's 3.16 -- 3.14, I'm sorry.

12     A.   He's quite a character, David Fiore.  The reason I

13  had to list him is because he originally filed that state

14  court suit, along with the George brothers and crazy John

15  George who was here, and he listed that amount in his suit,

16  so I had to transpose that.

17          Based on my experience in my own Chapter 11, where

18  I excluded a so-called creditor because I knew their claim

19  was barred by the statute of limitations, Judge Hyman gave

20  me a lot of grief for that.  So when I prepared this

21  schedule, I said I better -- said to myself, I better list

22  him for the amount that he claimed in that lawsuit.

23          Now, since the lawsuit has evolved to the extent

24  that it's apparent that he's not owed that money, but be

25  that as it may, I believed it was appropriate to err on the

Page 48

1   side of caution and list him at his initially claimed

2   amount.

3        Q.   Now, you haven't indicated on these schedules that

4   that amount is disputed, have you?

5        A.   No, because it's in litigation, so it's going to

6   be liquidated one way or the other, and I thought just

7   listing it as unliquidated would essentially cover the

8   condition of that claim accurately.

9        Q.   So in your mind, there was no connection between

10  that claim being in litigation and it being disputed?

11       A.   Well, the fact that there's litigation indicates

12  that it's disputed, doesn't it?

13       Q.   Okay.

14       A.   So if you want to ding me for checking the wrong

15  box, go ahead.

16       Q.   Just asking.

17       A.   But if you recall, this sorta came up in the 341

18  when Robert Furr asked me if I intended to amend the

19  schedules, and I told him I did.

20       Q.   And have you amended the schedules?

21       A.   No, I can't now, because you got the Judge to

22  order that I can't do anything more on behalf of the debtor.

23  I dragged my feet too long.  Now you've got to do it.

24       Q.   Sovereign Gaming, how is Sovereign Gaming a -- I'm

25  sorry, 3.15, you've listed Sovereign Gaming & Entertainment,

1   LLC --

2        A.   Correct.

3        Q.   -- as a creditor in the amount of $2 million.

4        A.   Correct.

5        Q.   How was Sovereign Gaming & Entertainment, LLC a

6   creditor in the amount of $2 million?

7        A.   Well, again, I felt it was appropriate to err on

8   the side of caution there.  That was the original amount

9   loaned to Sovereign by Chris George, and some or all of it

10  was then loaned to the debtor, so it was listed as an

11  estimated amount.

12       Q.   How was the loan from Sovereign to the debtor

13  evidenced?

14       A.   I don't know that it ever was.  It was evidenced

15  by the distributions.

16       Q.   What distributions?

17       A.   From Sovereign to Chance & Anthem.

18       Q.   Sovereign deposited $2 million in Chance &

19  Anthem's bank account?

20       A.   No, not all of it.  I remember a million of it was

21  used for the Trump Plaza property, but I didn't remember

22  that at the time I was filing out these schedules.

23       Q.   What do you mean by a million of it was "used for"

24  the Trump Plaza property?

25       A.   My recollection is that a portion of the money --

Page 50

1    I better not say a million, but that a portion of the money

2    was used toward the acquisition of the company that owned

3    the office.

4         Q.   Is that OB Real Estate?

5         A.   Yeah, OB Real Estate Holdings 1632, LLC.

6         Q.   And how would Chance & Anthem be liable for that?

7         A.   I don't know that they would be.  Again, I listed

8    it just to err on the side of caution.

9         Q.   But you didn't indicate that it was disputed?

10        A.   Well, I indicated that it was unliquidated.  So,

11   obviously, you'll discern whether or not any part of that is

12   an obligation of the debtor.

13        Q.   You indicated earlier that Chance & Anthem had

14   another bank account at SunTrust?

15        A.   Yeah.

16        Q.   Is there a reason that wasn't disclosed in the

17   debtor's schedules?

18        A.   I didn't remember it, but somehow it just came to

19   mind.

20        Q.   It just came to mind today?

21        A.   No, no, not today.

22        Q.   When did come to mind?

23        A.   I don't remember.

24        Q.   And how did it come to mind?

25        A.   How did it come to mind?  I don't remember whether

Page 51

1    I thought it of in my sleep or while I was driving or taking

2    a shower.  Come on, it just came to mind.

3         Q.   I would like to review the litigation that you've

4    indicated here Chance & Anthem is a party to.

5         A.   Yeah, not by choice, obviously.  Chance & Anthem

6    was sued, so.

7         Q.   At 7.1 Zokaites Properties versus Mohammed?

8         A.   Oh, let's straighten that out, because Frank's

9    name was butchered at the 341.  It's Zokaites,

10   Z-O-K-A-I-T-E-S.

11        Q.   I may never be able to pronounce that, so you'll

12   have to bear with me.  Zokaites, better?

13        A.   Yeah.

14        Q.   What's Chance & Anthem's interest in that

15   litigation?

16        A.   Which number are we looking at?

17        Q.   It's 7.1.

18        A.   What page?

19        Q.   Page 22 of 33.  And I got it right that time.

20        A.   Good job.

21             Okay.  That's just a disclosure of the litigation,

22   so what is your question?

23        Q.   What is Chance & Anthem's interest in that

24   litigation?

25        A.   Oh, this is Zokaites versus Mohammed, and Chance &

Page 52

1    Anthem is probably a defendant.  I don't remember why I

2    listed that.

3        Q.    All right.  Did you represent Chance & Anthem in

4    that case?

5        A.    Yes.

6        Q.    And why would Zokaites be --

7        A.    If it's in that case.  Oh, I remember now.  Chance

8    & Anthem was the plaintiff prior to Zokaites being the

9    plaintiff.  Chance & Anthem sold its interest in that

10   mortgage to Zokaites.

11       Q.    When did Chance & Anthem sell its interest in that

12   mortgage to Zokaites?

13       A.    I don't remember.

14       Q.    What was the amount of the mortgage?

15       A.    Face amount was $25,000.

16       Q.    And how much did Chance & Anthem receive for the

17   sale of that mortgage?

18       A.    I don't remember, somewhere about.  Maybe 22,500.

19             You asked me this at the 341.

20       Q.    Where did that 25,000 --

21       A.    The twenty-two-five went into the transfer account

22   at PNC, which you wrongfully confused with my trust account.

23       Q.    What is a transfer account?

24       A.    Just an account I set up, like I told you at the

25   341, at a bank which happened to be both in Pittsburgh,

Page 53

1    where Frank was, and in Florida, near where I am, so that he

2    could make deposits into PNC, and they would be available to

3    me the next day, as opposed to mailing me a check, which

4    sometimes took a week for some reason.

5         Q.   Who was the account holder of that account?

6         A.   Siskind Legal Services, LLC.

7         Q.   And was that account denominated an escrow

8    account?

9         A.   I called it a "transfer" account.  At times I've

10   utilized the term "escrow" for it, yeah.

11        Q.   That was not an IOTA trust account?

12        A.   No, huh-uh, never was.

13        Q.   And was it used for transactions involving anyone

14   other than Frank Zokaites?

15        A.   Well, I used it for business transactions after it

16   was set up, but never as a client escrow that I can recall.

17        Q.   What do you mean by "business transactions"?

18        A.   Just business transactions for the law firm.

19        Q.   And that's Siskind Legal Services?

20        A.   Right.

21        Q.   I'm confused, it happens a lot.

22             Siskind Legal Services, LLC is that your law firm?

23        A.   Yes.

24        Q.   Do you practice law through any other entities?

25        A.   I don't use Siskind Legal Services any more.  I

Page 54

1    just -- it's Jeff -- it's just called Siskind Legal now.  I

2    let Siskind Legal Services lapse.

3         Q.   You practice law just in your individual name, not

4    through any entity?

5         A.   Again, what period of time?

6         Q.   Currently.

7         A.   Right now, yes, just through my individual name.

8    Siskind Legal.

9         Q.   Is Siskind --

10        A.   Jeffrey M. Siskind, d/b/a Siskind Legal.

11        Q.   All right.  Siskind Legal is not incorporated?

12        A.   No.

13        Q.   How about New Wave Lenders versus Chance & Anthem,

14   7.2 in the schedules?

15        A.   What kind of question is that, "how about"?  How

16   about?  What's your question?

17        Q.   You're right.

18             What is Chance & Anthem's interest in New Wave

19   Lenders versus Chance & Anthem, LLC, the case you've

20   indicated at 7.2?

21        A.   Chance & Anthem was the defendant.

22        Q.   And what was the claim against Chance & Anthem in

23   that case?

24        A.   Foreclosure, we stopped paying the mortgage.

25        Q.   Mortgage on what?

1       A.    The project house.

2       Q.    And New Wave Lenders held a mortgage on that

3  project house?

4       A.    Correct.

5       Q.    And was Chance & Anthem the borrower that resulted

6  in that mortgage?

7       A.    That resulted?  I believe they were the borrower.

8       Q.    And what did Chance & Anthem do with the proceeds

9  from that loan?

10      A.    Utilized it toward the cannabis deal.

11      Q.    Not the project house?

12      A.    Some of the monies might have been used in the

13 project house.  But when we were faced with an eight-month

14 delay in Maryland on the award of the cannabis license,

15 which we were certain we were going to get, we took

16 preventative measures and borrowed some money to keep paying

17 bills.

18      Q.    Were the monies that were used for the project

19 house and the monies that were used for CannaMED segregated,

20 or they were just kept in one account?

21      A.    One account, as I recall.

22      Q.    Was there any --

23      A.    Well, let me just say this, they weren't

24 segregated.  They weren't segregated as between the two

25 projects, no.

1      Q.   Did you maintain any books for this account to

2  keep track of the assets and liabilities of Chance & Anthem

3  in writing in any way?

4      A.   Not that I recall, no.

5      Q.   Just kept all of that in your head?

6      A.   Or used the checkbook as the record.

7      Q.   In the checkbook, as in a handwritten check

8  register or --

9      A.   No, no, just --

10      Q.   -- just the bank accounts?

11      A.   -- the bank account information at Chase.

12      Q.   Never prepared --

13      A.   I guess at SunTrust too.

14      Q.   You never prepared any financial statements for

15  Chance & Anthem?

16      A.   No.  Not that I can remember, no.

17      Q.   Did Chance & Anthem have a QuickBook --

18      A.   No.  You asked me that at the 341 too.

19      Q.   Or any other sort of accounting program in the

20  cloud --

21      A.   No.

22      Q.   -- or on a computer?

23      A.   Nope.  Just the check -- check register.

24      Q.   Where was the check register maintained?

25      A.   On my computer.

Page 57

1      Q.   And what computer is that?

2      A.   The computer I use for everything I do.

3      Q.   Is that the computer that's in your home office?

4      A.   Correct.

5      Q.   What is the name of the program that you use?

6      A.   It's just a check writing program.  I can't

7  remember.  It's very old.  If you said it, I would know.

8      Q.   And that's on your computer at home?

9      A.   Right.  And it can interface with QuickBooks if

10  you have QuickBooks, but I don't have QuickBooks.

11      Q.   And that check register system would have a

12  history of every transaction that Chance & Anthem was

13  involved in?

14      A.   You could print off all the checks that were

15  written on the Chance & Anthem account, yeah.

16      Q.   Do you use that check writing software for your

17  trust account?

18      A.   I don't think that's relevant, but if you can tell

19  me how it is -- I think I've already answer it anyway.

20      Q.   Have you?

21      A.   I use it for everything.

22      Q.   So you do use that check register to maintain your

23  trust account?

24      A.   Yes.  Now, remember, it's just a check writing

25  program.  There's no balancing or anything like that in it.

Page 58

1    It's just a template that you use to write a check.

2         Q.   It simply keeps a record of every check written on

3    that program?

4         A.   No, not every check, because on the accounts

5    where, you know -- for instance, the bank account is the

6    better record, because I would -- if my recollection is

7    correct -- go to Maryland when it was near payroll day and

8    take checks that were printed out in blank and then fill

9    them out to the people that needed to be paid, on at least

10   one occasion, maybe many occasions.  I can't remember how

11   many.  So I often would not go back into that check writing

12   program and put in the amounts.  So you wouldn't have those

13   checks.  That's why I say the account information from the

14   bank is the better record.

15        Q.   And is that your signature at page 33 of 33 of

16   this document?

17        A.   Yes.

18             (Exhibit 3, amended schedules, was marked for

19   identification.)

20             THE WITNESS:  You didn't ask me about the Fiore

21   case.  Oh, maybe you did, 7.3?

22   BY MR. SUAREZ:

23        Q.   What is the debtor's interest in the Fiore case

24   identified at 7.3?

25        A.   The debtor is one of the defendants, but that case

Page 59

1    is a real mess, because like I told you, David Fiore

2    originally brought the case using Sofiye Williams as his

3    counsel, claiming that the claims against all of the

4    defendants -- which was me, my law firm, my father, maybe

5    his law firm, Chance & Anthem, Sovereign Gaming, I forget

6    what other defendants there may have been, claiming that he,

7    David Fiore, was owed all that money because he had

8    assignments from Chris George and Carl Stone.  It's still

9    hard to understand who is making the claim for the 800,000,

10   but the two million that he claimed he had a right to obtain

11   was then claimed by Chris George, who was added as a

12   plaintiff, and Diana George, who is his ex-wife.  I mean, so

13   at this point in time, I think all of his claims are at

14   zero.

15        Q.    All whose claims are at zero?

16        A.    David Fiore's, in that case, and I don't think --

17   did I list him as a creditor in the Chance & Anthem

18   bankruptcy?

19        Q.    You did.

20        A.    So you have to look at that.  I think you're going

21   to be able to defeat that claim.  I think you're going to be

22   able to defeat all those claims, the two million, whatever

23   David Fiore has claimed, and you should.

24        Q.    How about the Chris George claim?

25        A.    How about it?

Page 60

1          Q.    Can I defeat that?

2          A.    Yes.

3          Q.    How can I defeat that claim?

4          A.    Because he loaned the money to Sovereign Gaming.

5    It's an entirely separate company.

6          Q.    And what did Sovereign Gaming do with that money?

7          A.    It utilized it in the different projects that

8    Chris George authorized.  You should look at the case that

9    we call the Talavera case, T-A-L-A-V-E-R-A, where -- I can't

10   remember who the plaintiff is in that case.  Oh, it's

11   Zokaites Properties versus Sovereign Gaming, right, it's a

12   mortgage foreclosure, where one or more of the Georges

13   intervened.

14          In that case I wasn't present for the trial, and

15   they started talking about things that I did wrong, which I

16   was culpable for.  Well, as soon as I found out about that,

17   I filed all the correspondence from Chris George, which

18   elucidates all of the transactions that he authorized, and

19   at that point I had to.  Prior to that I couldn't, because

20   he was a client, but --

21          Q.    Chris George --

22          A.    -- when he put my interest at risk, I had to.

23          Yeah, Chris George was a client.

24          Q.    Did any of the money that Chris George lent,

25   according to your testimony, to Sovereign Gaming make its

Page 61

1    way into either the project house or CannaMED?

2         A.   I don't know.  You'd have to do a forensic

3    accounting to determine that.  That's why it's a good thing

4    you have Mr. Barbee onboard.

5         Q.   Let's go through Docket Entry 59, which I've

6    marked as Exhibit 3.

7              Is that your signature at the bottom of page 1 of

8    Docket Entry 59?

9         A.   Yes.

10        Q.   Okay.

11        A.   Although not a very good rendition of it.

12        Q.   But it is your signature?

13        A.   Yeah.

14        Q.   What caused you to file this amended Schedule A?

15        A.   Oh, I didn't even remember I did.  I probably --

16   yeah.  I changed the valuation of CannaMED from the nominal

17   number to what I thought would be a good valuation, which

18   was 14 million at the time.

19        Q.   And has that valuation since changed?

20        A.   Yep.

21        Q.   How has that valuation changed?

22        A.   Well, I think it's gone down appreciably since

23   their bankruptcy case was transferred to Florida.

24        Q.   Why?

25        A.   I don't think I'm going to have the leverage that

Page 62

1    I hoped to get out of the bankruptcy case in fighting the

2    CannaMED suit against the State of Maryland in Annapolis.

3         Q.   How are the two related in your mind?

4         A.   Well, Chance & Anthem owned 70 percent of CannaMED

5    Pharmaceuticals.  So if CannaMED Pharmaceuticals prevails,

6    Chance & Anthem is worth a lot of money.  If it doesn't

7    Chance & Anthem is worth zero.

8         Q.   And does Chance & Anthem being in or out of

9    bankruptcy impact the CannaMED suit?

10        A.   Well, we always used to have an expression up

11   there that Baltimore is a small town, and indeed it is.

12   There are attributes of the application process and what's

13   happened since that lend themselves to an understanding that

14   the appropriate leverage can best serve the outcome,

15   favorable outcome, in that litigation.

16        Q.   How does any of that have to do with Chance &

17   Anthem's bankruptcy?

18        A.   Well, I just explained to you, if that litigation

19   is won, that license is worth $40 million or more.  If that

20   litigation is lost, then we pretty much aren't doing much

21   here today, because Chance & Anthem is not going to be worth

22   anything.

23        Q.   Is Chance & Anthem a party to that litigation?

24        A.   No.

25        Q.   I'm sorry, I still don't understand what Chance &

Page 63

1    Anthem's bankruptcy has to do with the probability of

2    success in that litigation?

3         A.    I brought the Chance & Anthem bankruptcy in

4    Maryland to exert leverage.  I can't explain it more fully

5    than that.  You'll have to draw your own conclusions.

6         Q.    Chance & Anthem was not the applicant for the

7    cannabis grower license?

8         A.    Correct.

9         Q.    Chance & Anthem is not a party to the litigation

10   that CannaMED filed against the State of Maryland?

11        A.    Correct.

12        Q.    How is Chance & Anthem being in bankruptcy

13   affecting CannaMED's likelihood of obtaining a grower

14   license?

15        A.    Let me answer that with a question, series of

16   questions.  Chance & Anthem owns 70 percent of CannaMED

17   Pharmaceuticals, doesn't it?

18        Q.    I'm not answering your question, sir.

19        A.    Okay.  Well, let's just say, hypothetically, you

20   said yes.  Chance & Anthem was owned a hundred percent by

21   Jeffrey Siskind, wasn't it?  You're not going to answer, so

22   I'm going to say let's say it's a hypothetical yes.  If it's

23   known in Maryland that Jeffrey Siskind might face financial

24   difficulties because the CannaMED license was not treated

25   fairly, and Jeffrey Siskind has any influence at all in

Page 64

1    Maryland, do you think it might best serve CannaMED and

2    Chance & Anthem if we win that litigation, so that we should

3    do whatever we can in Maryland to try to leverage a positive

4    outcome?  Do you understand what I'm saying to you?

5         Q.   Sir, I'm not going to answer any of your questions

6    today.

7         A.   Well, let's say you said yes, hypothetically.  You

8    should.

9         Q.   What leverage do you have in Maryland?

10        A.   Well, officially, none.

11        Q.   Unofficially?

12        A.   Doesn't look like I have much right now, does it?

13             My family has practiced law there for over a

14   hundred years.

15        Q.   Your father was disbarred in the State of

16   Maryland?

17        A.   And re-admitted when the error was discovered.

18        Q.   Your father --

19        A.   Of course that has absolutely no relevance here,

20   but you sound like Robert Gibson.

21        Q.   I'm curious to know how you think your leverage in

22   Maryland effects the value of Chance & Anthem's interest in

23   CannaMED?

24        A.   Well, you ought to do a little research in

25   Maryland --

Page 65

1          Q.    I'm asking you --

2          A.    -- maybe you'll figure it out.

3          Q.    -- what relationships do you have in Maryland that

4    would be affected by the filing of Chance & Anthem's

5    bankruptcy?

6          A.    In Maryland?

7          Q.    Yes, sir.

8          A.    I thought it was a good idea to file in Maryland,

9    because it would published to those persons who could be of

10   assistance in our getting a license, the fact that I was

11   involved.

12         Q.    Who are the persons that could be of assistance?

13         A.    None that I can think of right now, Jesus.

14         Q.    So you think you've got so much influence in

15   Maryland that by filing this bankruptcy in Maryland people

16   of influence are going to help you get a grower license, but

17   you can't identify a single person of influence that would

18   have been moved by you filing Chance & Anthem in Maryland?

19         A.    Is that a question or a statement?

20         Q.    That is a question, sir.  Is that correct?

21         A.    You didn't phrase it as a question, but I'll take

22   it as a question.  I don't think it's appropriate to

23   identify anybody who could help me there, since it doesn't

24   appear that anyone has helped me there.  It would be

25   conjecture on my part, wouldn't it?

Page 66

1          Q.    Sir, is there any specific individual that you

2    hoped to influence by filing Chance & Anthem's bankruptcy in

3    Maryland?

4          A.    Yes.

5          Q.    Who?

6          A.    Ultimately the governor.

7          Q.    Larry Hogan?

8          A.    Yes.

9          Q.    What is your relationship with Mr. Hogan?

10         A.    I don't think that's relevant here.  I have no

11   special relationship with Larry Hogan.

12         Q.    Are you friends with Mr. Hogan?

13         A.    I wouldn't call myself a friend.

14         Q.    Are you an acquaintance of Mr. Hogan's?

15         A.    Yes.

16         Q.    If Mr. Hogan walked in here right now, would he

17   recognize you?

18         A.    Yes.

19         Q.    And Mr. Hogan, you hoped, would help you obtain a

20   cannabis grower license for CannaMED?

21         A.    Not directly.

22         Q.    How about indirectly?

23         A.    Yes.

24         Q.    How did you wish to influence Mr. Hogan indirectly

25   to help CannaMED obtain a grower's license?

Page 67

1      A.    Jesus, the trustee stands as, essentially, a

2   judgment lien creditor in this case.  How does all that

3   information concerning CannaMED impact your role in this

4   case at this point?

5      Q.    If I were to believe any of your testimony, sir,

6   Mr. Furr, owns 70 percent of CannaMED.

7      A.    Non-voting interest, correct.

8      Q.    What is a non-voting interest in your mind?

9      A.    You don't have a voting interest.

10     Q.    Do you have any shares in CannaMED?

11     A.    Do I personally?

12     Q.    Yes, sir.

13     A.    Yeah, you know I disclosed I had five percent of

14   CannaMED.

15     Q.    Does CannaMED have an operating agreement?

16     A.    Yes.

17     Q.    Where is that operating agreement?

18     A.    I have no idea where that operating agreement is

19   right now, but let me think who I may have given that too.

20   I'm sure someone has asked me for that operating agreement.

21     Q.    Is there any document anywhere in the world, in

22   your possession, custody, or control, that identifies --

23     A.    You started out like this, arms stretched out --

24     Q.    Can I finish my --

25     A.    -- and ended up like this.

Page 68

1          Q.    Can you produce a document today?

2          A.    Can I produce a document today?  No, I'm here.  I

3    can't go produce anything while I'm sitting here, and you

4    might keep me here all day.

5          Q.    Do you have access to any document --

6          A.    If you want --

7          Q.    Let me finish my question.

8          A.    -- the CannaMED operating agreement -- I know

9    where you're going, so let's stop dancing with each other.

10          If you want the CannaMED operating agreement, I

11    will try to find it for you.

12          Q.    All right.  Can you please --

13          A.    I'm sure that it exists because I had to give it

14    to somebody at some point, I'm sure.

15          Q.    You know, Mr. Siskind, you claim that Chance &

16    Anthem has a 75 percent non-voting interest in CannaMED, but

17    you can't --

18          A.    No, I didn't.

19          Q.    -- you can't produce --

20          A.    I did not claim that.

21          Q.    I'm sorry, please correct me.

22          A.    Seventy percent --

23          Q.    Seventy percent.

24          A.    -- non-voting.

25          Q.    You claim that Chance & Anthem has a 70 percent

Page 69

1   non-voting interest in CannaMED, but you can't produce a

2   single piece of paper that establishes that 70 percent

3   interest or establishes what Chance & Anthem's rights with

4   respect to CannaMED are, can you?

5       A.   You know, Jesus, I don't know whether you're just

6   plain sloppy or purposefully misrepresenting things.   I

7   thought I gave you a copy of the funding agreement, which I

8   think mentions the 70 percent share.   So there's one

9   document right there.

10      Q.   Where have you given me a copy of the funding

11  agreement?

12      A.   I told you at the 341 I thought I had it, and as I

13  was paging through the documents that I handed you on the

14  property in Maryland, I believe it was in that file.

15      Q.   Okay.

16      A.   So take a look in that file.

17           Now, if you want to take the position that you

18  don't believe you own anything in CannaMED, go ahead.

19      Q.   Sir, I'm simply trying to determine what our

20  interest is in CannaMED.

21      A.   Chance & Anthem, although it does me no good to

22  tell you this, owns 70 percent of CannaMED Pharmaceuticals,

23  LLC.

24      Q.   Any stock?

25      A.   It's an LLC.   They're unit shares.

Page 70

1      Q.    Where are the --

2      A.    There was a certificate.

3      Q.    -- unit shares?

4      A.    And I told you all of this already, so --

5      Q.    All right.  You can't find them --

6      A.    -- you're badgering me --

7      Q.    -- you can't find the unit shares --

8      A.    -- at this point you're badgering me.

9      Q.    -- you can't find the operating agreement --

10     A.    I didn't say I couldn't find the operating

11  agreement --

12     Q.    You just haven't tried --

13     A.    -- I told you I would go looking for it, or if I

14  didn't say that, I was about to say I'm happy to go looking

15  for it --

16     Q.    All right.

17     A.    -- I'd have to figure out who I sent it to and see

18  if I can get it back.  But the paper form, which was in my

19  files, which are now missing, which are believed to be in

20  Mr. Gibson's possession or which were thrown out by

21  Mr. Gibson to protect himself, is where the paper copy would

22  have been.

23     Q.    Okay.  Please turn to page 10 of Docket Entry 59.

24     A.    Right.

25     Q.    How was this document produced?

Page 71

1      A.   What do you mean by, "how was it produced"?

2      Q.   Did you prepare this document --

3      A.   Yes.

4      Q.   -- that appears here at page 10?

5      A.   I did.

6      Q.   And where did you prepare this document?

7      A.   On my computer.

8      Q.   Is that the computer you have at home?

9      A.   Using Word, yes.

10     Q.   Did you save this document on your computer?

11     A.   I doubt it.  I may have.  It would be saved as a

12  Word file if I have it.

13     Q.   And you ascribe a company value, based on income,

14  at $40 million.

15     A.   Right.

16     Q.   And the 70 percent share here is the 70 percent

17  share that you claim Chance & Anthem owns in CannaMED,

18  member interests, whatever you want to call them, you call

19  them shares here?

20     A.   They are units.  In an LLC you don't have shares.

21     Q.   No, you call them shares here.

22          It's a share of the member units?

23     A.   No, I didn't call it a share.  Read what it says.

24  It's a 70 percent share.  In other words we share this.

25     Q.   Oh, we share 70 percent of the member units with

Page 72

1   CannaMED?

2       A.   Correct, it's a little different.

3       Q.   Does it say anywhere here that it's non-voting?

4       A.   No.

5       Q.   When did you decide that share interest was

6   non-voting?

7       A.   When I set it up.  It's non-voting.

8       Q.   Is that reflected in any document?

9       A.   I don't know whether it's contained within the

10  funding agreement or whether it's in the operating agreement

11  as amended.  The operating agreement was amended at some

12  point, because we had a problem with one of our participants

13  that was behaving badly, and we amended to provide for --

14  oh, actually that would not have been that.  That's

15  something else.  Sorry.  We had a non-disparagement

16  provision.

17      Q.   Where --

18      A.   I was thinking of something entirely separate.  I

19  apologize for that.

20      Q.   Where is the amended operating agreement?

21      A.   Now, I think we should have kept Robert Gibson

22  here at this deposition, because maybe he could -- he could

23  answered that.  Although I don't think he'd answer it

24  truthfully.  I'd have to say I don't know.  I'm hoping I can

25  get it for you, because it certainly was published to

Page 73

1    somebody who participated or is participating in that

2    company.

3        Q.    Okay.  You've attached --

4        A.    You certainly have the right to it, if I can find

5    it.

6        Q.    Thank you.

7              You've attached to this valuation a schedule

8    starting at page 11 of 30.

9        A.    Mm-hmm.

10       Q.    What does this schedule reflect?

11       A.    This is part of our application, where we set

12   forth what the build-out costs are, the various phases, and

13   then the operating pro forma.

14       Q.    Who prepared this document?

15       A.    I did entirely.

16       Q.    Where was this document prepared?

17       A.    On whatever computer I had in the office when I

18   did this.

19       Q.    That's whatever computer you had in your law

20   office?

21       A.    Yeah.

22       Q.    You no longer have that computer?

23       A.    I don't know if this was done -- I can't think

24   right now as to whether or not this was on the old computer.

25       Q.    How did you physically retrieve this file --

1        A.    I don't remember.

2        Q.    -- for purposes of attaching it to this schedule?

3        A.    I don't remember, but I had -- I remember

4    furnishing this to an investor who was looking at doing a

5    deal with me in California, and that's why I probably had it

6    available to me.  Oh, I know how I got it.  I went in and

7    pulled down the application and printed it off there.  See

8    how it's got the MMCC logo on it?

9        Q.    I do, I see that.

10       A.    Yeah, it's part of the application.

11       Q.    Now, it says "216 of 284."

12       A.    Right, it was about a 300-page application --

13   284-page application.

14       Q.    Where are the rest of the pages of this

15   application?

16       A.    With the State of Maryland.

17       Q.    And you were able to download them online?

18       A.    Yes, and I must have it digitally.

19       Q.    Would you be kind enough to e-mail me the complete

20   application?

21       A.    I'll think about it.  I'll think about whether

22   it's proprietary.  I will if it's not.

23       Q.    If Chance & Anthem owns 70 percent of CannaMED,

24   how would it not be entitled to see the full application?

25       A.    It may not be entitled to see the full

Page 75

1    application.  I'll make that determination on behalf of

2    CannaMED and let you know.

3        Q.    What's your role with CannaMED?

4        A.    Managing member.

5        Q.    And we've got an operating agreement and an

6    amended operating agreement; is that correct?

7        A.    You have an amended operating agreement.

8        Q.    And are there any other agreements that control

9    the rights and relationships of the members of CannaMED,

10   other than the amended operating agreement?

11       A.    Not that I can think of, no.  Oh, you know what,

12   the operating agreement, prior to or after amendment may be

13   in this application.  In fact, I think it is.  It's a part

14   of that application.

15       Q.    Is Chance & Anthem a party to the operating

16   agreement?

17       A.    No.

18       Q.    Did anybody assist you in preparing this schedule?

19       A.    Nope.

20       Q.    What documents did you review in order to prepare

21   this schedule?

22       A.    The actual operating and build-out numbers that I

23   used when I opened the cannabis operation in California.

24       Q.    What was the name of that cannabis operation?

25       A.    Collective Management Associates.

1      Q.   CMA?

2      A.   CMA, which worked for a not-for-profit collective

3  called Riverside Collective.

4      Q.   Other than records of the entity that you've

5  described, did you rely on anything else to prepare this

6  schedule?

7      A.   Not that I can think of.  I may have done some

8  Internet research on what equipment costs were, to discern

9  whether they had changed over the years.

10          (Exhibit 4, commercial lease, was marked for

11  identification.)

12  BY MR. SUAREZ:

13     Q.   Exhibit 4 is a commercial lease with option to

14  purchase.

15          Does that document look familiar to you?

16     A.   Yes.

17     Q.   What is this document?

18     A.   A commercial lease with option to purchase.

19     Q.   And Chance & Anthem, LLC is the tenant under this

20  lease; is that correct?

21     A.   Yes, the identifier is tenant.

22     Q.   I'm sorry?

23     A.   The identifier is tenant, but it's more accurate

24  to describe it as a lessee/optionee.

25     Q.   And this is for the property --

1    A.    Optionor, I guess.  Right, optionor?

2    Q.    This is for the property located at 27120 Ocean

3  Gateway --

4    A.    Correct.

5    Q.    -- in Maryland?

6    A.    Correct.

7    Q.    And that's the property from where CannaMED

8  Pharmaceuticals operated?

9    A.    Correct.

10    Q.    Is that your signature on page 5 of this document?

11    A.    Yes.

12    Q.    Would you kindly take a look at page 4 and clause

13  19 c), it says that, "Landlord and Tenant agree that Tenant

14  shall pay an Option Fee of $300,000 prior to or at the

15  signing of the lease."

16    A.    Correct.

17    Q.    Did Chance & Anthem ever pay that $300,000?

18    A.    Yes.

19    Q.    How did Chance & Anthem pay that $300,000?

20    A.    To the seller of the property, whatever that was

21  called.  I can't think of the name.  It was a gas company

22  that owned the property.

23    Q.    Would Chance & Anthem have paid that from its

24  Chase account?

25    A.    I don't remember.

1       Q.    Would it have paid it from its SunTrust account?

2       A.    I don't remember.

3       Q.    Would it have paid it from anywhere else other

4  than a bank account titled in its own name?

5       A.    I don't remember.

6       Q.    Would Chance & Anthem have ever held its funds in

7  any account other than an account denominated in the name of

8  Chance & Anthem?

9       A.    No, it wouldn't have held its own funds in any

10 other account.  It could only hold its own funds in accounts

11 that were titled to it.

12      Q.    It never held --

13      A.    I may have held funds for Chance & Anthem, which

14 were destined to be paid over to Chance & Anthem and other

15 accounts.

16      Q.    What accounts would those be?

17      A.    I really can't recall at this point.  I certainly

18 transacted on behalf of Chance & Anthem from my trust

19 account, if that's what you're getting to.

20      Q.    Do you have any records of those transactions?

21      A.    No.  But if you'll be kind enough to provide me

22 with the record that you obtained wrongfully, I could

23 certainly do some diligence work to determine what funds

24 were extended on behalf of Chance & Anthem from the trust

25 account and save Mr. Barbee a lot of work and you a lot of

Page 79

1    expense.

2            (Exhibit 5, settlement statement, was marked for

3    identification.)

4    BY MR. SUAREZ:

5        Q.   Marked at Exhibit 5, a settlement statement

6    between 27120 Ocean Gateway, LLC and Machine Technologies,

7    Incorporated relative to the property at 27120 Ocean

8    Gateway.

9            THE WITNESS:  Madam reporter, don't let me walk

10   out with any of those exhibits, which I'm famous for doing.

11           Okay.  Looking at Exhibit No. 5, which is a

12   settlement statement, and you are correct -- oh, I'm wrong.

13   I apologize for that error.  The seller was Machining

14   Technologies, Inc., which reminds me, and you may not know

15   it yet, there was a gas lease on the property.  The gas

16   company owned a gas tank located at the rear of the

17   property, which they used to for transferring between

18   trucks, and so that's the role that the gas company had.

19   You're right, the seller was Machining Technologies, Inc.,

20   which manufactured guns essentially.

21   BY MR. SUAREZ:

22       Q.   When you look at the left column at line 206, it

23   reflects $300,000 in deposits by Sovereign Gaming.

24       A.   Where am I looking?

25       Q.   Line 206 and line 207, it reflects a --

Page 80

1      A.    Two-ninety plus ten, yeah, that's right.   The
2  original contract to purchase the building was Sovereign's
3  contract.   That's why Sovereign is shown there as having
4  paid those initial payments.

5      Q.    Did Chance & Anthem have any interest in those
6  payments?

7      A.    I don't know what you mean.

8      Q.    Did Chance & Anthem make those payments?

9      A.    No.   It appears they were made by Sovereign.

10      Q.    Why were they made by Sovereign if Chance & Anthem
11  is the one that had the obligation to make the payment?

12      A.    I don't know why this was represented this way on
13  the closing statement.   Ask Alan Bias that when you depose
14  him, to see whether he did it to get the loan to value to
15  look acceptable to his investors.   But you're right the
16  $300,000 was paid by Sovereign to the seller.   I think it
17  was paid directly to the seller, because it was
18  nonrefundable, yeah.   And that was prior to Alan's being
19  involved, if my recollection serves me correctly.

20      Q.    If you turn to the assignment and assumption of
21  lease, which is right behind the closing statement --

22      A.    Oh, yes.   By the way, I didn't draft these
23  documents.

24      Q.    -- it reflects that Sovereign Gaming &
25  Entertainment, LLC --

1        A.    Where are we looking?

2        Q.    -- second paragraph -- is the purchaser.

3        A.    Right.  Okay.  This would have been the agreement

4    with the seller, right, and this reflects that lease.  The

5    lease they are talking about here is the gas company's lease

6    of that tank that I told you about, of the -- I think they

7    own the tank.  The lease -- the gas company owned the tank,

8    but they leased -- they more or less had a license to put it

9    there on the property and pay, I think, $600 a month.  Is

10   that the right number?  I believe it was $600 a month for

11   that privilege.  You follow?  That was not our lease option.

12   This is a separate lease.

13       Q.    This was a separate lease by Sovereign?

14       A.    No.  This was a lease -- this was the assignment

15   of a lease, which Sharp Gas -- or Sharp Energy had with

16   Machining Technologies.

17       Q.    Mm-hmm.

18       A.    Let's say you're Machining Technologies and I'm

19   Sovereign, and I'm buying the building from you, you have to

20   assign that lease to me as part of the attribute of

21   ownership of the building.  You follow?  So I guess this was

22   done after the 300 was paid, I'm guessing.  I don't

23   remember.

24       Q.    Why was the 300,000 paid?

25       A.    Because --

Page 82

1       Q.    Was that the 300,000 that was due to --

2       A.    That was the best deal we would make.

3       Q.    -- Alan Bias' entity, 27120 Ocean Gateway, LLC?

4       A.    I don't know how you're going to read that.  It's

5   funny because I'd really have to study that, to figure that

6   documentation out.  But I can tell you that -- well, you

7   have the original purchase contract with Machining

8   Technologies in your file, what I gave, I think, it's

9   contained in there.

10      Q.    Sure.

11      A.    Look at that.  The deal was, as I remember, a

12  $950,000 purchase price with a total of $300,000 in initial

13  payments.  Maybe 10,000 of that went into the seller's

14  attorney's trust account, and the rest was paid to the

15  seller directly in payments that added up to $300,000, and

16  then by some deadline we had to close, okay.  So that's the

17  structure of that deal, as I remember it.

18      Q.    All right.

19      A.    I know we would have lost that 300 if we didn't

20  obtain the loan from Alan.

21      Q.    Who did Alan loan $300,000 to?

22      A.    Chance & Anthem I think.

23      Q.    Okay.  And how was that loan documented?

24      A.    Do you have the file with you, that I gave you?

25      Q.    I don't.

Page 83

1      A.   It should be in there.  How was that -- I'm sure

2  there was a promissory note and -- oh, I know what happened.

3  Obviously, we would have liked to have gone out and obtained

4  a mortgage, but Alan wouldn't do that, because, as he'll

5  tell you, he was very uncomfortable making a loan on a piece

6  of property this far away from where he lives.  So he said,

7  "I'll do it as an installment purchase," I guess would be

8  the best way to explain it, where he purchased the building

9  in an LLC which he controlled, and then we leased it from

10  the LLC with the option to buy.  As opposed to being a

11  mortgage, where we were the mortgagor and he was the

12  mortgagee.  It obviated the need for him to foreclose on it,

13  essentially.

14          (Exhibit 7, motion for reconsideration, was marked

15  for identification.)

16  BY MR. SUAREZ:

17      Q.   I'm going to show you what I marked as Exhibit 7,

18  and I understand we're skipping over some numbers.

19      A.   Why are you doing that?

20      Q.   Because I want to.

21          Exhibit 7 --

22      A.   Oh, yeah.

23      Q.   -- do you recognize this document?

24      A.   Yeah.

25      Q.   What is this document?

Page 84

1      A.    Plaintiff's Motion for Reconsideration of Order
2  Dismissing Case.
3      Q.    And that's --
4      A.    Oh, oh, okay.
5      Q.    And that's your signature here --
6      A.    Yep.
7      Q.    -- at the bottom of the unnumbered third page?
8      A.    Yep.
9      Q.    The plaintiff is CannaMED Pharmaceuticals?
10     A.    Correct.
11     Q.    Is Chance & Anthem a party to this litigation?
12     A.    Nope.
13     Q.    If I could turn your attention to paragraph 10 of
14  this document, it states, quote, "Plaintiff has, by means of
15  informal discovery conducted since filing of its initial
16  complaint, determined that Defendant's administration of the
17  application process was further flawed by the unfettered
18  ability of at least one government official, who has already
19  admitted to being secretly involved with a successful
20  applicant, to have access to the elements of the
21  applications, which were of a material nature, and these
22  were conveyed to what amounted to an inner circle of
23  applicants prior to submission, thereby thwarting the
24  impartiality and fairness for which the defendants were
25  bound to administer the application."  Do you see that?

1      A.    Yeah.

2      Q.    Who is the government official that you've

3  identified at paragraph 10?

4      A.    I cannot think of his name.  He was the legislator

5  who was responsible for -- or let's say largely responsible

6  for the medical cannabis legislation in Maryland, and I

7  believe his first name was Dan or is Dan.  He's not in the

8  legislature anymore.  He was a doctor, and if you said his

9  name, I would know it, but I can't remember it right now.

10     Q.    And who is the inner circle of applicants referred

11 to in paragraph 10?

12     A.    Some of the applicants that got licenses.

13     Q.    Can you identify any specific applicant?

14     A.    What relevance does that have today?

15     Q.    Can you identify any specific applicant?

16     A.    Not by name, no.

17     Q.    All right.  Can you identify them by any other

18 means?

19     A.    Yes.  I can tell you one of them was one that won.

20           I don't know what you mean by "other means."

21     Q.    Siskind Legal Group, is that an incorporated

22 entity?

23     A.    No.

24     Q.    That's just you?

25     A.    I believe it's just a change of name, Siskind

1    Legal to Siskind Legal Group, before it became Siskind

2    Legal.  So that's me, yeah, that's me.  It's right on there.

3         Q.   Is there any other counsel involved in this

4    litigation?

5         A.   No.

6         Q.   What is the current status of this litigation?

7         A.   It's in front of the Court of Special Appeals in

8    Maryland, which is the first appellate level there, like the

9    4th D.C.A.

10        Q.   Has a brief been filed in that litigation?

11        A.   No, it's not due yet.

12        Q.   When is the brief due?

13        A.   Early October.

14        Q.   Do you intend on filing that brief?

15        A.   Yes.  I chatted with Robert Furr the last time we

16   were in court together and asked him if he knew anybody in

17   Maryland who was a good lawyer who might help with that,

18   because I'm sort of busy right now.

19        Q.   Are you planning to retain another lawyer on

20   behalf of CannaMED in connection with this litigation?

21        A.   Planning on retaining?  No.  I would have to

22   answer that as a no, but if you asked me have I discussed

23   this with other lawyers in Maryland or other actionaries

24   (sic), you know, by filing appeal briefs here in Florida,

25   but never in Maryland, I would be -- I would be remiss if I

Page 87

1   didn't look for some allies there.  I think we can win that

2   suit.

3       Q.   Why do you think we can win that suit?

4       A.   Because I think that my complaint should have

5   never been dismissed.  If you read the complaint, which I

6   suppose you have --

7       Q.   I'll mark that as Exhibit 7B.

8       A.   What's that, the complaint?

9       Q.   The complaint.

10           (Exhibit 7B, complaint, was marked for

11   identification.)

12  BY MR. SUAREZ:

13      Q.   Is that the complaint you're referring to?

14      A.   It might be.  I may have amended.  I'm not quite

15  sure.

16      Q.   Page 14 bears your signature, 15th day of

17  August 2017?

18      A.   Yes, which was the very last day we could file,

19  one year to the day after the awards were announced, I

20  believe.  Yeah, I think we state a prima facie case here.

21      Q.   If you'll turn to page 6 of this complaint.

22           Are you admitted to practice in Maryland?

23      A.   What do you think?

24      Q.   Are you admitted to practice in Maryland?

25      A.   Of course.  Would I file a complaint as an

Page 88

1    attorney if I wasn't?

2        Q.   At the bottom of page 6, the applicant that you

3    referred to in this lawsuit is CannaMED Pharmaceuticals,

4    correct?

5        A.   Yes.

6        Q.   And here at the bottom of page 6, you state that,

7    "Numerous applicants selected and procured operating

8    premises and made significant investments toward acquisition

9    and improvements based upon same."

10             Is CannaMED one of those applicants?

11       A.   Absolutely.

12       Q.   What premises did CannaMED acquired in connection

13   with its application?

14       A.   27120 Ocean Gateway.

15       Q.   Those are the premises that were leased by the

16   debtor, Chance & Anthem?

17       A.   Correct.

18       Q.   Did CannaMED have any agreement to sublease those

19   premises?

20       A.   Well, I've already said, yes, that we had that

21   license agreement, where the gas company could be construed

22   to have a sublease for the tiny plot where its gas tank was.

23       Q.   Did Canna --

24       A.   And just to describe that accurately, you know, it

25   was the size of a small submarine, one of these huge propane

Page 89

1    gas tanks.

2        Q.   The question, more specifically, is did CannaMED

3    have a sublease for the premises leased by Chance & Anthem?

4        A.   Did it have a sublease?  You are asking whether

5    there was a written document, I don't remember, but the

6    intention was certainly to provide the property to CannaMED

7    for its operations.  Now, whether or not there's a written

8    agreement that reflects that in the application package,

9    which is, I think, the only place where it would likely be

10   found at this point, I don't know.

11       Q.   Okay.  Did CannaMED ever own any facility in

12   Maryland?

13       A.   No.

14       Q.   CannaMED ever have any real estate in Maryland?

15       A.   No.

16       Q.   Did CannaMED ever have a lease for any facility in

17   Maryland?

18       A.   Yes.

19       Q.   Which one?

20       A.   The 27120 Ocean Gateway.

21       Q.   And that facility was or was not documented, that

22   lease?

23       A.   I don't remember how it was documented.  I would

24   think that the reviewers would want to see some proof that

25   CannaMED had a right to use that property.

Page 90

1      Q.   In page 7 of the complaint you say, "Plaintiff,

2  having acquired a roughly 47,000-square-foot facility in

3  Wicomico County, was forced to spend in excess of $500,000

4  to acquire, improve and retain the operating premises, which

5  it acquired in order to meet the reasonably interpreted

6  requirement that an operating premise be obtained and the

7  announced geographic consideration factors."

8      A.   Correct.

9      Q.   Does that reference to "Plaintiff having acquired

10  a roughly 47,000-square-foot facility in Wicomico County"

11  refer to the premises leased by Chance & Anthem?

12     A.   The premises leased by Chance & Anthem?  It refers

13  to 27120 Ocean Gateway.

14     Q.   Did CannaMED ever purchase that property?

15     A.   No.  It had a leasehold interest in the property,

16  with an option, as you know.

17     Q.   Actually I don't know.  I haven't seen any writing

18  that substantiates that.

19     A.   I told you that.

20     Q.   Oh, there was no writing.

21     A.   I didn't say that.

22     Q.   Well, was there or wasn't there?

23     A.   There should have been a writing.  There may not

24  have been a writing.  But I told you that, so you should

25  believe it.

Page 91

1      Q.    That leasehold interest, does it exist anywhere

2  outside of your thoughts?

3      A.    My thoughts?  You mean outside my imagination?

4            You have paperwork on it, now that I think of it.

5  It's a lease option that we had with 27120 Ocean Gateway.

6      Q.    Between CannaMED and --

7      A.    Oh, no, that was with Chance & Anthem.

8      Q.    Okay.

9      A.    Right.  So your question is how does CannaMED have

10 any enforceable rights?  I don't know the answer to that.  I

11 don't know the answer as to whether or not there was a

12 writing.  The only reason the building was acquired by

13 Chance & Anthem was to be utilized by CannaMED

14 Pharmaceuticals.

15     Q.    Was that ever disclosed to the State of Maryland?

16     A.    In so many words, you mean, that there was a

17 related entity, for instance, that had the contract or right

18 to purchase?  I don't know if that was in the application,

19 if it was explained in the application.  But my instinct

20 tells me it had to have been.

21     Q.    Well, your lawsuit states the "Plaintiff, having

22 acquired a roughly 47,000-square-foot facility," I'm --

23     A.    Are you saying that I should dismiss the lawsuit

24 because that's a misrepresentation?

25     Q.    No, I'm just asking.

Page 92

1          A.    Is that what you want me to do?

2          Q.    I'd like to know what interest the plaintiff had

3     in that lease?

4          A.    I just explained it to you.  So you'll have to go

5     with that, and I suggest you keep your fingers crossed that

6     we succeed in the appeal.  And I do intend to amend, if we

7     do, for other reasons, but perhaps we should represent that

8     differently.  So your observation is a good one.

9          Q.    Earlier you told me that the judge got it wrong --

10    that wasn't earlier in today's deposition, but it was an

11    e-mail --

12         A.    Yeah, I know.

13         Q.    -- you told me the judge got it wrong in

14    connection with the dismissal of --

15         A.    He did.

16         Q.    -- the litigation.

17               How did the judge get it wrong?

18         A.    You asked me that, and I responded in an e-mail.

19         Q.    Well, I'm asking you again today?

20         A.    Well, as I recall the judge said based on the

21    argument of the assistant attorney general who appeared on

22    behalf of the state, Heda Neilson (phonetic), that we only

23    had 30 days to administratively challenge the decision by

24    the board of health and the Natalie LaPrade Cannabis

25    Commission, but he was wrong.  We had up to one year to do

Page 93

1    so in the manner in which we brought the suit.

2            Q.    And is that the basis of the appeal?

3            A.    That's a question I didn't know you'd be asking,

4    obviously, so I don't remember, but I presume so.

5            Q.    All right.  Let's take a short break.  I'm going

6    to significantly pare down the rest of today's examination.

7            A.    What does that mean, "pare down"?

8            Q.    That means, if you give me a break, I'm going to

9    see if I'm going to ask you all of the questions I meant to

10   ask you, or if I can cut them down, so we can get out of

11   here faster.

12           A.    Can we talk off the record now, then?

13                 MR. SUAREZ:  Sure.

14                 (A 15-minute recess was taken.)

15                 MR. SUAREZ:  Let's go back on the record.

16   BY MR. SUAREZ:

17           Q.    Mr. Siskind, we have unresolved issues regarding

18   the confidentiality agreement with respect to your trust

19   accounts --

20           A.    Of course.

21           Q.    -- and based on the unresolved issues, I won't be

22   able to conclude today's examination, because I can't ask

23   you about those records, unless you'd like to agree to waive

24   those issues on the record.

25           A.    Certainly not.

Page 94

1      Q.   Okay.  So with that understanding, I've adjusted

2 my examination, with the understanding that we'll come back

3 when the Court resolves those records.

4      A.   You mean resolves the issue as to whether or not

5 you should have cart blanche access to those records,

6 correct?

7      Q.   Resolves the issue of the confidentiality

8 agreement that you agreed to, sir.

9      A.   Let me state for the record that I have not agreed

10 to a confidentiality agreement, period.  I have agreed to

11 discuss what may be the attributes of a proper

12 confidentiality agreement, just to be clear, period.

13      Q.   Agree to disagree, and we'll take it up with the

14 person who wears the robe and makes the decisions.

15           Does Chance & Anthem prepare tax returns?

16      A.   You asked me that at the 341.

17      Q.   Has it ever filed a tax return?

18      A.   You asked me that at the 341.

19      Q.   Well, what's the answer?

20      A.   Well, I answered it at the 341.

21      Q.   Does it prepare a tax return?

22      A.   Do you want me to just give you the same answer,

23 which is still accurate?

24      Q.   Has it ever prepared a tax return?

25      A.   No, I said that at the 341.  That still remains

Page 95

1    true.

2         Q.   What are the tax attributes of Chance & Anthem, is

3    it a pass-through entity?

4         A.   What does that mean?

5         Q.   Have you ever disclosed any income from Chance &

6    Anthem in your personal income statements?

7         A.   I just told you that Chance & Anthem never had any

8    income.  So the answer to that is a logical no.

9         Q.   Was there any agreement between Chance & Anthem

10   and CannaMED relating to expenses that Chance & Anthem paid

11   on CannaMED's behalf?

12        A.   Yes, you have it.

13        Q.   That's the funding agreement you claim you gave

14   me?

15        A.   Well, that's an answer to your question.  It might

16   not be the kind of agreement that you're looking for.

17        Q.   I'm just trying to understand what agreement, if

18   any, exists.

19        A.   I believe that's the only one in writing.

20        Q.   Are there any other agreements that are not in

21   writing?

22        A.   Between me and me, essentially?

23        Q.   No, sir.  Between Chance & Anthem and CannaMED.

24        A.   Well, I mean, let's face it, I was the managing

25   member of both entities, so that would be very interesting.

Page 96

1    How do you answer that?  Are there -- there are

2    understandings that I have with myself, if that's what you

3    mean.  I wouldn't call them agreements.

4         Q.   They are understandings you have with yourself as?

5         A.   Managing member of one and managing member of the

6    other.

7         Q.   All right.  And these are agreements that were

8    never documented?

9         A.   These aren't agreements, I said.  These are

10   understandings.  There's a difference.

11        Q.   These are understandings --

12        A.   You can't --

13        Q.   -- never reduced to writing?

14        A.   -- have an agreement with yourself.  You can

15   understand that you wear two hats and that you're acting in

16   a certain capacity with respect to each.

17        Q.   So Chance & Anthem and CannaMED are basically the

18   same thing?

19        A.   I didn't say that at all.  They are, of course,

20   not.  They're separate entities.

21        Q.   Could those two entities have the legal capacity

22   to have agreements with each other?

23        A.   No, but, essentially, what I'm saying to you,

24   Jesus, is, obviously, they're both closely held entities,

25   and since I was the captain of each ship, whatever is in my

1    head is, essentially, an articulation of how things were

2    conducted.

3         Q.    And the accounts between the two entities were

4    never reconciled in any formal manner?

5         A.    No.  But Alan can do that.  I'm looking forward to

6    it, because that's going to be a lot of work that I don't

7    have to pay for.

8         Q.    Did CannaMED ever file tax returns?

9         A.    No, it had no income.  It never operated.

10   Remember, I told you that earlier.  I can tell you this,

11   based on what I said earlier, that neither entity had any

12   problem with the way the other entity conducted its

13   business.

14        Q.    What individuals -- in response to that statement,

15   Mr. Siskind, what individuals would have had the capacity in

16   your mind to object on behalf of either entity?

17        A.    That's asking for a legal conclusion, which really

18   isn't something that I ought to be doing here today.

19        Q.    Well, you said that neither entity had a problem

20   with what the other entity was doing.

21        A.    Right.

22        Q.    What individuals -- let me ask the question

23   differently.

24             What individual people were authorized to act for

25   Chance & Anthem?

Page 98

1      A.    Managing member.

2      Q.    That would be you?

3      A.    At that time.  Of course, now, Robert Furr has

4  stepped into those shoes.

5      Q.    Anyone else?

6      A.    You're asking again for more or less a legal

7  conclusion.

8      Q.    No, sir, you were the managing member of the

9  entity.

10            I'm asking whether, other than you --

11      A.    Oh, at the time --

12      Q.    -- other than you --

13      A.    -- prior to the bankruptcy.

14      Q.    -- prior to the bankruptcy, did anybody else have

15  the authority to bind Chance & Anthem?

16      A.    No.

17      Q.    How about CannaMED Pharmaceuticals, LLC?

18      A.    No.

19      Q.    You were the only person with authority to bind

20  CannaMED?

21      A.    Yes.

22      Q.    Prior to May of 2013, were you retained as an

23  attorney by Christopher George?

24      A.    I don't remember whether it was prior to 2013 or

25  not.

1    Q.    Have you ever been retained as an attorney by

2  Christopher George?

3    A.    That has no relationship with why I'm here today.

4    Q.    Have you ever been retained as an attorney by

5  Christopher George?

6    A.    That has no relationship to why I'm here today,

7  which is as managing member of Chance & Anthem and as its

8  counsel.

9    Q.    Are you refusing to answer the question?

10   A.    Yes.  It's not relevant.  You can certified.

11   Q.    Yeah, I'll certify the question for what it's

12  worth.  What did I do with the exhibit stickers?

13   A.    You used them up, because you skipped numbers.

14   Q.    Mark for identification, Exhibit 16, it's a quit-

15  claim deed prepared by 3485 Lago De Talavera Trust -- I'm

16  sorry strike that.  It's a quitclaim deed made in April 2013

17  between Christopher George, the grantor, and 3485 Lago De

18  Talavera Trust, care of Siskind Legal Services.

19         (Exhibit 16, quitclaim deed, was marked for

20  identification.)

21  BY MR. SUAREZ:

22   Q.    Do you recognize this deed?

23   A.    Yes.

24   Q.    Did you prepare this deed?

25   A.    I object to answering that.

Page 100

1          What relevance is there between this work and why
2   we're here today?  And further, it speaks for itself.  It
3   says right on it who prepared it.
4          Q.  So you did prepare this deed?
5          A.  Like I said, I object to the question.
6          Q.  Are you refusing to answer the question?
7          A.  I am.
8              MR. SUAREZ:  Certified the question.
9              MR. ZARETSKY:  May I see the document?
10             MR. SUAREZ:  Yes, sir.
11             THE WITNESS:  You got two of them.
12  BY MR. SUAREZ:
13         Q.  Did you have an engagement letter with Christopher
14  George?
15         A.  I object to the question as not being relevant to
16  why we're here today.
17         Q.  Are you refusing to answer the question?
18         A.  Yes.
19         Q.  Who is Burt (sic) Caso, C-A-S-O?
20         A.  Bart Caso.
21         Q.  Who is Bart Caso?
22         A.  He's a notary public.
23         Q.  Does Mr. Caso work for you?
24         A.  No.
25         Q.  Was Mr. Caso located in your office?

1    A.    Now?

2    Q.    Was he ever located in your office?

3    A.    Yes.

4    Q.    Was he employed by your office?

5    A.    No, not that I can remember.

6    Q.    Did he work out of your suite of offices?

7    A.    Yes.

8    Q.    What work did he do in your suite of offices?

9    A.    Why is that relevant?

10    Q.    Mr. Siskind, we're going to have a very long

11    afternoon if you're going to ask me --

12    A.    I'm happy to have a long afternoon, because you're

13    asking questions --

14    Q.    Relevance is not a proper objection in a Rule 2004

15    Examination, so either answer the question or refuse to

16    answer the question.

17    A.    All right.  I'll make it easier for you, on that

18    question I'll answer it, because it's meaningless.

19         He was a mortgage broker.

20    Q.    Okay.

21    A.    And a notary public.

22    Q.    And did Mr. Caso have any engagement with the

23    debtor?  Did ever do any work for the debtor?

24    A.    He may have notarized something, but I don't

25    remember what he would have notarized.  So I don't want to

Page 102

1    say no to that.  He certainly was never remunerated that I

2    can think of by the debtor.

3         Q.   Did you prepare a quitclaim deed for what I'll

4    refer as the Talavera house, which is a house located 3485

5    Lago De Talavera Drive?

6         A.   I object to the question, because it doesn't

7    pertain to any of my roles with the debtor.

8         Q.   Are you refusing to answer the question?

9         A.   I just said I object.  I refuse to answer.

10        Q.   The Talavera Trust, is that an entity that you

11   settled?

12        A.   I refuse to answer because it doesn't pertain to

13   Chance & Anthem, my role as managing member or its counsel.

14   Nor is there any claim in the Chance & Anthem bankruptcy

15   that's related to that property.

16             (Exhibit 19, indemnity mortgage, was marked for

17   identification.)

18             MR. SUAREZ:  I'll mark as Exhibit 19 an indemnity

19   mortgage prepared by Siskind Legal Services in connection to

20   3485 Lago De Talavera Trust.

21   BY MR. SUAREZ:

22        Q.   Is this a document that you prepared, Mr. Siskind?

23        A.   It says on it that I did.

24        Q.   And is the mortgagor under this document Siskind

25   Legal Services?

1      A.   The document speaks for itself.

2      Q.   What value did Siskind Legal Services give 3485

3   Lago De Talavera Trust in exchange for this indemnity

4   mortgage?

5      A.   I'm going to have to object to responding to any

6   questions concerning that transaction because they do not

7   relate to Chance & Anthem or my role as its former managing

8   member or counsel, which is why you noticed me for

9   deposition here today.

10          So it appears that we're taking this course with

11  all these documents that don't really pertain to why I'm

12  here, so for shortness of breath, I'll just say objection

13  from this point forward, and you can take that mean to

14  exactly why I objected to this document.

15     Q.   And I'll take that to mean you're refusing to

16  answer the question --

17     A.   Yeah.

18     Q.   -- and we'll agree that by refusing to answer the

19  question, I've certified it to the Court for its resolution.

20     A.   Correct.

21     Q.   I'm going to ask you a number of questions about a

22  number of real estate transactions.  It's not my job to

23  explain to you what they mean or how they're related to the

24  debtor.  You can answer them, or you can refuse to answer

25  them.  I'm giving you an opportunity today to answer them.

Page 104

1    If you don't want to answer them, I'll --

2         A.    Yeah, why don't --

3         Q.    -- take it up with the Court.

4         A.    -- you just call me back in a difficult capacity,

5    as opposed to managing member or counsel for Chance &

6    Anthem.  If you do that, I'll be happy to answer them then.

7         Q.    Okay.

8         A.    But we have to keep the delineations clear.  Those

9    things don't even involve the debtor, so why would you even

10   be asking those questions.

11        Q.    Christopher George and Diana George filed claims

12   in the bankruptcy case.  So I'm trying to test whether the

13   claims in the Lago De Talavera Trust house have anything to

14   do with our case and whether I can properly object to them.

15   So I'm giving you an opportunity to walk me through these

16   transactions, so I can explore whether they're --

17        A.    Whoa, whoa, okay, I understand why you're worried.

18        Q.    And 3485 Lago De Talavera Trust also filed a claim

19   in the case.

20        A.    That's news to me.

21        Q.    Yep.

22        A.    When were those claims filed?

23        Q.    That claim was filed, in the spirit of helping you

24   resolve your objection --

25        A.    I appreciate that.

Page 105

1          Q.    -- on August 10th.

2          A.    Okay.  And who was the claimant?

3                MR. SUAREZ:  I'll give you a copy of the proof of

4    claim, and I'll mark it as Exhibit 13.

5                (Exhibit 13, proof of claim, was marked for

6    identification.)

7    BY MR. SUAREZ:

8          Q.    That's Claim No. 6.

9          A.    Okay.  I understand this claim.  I've seen this.

10   This is the lawsuit we spoke about in state court.  They are

11   not claiming any amount on this claim, are they?  I don't

12   see a claimed amount.  This was signed by Steven Newburgh,

13   who I understand just withdrew.

14         Q.    Okay.

15         A.    So I do see a tie there, so you're correct.  I

16   will answer the questions regarding those documents.  I

17   didn't realize they had filed a claim, or I had known about

18   it and forgotten about it.

19         Q.    Okay.  Turning you back to Exhibit 16, a quitclaim

20   deed --

21         A.    Right.  I prepared this deed --

22         Q.    Okay.

23         A.    -- as it says.

24         Q.    And why was this deed prepared?

25         A.    This was a deed that was prepared on behalf of

Page 106

1    Christopher George who wished to place his property into a

2    trust.

3        Q.    And you represented Mr. George in connection with

4    this transaction?

5        A.    I believe on this one I may have represented the

6    trust.

7        Q.    And not Mr. George?

8        A.    I don't remember.

9        Q.    Did you have a retention agreement with either

10   Mr. George or the trust?

11       A.    I never had a retention agreement with Mr. George,

12   and, no, I don't think I had a retention agreement with the

13   trust.

14       Q.    Is it your practice to prepare retention

15   agreements in connection with your engagements undertaken on

16   behalf of your clients?

17       A.    Yes, if it's arm's length client that's paying a

18   bill, yes, that I'm charging money to, I usually do it, so I

19   get paid.

20       Q.    Mr. George was not an arm's length client that you

21   were charging money to?

22       A.    As I said, I think I was the representative here

23   of the trust.

24       Q.    Did you settle the trust, 3485 Lago De Talavera?

25       A.    Yes.

1      Q.    And why was that trust settled?

2      A.    I believe that trust was created to take title to

3   a house located 3485 Lago De Talavera in Lake Worth,

4   Florida.

5      Q.    And from now we'll called that the Talavera house;

6   is that fair?

7      A.    Sure.

8      Q.    Who are the beneficiaries of the trust?

9      A.    The only beneficiary was Sympatico Equine Rescue,

10  which I believe is a Florida corporation, a not-for-profit.

11     Q.    Sympatico Equine Rescue is the beneficiary of 3485

12  Lago De Talavera Trust, do I understand that correctly?

13     A.    Yes.

14     Q.    And what is Sympatico Equine Rescue?

15     A.    It's a Florida not-for-profit, so I think it's a

16  corporation that I created years ago.

17     Q.    And why would Mr. George quitclaim his house into

18  an entity that benefits Sympatico Equine Rescue?

19     A.    You'll have to ask him.

20     Q.    To the best of your knowledge, why was the trust

21  created to benefit Sympatico Equine Rescue?

22     A.    To take title to the house.

23     Q.    Why was Sympatico Equine Rescue the beneficiary?

24     A.    Because that was the intent of the parties.

25     Q.    Who are the parties?

1      A.    Well, that was Chris George's intent and the

2  trustee of 3485 Lago De Talavera Trust.

3      Q.    Is that Mr. Haggerty?

4      A.    At this point, yes, but not -- he was not the

5  original --

6      Q.    Who was the original trustee?

7      A.    Now, wait a minute, I may have misspoken.

8             As best I can recall, the original trustee was

9  Florida Association of Community Banks and Credit Unions,

10 LLC.

11     Q.    What's the Florida Association of Community Banks

12 and Credit Unions?

13     A.    It's a banking association.

14     Q.    And what interest, if any, do you have that in

15 that banking association?

16     A.    I believe I was the managing member when it was

17 active.

18     Q.    And what did that association do?

19     A.    Represented community banks and credit units.

20     Q.    What community bank or credit union did it

21 represent?

22     A.    Well, we had a list of people that we represented.

23 When I say "people," entities.  But I have to tell you that

24 it was a failed attempt to unite credit unions and community

25 banks to obtain the privileges for community banks that

Page 109

1   credit unions have to give them a better edge in competing

2   with the large commercial banks.

3        Q.   When was the last time it was an active company?

4        A.   I don't remember.  You need to look on Sun Biz.

5        Q.   Did it ever have any managers other than yourself?

6        A.   No.

7        Q.   Did it ever generate any revenue?

8        A.   No.

9        Q.   Did it ever successfully engage in any business

10  transactions?

11       A.   There was a planned conference, which was going to

12  be held down in Key Largo, Florida, but we didn't get a

13  sufficient number of attendees to be able to conduct it, so

14  after that I stopped devoting any efforts to that entity.

15       Q.   And why was that entity the trustee of the

16  Talavera Trust?

17       A.   Because it comported with the intent of the

18  parties.

19       Q.   What was the intent of the parties?

20       A.   To place the property into a trust to -- that's

21  it, to hold the property.  I have a copy of that trust

22  somewhere.

23       Q.   Where do you keep a copy of that trust?

24       A.   I found it with all those letters that I think I

25  spoke about earlier, from Chris George.

Page 110

1       Q.    And what did the trust do with the house once it

2    acquired title?

3       A.    I don't remember.  At some point the house was

4    foreclosed by Sovereign -- oh, I know what happened.  David

5    Fiore, through his girlfriend Michelle Watson, had a

6    $200,000 mortgage against the house, which was supposedly

7    money he loaned to the George brothers to pay their

8    attorneys to do work after Chris George was incarcerated,

9    but I think before Jeff George went to prison.

10           David was getting -- I'm sorry.  Yeah, David was

11   getting upset because he hadn't been paid back.  Sovereign

12   purchased the note and mortgage.  At that point in time,

13   there were no payments.  Sovereign foreclosed.  Haggerty, as

14   trustee, gave a deed in lieu of foreclosure to Sovereign.

15   That's how Sovereign ended up owning that property.

16      Q.    Who is Haggerty?

17      A.    Michael Haggerty is Chris George's stepfather.  He

18   lives with Chris George's mother in a house in Wellington,

19   where the Feds took $3 million out of the attic, if you

20   remember that news story.

21      Q.    Turning back to Exhibit 18 --

22           (Exhibit 18, assignment of mortgage, was marked

23   for identification.)

24   BY MR. SUAREZ:

25      Q.    -- have you ever seen this document before?

Page 111

1      A.    Yes, I prepared this document.  It's an assignment

2  of mortgage from Michelle Watson, who was David Fiore's

3  girlfriend, to Sovereign Gaming.

4      Q.    What consideration did Sovereign Gaming pay for

5  this mortgage?

6      A.    I don't remember, but I'm thinking it was

7  $200,000, because that was the face amount of the mortgage.

8      Q.    What is Sovereign Gaming?

9      A.    An LLC that was set up to pursue gaming ventures.

10      Q.    Who owns Sovereign Gaming?

11      A.    I don't remember whether Sovereign has lapsed now

12  or not.  I believe -- there was a Sovereign Gaming &

13  Entertainment in Oklahoma, and then there was -- which

14  lapsed, and then there was a Sovereign Gaming &

15  Entertainment in Florida.  They are two separate LLC's

16  really.  I think I was the managing member of the Oklahoma

17  LLC, and my father was the managing member of the Florida

18  LLC.  If memory serves me correctly, the Florida LLC was

19  established after the Oklahoma LLC lapsed, but I'm not a

20  hundred percent certain.  That would just seem to make

21  sense.

22      Q.    For what purpose was Sovereign Gaming &

23  Entertainment, LLC incorporated?

24      A.    To pursue gaming ventures.

25      Q.    What gaming ventures did it pursue?

1          A.    A couple Native American tribal casinos out in

2    Oklahoma, and then here we were looking at the possibility

3    of reopening my late great uncle's race track in Miami.

4          Q.    Did Sovereign Gaming ever conduct any gaming

5    business?

6          A.    No, it was a development company.

7          Q.    Did it ever develop anything?

8          A.    It attempted to, but there was no dirt turned, if

9    that's what you mean.

10         Q.    Did it ever become a party to any development

11   contract?

12         A.    No.  We were never able to obtain an agreement to

13   proceed on any project.

14              MR. SUAREZ:  Oh, I'm out of exhibit stickers.

15              THE WITNESS:  That's because you number them too

16   high, you skip numbers.

17              (Exhibit 18B, notice of lis pendens, was marked

18   for identification.)

19   BY MR. SUAREZ:

20         Q.    I marked this as 18B.

21              Is this a document that you filed on behalf

22   Sovereign Gaming & Entertainment, LLC?

23         A.    I don't remember filing this.  I see that it's got

24   a stamp at the top.

25         Q.    And your signature at the bottom?

1      A.    Well, it's an electronic signature.

2      Q.    Is that your signature, your electronic signature,

3  affixed to this notice of lis pendens?

4      A.    I don't know.  I usually don't use this typeface.

5  I just about always use Times Roman, so.

6      Q.    Are you suggesting that you are not, in fact, the

7  person that prepare and filed this document?

8      A.    I didn't say that.  I said I don't remember, to

9  the extent that I claim that this is my electronic

10  signature.  However, this should go along with the

11  foreclosure suit.  If you show me that, if you have it, and

12  it's in this same typeface, maybe I used a different

13  typeface for once in my life.

14      Q.    Sovereign Gaming & Entertainment is an entity that

15  was owned by your father?

16      A.    He was the managing member of the Florida LLC.

17      Q.    Who owned the Florida LLC?

18      A.    I don't remember.

19      Q.    Sovereign Gaming & Entertainment, LLC was your

20  legal client?

21      A.    Yes.

22      Q.    You appeared in court on behalf of Sovereign

23  Gaming & Entertainment, LLC?

24      A.    I don't remember -- yeah, I have.

25      Q.    And 3485 Lago De Talavera Trust is a trust that

Page 114

1   you settled?

2       A.   Yes.

3       Q.   And the entity, the Florida Association of

4   Community Banks and Credit Unions, was an entity that you

5   controlled?

6       A.   Yes.

7       Q.   And they were the trustee of 3485 Lago De Talavera

8   Trust?

9       A.   At one time, yes.

10      Q.   And the beneficiary of 3485 Lago De Talavera Trust

11  was Sympatico Equine Rescue; is that correct?

12      A.   Still is.

13      Q.   Still is.  And Sympatico Equine Rescue is a

14  non-profit that you control?

15      A.   Yep.

16           (Exhibit 19, indemnity mortgage, was marked for

17  identification.)

18  BY MR. SUAREZ:

19      Q.   All right.  Moving on to what I previously marked

20  as Exhibit 19.  It's an indemnity mortgage given by 3585

21  Lago De Talavera Trust through Michael Haggerty as trustee

22  for Siskind Legal Services, LLC?

23      A.   Right.

24      Q.   What value did Siskind Legal Services, LLC give to

25  the Talavera Trust in exchange for this mortgage?

1     A.    That was to protect my legal fees in the event

2   that they were never paid, by putting a lien against the

3   house.

4     Q.    At what point in time did Michael Haggerty become

5   the trustee of 3485 Lago De Talavera Trust?

6     A.    That's what I was thinking just before you went on

7   to that new document.  I don't remember -- I don't remember

8   when he was substituted in, but I think I have a copy of

9   that substitution with the trust document.

10    Q.    All right.

11    A.    I'm happy to provide that to you.

12    Q.    I'd appreciate that.

13          What legal services did Siskind Legal Services

14  provide to the trust?

15    A.    Well, Siskind Legal created the trust.  I can't

16  think of what else, explicitly, for the trust.

17    Q.    And the mortgage was recorded in amount of

18  $300,000?

19    A.    Correct.

20    Q.    Why was it recorded in the amount of $300,000?

21    A.    That's what we, at the time, perceived to be the

22  remaining equity in the house, and you've got to be careful

23  not to confuse that with another mortgage that was taken

24  from a company in Miami, that that mortgage, in the same

25  amount, 300,000 face value, that this 300,000 subordinated

Page 116

1      to.

2              (Exhibit 20, deed in lieu of foreclosure, was

3      marked for identification.)

4      BY MR. SUAREZ:

5          Q.    Let me show Exhibit 20.  It is a deed in lieu of

6      foreclosure.

7          A.    Correct, signed by Mike Haggerty.

8          Q.    Signed by Mike Haggerty.  Prepared by you?

9          A.    Correct.

10         Q.    Deeding the property from the trust to Sovereign

11     Gaming & Entertainment, LLC?

12         A.    Correct.

13         Q.    Why did the trust deed the property to Sovereign

14     Gaming & Entertainment, LLC?

15         A.    Because there were no payments on the mortgage

16     held by Sovereign, and Chris George directed Mike Haggerty

17     to deed the property over to Sovereign Gaming.

18         Q.    And at the time that that occurred, the

19     beneficiary was still Sympatico Equine Rescue?

20         A.    Correct.  Somewhere about that time, Diana George,

21     who is now Chris George's ex-wife, was living in the house.

22     She was supposed to be renovating it for sale, which she

23     never did.  Chris wanted her out, and asked his stepfather

24     to make sure that the house, which we were -- "we" meaning

25     Sovereign, was foreclosing on anyway, was deeded over to

Page 117

1    Sovereign.

2            (Exhibit 21, assignment of second mortgage, was

3    marked for identification.)

4    BY MR. SUAREZ:

5        Q.   I'll show you a document marked as Exhibit 21.

6    It's an assignment of a second mortgage --

7        A.   To George Maler.

8        Q.   -- to George Maler.

9        A.   And Jeri Maler, yeah.

10       Q.   Is this an assignment of the mortgage procured by

11   Siskind Legal Service against the house?

12       A.   Yes.

13       Q.   What consideration did Siskind Legal Services

14   receive in connection for this assignment?

15       A.   A hundred thousand dollars.

16       Q.   And why was a mortgage assignment --

17       A.   Well, actually, we only received 90,000, I think.

18       Q.   Why was the mortgage assigned in the amount of

19   $300,000?

20       A.   Siskind Legal needed operating capital, and we had

21   that as an asset.

22       Q.   I understand the mortgage --

23       A.   Oh, I'm -- I'm sorry, that's not correct, ah --

24   yes, that is correct.  I'm starting to the confuse the two

25   mortgages myself.

1      Q.   That was the indemnity mortgage, right?

2      A.   Correct.

3      Q.   In the amount of $300,000?

4      A.   Correct.

5      Q.   I thought that the indemnity mortgage was only

6  supposed to protect your legal fees?

7      A.   It was.

8      Q.   And did Siskind Legal Services render $300,000 in

9  legal services to the trust?

10     A.   By now, at the rate of 50,000 a month, yeah, we

11  surpassed that.

12     Q.   You had an agreement to pay Siskind Legal Services

13  $50,000 a --

14     A.   No, no, that was with Chris George.

15     Q.   You had an agreement with Chris George for the

16  trust to pay Siskind Legal Services $50,000 a month?

17     A.   No, not the trust.  But Chris George's interests

18  would be protected by my law firm, and we agreed that

19  $50,000 a month was a suitable sum to accrue.

20     Q.   From the trust?

21     A.   The trust never had any money to pay anything.

22     Q.   The equity in the house guaranteed that fee

23  arrangement?

24     A.   Correct.

25     Q.   Were there any bills generated in connection with

Page 119

1    that agreement?

2         A.    No.

3         Q.    Was that agreement ever reduced to writing?

4         A.    No.  Well, I do think, though, that somebody

5    said -- and I think it was Diana George who recited the

6    $50,000 fee, but she had it wrong.  She had it as a one-time

7    fee, which was not what was agreed to.

8         Q.    Where did she recite that?

9         A.    I forget what she filed, but I saw something where

10   she wrote that.  But it was more or less a marker.  We never

11   really obtained those payments.

12        Q.    I'm sorry, I don't follow.

13        A.    It was a marker.  It was just a reservation, as

14   against the property, to be able to obtain those payments.

15   But we ended up not doing the things that we had envisioned

16   doing for that money anyway, which at this point I can't

17   even recall what they are, but --

18        Q.    But you sold the mortgage and the full face amount

19   to --

20        A.    George.

21        Q.    -- the Malers?

22        A.    With the understanding that he really only wanted

23   his hundred thousand dollars back.

24        Q.    Was that understanding ever reduced to writing

25   anywhere?

Page 120

1        A.   No.  But George will tell you that in a heartbeat,

2    that that was the agreement.

3        Q.   Let me show you what I'll mark as Exhibit 22.

4             (Exhibit 22, mortgage, was marked for

5    identification.)

6    BY MR. SUAREZ:

7        Q.   It's a mortgage given by Sovereign Gaming &

8    Entertainment against the Talavera house?

9        A.   Right.  This was the second mortgage -- I'm sorry,

10   the first secured mortgage, but was the second mortgage that

11   we permitted against the property.  When I say "we," I'm

12   talking about Sovereign Gaming & Entertainment, LLC, which I

13   represented.

14       Q.   And what did Sovereign Gaming & Entertainment, LLC

15   receive in exchange for this mortgage?

16       A.   I don't remember what our net receipt was, but

17   this was a mortgage that David Fiore was somehow involved

18   in.  The lender was a friend of a friend of his.  He had

19   made some sort of a deal, and I can't remember what the

20   attributes of it were.  But from the proceeds of this

21   mortgage, I remember we gave him around $200,000.

22       Q.   Gave who $200,000?

23       A.   I believe it went to David Fiore individually.

24       Q.   I just want to make sure I understand.

25            Sovereign Gaming took a mortgage out on the

Page 121

1    Talavera house for $300,000?

2        A.    Correct.

3        Q.    And from that mortgage gave $200,000 to David

4    Fiore?

5        A.    I believe that's right.

6        Q.    And kept a hundred thousand?

7        A.    I don't know that we really even kept a hundred

8    thousand.  It seemed to me that we -- I don't remember.

9    Seemed to me we didn't get anything like that.

10       Q.    Where would --

11       A.    I remember a significant portion of that -- those

12   proceeds went to David Fiore.

13       Q.    And when Sovereign Gaming took out the $300,000

14   mortgage, where would that money have gone to initially?

15             It would have come out of Tatarow and gone?

16       A.    I don't know if it went into my trust account, if

17   that's what you're asking.

18       Q.    I'm asking where it went, period.

19       A.    You have to ask the closing attorney who did that.

20   We didn't do that.

21       Q.    Okay.  That would be Mr. Arsenault?

22       A.    I guess so.

23       Q.    And he was counsel to Tatarow?

24       A.    I guess so, yeah.

25       Q.    Who is Tatarow?

Page 122

1      A.   I can't remember his first name right now.  He's a

2  strip club owner out of Tampa, friendly with that whole

3  gang, you know, Fiore, and maybe the George brothers.

4           (Exhibit 23, assignment of mortgage, was marked

5  for identification.)

6  BY MR. SUAREZ:

7      Q.   Show you a document marked as Exhibit 23.  It's an

8  assignment of mortgage to --

9      A.   To Zokaites.

10     Q.   -- Zokaites Properties.

11          Were you involved in this transaction?

12     A.   Yeah.  I don't think I did this assignment,

13  though, but I remember working on this.  That's my writing

14  where we struck out certain sections.  I think that the form

15  may have been given to us by Mr. Tatarow's attorney, whose

16  name was Sidney, up in Jacksonville.  And I see here,

17  Tatarow's first name was Kenneth, so Ken Tatarow.

18          MR. SUAREZ:  I think this is a good point to break

19  for lunch.  How long would you like?

20          THE WITNESS:  Five minutes.

21          MR. SUAREZ:  How about half an hour?

22          THE WITNESS:  Oh, come on, where am I going to go

23  for half an hour?

24          MR. SUAREZ:  Cafeteria downstair.

25          THE WITNESS:  What, to sit there for half an hour?

Page 123

1           I thought you were going to wrap this up.

2           MR. SUAREZ:  Well, I'm going to wrap it up.

3    Mr. Zaretsky --

4           THE WITNESS:  Oh, yeah --

5           MR. SUAREZ:  -- has some questions.

6           THE WITNESS:  -- Richard.  Why don't we just go

7    through and finish you, and then we'll redo with Richard

8    after lunch.

9           MR. SUAREZ:  I'd like to stop for lunch.

10          THE WITNESS:  Very well, then.

11          (A lunch recess from 12:45 p.m. to 1:15 p.m.)

12          MR. SUAREZ:  Back on the record.

13   BY MR. SUAREZ:

14       Q.   Mr. Siskind, we've endeavored to review the Chase

15   Bank account records that you identified as being a debtor

16   account.  I'd like to ask you about a couple transfers in

17   particular.

18          You had a debit card for the debtor; is that

19   correct?

20       A.   For Chase, yes.

21       Q.   For the Chase account.

22          Did you ever place any personal expenses on that

23   account?

24       A.   Oh, yeah.

25       Q.   All right.  If we went through a reconciliation of

Page 124

1    those personal expenses, would you be able to tell me what

2    belonged to the debtor and what belonged to you

3    individually?

4        A.    If you let me take it with me and spend some time

5    with it, sure.

6        Q.    What documents would you need to review in order

7    to confirm whether an expense was personal or not personal?

8        A.    Well, if you did a summary, let me see that, and

9    give me, if you can, electronically, whatever you got from

10   Chase.

11       Q.    Did you ever reimburse the debtor from any

12   personal expenses that you paid from its account?

13       A.    I believe I reimbursed them for all of them.

14       Q.    How were those reimbursements made?

15       A.    I don't remember.  Like I said, if you give me a

16   summary, I'll spend some time on it.  And if you want to

17   highlight the ones you're most concerned with, I'll do those

18   first.

19       Q.    Earlier you identified a number of employees that

20   worked up in Maryland in connection with the debtor's

21   business, Harold Saylor, Jess Parker --

22       A.    That's the name I couldn't remember, Jess Parker.

23       Q.    -- Joshua O'Brian, Robert Sauve, Russell Cross and

24   Ruttman (phonetic) Law?

25       A.    Ruttman Law?  Is that a Maryland company?

Page 125

1          Yeah, those names of the individuals are correct.

2   A couple of them are the contractors that I referred to, and

3   a couple of them are the employees -- or the individuals

4   that were going to be the employees of CannaMED.

5          Q.   And that's about $60,000 that we've identified in

6   payments to them.

7          Would they have been paid from any other source or

8   any other account?

9          A.   I don't think so, not them, no.

10         Q.   How about the SunTrust account?

11         A.   Well, yeah, the SunTrust account, they could have

12  been paid from that.  But I believe I always paid them from

13  a Chance & Anthem account.

14         Just for your general information, I tried to open

15  a CannaMED account.  I was thinking about that.  I went up

16  to SunTrust in Salisbury, Maryland, and because it was

17  cannabis related, they wouldn't do it.

18         Q.   Do you know why the debtor would have received a

19  $60,000 deposit from an entity named Aibara & Reed, PLLC?

20         A.   Yes, that's -- what was that creditor's name?  Not

21  3 Gen, but the other one?  That was the attorney for that

22  claimant.

23         Q.   How about $50,000 from In the Weeds Productions,

24  LLC?

25         A.   That's a related entity of mine, but I don't know

Page 126

1    why that came from In the Weeds.

2        Q.    What is the business of In the Weeds Productions,

3    LLC?

4        A.    In the Weeds was created to conduct a three-day

5    music festival in Colorado called Event 64, which was named

6    after their law, which was something 64 that legalized

7    recreational cannabis.

8        Q.    Did it have any interest in the debtor?

9        A.    No.

10       Q.    Did it ever make any loans to the debtor?

11       A.    Other than that, I don't know, Jesus.  I'd have to

12   see the record.

13       Q.    How about South Properties, LLC, they deposited a

14   hundred thousand dollars in the debtor's bank accounts?

15       A.    I believe that's Ven -- whatever that creditor's

16   name is 3 Ven.

17       Q.    3 Gen or 3 Ven?

18       A.    3 Gen, whatever.

19       Q.    Robert Smith S Account --

20       A.    No idea what that is.

21       Q.    -- $25,000?

22       A.    Robert Smith S Account?  No idea.

23       Q.    Do you know why the debtor would have paid $1500

24   to the Florida Association of Community Banks and Credit

25   Unions?

1      A.    No.  But, of course, that's a related entity as I

2   explained.

3      Q.    Related entity of yours?

4      A.    Correct.

5      Q.    How about 1.12 million to Fidelity National Title

6   of Florida?

7      A.    No idea.  Oh, that could have been for the

8   purchase of -- when was that?

9            (Inaudible discussion between Mr. Barbee and

10   Mr. Suarez.)

11           THE WITNESS:  Just see if that was about the same

12   time that Richard Neff deposited $500,000 to Chance &

13   Anthem.

14   BY MR. SUAREZ:

15     Q.    October 22, 2015?

16     A.    I believe that was for the purchase of the project

17   house.

18     Q.    That's the Santa Barbara house?

19     A.    Yeah.

20     Q.    What is Theassociates.com P.A.?

21     A.    It was -- what is that?  That's a law firm owned

22   by -- or managed by David Merrill.

23     Q.    Did that law firm ever do any work for the debtor?

24     A.    I don't remember.

25           How much was paid to them?

1      Q.    Twenty-two thousand six-hundred and eighteen

2   dollars.

3      A.    Oh.

4      Q.    Deposited from that law firm into the debtor.

5      A.    That could have been a loan for a project up in

6   Port St. Lucie.

7      Q.    What project is that?

8      A.    There was a house up in Port St. Lucie.  I don't

9   remember what entity the house was in.  It was purchased,

10  rehabilitated, and sold.

11     Q.    Did the debtor own that house?

12     A.    No.

13     Q.    Why would the loan have been made to the debtor?

14     A.    I don't remember.  I presume we just did it when

15  we had some extra cash.  It looked like a good business

16  deal.

17     Q.    It wasn't documented?

18     A.    I'm sure it was.  Of course it was, yes.

19     Q.    And where would those documents be?

20     A.    Would have been in with my files at the office.

21     Q.    The ones Gibson, you say, took?

22     A.    Well, you know, Jesus, as much as I would like to

23  pin that on Gibson, I can't say with 100 percent certainty

24  that he took them.  So whenever you say anything like that,

25  let's just realize it to mean I "believe" he took.

Page 129

1      Q.    Okay.

2      A.    Okay.

3      Q.    910 Dalton Avenue?

4      A.    That's it.

5      Q.    And the debtor also paid expenses related to that?

6      A.    I don't know, we might have.

7      Q.    Did it get anything from that entity when it was

8   sold?

9      A.    Oh, yeah.

10      Q.    What did it get?

11      A.    I don't remember.

12      Q.    Would that have been the 22,000 bucks from The

13   Associates --

14      A.    Oh, it came from The Associates?

15      Q.    Yeah.

16      A.    Oh, might have been, yeah.

17      Q.    What's the Alexa Elliot Guardianship?

18      A.    I don't remember -- oh, that was a client.

19      Q.    Do you know why they would have deposited $2,000

20   in the debtor's bank account?

21      A.    No.

22      Q.    How about Cameron Worth?

23      A.    Cameron Worth?  Cameron was a client.

24      Q.    Do you know why Cameron would have deposited $3300

25   in debtor?

Page 130

1      A.    No.

2      Q.    What was the Malers' interest in 915 Dalton

3  property?

4      A.    Whose interest?

5      Q.    The Malers, George and Jeri Maler.

6      A.    Maler was a lender on that property at some point.

7  I forget when.

8      Q.    How was that loan documented?

9      A.    It should have had a mortgage and a promissory

10 note.

11     Q.    Was the debtor obligated on that mortgage and

12 promissory note?

13     A.    I don't remember.

14           What are you looking at there, just a deposit from

15 George and Jeri Maler?

16     Q.    Payments from the debtor to George and Jeri Maler,

17 reference, 910 Southwest Dalton.

18     A.    Oh, they must have been mortgage payments.

19     Q.    Tanya Siskind is your wife?

20     A.    Correct.

21     Q.    Is there a reason she received $17,000 from the

22 debtor?

23     A.    She may have received -- never that amount, but

24 maybe a total of that amount, which was money owed to me

25 that I just wrote to her.

1          Q.    And how was that money owed to you?

2          A.    For work I did for the debtor.

3          Q.    What kind of work?

4          A.    Legal work.

5          Q.    Those were monies owed to you for legal services?

6          A.    There was, but I just forfeited it when I filed

7    the bankruptcy.  I'm not looking for anything.

8          Q.    But to be clear, the $17,000 would have been legal

9    fees owed to you that you had paid to Tanya Siskind?

10         A.    Yeah, it was either legal fees owed to me or

11   reimbursement of money owed to me for money I put into the

12   debtor, to sustain the debtor.  I think if you do a balance

13   sheet of how much I put in and what I took out, I'm owed a

14   considerable sum of money -- or I would have been owed a

15   considerable sum of money.

16         Q.    There's commissions paid to Jose Legrand?

17         A.    Yes.  Jose was the real estate agent who brought

18   in the Alan Bias loan.

19         Q.    How about Kerry Kensington?

20         A.    Kerry Kensington was a real estate agent who

21   worked on the project house.  I think she brought in the --

22   I can't remember the name of that company.  Not the 3 Gen,

23   the other one.

24         Q.    Is that the young lady that was with you at the

25   hearing a couple weeks ago?

Page 132

1      A.    The one that yelled at me?

2      Q.    Yes.

3      A.    She wasn't with me.

4            The one that yelled at me, right.

5      Q.    She yelled at me too.

6      A.    She did?

7      Q.    Yeah.

8      A.    Yes.  She's a Realtor I've known since I started

9  my practice here, who I allowed to use one of the offices in

10 my suite, but she's angry about not getting some commission

11 money.

12     Q.    Was she owed money from -- commission money from

13 the debtor?

14     A.    No.  Not that I'm aware of, no.

15     Q.    She's just angry with you?

16     A.    Yes.  We talked that day after she yelled at me.

17 I didn't know she yelled at you, but -- she must think

18 you're my brother.  We do sort of look alike, but I'm better

19 looking.  No.  I'm sorry that she yelled at you.

20     Q.    Move to strike.  Fake news.

21           What's the Long Badger & Sheller?

22     A.    Oh, that's the law firm that Chance & Anthem used

23 in the closing up in Salisbury, Maryland.

24     Q.    For the Gateway property?

25     A.    Yeah.

1      Q.    Gateway Boulevard property?

2      A.    Yeah.

3      Q.    There's a number of transfers to a checking

4  account at Chase ending 0683.

5            Do you know who that checking account belongs to?

6      A.    That's my business account for Siskind Legal.

7      Q.    That's Siskind Legal Services, LLC?

8      A.    Yeah.  So everything you saw there during the

9  course of the Chapter 11 should show as a deposit.

10     Q.    How about to the Chase account ending 2061?

11     A.    That's my household account, DIP account, at

12  Chase.

13     Q.    And how about Chase ending 3506?

14     A.    That's Sympatico.

15     Q.    That's the same entity that was the beneficiary of

16  Talavera Trust?

17     A.    Correct.

18     Q.    Does Sympatico have -- I can say it in Spanish and

19  English.  It's all right.

20           Does Sympatico have any current operations?

21     A.    No, not right now.

22     Q.    Does it file tax returns?

23     A.    Not now, no.

24     Q.    When did it last file a tax return?

25     A.    Gee, I don't remember.  I let it lapse, because we

Page 134

1    didn't file the Form 9090.

2            Sympatico was formed to entice horse rescue

3    operations into changing their regime to become horse

4    therapy operations, so that retired polo ponies and show

5    horses would be used for what they call hippotherapy, and

6    our job was to raise money, and then gift it over to the

7    horse rescue operations, provided that they instituted a

8    therapy program for kids with disabilities.

9        Q.   Is there a reason that Chance & Anthem would have

10   transferred $750,000 --

11           (Inaudible discussion off the record between

12   Mr. Barbee and Mr. Suarez.)

13   By MR. SUAREZ:

14       Q.   -- oh, I'm sorry, 6890, Chase 6890, do you know

15   what account that was?

16       A.   I think that's Florida Association of Community

17   Banks and Credit Unions.

18       Q.   Gotcha.  That's the account that we show $750,000

19   from the debtor on October 21, 2015.

20       A.   I don't remember why.  I don't remember why.  I'd

21   have to figure that one out, it's so long ago.

22       Q.   We'll see if Mr. Barbee can help us with the

23   backup.

24       A.   Okay.

25       Q.   All right.  Let' work through a couple more things

Page 135

1    here.

2            (Exhibit 25, special warranty deed, was marked for

3    identification.)

4    BY MR. SUAREZ:

5        Q.    Show you a document marked as Exhibit 25.

6              Do you recognize this document?

7        A.    Oh, yeah.  Yes.

8        Q.    And was it through this document that the debtor

9    took title to the Santa Barbara house that you've referred

10   to as the project house?

11       A.    I believe so, yes.

12       Q.    How did the debtor fund the $1.25 million purchase

13   price?

14       A.    I believe we took whatever monies we needed from

15   the $800,000, which was advanced by Carl Stone, David Fiore,

16   whichever one or both did it, and 500,000 from Richard Neff.

17             (Inaudible discussion off the record between

18   Mr. Barbee and Mr. Suarez.)

19             MR. SUAREZ:  Alan is better than I am.  I wish he

20   could just ask the questions.

21             THE WITNESS:  Let him.

22             MR. SUAREZ:  A document I'm going to mark

23   Exhibit 26.  Take a look at that.

24             Mr. Zaretsky, here you go.

25             MR. ZARETSKY:  Thank you.

Page 136

1              (Exhibit 26, mortgage, was marked for

2    identification.)

3    BY MR. SUAREZ:

4         Q.   This is a mortgage that Chance & Anthem took out

5    on the Santa Barbara house; is that correct?

6         A.   Looks correct.

7         Q.   And when Chance & Anthem took this mortgage out,

8    what did it do with the mortgage proceeds?

9         A.   I believe the bulk of it was used to -- well, let

10   me just say this, it was used to sustain our operations

11   while we were involved with the cannabis deal.

12        Q.   Where were the proceeds deposited?

13        A.   I don't remember.

14        Q.   Were they deposited in the Chase bank account?

15        A.   I don't remember.

16        Q.   If not, the SunTrust bank account?

17        A.   I don't remember.

18        Q.   My question more directly --

19        A.   I could find out.

20        Q.   -- is, did that money go anywhere other than the

21   debtor's bank account?

22        A.   I don't remember.

23             Well, let me ask you a question.  Did you see it

24   going into the debtor's bank account?

25        Q.   I'm going to go back to the I'm going to ask the

Page 137

1    questions here, Mr. Siskind.

2        A.    "I'm not answering your questions."

3        Q.    What number did I give you there?

4        A.    Twenty-six.

5              (Exhibit 27, mortgage, was marked for

6    identification.)

7    BY MR. SUAREZ:

8        Q.    All right.  I'm going to give you 27 now.  Here's

9    another mortgage that the debtor gave on the project house,

10   the Santa Barbara house, to ABK South Properties.

11       A.    Right.

12       Q.    In the amount of $500,000?

13       A.    It was a line of credit, yeah.

14       Q.    How much did the debtor draw on the line of

15   credit?

16       A.    I believe $162,000.

17       Q.    And what did it do with that money?

18       A.    Used it to sustain operations and put it into the

19   project house, and this group gave us another hundred

20   thousand for the cannabis deal.

21       Q.    How did it put the money into the cannabis deal?

22       A.    I don't remember.  I'd have to look.

23       Q.    Okay.

24       A.    If I knew the date that they funded, I could look

25   through the accounts to determine.

Page 138

1       Q.    It's recorded on March 30, 2016.

2       A.    What is?

3       Q.    The mortgage.

4       A.    Oh, it's made out on March 23, 2016.

5       Q.    Mm-hmm.

6       A.    But I don't have records with me.  I would have to

7   check my records online, if I can go online, or if you

8   provide them.  But I'm sure the entire net proceeds went

9   into one place.

10          Well, now, wait a minute.  I don't know what the

11  net proceeds were, because like I said, it was a line of

12  credit, and I don't know what their first disbursement was.

13      Q.    And I hate to ask you again, but there were no

14  records -- you have, currently, no records about that line

15  of credit, agreements?

16      A.    Correct, but they'll be happy to give them to you.

17  It's operated by two attorneys and one other individual.

18  They'll have them.

19          MR. SUAREZ:  We'll mark this as Document 28,

20  please.

21          (Exhibit 28, complaint, was marked for

22  identification.)

23  BY MR. SUAREZ:

24      Q.    Do you recognize this?

25      A.    Yes, I do.

1       Q.   This is a foreclosure lawsuit filed against the

2  debtor?

3       A.   Correct.

4       Q.   And this was a foreclosure lawsuit filed by New

5  Wave Lenders?

6       A.   Correct.

7       Q.   This was filed in connection with the mortgage

8  that New Wave -- that the debtor gave to New Wave?

9       A.   Correct.

10       Q.   Is there a reason New Wave wasn't repaid?

11       A.   We ran out of money.  "We" meaning Chance &

12  Anthem, the debtor.

13       Q.   Chance & Anthem ran out of money because it wasn't

14  paying its debts as they became due?

15       A.   No --

16       Q.   I'm sorry --

17       A.   -- it's the other way around.

18       Q.   -- other way around.

19       Chance & Anthem wasn't paying its debts as they

20  became due, because it ran out of money?

21       A.   Right.

22       Q.   Got it.

23       MR. SUAREZ:  Making my binder lighter for the trip

24  home.

25       MR. ZARETSKY:  Thanks, it's being transferred over

1    to me.

2            (Informal discussion off the record.)

3    BY MR. SUAREZ:

4        Q.    Who is Bruce Lowe?

5        A.    Bruce Lowe worked for me in the office.  He's five

6    percent owner of Chance & Anthem.

7        Q.    He owns five percent of Chance & Anthem?

8        A.    No, I'm sorry, I misstated.  He owns five percent

9    of CannaMED Pharmaceuticals.

10       Q.    Are his --

11       A.    Wait a minute.  Yes.  Lunch tired me out.  Yes,

12   five percent of CannaMED.

13       Q.    You want some coffee?

14       A.    No, I got tea.

15       Q.    Is his share in CannaMED -- his share of the

16   membership units in CannaMED documented?

17       A.    I don't think I ever gave him anything more than

18   an e-mail to be honest with you.

19       Q.    And you would have sent that e-mail from your MSN

20   account?

21       A.    Sure, years ago.  And as I remember it was a

22   one-line e-mail when he got nervous about not being able to

23   prove his participation, and I think I said to him something

24   like, "You have what I have."

25       Q.    How did Zokatees (phonetic) Zakatus (phonetic) --

Page 141

1    help me out.

2         A.    Zokaites.

3         Q.    How did Zokaites Properties end up acquiring their

4    interest in the Santa Barbara project house?

5         A.    They bought the mortgage, and -- when it was in

6    foreclosure and finished the foreclosure.

7         Q.    They bought the mortgage from New Wave Lenders?

8         A.    Right.

9         Q.    And how much did they pay to acquire the mortgage?

10        A.    Full boat.

11        Q.    And at the foreclosure sale, did they pay in

12   excess of their judgment amount for the property?

13        A.    No.  I think a little less, like 40 or $50,000

14   less.

15        Q.    And I know we went through this at the 341, but

16   Frank Zokaites is your friend?

17        A.    Yeah, longtime friend.

18        Q.    Longtime business associate?

19        A.    Yeah.

20        Q.    He understands that there are creditors that loss

21   money in connection with the Santa Barbara house?

22        A.    Not yet.

23        Q.    What agreement do you and he have concerning the

24   disposition of the Santa Barbara house, if any?

25        A.    There's no official agreement, as I explained at

1    the 341, nothing that can be enforced against him.  But the

2    reason that I disclosed the entire redevelopment deal to him

3    was so that he could step in, make a little money, and then

4    address my creditors.

5         Q.    You would like for him to address your creditors?

6         A.    Correct.

7         Q.    What's the -- why would he do that?

8         A.    Well, I explained at the 341 generally why, but,

9    look, he and I go back a long way, and it's just the way

10   he's built.  So when things kind of blew up because the

11   cannabis license didn't go our way, I called him and said,

12   "Will you step in on a few of these things and see if you

13   can help, so that my creditors get paid, because whatever I

14   get by involving you will make it easier on me to make up

15   the rest."

16        Q.    Okay.  Suite 500 at 525 South Flagler Drive --

17        A.    That was my office.

18        Q.    That was your office.  It was a number of suites

19   in the corner of the building, I understand?

20        A.    No, it was the entire top floor.

21        Q.    Entire top floor of the Trump --

22        A.    Trump Plaza Office Center.

23        Q.    Plaza Office Center.

24              Is it correct, you originally acquired it through

25   an entity named TP5, LLC?

Page 143

1      A.    Yes.

2      Q.    Trump Plaza 5, LLC?

3      A.    Fifth Floor.

4      Q.    TP5, LLC lost the property in a foreclosure to

5  Optimum Bank, correct?

6      A.    Correct.

7      Q.    And Optimum Bank eventually sold the entity

8  through which it acquired title to the office suite --

9      A.    Which was called OBR -- OB Real Estate Holdings

10  1732, LLC, which was their loan number.

11      Q.    Right.  Who owned OB Real Estate Holdings 1732,

12  LLC?

13      A.    William Siskind, my father.

14      Q.    Did he own it directly or through an entity?

15      A.    I believe directly.

16      Q.    And were any assets -- strike that.  Give me a

17  second.  Let me make sure I ask the question right.

18            Was Sovereign involved in the purchase of the

19  office suite from Optimum Bank?

20      A.    Maybe.  Because I think to the extent that

21  George's loan money was used for the purchase, it would have

22  come from Sovereign.

23      Q.    If I understand it correctly, Christopher George

24  lent Sovereign a million dollars, and that million dollars

25  was used by your late father to purchase OB Real Estate

Page 144

1    Holdings 1732, LLC?

2        A.    He loaned $2 million.

3        Q.    Mr. George lent $2 million to Sovereign?

4        A.    Correct.

5        Q.    And of that $2 million, a million was used to

6    purchase OB Real Estate Holdings 1732?

7        A.    I believe so.  I believe it came from them.

8        Q.    I am going to show you Exhibit 32.

9            (Exhibit 32, mortgage deed, was marked for

10   identification.)

11   BY MR. SUAREZ:

12       Q.    OB Real Estate Holdings took out a mortgage in the

13   amount of $200,000 on account of a loan from the Malers; is

14   that correct?

15       A.    Oh, yeah, I think numerous loans from the Malers

16   that added up to about $750,000.

17       Q.    What were those loan proceed used for?

18       A.    I don't remember.  Wherever they were needed, I

19   guess.

20       Q.    What do you mean "wherever" they were needed?

21       A.    Whatever entity needed cash to pay its bills at

22   the time.

23       Q.    Would that include Sovereign?

24       A.    I don't know.

25       Q.    Would it include Chance & Anthem?

1      A.    I don't know.

2      Q.    Would it include Sympatico?

3      A.    I doubt it, but I'm not sure.

4      Q.    How about Florida Equine?

5      A.    No, Sympatico Equine.

6      Q.    Sympatico Equine and Florida Community.

7      A.    I don't think so.  I don't know why we would have

8  had to fund Florida Association of Community Banks and

9  Credit Unions.

10            (Exhibit 33, mortgage modification, was marked for

11  identification.)

12  BY MR. SUAREZ:

13      Q.    Exhibit 33 was another amendment for $150,000 for

14  the mortgage --

15      A.    Correct.

16      Q.    -- is that correct?

17      A.    Correct.

18      Q.    And what were those loan proceeds used for?

19      A.    I have no idea at this point.

20      Q.    Who would know?

21      A.    Well, if you do a little bit of forensic

22  accounting work and let me review your work, I might be able

23  to help you discern where the money went.

24            But why does this have anything to do with Chance

25  & Anthem?  Oh, because you're wondering whether Chance &

1   Anthem got any of this money, right?

2       Q.   Well, Chris George says we owe him, so I'm trying

3   to figure out where his money went, so I can see what we owe

4   to whom and who may owe us.

5       A.   If you saw the promissory notes that he initialed,

6   it's plain that the loan was to Sovereign.

7       Q.   Let's go through this.

8       A.   That's the end of his story.  He can't change it.

9       Q.   So he lent the money to Sovereign?

10      A.   Correct.

11      Q.   And then Sovereign used some of it for OB Real

12  Estate and used some of it for --

13      A.   Whatever it used it for.

14      Q.   Whatever it used it for, okay.

15      A.   He's out of privity, so he shouldn't even be a

16  factor, and you ought to get rid of him and John George and

17  Diana George too.

18      Q.   There was another modification agreement on the

19  20th of March 2015.  I'll mark it at Exhibit 34.

20           (Exhibit 34, mortgage modification, was marked for

21  identification.)

22  BY MR. SUAREZ:

23      Q.   Do you see that?

24           Exhibit 32, 33, and 34, the Malers actually

25  funded --

Page 147

1      A.    Malers, Malers.

2      Q.    -- the Malers, M-A-L-E-R, they actually funded on

3  those mortgages?

4      A.    Oh, yeah, he and his investment group.

5      Q.    And where was that money funded to?

6      A.    Oh, I don't remember.

7      Q.    And what was the money used for?

8      A.    I don't -- I don't remember.

9      Q.    Just however it was needed?

10     A.    Yeah.

11           MR. SUAREZ:  I'll marked another modification

12  agreement 35.

13           (Exhibit 35, mortgage modification, was marked for

14  identification.)

15  BY MR. SUAREZ:

16     Q.    Do you see this?

17     A.    Are these in date order?

18     Q.    They should be.

19           Thirty-five also increases the mortgage by

20  $250,000 against the office suite?

21     A.    I think it's a total of seven-fifty, so whatever

22  it ends up being.  I'm trying to find a date on this one.

23  Oh, here it is.  It's stamped sideways, so.

24     Q.    September 20th, the document is dated

25  September 20th.

1      A.   Hold on a second, one-fifty plus one-fifty is 300,

2   plus 200 is 500, plus two-fifty, there you go, 750,000.

3      Q.   And the proceeds of the mortgage we've identified

4   as 35, where did those go?

5      A.   What?

6      Q.   The proceeds --

7      A.   Oh, the exhibit number 35.

8      Q.   Yeah.

9      A.   I don't know, Jesus.  I would have to, you know,

10   visit the records.

11      Q.   At some point did your late father sell his

12   interest in OB Real Estate Holdings to Frank Zokaites?

13      A.   Yes.

14      Q.   What were the terms of that transaction?

15      A.   I think Frank paid $10,000 for it.

16      Q.   And assumed the mortgages?

17      A.   Correct.  And all the other debt, we were behind

18   about three months on everything there.

19      Q.   On OB Real Estate?

20      A.   Well, yeah, on the condo fees, the mortgage

21   payments, taxes.

22      Q.   Was that transactions documented?

23      A.   Yes.

24      Q.   How was it documented?

25      A.   I thought there was a one-page agreement on that

Page 149

1    as I remember.

2         Q.    Would Mr. Zokaites have it?

3         A.    Sure.  In fact, I think he sent it to somebody

4    recently for some reason.  He may have copied me on the

5    e-mail.  If he did, I have it.  He may have responded to a

6    request from you.

7         Q.    Not from me.

8         A.    No?

9         Q.    OB Real Estate eventually sold Suite 500; is that

10   correct?

11        A.    Yes.

12        Q.    To an entity named Ezrick (phonetic) PB Office,

13   LLC?

14        A.    I don't know.  Sounds familiar.

15        Q.    Are you related to that entity in any way?

16        A.    No.

17        Q.    Did you receive anything from the sale of that

18   property by Mr. Zokaites?

19        A.    Is your question whether I received any proceeds

20   from that sale?

21        Q.    Yes.

22        A.    The answer is no.

23        Q.    All right.  Let me show you Exhibit 39.

24              (Exhibit 39, assignment of mortgage, was marked

25   for identification.)

Page 150

1    BY MR. SUAREZ:

2        Q.    Have you seen this document before?

3        A.    Yes.

4        Q.    What is this document?

5        A.    It's an assignment of the mortgage on the condo

6    over at Cross Creek.

7        Q.    It's an assignment from George Maler to Chance &

8    Anthem?

9        A.    Yes.

10       Q.    And what did Chance & Anthem pay for this

11   mortgage, if anything?

12       A.    Twenty-seven thousand two-hundred fifty dollars.

13       Q.    Why would Chance & Anthem pay $27,000 for a

14   $25,000 mortgage?

15       A.    Because it had the money, and because George

16   wanted me to take him out, because he thought that I lost

17   the promissory note.

18       Q.    He couldn't foreclose or establish his debt,

19   because he thought you didn't have the promissory note?

20       A.    Yeah, he thought I lost it.  He found it

21   eventually in his files.

22       Q.    And you started a foreclosure proceeding on behalf

23   of Chance & Anthem?

24       A.    Later, yeah.

25       Q.    Is that the foreclosure procedure identified at

Page 151

1  Exhibit 39?

2      A.   That appears to be a lis pendens related to that

3  foreclosure.  Wait, you've go two Exhibit 39's now.

4           MR. SUAREZ:  We'll call this 39B.  The notice of

5  lis pendens.  The second 39 will be 39B.

6           (Exhibit 39B, lis pendens, was marked for

7  identification.)

8           MR. SUAREZ:  Exhibit 40.

9           (Exhibit 40, verified complaint, was marked for

10 identification.)

11 BY MR. SUAREZ:

12     Q.   Do you recognize this document?

13     A.   Yes.

14     Q.   What is this document?

15     A.   This is the foreclosure suit brought against the

16 Mohammeds, who had the Cross Creek condominium.

17     Q.   And that's your signature at the end of the

18 document --

19     A.   Yes.

20     Q.   -- end of the pleading?

21     A.   Sure.

22     Q.   As managing member of Chance & Anthem?

23     A.   No.  Well, I signed it on behalf of Siskind Legal

24 Group at the end, but the verification was signed by me as

25 managing member of Chance & Anthem.

Page 152

1    Q.   And on the second page after that, Exhibit A, is a

2  promissory note for $25,000 made by Mr. and Mrs. Mohammed?

3    A.   Yes.

4    Q.   And at the bottom of that it reflects that the

5  promissory note was endorsed to Chance & Anthem by George

6  Maler?

7    A.   Correct.

8         (Exhibit 41, assignment of mortgage, was marked

9  for identification.)

10 BY MR. SUAREZ:

11   Q.   Exhibit 41, sir, do you recognize this document?

12   A.   Yes.

13   Q.   What is this document?

14   A.   An assignment of mortgage.

15   Q.   Okay.  Does this document assign Chance & Anthem's

16 interest in the mortgage previously marked -- or the subject

17 of the complaint identified in Exhibit 40 to Zokaites

18 Properties?

19   A.   Right.  We refer to that as the Mohammed mortgage.

20   Q.   What consideration, if any, did Chance & Anthem

21 get in exchange for the assignment of the Mohammed mortgage

22 to Zokaites Properties?

23   A.   I believe it was 22,500.

24   Q.   And where were those fund deposited?

25   A.   I don't remember.  Oh, probably into the transfer

Page 153

1    account at PNC Bank.

2         Q.    All right.

3              THE WITNESS:  Off the record.  My wife wants to

4    know how much longer we're going to be.

5              Another two hours, you figure?

6              MR. ZARETSKY:  Well, I have to be in Jupiter at

7    five sharp.

8              THE WITNESS:  What time is it?  Oh, it's two.

9              MR. ZARETSKY:  Whatever it is, we'll finish or

10   adjourn at four.

11             THE WITNESS:  Okay.  Let me just see if there's

12   any problem.

13             (A brief recess was taken.)

14   BY MR. SUAREZ:

15        Q.    Okay.  I'd like to show you what I've marked

16   Exhibit 15, Mr. Siskind.

17        A.    Oh, yeah, the famous promissory notes.

18             (Exhibit 15, promissory note, was marked for

19   identification.)

20   BY MR. SUAREZ:

21        Q.    You have testified that these notes were made

22   by --

23        A.    Sovereign Gaming.

24        Q.    -- Sovereign Gaming, executed by your late father;

25   is that correct?

1     A.    Either he -- it doesn't look like his signature to

2   me.  I might have executed that for him to be honest with

3   you, but the initials up in the upper right-hand corner, as

4   lousy as they are, belong to Chris George.

5     Q.    And where was Mr. George when this promissory note

6   was signed?

7     A.    There are two promissory notes here.

8     Q.    Yes, they're on both sides of the page.

9     A.    Right.

10    Q.    I grant you that.

11    A.    And both them were signed by him while he was

12  incarcerated up in the Atlanta federal penitentiary.

13    Q.    How did he physically get these promissory notes

14  to sign?

15    A.    I took them to him.

16    Q.    In Atlanta?

17    A.    Yeah.

18    Q.    When did you take them to him?

19    A.    I made three trips up there.  I presume that these

20  were on the last trip.

21    Q.    So they were both signed at the same time?

22    A.    Yes.  Well, no, they were both initialed at the

23  same time.

24    Q.    But one was made in --

25    A.    December 24th --

Page 155

1      Q.    -- 2013.

2      A.    -- and then January 9, 2014.

3      Q.    And was on the same trip that you would have

4   initialed them?

5      A.    Oh, yeah.

6      Q.    What was the purpose of having Mr. George initial

7   the promissory notes?

8      A.    Just for my peace of mind, so that he wouldn't

9   later claim he didn't know anything about them.

10      Q.    And these were funds that were deposited into

11   Sovereign Gaming & Entertainment's bank account?

12      A.    No, I don't know that they all went into there.  I

13   might have transacted this money through my -- well, I

14   definitely transacted this through my trust account on

15   behalf of Sovereign Gaming.

16      Q.    Okay.

17      A.    If you remember, the facts behind this are that

18   Chris George got a $2,050,000 IRS tax refund, thereabouts.

19   So he loaned $2 million to Sovereign, and then Diana George,

20   his wife at the time, now his ex-wife, who was living at the

21   Talavera property, got the difference, 40 or $50,000.

22      Q.    And those funds would have all been disbursed from

23   your trust account?

24      A.    Oh, yeah.

25      Q.    And other than the promissory note --

Page 156

1       A.   That's not to say they wouldn't have been

2  disbursed into these other entities, right?

3       Q.   Right.  But they would have originated from your

4  trust account?

5       A.   They would have gone from Diana -- I'm sorry, from

6  Chris George's bank account into my trust account and then

7  been disbursed from there.

8       Q.   And not to belabor the point, but you don't have

9  any ledgers made contemporaneously that account for these

10 transactions?

11      A.   No, thanks to my paralegal.  But I can recapture

12 those, obviously, if I spend some time on it.

13      Q.   Are there any other writings that evidence these

14 transactions?

15      A.   Yes.  Go to the Zokaites Properties versus 3485

16 Lago De Talavera foreclosure suit, and you'll see that after

17 Sofiye Williams, on behalf of Chris George or whoever else,

18 tried to get the judge to sign an order saying that I had

19 engaged in wrongdoing, I submitted a paper, attached to

20 which were all of his handwritten correspondence to me, and

21 you can see -- and it's a lot easier if you see my

22 highlighting on the -- I haven't looked at it since it was

23 filed, but if you can discern my highlighting, you you'll

24 see quite readily how he authorized the use of his money.

25           Now, it's important for you, while you're looking,

Page 157

1    to know that John George -- not only did he not have nothing

2    to do with any of that or the house, but that, frankly,

3    Chris' purpose was to keep that money away from his family

4    and see that it was utilized, hopefully, in a business that

5    would be making money, as opposed to be being squandered by

6    his father or his now ex-wife.

7            MR. SUAREZ:  I'm going to mark this as Exhibit 50.

8            (Exhibit 50, motion for reconsideration, was

9    marked for identification.)

10   BY MR. SUAREZ:

11       Q.   Is that the document that you were referring to?

12       A.   No.  Oh, yeah, there it is.  Oh, my God, they

13   didn't come out very well, did they?  Yeah, these are the

14   letters.  You can barely make out the highlighting.  In

15   fact, it looks like, because of the highlighting, you can't

16   read underneath where I highlighted.

17       Q.   Are there any other e-mails or writings that

18   relate to these transactions?

19       A.   Oh, yeah, there's a terrible e-mail he sent me,

20   once, which I couldn't find on that CorrLinks e-mail.

21            THE REPORTER:  On what e-mail?

22            THE WITNESS:  CorrLinks, C-O-R-R-L-I-N-K-S, is the

23   service that the inmates use to e-mail, and it's reviewed,

24   you know, the Corrections Department can see it all, so they

25   make them use that e-mail.  Oh, yeah, he sent me a horribly

Page 158

1    threatening e-mail once.

2              (Exhibit 51, Chase statement, was marked for

3    identification.)

4    BY MR. SUAREZ:

5        Q.    I'm going to show you what I've marked as

6    Exhibit 51, a Chase bank account record.  It's a composite

7    exhibit with Chase Bank account records of the debtors.  If

8    you'll scroll through to the fifth page, you'll see a check

9    made by Chance & Anthem to the Jeffrey M. Siskind Trust

10   Account for $5,000.

11       A.    Right.  I remember there was a $5,000 check to the

12   trust account.  I think that's the only time that Chance &

13   Anthem ever transferred money to the trust account.

14       Q.    And why would Chance & Anthem have transferred

15   $5,000 to the trust account?

16       A.    I don't remember.  I can find out for you, just by

17   looking at whatever other transactions occurred near to that

18   time.

19       Q.    Was it a loan to the trust account?

20       A.    I don't remember.  It's not marked as a loan.

21       Q.    Can you turn to the next page.

22              The next page is a check from Chance & Anthem to

23   Tanya Siskind for $2500?

24       A.    Right, which I signed on behalf of her on the back

25   and deposited it.

1        Q.    Into an account ending 47764?

2        A.    That's her bank account at Wells Fargo.

3        Q.    And why did Chance transfer that money to Tanya

4   Siskind?

5        A.    That was money that I was taking back from Chance

6   & Anthem that I just made it out to her, rather than making

7   it to me and having to wait a day before I could pay it over

8   to her.

9        Q.    The next page, N&P Construction, do you see that?

10       A.    Right.

11       Q.    What was the purpose of that payment?

12       A.    That was for their -- job number 2619, revised.

13  That was the fee to tear down the three-story -- I'm sorry,

14  three-car, two-story garage at the project house in

15  Wellington.  They're a demolition company.

16            You want me to get you better copies of these

17  handwritten notes from jail?

18       Q.    Sure.

19       A.    I'll tell you what I'll do, when I get home, I'll

20  look on the computer to see if you look at them online

21  whether they are more readable.  If they are I will just let

22  you know to look at them online.  If not I'll see if I have

23  better -- maybe this has been copied too many times, but you

24  can't even read what this says.

25            (Exhibit 52, Chase statement, was marked for

Page 160

1    identification.)

2    BY MR. SUAREZ:

3         Q.    Marked as Exhibit 52, a composite, the

4    June 2018 -- no, strike that -- the April 30th through May

5    31, 2016 Chase bank account and related records of the

6    debtor.

7              Mr. Siskind these records reflect, if you turn to

8    the third page, a check in the amount of $25,000 to Chance &

9    Anthem from your trust account --

10        A.    Right.

11        Q.    -- on May 13, 2016.

12             What was the purpose of that transfer?

13        A.    Without looking through the records, I don't know.

14        Q.    On the next page, there's a $20,000 check to

15    Chance & Anthem from your trust account on May 16, 2016.

16             What was the purpose of that transfer?

17        A.    I can't tell you without doing some research,

18    obviously.  Same answer.

19        Q.    What documents would you need in order to be able

20    to answer that question?

21        A.    Well, if you make a list of these checks and their

22    dates, I'll go back through the online records of the trust

23    account and see what was going on at that time and also see,

24    by looking at the Chance & Anthem account, what that money

25    might have been utilized for.  It might have been just a

Page 161

1  release of funds to Chance & Anthem for whatever they needed

2  at the time.  So this was in May of 2016.

3      Q.   When you say "just a release of funds" for

4  whatever they needed at the time, what would have been the

5  source of the funds in the trust account that were deposited

6  to Chance & Anthem?

7      A.   Well, it could have been any of the people who

8  provided funding for the various projects.

9      Q.   And they would have provided funding into your

10 trust account?

11     A.   Not everybody, but some, yeah.

12     Q.   Some would have provided funding into your trust

13 account?

14     A.   Well, Fred Volkwein, for instance, would have been

15 transacted through the trust account.  David Fiore, Carl

16 Stone's money went through the trust account.  Let me think

17 of anybody else.  There may be others.

18     Q.   Show you a bank statement marked as Exhibit 53.

19 It's a composite.

20          (Exhibit 53, Chase statement, was marked for

21 identification.)

22 BY MR. SUAREZ:

23     Q.   Do you see in the first page, February 19, 2019 --

24 I'm sorry strike that -- September 19th of 2016.

25     A.   A wire for 40,000?

1          Q.    From Wells Fargo Bank.

2                Would that have been a transfer from the trust

3     account into the debtor?

4          A.    I can't tell from this.

5          Q.    Did you have any other accounts at Wells Fargo,

6     other than your trust account?

7          A.    Not until recently when I went on an account with

8     my father.

9          Q.    That would have been a personal account of your

10    father's?

11         A.    Yes, which I could see, because he was being

12    harassed by some of these telephone fraudsters.

13         Q.    Yeah, I get that.

14         A.    Yeah.  I can't tell where this 40,000 came from

15    this, expect that it came from a Wells Fargo bank account

16    somewhere.

17               MR. SUAREZ:  All right.  And the last one I have

18    for you, I'll mark as Exhibit 54.  This is also the debtor's

19    bank statement.

20               (Exhibit 54, Chase statement, was marked for

21    identification.)

22    BY MR. SUAREZ:

23         Q.    On October the 6th --

24         A.    I was going to say this had a lot of transactions.

25         Q.    -- of 2015, the debtor received a deposit for

Page 163

1    $750,000.

2        A.    Did you ask me about that before?

3        Q.    If you turn to the third page, you'll see a

4    cashier's check in the amount of $750,000.

5        A.    Yeah.

6        Q.    The remitter reflects as being Jeffrey Siskind.

7        A.    I have no idea.

8        Q.    And it's a cashier's check drawn on Wells Fargo

9    Bank.

10       A.    Yeah, that's interesting.

11       Q.    Do you know where this cashier's check -- why this

12   cashier's check was deposited into the debtor's bank

13   account?

14       A.    No.  But that may have come from David Fiore's

15   money, because that seems to be around the time of the

16   purchase of the project house.

17       Q.    And is there a reason why it would been done by a

18   cashier's check?

19       A.    I can't answer as to why.  But I can conjecturally

20   state that I suppose we had to move the money quickly, so

21   that we could close.  That's my guess.

22       Q.    So you could close on the purchase of the Santa

23   Barbara house from JP Morgan Chase?

24       A.    Correct.

25       Q.    The next page --

Page 164

1        A.    Oh, yeah, because, look, you see the same date was

2   the 500,000 on 10/6, which must have come from Richard.

3        Q.    From Richard?

4        A.    Neff.

5        Q.    The transfer from 7527?

6        A.    Yeah, that's not one of my accounts.

7        Q.    So the seven-fifty is from Fiore?

8        A.    Could have been.

9        Q.    The 500 is from Neff?

10       A.    I think so.

11       Q.    And then October 22nd, it shows a deposit for

12  seven-twenty-five?

13       A.    Yeah, I don't know where that came from.

14       Q.    If you turn to the last page of this exhibit,

15  there's a deposit slip?

16       A.    Yeah, I didn't write that.  I don't know.

17       Q.    That reflects $725,000 in cash being deposited

18  into the debtor's bank account.

19       A.    Where does it say "cash"?  Oh, yeah, look at that.

20  I have no idea where that came from.  That might have been

21  the proceeds of that -- of that loan from New Wave.

22            Do those dates coincide?

23       Q.    How would that have been -- how would that be a

24  cash deposit?

25       A.    I guess because maybe -- I don't know.  I have no

1    idea what that is, but I don't think -- well, let me say

2    this.  There was never a 25,000 -- $725,000 cash deposit.

3    That would have been a big sack, so I don't know why that

4    was put that way, and the writing, I don't even recognize

5    the writing.

6          Q.   All right.  Let me --

7          A.   It's a woman's writing.  I can tell you that.

8               That didn't sound sexist, did it?

9               MR. SUAREZ:  Let me confer with Mr. Barbee for a

10   second.  I think I'm done subject to the reservation on the

11   trust account records.

12               (A 15-minute recess was taken.)

13   BY MR. SUAREZ:

14          Q.   Mr. Siskind, I want to revisit the issue of what

15   type of entity Chance & Anthem is.  The trustee may have an

16   obligation to file tax returns even if Chance & Anthem has

17   never made a dollar.

18               When you took out the tax ID number, when you

19   incorporated Chance & Anthem, was it treated as an S

20   corporation, a partnership, a pass-through?

21          A.   Isn't it just a corporation?  I'm not sure.

22          Q.   I'm not a tax expert, but I understand that every

23   company has to have a tax status.

24          A.   I think it's just an LLC, so --

25          Q.   So it -- and --

1          A.    This couldn't be the chair I was sitting in

2     before, could it?

3          Q.    It's a single member LLC, you're the only member?

4          A.    Of Chance & Anthem?  Hmm, no, I wouldn't be.

5                Oh, Chance & Anthem --

6          Q.    Chance & Anthem, yeah.

7          A.    -- I was thinking of CannaMED.

8                Yeah, I believe it is.

9          Q.    Not --

10         A.    Chance & Anthem, LLC, yeah, single member --

11         Q.    So it's a single member LLC.

12               Do you know if it's treated as a disregarded

13    entity, and it just flows through to your tax returns?

14         A.    It wasn't treated anyway.  I guess, you could make

15    the election.

16         Q.    You haven't made an election one way or the other?

17         A.    Huh-uh.

18         Q.    It has a tax ID number?

19         A.    Yeah.

20         Q.    Who procured that tax ID number?

21         A.    I did.

22         Q.    Do you have the forms that you used to procure

23    that tax ID number?

24         A.    No, I probably did it online.

25               MR. SUAREZ:  All right.  Mr. Zaretsky, the floor

Page 167

1    is yours.

2              THE WITNESS:  Times up.

3                       DIRECT EXAMINATION

4    BY MR. ZARETSKY:

5         Q.   Mr. Volkwein -- or pardon me.  I'm representing

6    Fred Volkwein --

7         A.   And Sarenil.

8         Q.   -- and Sarenil and any other related entities that

9    you might have dealt with that my questions may delve into.

10             First, this is my first time meeting you.  Tell me

11   a little bit about your background.

12             For example, can you give me your education from

13   college on?

14        A.   Certainly.  I went to Harvard undergrad, Harvard

15   for a masters degree, and then I went Southern Western

16   University in Los Angeles for my law degree, and I'm

17   currently working on a masters in international law at

18   American University.

19        Q.   When did you finish your J.D. degree?

20        A.   I think in 1996.

21        Q.   And which was the first bar that you were admitted

22   to?

23        A.   Maryland.

24        Q.   When was that?

25        A.   I'm thinking it was 1997, yeah.

Page 168

1      Q.    And thereafter?

2      A.    Then I think the next one is Florida, then New

3  Mexico, then the U.S. Virginia Islands.

4      Q.    And why did you also try out for the bar in

5  Florida and the U.S. Virgin Islands?

6      A.    Well, I took Maryland because my father was

7  operating a law office there, and then I went to Florida

8  because we had a winter home here, and I thought I would

9  maybe one day consider practicing law here.  And then -- oh,

10  then New Mexico, I guess.  I don't remember which was next

11  New Mexico or the U.S. Virgin Islands, but we working on

12  casino deals in both places.  So I figured, why not take the

13  bar there while I'm there, and then I waived into the DC

14  bar.

15      Q.    So you took the bar in New Mexico when?

16      A.    I don't remember.  Somewhere around when I just

17  graduated from law school, '98, maybe.

18      Q.    So in '98 your father was working on the casino

19  deals?

20      A.    Yeah.

21      Q.    And where was the first place that you practiced?

22      A.    Maryland.

23      Q.    And that was because the family law firm was

24  there?

25      A.    Correct.

1        Q.    And how long did you practice there?

2        A.    Oh, a year or two, I'm thinking.  I don't remember

3   really.

4        Q.    And that was practicing law with your father?

5        A.    Well, not really.  He didn't practice.  He was off

6   building hotels and things like that, but I practiced with

7   the rest of the firm.

8        Q.    But the name of the firm there was what?

9        A.    I believe at the time it was Siskind, Birch, Grady

10  & Hoover.  Birch was the former attorney general of

11  Maryland.  Grady was the former chief judge of the Baltimore

12  City Supreme Bench, and Rosen and Hoover.  So there was one

13  more Rosen.  Siskind, Birch, Grady, Rosen & Hoover.  Rosen

14  and Hoover were prior law associates or partners of my

15  father.

16       Q.    What was the reason you left Maryland and came

17  to -- another place?

18       A.    Florida.

19       Q.    Was it you came to Florida?

20       A.    Yeah.  I came down here and bought a little

21  apartment in Palm Beach, a studio on South Ocean Boulevard

22  for $11,000, and I started spending some time here with my

23  wife, and before you know it, all the people who were in

24  that cooperative called the Embassador Hotel, wanted me to

25  get on the board.  Then they wanted me to be president, and

Page 170

1    then they wanted to give me law work.  So I figured, what

2    the heck, before you know it, I had more work here than I

3    had at home.  So I said, "Let's just stay here," and my wife

4    agreed to do it.  So we became Floridians and bought a home

5    here in 2001.

6         Q.    And where was that home?

7         A.    Wellington.

8         Q.    In regard to Fred Volkwein, how was it that you

9    met him?

10        A.    I had a sailboat at the marina in West Palm Beach

11   and Fred had a sailboat at the marina, and we just met

12   hanging around the boats.  And then he also did a lot of

13   canvass work, and he did a lot work for me on my boat, and

14   then when I wanted to take the boat over to the Bahamas and

15   I didn't have that experience, I asked him to go along, and

16   so we took that trip.  And that would have been back in

17   1988, I'm guessing, somewhere around there, and we became

18   friends since then.

19        Q.    How was it that he first retained you as an

20   attorney?

21        A.    Gees, I don't remember.  I always did little

22   things for him over the years.  He owned real estate that he

23   rented out.  I don't think we ever were engaged in

24   litigation until more recently.  Yeah, I don't remember any

25   litigation until we sued the seller of a tiny little

1    property up in Northwood that the seller refused to close

2    on.  I think that was the actual first lawsuit I ever did

3    for Fred.

4         Q.   So I want to go through a whole bunch of

5    documents, and I would like you to try explain --

6         A.   I better move --

7         Q.   -- those documents.

8         A.   -- right?

9         Q.   You can.

10        A.   Better move over.

11             MR. ZARETSKY:  I would like you to try to explain

12   those documents.  I'm going to ask the court reporter and

13   counsel, I have these marked already with miscellaneous, but

14   in order, notations.  Is it acceptable if I were to just

15   retain these same designations?

16             MR. SUAREZ:  Yes, sir.

17             MR. ZARETSKY:  As long as we can identify them

18   through the deposition, correct?

19             MR. SUAREZ:  Absolutely.

20             MR. ZARETSKY:  Perfect.

21   BY MR. SUAREZ:

22        Q.   I'm going to show you a typed document marked as

23   Exhibit A, we'll call it Volkwein Exhibit A, and ask if you

24   recognize this from December 18th of 2002?

25        A.   Yeah.  This looks like my signature, back when I

Page 172

1    could sign a decent signature.

2         Q.    And the handwriting below that, is that your

3    handwriting as well?

4         A.    No, huh-uh.

5         Q.    Do you remember this $10,000 in cash --

6         A.    No.

7         Q.    -- you received from him?

8         A.    No.

9         Q.    This indicates down at the bottom, by someone

10   else's handwriting, who I believe is Fred Volkwein's --

11        A.    I believe it's Fred, yeah.

12        Q.    Do you know who this Phil E-I-C-H or something of

13   that sort?  Do you see the designation Phil somebody?

14        A.    I do, scratched through.  I have no idea what this

15   was, but I think I -- I think I remember that Fred had a

16   friend named Phil.

17        Q.    Okay.  Did you ever borrow money from Phil?

18        A.    No, not that I remember.

19        Q.    But you're not aware that you know this person?

20        A.    As I said, I think Fred had a friend named Phil.

21        Q.    Okay.  We'll go on to the next document.

22        A.    Want me to keep the stack here for the court

23   reporter?

24        Q.    Yes, please, that would be excellent.

25              This is designated as an Assignment of Proceeds of

Page 173

1    Mortgage Interest Agreement -- and Interest Agreement, dated

2    June 26, 2006.  We have it marked as Exhibit B.

3        A.    I remember this deal.

4        Q.    So let me ask you some questions about it.

5              You borrowed $50,000 from Fred?

6        A.    No, this looks like it was borrowed by the

7    Wilkins -- oh, hold on, let me read it.

8              Oh, right.  This was a loan that I had made to

9    Steven and Karol Wilkins, and then I needed to cash out, so

10   I borrowed that money from Fred.

11       Q.    In the amount of $50,000?

12       A.    That looks correct, yeah.

13       Q.    And you promised to pay him a return for lending

14   that money to you?

15       A.    Looks like I did.

16       Q.    Okay.  And it says that the loan will accrue

17   interest at the rate 20 percent per annum until repaid in

18   full?

19       A.    Yeah, I guess so.

20       Q.    At the time that you did this, you were acting as

21   Fred's attorney?

22       A.    No.  I would have been the borrower.

23       Q.    Did you give Fred any legal advice in regard to

24   this transaction?

25       A.    I don't think so.

1      Q.    Did you prepare this document?

2      A.    I did prepare this document.

3      Q.    At the time that you prepared this document, you

4  were an attorney in Florida, correct?

5      A.    Yes, in 2006.

6      Q.    And do you know and understand the law concerning

7  interest rates --

8      A.    Oh, sure --

9      Q.    -- in the State of Florida?

10     A.    -- I might not have then.  I do know that it's an

11 18 percent usury cap.

12     Q.    So this loan actually was a usurious loan?

13     A.    On its face it appears to be, but I'm sure that

14 Fred, when he was repaid, didn't receive that 20 percent

15 interest.

16     Q.    On the --

17     A.    Or maybe he did.  I don't see what difference it

18 makes now.

19     Q.    On the face of the document, to the left of the

20 signatures there, it says, in abbreviation, received --

21 either check -- I guess it's check 1017, 6/26/06.

22     A.    Right.

23     Q.    Is that your handwriting?

24     A.    Yes.

25     Q.    Is that your acknowledgement that you received a

Page 175

1    check, and the check was number 1017?

2         A.   I have no idea.  That looks like one of my check

3    numbers.

4         Q.   Are you talking about a checking account number or

5    simply the number of the check?

6         A.   No.  The check number.

7         Q.   Well, I would assume that everybody at point time

8    or another has a check numbered 1017.

9         A.   Yeah, I guess you're right.

10        Q.   Was this loan repaid?

11        A.   Yes.

12        Q.   I'm going to show you next what I've marked as

13   Exhibit C.  This has handwriting on the top of it.  It's

14   dated 8/6 -- pardon me, it's dated -- pardon me, it doesn't

15   have a date.  There's a date typed on the check stub of

16   8/6/2007.

17        A.   Right, I see that.

18        Q.   It's marked as Exhibit C, and it says in

19   handwriting, "I own" -- or "I owe Fred Volkwein $25,000 plus

20   interest at ten percent a year, due November 6, 2007," and

21   there's a signature behind it, which appears to be Jeffrey

22   Siskind.

23             Is that your handwriting and your signature?

24        A.   No.  It's my signature, sort of.  It's a little

25   different from my normal signature, but it could be mine.

Page 176

1       Q.   Do you remember receiving these funds?

2       A.   No.

3       Q.   Do you deny that these funds went to you?

4       A.   Well, I don't admit or deny it, because I don't

5   see any further proof, but I can tell you that these old

6   loans were repaid.  I'm sure of it.

7       Q.   So if this money was received by you, you're

8   saying that this was repaid?

9       A.   Yes.

10      Q.   Next is a composite exhibit evidenced as a

11  SunTrust account statement with a copy of a check on it,

12  dated 9/14/2007 for $11,000 made payable to Jeff Siskind.

13  In the memo it says 15,000 plus 4,000 -- actually it says

14  15,000 equals 4,000 plus 11,000.

15           Do you recall receiving this check?

16      A.   No.

17      Q.   Did I not give you a copy?

18      A.   You didn't give it to me.

19      Q.   Okay.  Sorry.

20      A.   Yes, I have to say that I recall this.  This is my

21  writing.

22      Q.   So this entire second sheet is your handwriting?

23      A.   Yes.

24      Q.   And can you explain what this transaction was?

25      A.   Did I?  No, just a loan back in 2007.

1       Q.    And to your knowledge was this money repaid?

2       A.    I believe so.  Now, I will say also that this

3   seems to relate to the prior $25,000 loan.

4       Q.    Are you talking about Exhibit C?

5       A.    Yes.

6       Q.    Which that loan was due November 6, 2007?

7       A.    Right.

8       Q.    This loan says it's due November 1, 2007?

9       A.    It looks like the due November 6, 2007 was added

10  at some later time.

11      Q.    But you believe that it was repaid?

12      A.    Yeah, either these were repaid with cash, or we

13  rolled them into new loans.

14      Q.    Okay.  So the question that I now have is, we have

15  now gone through four loans, why were you borrowing money

16  from Fred Volkwein?

17      A.    Well, Fred always did deals with me.  The one deal

18  was when I had loaned a friend $50,000 and needed the money

19  back, so Fred substituted in.  And then these other deals

20  were 10,000, 11,000, and 4,000 and 25,000, must have been

21  for -- either I borrowed the money to loan that money to

22  other friends or used it for working capital, if we had a

23  shortage.

24      Q.    Working capital in what --

25      A.    We did a lot of these deals.

1        Q.    -- your law firm?

2        A.    Or for entrepreneurial stuff we were doing at the

3    time.  I don't remember.  It's been so long, 2007, ten years

4    ago.  Seems to me we might have been working on a casino

5    deal out in New Mexico or Oklahoma about that time.

6        Q.    Would there have been any documentation regarding

7    that?

8        A.    Sure.

9        Q.    Next --

10        A.    By the way, just to comment, the casino deals had

11    a lot of documentation obviously, because there were

12    contracts with the tribes.  In those older deals there are

13    complete plans, you know, hundreds of thousands of dollars

14    worth of expenditures for plans.

15        Q.    Well, that's not your relationship with Fred

16    though?

17        A.    No, no.

18        Q.    Fred was simply a piece of paper, "I owe you this

19    money"?

20        A.    Correct.

21        Q.    And most of these loans so far have been

22    short-term loans?

23        A.    I guess.

24        Q.    You were borrowing at the end of September and

25    you're paying it back at the beginning of November?

Page 179

1      A.    Yeah.

2      Q.    So basically four- to six-week loans?

3      A.    More or less, yeah, so far.

4      Q.    The next document, which I've marked as Exhibit E

5   is a check made payable to Jeffrey Siskind from Dockside,

6   Inc. dated 2/11/2008 --

7      A.    Okay.

8      Q.    -- for $5,000, and there's some initial up on top.

9            Do you recognize that initial?

10     A.    No, not mine.

11     Q.    Do you remember what these funds were for?

12     A.    No.

13     Q.    Do you know if these funds were to be repaid?

14     A.    No, not from this.  There would be a loan document

15  to go with it, some sort of, you know, shorthand paper

16  document somewhere, I would guess.

17     Q.    You're not aware of it, however?

18     A.    No, not for this.  That may be Fred's initials?

19  No, no, that would be the teller's initials.  It says, "Okay

20  with passport," maybe.

21     Q.    So instead of depositing this, you cashed this

22  check?

23     A.    I don't know.

24     Q.    Well --

25     A.    I need to see the back of it.

Page 180

1      Q.   Would you agree that you don't need a passport to

2  deposit your check to your account?

3      A.   Oh, well, that's a good point.  But I don't know

4  if I cashed it.  It looks like it could have been cashed.

5      Q.   And what would this money be for?

6      A.   I have no idea.  This was back ten years ago.

7      Q.   Next I'm going to show you what I've marked as

8  Exhibit F, also drawn on Dockside.  This check is dated

9  June 13, 2008 for $3600, and it's made payable to cash by

10 Mr. Volkwein.  Do you recall -- did I give that to you?  No.

11         Do you recall this check?

12     A.   No.

13     Q.   Is there a reason why you would request cash, a

14 cash check, from him as opposed to --

15     A.   No, this looks --

16     Q.   -- a check that's made to your name?

17     A.   -- like this was cashed, right?

18         Do you agree?  It looks like it was cashed,

19 because it's got somebody's driver's license number on it.

20     Q.   It does.  Is that your driver's license?

21     A.   No.

22     Q.   Can I see your driver's license?

23     A.   Certainly.  I'm pretty darn sure that's not my

24 driver's license number.  No, that's not my driver's license

25 number.

1    Q.    Well, this wouldn't be your driver's license

2    number, because the check is from 2008, and this driver's

3    license was issued in 2013.

4    A.    But your number stays the same, I think.

5    Q.    This I don't know.

6          Would you have provided this check to somebody

7    else as payment for something?

8    A.    No.

9    Q.    Is that, no, I don't think so, or absolutely not?

10   A.    Absolutely not, from the best of my recollection.

11         Fred loaned money to other people too.  This must

12   be somebody else.

13   Q.    Were you involved in any loans by Mr. Volkwein to

14   anybody else?

15   A.    No, just the substitution of the $50,000 loan for

16   Steve and Karol's house.

17   Q.    That's what we went through as Exhibit B?

18   A.    Yeah.

19   Q.    Next I'm going to show you what's marked as

20   Exhibit G, composite Exhibit G, which on the first page

21   evidences a check, No. 10392, for $10,000 made payable to

22   yourself by Dockside Canvass Company; is that correct?

23   A.    Yes.

24   Q.    Is Dockside Canvass Company a company that

25   Mr. Volkwein had?

Page 182

1      A.    Yes.

2      Q.    Now, there are e-mails attached to this dating

3  from Thursday, August 13, through Friday, August 14, and it

4  talks about various monies that have been loaned or advanced

5  and funds that are owed to Mr. Volkwein.

6      A.    Right.

7      Q.    In the August 13, 2009, at 10:25 a.m., it talks

8  about a company called Collective Management Associates,

9  LLC?

10     A.    Right.

11     Q.    So can you explain what that company is?

12     A.    That was the cannabis operation in California.

13     Q.    And what is the purpose of your providing 5,000

14 shares equal to one percent to Fred?

15     A.    I gave him a point in that company and looks like

16 a warrant to convert 55,000 that I borrowed into additional

17 shares.

18     Q.    Now, was this company earning revenues at the time

19 that you did this in 2009?

20     A.    I don't know if we were earning revenues yet, but

21 it did make money.

22     Q.    And how was it that you provided any information

23 concerning this company to Mr. Volkwein?

24     A.    Now, what do you mean by that?

25     Q.    Did you provide him with a business plan?

1          A.    Oh, sure, I did.  Absolutely, I did.  Yes, I

2     remember that.

3          Q.    And where would a copy of that business plan be

4     now?

5          A.    You have to ask Fred if he kept it.

6          Q.    Is this company still in business?

7          A.    No.

8          Q.    And why not?

9          A.    We were shut down in 2010 by the Los Angeles

10     sheriff's department.

11          Q.    Why were you shut down by the sheriff's

12     department?

13          A.    For no good reason.  The district attorney of LA

14     County at the time was running for attorney general, and he

15     thought it was -- which was Jerry Brown's position, and he

16     thought the best way he could get himself elected was to

17     shut down as many cannabis-related businesses as possible,

18     so he shut down about 400 of them.

19          Q.    Well, what exactly was the business of Collective

20     Management Associates?

21          A.    We grew medical cannabis for a collective called

22     the Riverside Collective, which was a not-for-profit with a

23     certain number of patients.

24          Q.    And how was it that you got involved in this

25     company?

Page 184

1      A.    I started the company.

2      Q.    And how is it that you got involved in the

3  business of cannabis production?

4      A.    Well, I was sitting in the office --

5      Q.    Actually, let me clarify that.

6            How was it that you got involved in cannabis

7  production in California?

8      A.    I was sitting in the office one day in West Palm

9  Beach, and I looked at Bruce Lowe, and I said -- oh, we were

10 working on a project for an Indian tribe in Oklahoma.  I

11 can't remember the name of the tribe, but it was Redman

12 Raffle.  It was going to be an online raffle, which would

13 emanate from their trust property, so it'd be lawful, and we

14 couldn't get the thing to gain any traction.  We worked on

15 it for months.  People just didn't trust the site, and so I

16 was looking at Bruce saying, "Look, we're getting further

17 and further in the hole here, what are we going to do?"  And

18 he said, "Well, you know, I've been reading a lot of

19 articles, people out in California are legally growing

20 marijuana."  I said, "What, that can't be true, show me some

21 articles."

22            So for about two months Bruce kept coming back

23 into my office with articles, and then Jerry Brown

24 published -- well, the way the law was out there -- let me

25 see if I can remember all this.  California passed a

Page 185

1    Compassionate Care Act, I forget the statute or

2    constitutional amendment number, but people were getting in

3    the game and getting shut down all the time.  And I said at

4    the time, "Look, it still looks like it's federally illegal,

5    and they don't know what they are doing out there.  It's

6    just the Wild Wild West," and then Jerry Brown published

7    guidelines, which explained not only the Compassionate Care

8    Act, but some statute, Senate Bill 420.  In the cannabis

9    world, you'll see a lot things with the number 420 attached

10    to it.  So now you had the Compassionate Care Act, and the

11    senate bill which supposedly iterated the law as to how were

12    supposed to act if you were in the cannabis world, business,

13    but still people didn't understand what to do, and everybody

14    was afraid of it.  But then Jerry Brown published the

15    guidelines, and they were a road map to how you could

16    lawfully enter and conduct business in medical cannabis.

17            So at that point I said, "All right, let's go out

18    there and check it out," and I felt comfortable doing it

19    because I went to law school out there, and because at about

20    that time, my father discovered that he had about 200 acres

21    of land near Riverside.  That's a whole other story.  But

22    anyway we went out there to survey the land, Bruce Lowe,

23    Steve -- I forget his last name, Casper, Steve Casper, who

24    did construction work for me, and me.  Well, we got out

25    there for a few days, and by the time we had finished, we

1   realized you couldn't grow cannabis outdoors.  That's not

2   what they were buying.  So we said forget about using the

3   land, but at the same time, we met enough people who were

4   involved in the industry, that I felt it was a secure

5   investment and that I would work on putting together a deal

6   out there, and I did.  I put together the Riverside

7   Collective and Collective Management Associates.

8       Q.   Were there any other investors in Collective --

9       A.   Oh, sure --

10      Q.   -- Management Associates?

11      A.   -- like, 30, about 30.

12      Q.   And who managed it?

13      A.   I did.

14      Q.   How did you come up with a valuation for

15  Collective Management Associates?

16      A.   I have no idea at this point.  I mean, I remember

17  generally what the value was.  It wasn't a very big space.

18  We had a 6500-square-foot facility, and of that we had six

19  production rooms, call them grow rooms if you want, which

20  were 300 feet each, so 1800 square feet.  But that would

21  cost about -- I forget what it was -- three quarters of a

22  million to build out.  It was leased, leased property, and

23  it could -- it would earn a million-eight, I think that was

24  the number, a year, a million-eight gross, and expenses at

25  600,000, so a million-two a year were the revenues on a

Page 187

1    total investment of $750,000, with paying all your people to

2    do the build out and to operate it handsomely, because it

3    was a cash business, so you didn't want to be restrictive on

4    your people and have them become unwitting partners.

5         Q.   Well, according to your math here, it looks like

6    you had valued the company at $15 million?

7         A.   No.  Did I?  Ten times, eight times earnings?

8         Q.   Well, it was 5,000 shares equals one percent of

9    outstanding shares.

10        A.   I don't know what you're looking at.

11        Q.   I'm looking at the e-mail.

12        A.   What date?

13        Q.   The top one, August 13 at 10:26, and then --

14        A.   No, I gave that --

15        Q.   -- the next paragraph, it says, the original

16   offering price is $3 per share.

17        A.   That was a correct number.  But the one percent

18   was given to him as a kicker on whatever was borrowed.  See

19   how it says, "In addition to repayment"?

20        Q.   Yeah.  But it says "equal to one percent of the

21   shares."

22        A.   One percent of the hundred percent of shares.

23        Q.   Right.  But if 5,000 shares is one percent,

24   then --

25        A.   Right.

Page 188

1      Q.    -- a hundred percent is a hundred times 5,000?

2      A.    Five hundred thousand.

3      Q.    Five million.

4      A.    No -- hold on.  No, 500,000, your math is wrong, I

5   think.

6      Q.    You add on three zeros, don't you?

7      A.    Two zeros.

8      Q.    Okay.  Five hundred thousand times $3 a share, a

9   million-five.

10     A.    Is my math right?

11     Q.    Well, I think one of us is right.  So the value is

12  somewhere between a million --

13     A.    It should be worth more than a million-five if the

14  net yearly is a million-two.

15     Q.    Well, when you first issue it, you don't have any

16  net.

17     A.    So one times earnings?  I don't know.  It's so

18  long ago, who remembers, but it was a great little company.

19  It was a shame it got shut down.  Of course, then they

20  invited us back.  They said, "We went through all of your

21  paperwork, and low and behold, you were legal, come back,

22  reopen."  Well, at that point all my people scattered to the

23  various, you know, ends of the earth, and they weren't

24  coming back.

25     Q.    So next is a check made payable to -- the stub

Page 189

1    from a check made payable to Jeffrey Siskind, Esquire.

2         A.    Yep.

3         Q.    It has down on -- first of all, it's Fenderhooks.

4    We've marked it as Exhibit H.  It's dated December 23, 2009

5    for $12,000.  It says, "Licenses and Permits: LEGAL, Trade

6    mark Search."

7         A.    That might have been leftover from another check

8    he did or something.

9         Q.    So this wasn't for legal work; this was simply, as

10   written on top, "I owe Fred Volkwein $12,000 on or before

11   January 16, 2010"?

12        A.    That's Fred's writing above my signature.

13        Q.    So this was, essentially, a three-week loan?

14        A.    I guess.

15        Q.    And what would you need this money for?

16        A.    Who knows, Richard, that's nine years ago.

17        Q.    Was it repaid?

18        A.    I would have to think so, yes.

19        Q.    Next is a statement or returned item statement

20   from PNC Bank.  We've marked it as Exhibit I, and the check

21   is from -- the written check is from Siskind Legal Services,

22   LLC, Special Purpose Escrow Account.

23        A.    SunTrust, yeah.

24        Q.    It says "SunTrust" on the check.

25        A.    Oh, I thought you said "PNC."  Oh, I see his

Page 190

1    account was at PNC, okay.

2        Q.    Yeah.  So can you tell me, first, this check is

3    made payable to Fenderhooks for $12,000 --

4        A.    Right.

5        Q.    -- did this -- oh, and it's dated January 25,

6    2010.  Does this check relate back to Exhibit H?

7        A.    Seems to.  I would -- if I were reviewing this

8    with limited knowledge, I would say it did.

9        Q.    And it says that it was returned for insufficient

10   funds --

11       A.    Right.

12       Q.    -- not sufficient funds?

13       A.    Might have been.

14       Q.    Can you give me an explanation as to why there

15   would be insufficient funds in the account on a check that

16   you wrote?

17       A.    Looks like there weren't funds in there that day.

18   I'm sure it got replaced.

19       Q.    Now, what is a special purpose escrow account?

20       A.    I have no idea.  Maybe it was an account we opened

21   up for special purposes, like, borrowing money to loan to

22   other people.  I can't remember.

23       Q.    At the time that Fenderhooks received this check,

24   was Mr. Siskind a client of your firm?

25       A.    You mean Volkwein?

Page 191

1        Q.    Pardon me, Mr. Volkwein.

2        A.    Don't get his disease.

3        Q.    Yes.  It's getting later in the day.

4        A.    Not really.  I mean, I did little things for Fred

5   here and there, but like I said, we didn't really have a

6   case until -- the earliest thing I can remember is the case

7   against the seller who wouldn't close on the property.

8        Q.    But you're talking about a litigation case?

9        A.    Yeah.

10       Q.    But you dispensed legal advice to him from time to

11   time?

12       A.    Oh, sure, sitting on the back of the boat, that

13   sort of thing.

14       Q.    Ah --

15       A.    Talking over labor problems he had with employees,

16   stuff like that.

17       Q.    And when you would ask him to invest, for example,

18   in Collective Management or you offered him the stock in

19   Collective Management, did you tell him any of the risks

20   involved with Collective Management?

21       A.    Oh, I'm sure we did.  I remember the booklet, it

22   was only about that thick, but it did have disclaimers in

23   it, but I don't remember if he invested anything prior to

24   our actually getting up and operating.  So that was a real

25   operating business.  We sold -- we were wholesalers.  We

Page 192

1   sold to dispensaries.

2        Q.   Did you provide him with any suggestion that he

3   obtain legal advice separate from yourself --

4        A.   Probably.

5        Q.   -- before he accepted your offer of that stock?

6        A.   But remember, I gave him that stock as far as I

7   can remember.

8        Q.   Well, you also encouraged him to invest in

9   warrants?

10       A.   I didn't encourage him.  I think I gave him the

11  warrants.  But he was in this casino deal, and I didn't want

12  to see him lose his money, so I rolled him forward.  When

13  the casino deal was kaput, unable to proceed, I said, "Don't

14  worry, I'll move you into the next deal," and that's what I

15  did with Collective Management.

16       Q.   And the casino deal you're talking about is

17  Sovereign?

18       A.   Yes, but it was a different company.  It was

19  called Sovereign Consulting.

20       Q.   As opposed to?

21       A.   Sovereign --

22       Q.   Gaming?

23       A.   -- Gaming & Entertainment, yeah.  It was my

24  father's company.

25       Q.   So this special purpose escrow account, was this

Page 193

1    actually a lawyer's escrow account?

2        A.    No, huh-uh.  My IOTA account was always at Wells

3    Fargo.

4        Q.    Now, does your IOTA account say that it's an IOTA

5    account?

6        A.    I guess it does.  I'm not sure.  I think it says

7    "Attorney Trust Account."

8        Q.    What's the difference between a special purpose

9    trust account and an attorney's trust account?

10       A.    I don't remember what we put this escrow together

11   for.

12       Q.    Well, it's not even a question of what it's for.

13   It's what it was in the view of a client.

14       A.    This was not an attorney/client relationship

15   thing.  This was a loan from Fenderhooks.  By the way, I

16   don't think I ever did any work for Fenderhooks, legal work.

17       Q.    I'm going to show you what I marked as Exhibit J,

18   which is a check stub from Dockside Canvass Company to

19   Siskind Legal for $3,000, with a deposit slip attached to it

20   for $3,000, date 12/31/2009.

21           Is this your signature where it says, "Jeff

22   Siskind repay January 6, 2010"?

23       A.    No.  It looks like Fred's notes.

24       Q.    And what about above it, "Agrees to pay back

25   $3,000 plus bonus by January 6, 2010"?

1      A.    No, but it looks like it was "Fred R. Volkwein as

2  per JS by phone."  That's his note.

3      Q.    So you believe this was a telephone conversation

4  you had?

5      A.    Well, that's what it looks like Fred is saying it

6  was.

7      Q.    So we can call this a loan by phone?

8      A.    That's interesting.  You might have come on to

9  something there, a new industry.

10      Q.    Am I correct?

11      A.    I don't know what you're going to call it.  But it

12  looks like Fred placed $3,000 into an account of mine at

13  SunTrust Bank.

14      Q.    Okay.  So he actually made the deposit at SunTrust

15  for you?

16      A.    He must have, yeah.

17      Q.    Do you know if this loan was repaid?

18      A.    Yeah, I believe so.  And this might not even have

19  been for me.  This might have been for somebody who needed

20  $3,000.

21      Q.    So if it was -- well, the account that he put it

22  into, do you recognize that account number?

23      A.    No, huh-uh.

24      Q.    You believe it's one of your accounts?

25            You don't know if it's a trust account or

Page 195

1    operating account of Siskind Legal?

2        A.    No.  I'm just guessing that it has to be a Siskind

3    Legal account, because it looks like the check was made

4    out -- from the stub anyway, to --

5        Q.    To Siskind Legal --

6        A.    -- Siskind Legal.

7        Q.    -- right.

8        A.    Now my trust was always called Attorney Trust

9    Account, Jeffrey M. Siskind, Attorney Trust -- Jeffrey M.

10   Siskind Trust Account, so.

11       Q.    So how would a client know that that was the IOTA

12   trust account?

13       A.    I don't know, but the titling comports with the

14   rules, because I remember when I set it up, we had to send

15   in paperwork.

16       Q.    I'm going to show you what is marked as Exhibit K.

17   This is from Dockside Canvass Company payable to Jeffrey M.

18   Siskind.  It's only a check stub, $10,000, April 16, 2010.

19   There's "2 weeks" written on that.

20            I assume that's Mr. Volkwein's handwriting, or

21   might it be yours?

22       A.    It's not mine.  Right, I presume that when he kept

23   lending me money, the prior money was repaid all the time.

24       Q.    Well, you would know best, wouldn't you?

25       A.    Not at this point in the game.  I mean, if I had

1    records that old, I would, quote unquote, know, but, you

2    know, you're talking about eight years ago here.

3        Q.    And do you know if that loan was repaid?

4        A.    I don't know.  I mean, here we go again with the

5    word "know," K-N-O-W, know.  I presume it was if there were

6    later loans.  I don't think that anybody would keep loaning

7    money to somebody if the prior loans weren't repaid.

8        Q.    I'm going to show you next Exhibit L, which is

9    simply a notation that says, "I owe Fred Volkwein $2500."

10   It's dated 2/3/2011.  This is a short-term loan payable on

11   or before February 10, 2011?

12       A.    Yeah, he wrote that, but it's my signature.

13       Q.    And it's dated --

14       A.    Not a very good one, but it is.

15       Q.    And it's dated seven days before that, correct?

16       A.    Correct.

17       Q.    Why would you need a short-term loan of $2500?

18       A.    I have no idea, and, again, it might not have been

19   for me.  It might have been that I needed to loan money to a

20   client or to a friend or whatever.  I was always loaning

21   money to friends, back when they all thought I had money.

22       Q.    Well, but -- you were lending money to friends.

23             But if you didn't have the money to lend to

24   friends, why would you take it from other people?

25       A.    Because it's hard to say no to people when they

Page 197

1  need it.

2      Q.   Do you know what happened with that money?

3           Did it go into your account?

4           Was it cash?

5      A.   I have no idea.

6      Q.   Next I'm going to show you what is marked as

7  Exhibit M.  This is a copy of a check made payable to

8  Siskind Legal.

9      A.   Additional amount loaned.

10     Q.   It says, "Additional amount loaned," 12/10/2012

11  for $10,000.  Do you remember this loan?

12     A.   No.

13     Q.   Do you know what happened to it?

14     A.   No.

15     Q.   Do you know where it was deposited?

16     A.   I don't know if it even was deposited.

17     Q.   Do you know if it was -- well, this is a canceled

18  check, isn't it?

19     A.   No.

20     Q.   This is a copy --

21     A.   But it looks like it came from a bank, so it might

22  have been canceled.  You know what I mean, like, his bank

23  provided it?  You just don't have the back of it.  So if it

24  did get canceled, then it went to where it was supposed to.

25  It seems like it went into my operating account.

1      Q.    Why would you need $10,000?

2      A.    Richard, who remembers back -- all right.  Now

3  we're down to six years ago, but I don't remember.

4      Q.    Well, why would -- I'm trying to really get my

5  arms around why you would borrow all these relatively small

6  amounts of money on a continuous basis from a person like

7  this?

8      A.    Well, I wasn't gambling if that's what you were

9  thinking.

10      Q.    I don't know what you were doing or what the money

11  was for.

12      A.    Right.  We had a lender/borrower relationship, as

13  well as a friendship.  So I don't know what you don't

14  understand.

15      Q.    Okay.  On Exhibit M were those monies returned?

16      A.    I would think so, yes.  I mean, this was six years

17  ago, and Fred was not beating my door down, saying, "Hey,

18  you haven't paid me back."

19      Q.    Next I'm going to show you a loan agreement marked

20  as composite Exhibit N, as in Nancy, from November 28, 2012,

21  between yourself as the borrower and Volkwein as the lender

22  for $50,000.

23      A.    Right.

24      Q.    Now, it says here -- first of all, do you

25  recognize this agreement?

1      A.    Sure.

2      Q.    Did you sign this agreement?

3      A.    I believe I did, yes.  Yes, I did.

4      Q.    Did you prepare this agreement?

5      A.    I don't remember.

6      Q.    If you didn't prepare this agreement, who would

7 have prepared it?

8      A.    I have no idea.  I just -- you know, I don't tend

9 to use this typeface.  I could have.

10     Q.    Well, you've said that before on some other

11 documents.

12     A.    One other document, yeah.

13     Q.    So, well, does it make sense that Mr. Volkwein

14 would have prepared this document and come to you and said,

15 "Hey, I understand you have a 1973 Jaguar" --

16     A.    No, no, I would have --

17     Q.    -- "that I want to lend" --

18     A.    -- gone to him, not the other way around.

19     Q.    -- "you $50,000 on it"?

20     A.    No, he wouldn't have done that.

21     Q.    So in this document you're agreeing to provide

22 collateral of 1973 Jaguar XKE V-2 with a VIN number,

23 correct?

24     A.    Correct.

25     Q.    And it has all the typical language that you would

Page 200

1    have in a collateral agreement?

2        A.    Correct.

3        Q.    With defaults and waiver of jury and --

4        A.    Well, I'm not reading it word for word, but --

5        Q.    Neither am I.

6        A.    -- I generally see what it says, yeah.

7        Q.    And the rights of the lender to repossess the

8    automobile?

9        A.    Yep.  Does it?

10       Q.    Is that paragraph --

11       A.    I'm sure it should.

12       Q.    -- 6?

13       A.    What paragraph is that?

14       Q.    Paragraph 6.

15       A.    Right.

16       Q.    Or Paragraph 5 and 6, rather.

17       A.    Okay.

18       Q.    And then attached to it there's a check --

19       A.    Correct.

20       Q.    -- No. 1048, and it's payable -- it's from

21   Frederick Volkwein and it's payable to Jeffrey M. Siskind,

22   Trust Account --

23       A.    Correct.

24       Q.    -- $50,000, and the reference is Loan agreement.

25             Did you negotiate that check?

1         A.    I would think I did.

2         Q.    On the next page is a document, which looks like a

3    certificate of title from the State of Florida.

4         A.    Copy of a title, right.

5         Q.    And this is a copy of the title to the Jaguar?

6         A.    Yes.  It has to be, yes.

7         Q.    It says it's owned by Enterprise Trust --

8         A.    Right.

9         Q.    -- and it has your office address?

10         A.    Correct.

11         Q.    What is Enterprise Trust?

12         A.    It's a trust my father started years ago, back in

13    1990, I guess.

14         Q.    And your the seller?

15         A.    The what?

16         Q.    I mean, you're the trustee?

17         A.    No.

18         Q.    Who was the trustee?

19         A.    I don't remember who the trustee was.

20         Q.    Was this certificate of title to act as part of

21    the collateral?

22         A.    Well, I believe Fred has the original title.  I'm

23    not sure.

24         Q.    And the next page is --

25         A.    Insurance.

1     Q.    -- the insurance on the property?

2     A.    Correct --

3     Q.    And it says --

4     A.    -- on the vehicle.

5     Q.    Well, yes.  And it says the name of insured is

6  Jeffrey Siskind and Enterprise Trust.

7     A.    Right.  And that's because I had a relationship

8  with American Bankers Insurance, which is known as -- I

9  forget, something --

10    Q.    American Collectors Insurance?

11    A.    Right.  American Collectors Insurance.

12    Q.    I just got a quote from them today?

13    A.    Did you, today?

14    Q.    Yeah.

15    A.    Must have a classic car.

16    Q.    Yes.

17          So what happened with the XKE?

18    A.    It was eventually sold, I guess about a year ago.

19    Q.    And you said that Mr. Volkwein had the original

20  title?

21    A.    Correct.  I don't know if he still has it or if I

22  got it back.  I'm not sure.

23    Q.    Well, how is it that you were able to sell the

24  car?

25          Did you pay off Mr. Volkwein, the $50,000?

1     A.    I thought we rolled this into a different deal,

2  against another car or an airplane.  I can't remember which.

3     Q.    We'll be getting to the airplane.

4     A.    We will?

5     Q.    We will.

6     A.    Good.

7     Q.    So isn't it true that you actually simply applied

8  for a lost titled and then sold the car?

9     A.    Not that I recall, no.  No, but the car was sold.

10     Q.    Right.  And I could get those records as to

11  whether you applied for a lost title certificate from DMV?

12     A.    Well, it would have been a year or so ago.  We

13  might have.  If Fred couldn't find his title, we might have

14  asked for a -- funny, because I gotta go do that right now

15  on a car.

16     Q.    So I'm going to be receiving that information from

17  DMV.

18           Are you sure you have no firm recollection as to

19  whether you applied for a loss title or not on this?

20     A.    I don't remember, but I may have.

21     Q.    Okay.  And if you did, then wouldn't that be in

22  derogation of the loan agreement and security agreement?

23     A.    Possibly.

24     Q.    Why do you say "possibly"?

25     A.    Well, unless I --

Page 204

1    Q.   Is there some gray --

2    A.   -- paid this back.

3    Q.   -- area that I'm missing here?

4    A.   Yeah.  If we rolled it to a different deal, with

5    different collateral, then it wouldn't be in derogation of

6    this agreement, obviously.

7    Q.   And do you have any documentation concerning

8    rolling it into some other agreement?

9    A.   I don't have any documentation on anything,

10   unfortunately.  But I'm sure that we had conversations about

11   it.

12   Q.   Well, if --

13   A.   I might have e-mails, but I'm not sure.

14   Q.   If Mr. Volkwein had the title, why would you have

15   to apply for a lost title?

16        Couldn't you have just asked him for the title?

17   A.   If he had the title, yeah.

18   Q.   Okay.  But you didn't ask him, did you?

19   A.   I don't remember.  I remember talking about it

20   when I sold the vehicle, but --

21   Q.   You remember talking about it to whom?

22   A.   Fred.

23   Q.   And what did you tell him?

24   A.   I told him we sold the vehicle.

25   Q.   Did he wonder, "How the hell did you sell the

Page 205

1    vehicle if I have the title" --

2         A.   I don't remember.

3         Q.   -- "where's my money, the $50,000?"

4         A.   Well, he didn't seem upset about it.  I thought we

5    rolled it --

6         Q.   At that point you said, "Well, let me roll you

7    into some new investment."

8         A.   No, no.  I rolled it into another investment

9    earlier than that.  Not then.  Are you kidding?  I was in

10   trouble then.  He wouldn't have rolled into a new

11   investment.  That was after we lost the cannabis license

12   application, so.

13        Q.   Why did he give you a check payable to your trust

14   account --

15        A.   I have --

16        Q.   -- as opposed to you individually?

17        A.   -- I have no idea.

18        Q.   Did you tell him to make it out to the trust

19   account?

20        A.   No, not that I recall.  I don't know what it was

21   for, so I don't know.

22        Q.   Now, you were a licensed attorney at the time you

23   prepared this document, correct?

24        A.   Correct.

25        Q.   And at the time that you provided him with the DMV

1 title, correct?

2   A. If I provided him with a title, yes.

3   Q. And you're familiar with -- come to think of it,

4 you've been involved in collections of cars yourself,

5 haven't you?

6   A. No.  What do you mean "collections"?

7   Q. Collections, any types of antique vehicles or --

8   A. I had the Jag, a Rolls, and a Cadillac.

9   Q. So you've had plenty of cars.

10    You've had loans on the cars?

11   A. Oh, yeah, over time, sure.

12   Q. And you've purchased and sold cars?

13   A. I usually don't sell them.  I think I have every

14 car I ever bought, except for the Jag.

15   Q. And you're familiar with how the titles work?

16   A. Yeah, more or less.

17   Q. So when you get a loan on a title or you get money

18 on a title, the original title goes to the lender, and the

19 lender, then, knows, because they're usually a sophisticated

20 lender to go to the DMV and register their lien; am I

21 correct?

22   A. Correct, I guess, yeah.

23   Q. In this case did you advise Mr. Volkwein to go to

24 DMV and register his lien?

25   A. I didn't advise him of anything.  I just --

1       Q.    You just gave him the original title?

2       A.    I believe I gave him the original title, yeah.

3       Q.    And gave him the false hope that he actually had a

4   lien on the car?

5       A.    No, I never gave him a false hope of anything.

6   Whatever hope I gave him is in this document.

7       Q.    Let's go on to your airplane --

8       A.    Well, I don't own an airplane, but that's all

9   right.

10      Q.    -- which is composite Exhibit O.  This agreement

11  is made -- no date on the front page, but it shows a

12  transaction of $25,000 on April 5, 2013 --

13      A.    Right.

14      Q.    -- by way of a wire from Scupper, and Scupper is

15  Scupper Enterprises Limited Partnership.

16      A.    Okay.

17      Q.    That's a company of Fred Volkwein's?

18      A.    I believe, yes.

19      Q.    Actually there's a date on the front.  It's

20  April 3, 2013.

21      A.    April 5, 2013.

22      Q.    April 5, yeah.

23            What was the purpose of this loan agreement?

24      A.    This was to put a deposit down on a piece of real

25  estate in -- I can't remember the county's name, but in

Page 208

1    Colorado for that Event 64 concert.

2        Q.    This doesn't say anything about a concert.  This

3    simply says that you're borrowing $25,000.

4        A.    Correct.

5        Q.    And -- Avaitat?

6        A.    Avaitat, right.

7        Q.    -- LLC is your company?

8        A.    It was.  It's lapsed.

9        Q.    Avaitat borrowed $25,000 from Scupper Enterprises,

10   and it was to be a first secured lien on behalf of Scupper

11   against a Beechcraft Baron --

12       A.    Correct.

13       Q.    -- model C-55 --

14       A.    Correct.

15       Q.    -- with a serial number, I guess.

16             Is that the tail number?

17       A.    That's the tail number that starts with an N.

18       Q.    And in addition Scupper is to receive tickets to

19   Event 64.  Is that what you were referring to?

20       A.    Correct.

21       Q.    Which tickets have a net value of $25,000?

22       A.    Correct, sufficient tickets, so that he could earn

23   $25,000 from the sale of those tickets.

24       Q.    But that event never came off the ground?

25       A.    No.  Unfortunately, they -- it didn't happen.  We

1    tried.  We had our license, and then they revoked it,

2    because they thought it was going to be too successful and

3    cause a public nuisance.

4        Q.    So you received these funds?

5        A.    I must have -- no, he didn't give them to me.  He

6    sent them directly to Michael Mannis.

7        Q.    Michael Mannis is who?

8        A.    The attorney for the seller of the property.

9        Q.    The seller of the property in Colorado?

10       A.    Yes.

11       Q.    And it went to his IOTA account?

12       A.    Correct.

13       Q.    As directed by you?

14       A.    I suppose so, yeah.

15       Q.    Did any type of lien with the FAA get recorded

16   concerning this --

17       A.    No, because it was paid back.

18       Q.    Well, let's look to the last page.  The last page

19   is a check for $25,000 from the Jeffrey M. Siskind, Trust

20   Account.  Is that your lawyer trust account?

21       A.    Um, hold on.  No, that was a different trust

22   account.

23       Q.    And what trust account might that be?

24       A.    That was a Mercantile trust account, and, yes, I

25   remember this.  Oh, God, that's right, he put in the check

1    before we agreed he could, and then I made it good a couple

2    days later.  Yeah, he put this in his bar complaint.  So I

3    went looking, and I have the proof that he got paid.

4        Q.    Do you want to supply me with that proof when you

5    have the opportunity?

6        A.    Absolutely.

7              In fact, I'll do it tonight, because I scanned the

8    Mercantile -- what was it -- statement, it's on the same

9    page, where it got returned and a couple lines down it

10   cleared.

11       Q.    I'm going to show you another document which we've

12   marked as Exhibit P.  It seems to be signed by you at the

13   top?

14       A.    No.

15       Q.    It's initialed by you below --

16       A.    Yes.

17       Q.    -- am I correct?

18       A.    Yeah.

19       Q.    It says, "Loan of $1,000 due 7/7/13."

20       A.    Yeah.

21       Q.    So why would you --

22       A.    That's my signature.

23       Q.    Why would you borrow $1,000 from --

24       A.    I haven't --

25       Q.    -- this man?

1          A.    -- the foggiest idea.

2                MR. SUAREZ:  Did you get both?

3                THE REPORTER:  (Nods her head.)

4                THE WITNESS:  I don't remember.

5     BY MR. SUAREZ:

6          Q.    Did you repay the money?

7          A.    I believe I did, sure.  Well, as long as I

8     borrowed more money later.  I don't think he would have kept

9     loaning me money if I didn't pay him back.

10         Q.    But he may have?

11         A.    May have.  Well, toward the end, when he kept

12    disbursing money, we may have not paid some money back, but

13    this was back in 2013, so I'm pretty sure I paid him back.

14         Q.    The next is Exhibit Q, which are articles of

15    incorporation for Sovereign Consulting, and you testified

16    before that it is both Sovereign Consulting and Sovereign --

17    what was it, Enterprises?

18         A.    Gaming & Entertainment.

19         Q.    Gaming & Entertainment, thank you.

20                So what is the difference between these two

21    entities?

22         A.    Well, this was my father's company, and this was

23    the company that had the contract with the Delaware Nation

24    of Oklahoma, which was an Indian tribe, and this is what I

25    gave Fred, I think, a point in, one percent.

Page 212

1          Q.    And how was it that you had the ability to give

2     him one percent of this?

3          A.    I asked my father if I could.

4          Q.    Indicated on page 2 of the operating agreement --

5          A.    Right.

6          Q.    -- under Capital Contributions, it lists -- it

7     doesn't list you individually as a shareholder or a member

8     at all.

9          A.    Correct.

10         Q.    So where was that one percent coming from?

11         A.    I don't remember, but I was the attorney for the

12    trust, and there were -- there were undistributed unit

13    shares at the time.

14         Q.    Would there have been a record of owners or a

15    membership record?

16         A.    Oh, yeah, there was.

17         Q.    And where would that be now?

18         A.    What do you think?

19         Q.    I'm asking you the question.

20         A.    It's missing, with all my business and client

21    files.

22         Q.    Well, would your father have had these?

23         A.    No.  No, because all of dad's files were in the

24    file cabinets next to the receptionist desk.

25         Q.    Here in Florida?

1    A.    Yes, when we moved him down from Maryland, and all

2    these files were thrown out when we left the office.

3    Q.    Is there any evidence of these shares going to --

4    these membership interest going to --

5    A.    To Fred.

6    Q.    -- to Fred?

7    A.    He may have had a certificate.  I can picture the

8    certificate in my head, because those certificates were

9    typed.  They were preprinted and typed.  They weren't done

10    on a computer, so -- and there were other friends of mine

11    that received certificates in that as well.

12    Q.    Next I'm going to show you what is marked as

13    Exhibit T, as in Tom.  This is dated March 23, 2004.  It

14    says, "Received $10,000 from Fred Volkwein toward purchase

15    of one share of Sovereign Consulting, LLC stock," with a

16    notation, "$30,000 paid to date, $10,000 is still due."

17    A.    Right.

18    Q.    And then it's signed by you as president.

19          Is that president of Sovereign Consulting?

20    A.    Yes.

21    Q.    And how was it that you received $30,000 from

22    Fred?

23    A.    I think it was rolled from prior deals.

24    Q.    Do you know what prior deals it was rolled from?

25    A.    No.  If it's not in these deals, then there's

Page 214

1    other deals that you just don't have records of.

2        Q.    So just a serial, whew-whew-whew-type deals.

3        A.    I don't know that the court reporter is going to

4    get that down very well, but --

5        Q.    I was wondering how she was doing to do that.

6        A.    -- let's see, Richard waved his hand wildly.

7              I don't know, Richard, but if I certified that on

8    there and signed it, he had given 30,000.

9        Q.    And the $10,000 due is not this $10,000 but an

10   additional $10,000?

11       A.    Yes, I would say that's what that means.

12       Q.    So it's not $10,000 was due and is now paid?

13       A.    Just give me a minute to read it.  It looks like

14   he was buying one share of Sovereign Consulting for $40,000,

15   and he paid 30,000 and was still going to pay an additional

16   ten at some point.

17       Q.    I'm going to show you what's marked as Exhibit U.

18   This is a check from Dockside Canvass made payable to

19   Jeffrey M. Siskind Trust Account --

20       A.    Right.

21       Q.    -- for $5,000.

22              Do you recall receiving these funds?

23       A.    No.

24       Q.    You're denying that you received the funds?

25       A.    No.  You asked me if I recall.  I don't recall.

Page 215

1    That doesn't look like a check that I'm familiar with,

2    but --

3         Q.    And it looks like Fred's notation above says,

4    "need $5,000 for" -- I can't tell if that's "1" share or "7"

5    shares, 4/20/2004?

6         A.    I don't know what this would have been for back in

7    2004.

8         Q.    Well, in the previous exhibit, Exhibit T --

9         A.    Oh, that's '04 also?

10        Q.    Yes.

11        A.    Oh, we jumped way back.

12        Q.    It says, "$10,000 due."

13              So is this $5,000 toward that $10,000?

14        A.    No idea.

15        Q.    You don't -- no idea as to whether Exhibit U is a

16   loan or whether it's in payment for that stock?

17        A.    Oh, no, it wouldn't be a loan if it's mentioning

18   shares.  Plus, it went into my trust account, which

19   indicates to me that it left my trust account and went

20   somewhere else.

21        Q.    Yeah, but which trust account?

22        A.    Well, I mean, I would say that this -- I'll look.

23   Oh, I don't know if I can look at that account, other than

24   that one page I have.  You raise a good point.  I can't tell

25   you.  By the way, this is an unsigned check, so I don't even

1    know if I received it.

2          Q.    Okay.  Well, the next exhibit, Exhibit V.

3          A.    Oh, there you go, that is the share of stock or

4    unit share typed in with Fred's --

5          Q.    So this would be the share of stock relative to

6    the additional -- to the full payment of that $40,000 that

7    you referred to?

8          A.    I have no idea.

9                So this was signed by Ida Manly, who was my

10   father's secretary.

11         Q.    And signed by you as president?

12         A.    And me as president, right.

13         Q.    Dated May 5, 2004?

14         A.    Right.  And it would have been prepared in

15   Baltimore, because we didn't use typewriters.  She did it

16   that way.  So to respond to these amounts, it would be more

17   or less pure conjecture as to what was going on with the

18   money.

19         Q.    And, in fact, an additional share was issued to

20   him in February 2006; am I correct?

21         A.    I don't know.

22         Q.    I'm going to show you Exhibit W, which also

23   appears to be signed by you, dated February 6 -- February 7,

24   2006.

25         A.    Correct, correct.  I'm not sure I understand your

Page 217

1    point, but it looks like he owned two points.

2         Q.    So next I'm going to show you composite Exhibit X.

3         A.    Right, I remember this letter.

4         Q.    So this is a letter dated February 7, 2007, from

5    Kerry Hulton --

6         A.    Correct.

7         Q.    -- president of the -- pardon me, to Kerry Hulton,

8    president of the Delaware Nation in Oklahoma --

9         A.    Correct.

10        Q.    -- concerning Sovereign Consulting and the Biscuit

11   Hill Casino.

12             Is that the casino you were working on?

13        A.    Yes.

14        Q.    And this letter is from you.

15             What was the purpose of this letter?

16        A.    Let me read it.

17             Kerry Hulton was the new president of the tribe.

18   The tribal council was reconstituted and the new council

19   decided that we didn't have a valid contract with the tribe.

20        Q.    And when did the new council come into being?

21        A.    I have no idea.  The old council was fully onboard

22   with the casino project, but then this guy Steve Sandven got

23   involved.  He was their new attorney, and he probably had a

24   bigger, better deal.  Happens all time in Indian country,

25   unfortunately.

Page 218

1      Q.   And what is the letter on the next page, April 7,

2  2006?

3      A.   Looks like a letter from dad to Steve Sandven, who

4  was the enemy.

5      Q.   Who did he represent?

6      A.   The tribe.

7      Q.   So when did Sovereign first learn that they

8  weren't -- that the tribe wasn't going to honor the

9  agreement, the alleged agreement?

10      A.   I guess sometime in late 2006, I'm not sure.

11  Maybe mid-2006.  Gotta read this letter and see if this was

12  the first inkling of a problem.

13           Yeah.  This looks like the letter when dad went

14  after Sandven because Sandven had told him that the tribe

15  doesn't believe they have a valid contract with us, with

16  Sovereign.  So this was in April of 2006, and then -- when

17  was my letter to him?  February of 2007, I wrote to Kerry.

18  Looks like he wrote back in December of '07, just looks like

19  a letter -- oh, here he goes, subject, hopes will be

20  realized.  I don't know whose hopes he's talking about,

21  because he stabbed us in the back.

22      Q.   And this is from the president of the Delaware

23  Nation?

24      A.   Yes.  So I guess if you look at that certificate

25  back in February of '06, we were still in good standing, but

Page 219

1    then in April, when dad wrote the letter to Steve Sandven,

2    we were having problems, and then, of course, the follow-up

3    letters from me trying to be friendly with the new chief or

4    president of the tribe, whatever he called himself, I don't

5    know what motivated him to write back in December, I guess

6    that's December.

7        Q.   Yeah, well, he says here, he hasn't had any

8    opportunity to speak with anyone familiar with the situation

9    since he's been in office.

10       A.   Oh, I'm sorry, it's February.  He wrote back the

11   very next day.  What does he say?

12       Q.   It says that he hasn't had time to speak to

13   anybody concerning this, so he's not up to speed on it.

14            But my question is, you were still accepting funds

15   for this investment just six weeks prior to the letter from

16   your father saying -- with his knowledge that the deal had

17   gone south?

18       A.   I don't think he believed the deal had gone south

19   at that point.  I think -- we ended up suing them and

20   losing, but I also want to say that although this

21   certificate was issued in February '06, it could have taken

22   a couple months for Ida to finally get it done, since she

23   did these up in Baltimore.

24       Q.   Now, the last item I have here in this Sovereign/

25   Nation matter is Exhibit Y-1, and this deals with -- well,

1   I'm not quite sure exactly what this is.  It seems to be a

2   memorandum or a letter from somebody.

3        A.   I don't know what this is.

4        Q.   Well, it says, "Initial member profit share

5   payments will be made 100 days from the opening day of the

6   casino and every 90 days thereafter."

7        A.   Mm-hmm.

8        Q.   So it would seem that it's coming from somebody,

9   perhaps the president of Sovereign Consulting, who would be

10  you?

11       A.   How are you getting that?

12       Q.   Well, you're the president of Sovereign Consulting

13  according to the --

14       A.   No, but why do you say it's coming from me.

15       Q.   I'm presuming that since it's an update of the

16  litigation that it would be coming from the president.

17            If it's not coming from you, then who would this

18  be coming from?

19       A.   I presume my father or somebody else in the office

20  who was working on the project.  It could be Willy Russell

21  who was the lead designee, I don't know if that's the best

22  word to describe him, but he was the one running back and

23  forth from Oklahoma.

24       Q.   So you have no idea where this came from?

25       A.   I don't, no.

1          MR. ZARETSKY:  Okay.  You know, it's four o'clock.

2    Mr. Furr has walked into the room.

3          THE WITNESS:  To kick us out.

4          MR. FURR:  No, I'm just here to observe.

5          MR. ZARETSKY:  As I previously stated, I have

6    appointment in Jupiter at five o'clock.

7          THE WITNESS:  And you're not going to get through

8    that in the next ten minutes, so --

9          MR. ZARETSKY:  And I'm not going to get through

10   all of this, which looks like probably another hour and a

11   half.  So you have some pending matters in which you want to

12   reconvene on anyway.

13         MR. SUAREZ:  Correct.

14         THE WITNESS:  What were they?

15         MR. SUAREZ:  Trust account.

16         THE WITNESS:  Yeah.

17         MR. ZARETSKY:  So can we tentatively set a new

18   date now?

19         MR. SUAREZ:  Happy to do it.

20         THE WITNESS:  I told you I'm busy after today

21   until November 7th, but things have moved.  So I am

22   available the next few days.

23         MR. SUAREZ:  Well, our issue is going to be

24   waiting to get a resolution from Judge Mora, so it's kind of

25   hard to put the --

Page 222

1              THE WITNESS:  Well, do you need them here,

2     Richard, or could we just reconvene up in West Palm Beach

3     and finish those documents?

4              MR. ZARETSKY:  I would think they want to be here

5     for the next material.  They seemed bored, but they are

6     really interested.

7              THE REPORTER:  Do you want all of this on the

8     record?

9              MR. FURR:  No.

10             MR. ZARETSKY:  No.

11             THE REPORTER:  Will you read?

12             THE WITNESS:  I don't need to read that, no.

13             (Thereupon, the 2004 EXAMINATION was adjourned and

14    the reading and signing of the deposition was duly waived.)

15

16

17

18

19

20

21

22

23

24

25

Page 223

1  STATE OF FLORIDA                    :

2  COUNTY OF PALM BEACH                :

3

4

5

6                   CERTIFICATE OF OATH

7          I, Anna M. Meagher, Stenographic Reporter, in my

8  capacity as a Notary Public of the State of Florida at

9  large, was authorized to administer oaths on this 5th day of

10 September, 2018, and that JEFFREY M. SISKIND personally

11 appeared before me and took an oath or affirmation for the

12 purpose of giving testimony in the matter described on Page

13 1.

14

15           _____

16            Anna M. Meagher, Stenographic Reporter
                Court Reporter and Notary Public
17          in and for the State of Florida at Large
                  Commission #GG 060693
18                  January 9, 2021

19

20 Personally known  _____

21 or produced driver's license __X___

22

23

24

25

Page 224

1                        CERTIFICATE

2

3    STATE OF FLORIDA              :

4    COUNTY OF PALM BEACH          :

5

6

7           I, Anna M. Meagher, Stenographic Reporter, Notary

8    Public for the State of Florida at Large, do hereby certify

9    that I reported the 2004 EXAMINATION of JEFFREY M. SISKIND,

10   the witness herein; that the said witness was first duly

11   sworn by me; and that the foregoing pages, numbered from 1

12   to 224, inclusive, constitute a true record thereof.

13          I further certify that I am not of counsel, I am I

14   not related to, nor employed by any attorney in this case.

15          DATED this 19th day of August 2019.

16

17          _____

18              Anna M. Meagher, Stenographic Reporter

19

20

21

22

23

24

25