Page 1

1             UNITED STATES BANKRUPTCY COURT
               SOUTHERN DISTRICT OF FLORIDA
2                WEST PALM BEACH DIVISION

3

4                          Case No.  18-16248-MAM

5

6    In re:

7    CHANCE & ANTHEM, LLC,

8        Debtor.
     _____/

9

10

11

12

13

14                   FURR COHEN, P.A.
                2255 Glades Road, Suite 301-E
15               Boca Raton, Florida  33431
                Wednesday, December 19, 2019
16                10:30 a.m. to 2:55 p.m.

17

18           CONTINUED 2004 EXAMINATION

19                       OF

20              JEFFREY M SISKIND

21           taken pursuant to notice
            on behalf of Robert C. Furr,
22               Chapter 7 Trustee.

23

                    -   -   -   -   -
24
                                  PLAINTIFF'S
25                                TRIAL EXHIBIT
                                  **T-110**

Page 2

```
 1                    APPEARANCES:
 2

         GENOVESE JOBLOVE & BATTISTA, P.A., by
 3              JESUS M. SUAREZ, ESQUIRE
      on behalf of Robert C. Furr, Chapter 7 Trustee.
 4
 5        JEFFREY M. SISKIND, ESQUIRE, PRO SE
 6
                      ALSO PRESENT:
 7
           ROBERT C. FURR, Chapter 7 Trustee
 8              ALAN BARBEE, CPA
 9              - - - - - -
10              I N D E X
11
WITNESS                        DIRECT    CROSS
12 JEFFREY M SISKIND
      By Mr. Suarez                 4        --
13
14         EXHIBITS MARKED FOR IDENTIFICATION
15    NUMBER                                 PAGE
16      1, Renewed Notice of Rule 2004 Exam      7
        2, CannaMED operating agreement         24
17      3, E-mail dated 2/24/16, executive summary   30
        4, E-mail dated 2/4/16 and attachments   37
18      5, E-mail dated 3/21/16 and attachments   80
        6, E-mail dated 8/2/16 and attachments   84
19      7, E-mail dated 6/9/16 and attachments   87
        8, E-mail and attachment               89
20      9, E-mail dated 10/29/15 and attachments   93
       10, E-mail dated 12/21/15 and business plan   95
21     11, E-mail dated 12/29/15 and business plan   98
       12, Chase Withdrawal dated 9/18/18       99
22     13, SunTrust Withdrawal Ticket dated 11/13/15 101
       14, SunTrust Withdrawal Ticket dated 11/23/15 105
23     15, SunTrust Withdrawal Ticket dated 4/27/15  105
       16, SunTrust Withdrawal Ticket undated    109
24     16, Voluntary petition for bankruptcy     110
25                              Continued...
           EXHIBITS MARKED FOR IDENTIFICATION
```

1

        NUMBER                                          PAGE

2

        17, Bankruptcy schedules dated 2/12/18          111
3   17-A, SunTrust Withdrawal Ticket dated 12/11/15     114
    17-B, SunTrust Withdrawal Ticket dated 12/16/15     115
4       18, Bankruptcy schedules dated 4/24/18          111
        18, SunTrust Withdrawal Ticket dated 12/31/15   115
5       19, Chase Deposit dated 7/18/16                 116
        20, Chase Deposit dated 7/19/16                 117
6       21, Chase Deposit dated 9/9/16                  119
        22, Chance & Anthem Check No. 1026              121
7       22, Chance & Anthem Check No. 1027              123
        23, Chance & Anthem Check No. 1012              123
8       24, Chance & Anthem Check No. 1014              124
        25, Chance & Anthem Check No. 1015              125
9       25, SunTrust statement dated 11/30/15           126
        26, Chance & Anthem Check No. 1030              127
10      27, SunTrust statement dated 11/30/15           128
        28, Chance & Anthem Check No. 1037              128
11      29, Chance & Anthem Check No. 1041              129
        30, Reef Gallery Check No. 7288                 130
12      31, Chance & Anthem Check No. 1038              131
        32, Affidavit of Carl Stone                    133
13      33, SunTrust Withdrawal Ticket dated 4/10/15    136
        34, SunTrust Withdrawal Ticket dated 12/23/14   137
14      35, SunTrust Withdrawal Ticket dated 4/24/15    138
        36, Chance & Anthem Check No. 1316              138
15      37, SunTrust Deposit Ticket dated 11/7/14       139
        38, SunTrust statement dated 12/31/14           141
16      39, SunTrust Deposit Ticket dated 2/5/15        141
        40, SunTrust Deposit Ticket and Check No. 3903  141
17      41, Chase Deposit and Check No. 2855            142
        42, Chance & Anthem Check No. 1003              143
18      43, Chance & Anthem Check No. 1210 & 315        144
        44, Chance & Anthem Check No. 1308              145
19      45, Chase statement dated 10/30/15              146
        46, Chance & Anthem Check No. 1017 & 1018       147
20      47, Chase statement dated 3/31/16               149
21
22
23
24
25

1    Thereupon:

2                          JEFFREY M SISKIND,

3    after first being duly sworn, was examined and

4    testified under oath as follows:

5            MR. SUAREZ:  Let me have the exhibit

6    stickers, please.

7            THE WITNESS:  Here's your change, a dollar-

8    thirty-seven.

9            MR. SUAREZ:  Thank you.  From the Florida

10   Association of Community Banks and Credit Unions,

11   Incorporated.

12           THE WITNESS:  That just happened to be an

13   envelope that I had leftover.

14                       DIRECT EXAMINATION

15   BY MR. SUAREZ:

16       Q   What's your position with the Florida

17   Association of Community Banks and Credit Unions?

18       A   I don't remember whether that was an LLC or a

19   corporation.  If my memory serves me correctly, it was

20   an LLC, in which case I was probably the managing

21   member.

22       Q   Were there any other members?

23       A   I don't remember.

24       Q   Did anybody else work for the Florida

25   Association of Community Banks and Credit Unions,

1  Incorporated?

2       A    No one got paid, if that's what you mean.  It

3  was an association, so I -- at various times I do

4  believe I had people doing work for that entity, but I

5  don't remember what they did.

6       Q    What was the Florida Association of Community

7  Banks and Credit Unions?

8       A    It was an association to serve community

9  banks and credit unions.

10      Q    Was there ever a community bank or credit

11  union associated with the entity?

12      A    I don't know what you mean by "associated."

13      Q    Did a community bank or credit union ever pay

14  dues to --

15      A    No, no, there were no dues.

16      Q    Did a community bank or credit union ever

17  become a member of the Florida Association of

18  Community Banks and Credit Unions?

19      A    I don't know what that has to do with today's

20  2004 Examination.

21      Q    You can either answer the question or you can

22  decline to answer the question.

23      A    I'm going to decline to answer that question,

24  because it's outside the scope of today's 2004

25  deposition.

1    Q   Well, you just handed me money in an envelope

2    from the Florida Association of Community Banks and

3    Credit Unions, Incorporated.  I would like to know

4    what that entity is, and why it's --

5    A   That entity has lapsed, but it is an envelope

6    that I just happened to have in my stack of unused

7    envelopes, so I figured since it wasn't going in the

8    mail, why not used it to put your dollar and 37 cents

9    in.

10   Q   Is any other individual, other than yourself,

11   associated with the Florida Association of Community

12   Banks and Credit Unions, Incorporated?

13   A   Now, no.  But remember, this is outside the

14   scope of this 2004 Examination.

15   Q   Has any bank ever been associated with the

16   Florida Association of Community Banks and Credit

17   Unions?

18   A   I don't know what you mean by "associated."

19   But, again, these questions are outside the scope.

20   Florida Association of Community Banks and Credit

21   Unions has not been noticed.

22   Q   Did it ever have any legitimate business

23   operations?

24   A   Outside the scope.  But, yes, the answer to

25   that is, yes, of course.

1    Q    What was its legitimate business operations?

2    A    Outside the scope.  I know where you're going

3  with this, and I'm not going to fall into this trap.

4  You are outside the scope of this 2004 Examination.

5          (Thereupon, a document was marked as Exhibit

6  No. 1 for identification by Mr. Suarez.)

7  BY MR. SUAREZ:

8    Q    All right.  I've marked as Exhibit 1 --

9    A    Next time I'm going to be a lot more careful

10  with what envelope I use to deliver money to you.

11   Q    I've marked as Exhibit 1 today's notice of

12  examination.

13   A    Yes.

14   Q    You are Jeffrey Siskind?

15   A    I indeed am Jeffrey Siskind.

16   Q    Have you ever gone by any other name?

17   A    No.  Well, Jeffrey Mark Siskind, Jeffrey M.

18  Siskind, Jeff Siskind, a few nicknames in different

19  circles that I care not to repeat sometimes.

20   Q    All right.  And you're here today

21  individually and as the managing member of CannaMED

22  Pharmaceuticals, LLC?

23   A    I am, and I didn't want to trouble you with a

24  motion, but I really don't understand why I'm here

25  individually, because I think the Judge's order said

1    that I appear as the managing member of CannaMED.

2        Q    Well, you're here individually and CannaMED,

3    aren't you?

4        A    Right, because I don't want to come back

5    again.  I like seeing you, but not that much.

6        Q    If you could please turn to Page 8, there are

7    a list of documents that were to be produced in

8    advance of today's examination.

9        A    Right.

10       Q    The first is "Any and all communications

11   between the Debtor and CannaMED Pharmaceuticals, LLC."

12       A    Right.

13       Q    What, if anything, did you do to ascertain

14   whether responsive documents existed?

15       A    I don't remember.  Didn't I respond to that?

16   I thought I filed something.  I think I filed

17   something.

18       Q    Was anyone other than yourself involved in

19   preparing for the examination of CannaMED

20   Pharmaceuticals, LLC?

21       A    No.

22       Q    What is your position with CannaMED

23   Pharmaceuticals, LLC?

24       A    Well, that has lapsed, but I was the managing

25   member.

Page 9

1      Q    What do you mean by, it has "lapsed"?

2      A    It was a Maryland limited liability company

3   which lapsed.

4      Q    What do you mean by "lapsed"?

5      A    It's not registered to do business any more.

6      Q    Why is it no longer registered to do

7   business?

8      A    Because it lapsed.

9      Q    Who allowed it to lapse?

10      A    I did.

11      Q    How did you make the decision to lapse

12   CannaMED Pharmaceuticals, LLC?

13      A    I looked in my checking account and didn't

14   have the money to pay to renew it, so I let it lapse.

15      Q    Was there a resolution of the members of

16   CannaMED Pharmaceuticals, LLC permitting it to lapsed?

17      A    No.

18      Q    Were the members of CannaMED Pharmaceuticals,

19   LLC ever advised that you would allow its registration

20   to lapse?

21      A    Not that I recall.

22      Q    So going back to my initial question --

23      A    But you can always renew it if you want to.

24   Do you want to pay for it?  Be my guest.

25      Q    Going back to my initial question.

1          What, if anything, did you ascertain -- did
2    you do to ascertain whether any communications existed
3    between the debtor and CannaMED Pharmaceuticals, LLC?
4         A    I know that there were none.  There were no
5    communications between the debtor and CannaMED.
6         Q    And how is it that you know that?
7         A    That's an interesting question.  I know it
8    because I know it.  I just know it.  There are no
9    communications.
10        Q    Is that because you were the sole control
11   person of the debtor and the sole control person of
12   CannaMED Pharmaceuticals, LLC?
13        A    That may be the case, yes.
14        Q    Any other reason why?
15        A    No.
16        Q    All right.  What, if anything, did you do to
17   ascertain what books and records of CannaMED
18   Pharmaceuticals, LLC exist?
19        A    I know there were no books and records of
20   CannaMED.  There was no business conducted by
21   CannaMED.  So there was no book or record.
22        Q    Category No. 3 in front of you.
23             What, if anything, did you do to ascertain
24   whether there were any documents responsive to
25   Category No. 3?

1    A    I know that I don't have any of those files,

2    because as I've told you before, they were taken.

3    Q    I'm sorry, can you remind me -- Category No.

4    3 calls for, "Any and all documents, including but not

5    limited to, bank statements, escrow accounts,

6    operating accounts, checking accounts, cancelled

7    checks, checkbooks, drafts, cash receipts, deposit

8    slips, wire transfers, and/or any other writings of

9    any kind that refer, relate to and evidence any monies

10   transferred by you" -- I'm sorry, "transferred to you

11   by or from the debtor."

12   A    Right.  I don't have any of that.

13   Q    Did CannaMED Pharmaceuticals ever have a bank

14   account?

15   A    No.

16   Q    What records would have existed that are no

17   longer in your possession that would be responsive to

18   Category No. 3?

19   A    The only records that I can think of while I

20   look here at the descriptions are just the online

21   check register, which I've already given you.

22   Q    The online check register of the debtor?

23   A    Correct.  That's it.

24   Q    All right.  What, if anything, did you do to

25   ascertain whether any documents responsive to Category

1    No. 4 existed?

2        A    I just looked through the closet where I have

3    whatever files I have left from my old offices, and

4    there was nothing in there that was responsive to that

5    question, and they wouldn't be anywhere else.

6        Q    Did you search your e-mails?

7        A    I provided you with all the e-mails.

8        Q    Did you search your e-mails in responding to

9    this subpoena?

10       A    I searched my e-mails only to the extent that

11   I located the e-mail that I sent to you previously

12   with all those e-mails attached to it and discerned

13   that it did get sent to you.

14       Q    In responding to this subpoena, did you on

15   behalf of CannaMED Pharmaceuticals search your e-mails

16   to see if there were any documents responsive to

17   Category No. 4?

18       A    Oh, no, because I know there aren't.  I

19   thought you were talking about the debtor.

20       Q    No.

21       A    Oh, four.  We were talking about three.  I

22   didn't know you jumped to four.

23            Did you jump to four?

24       Q    Let's look at No. 4.

25       A    Okay.  We're jumping to four.  There are no

1    document responsive to No. 4.

2        Q    How do you know that?

3        A    I know it because I know.  Remember CannaMED

4    didn't do any business.  All the business was handled

5    by Chance & Anthem.

6        Q    I'm sorry, can you remind me -- and I'm sorry

7    if you've testified to this before -- how it was that

8    Chance & Anthem handled all of CannaMED's business?

9        A    Chance & Anthem did business.  CannaMED was

10   an applicant for a medical cannabis license in

11   Maryland, which it did not get.  So CannaMED never had

12   the chance to go into business.

13       Q    What's the status of the litigation regarding

14   that license?

15       A    It was appealed.  We're overdue to file the

16   brief.  I guess they could dismiss that appeal any

17   day, but I just haven't had the time or the energy to

18   do the brief.

19       Q    Are you counsel of record for CannaMED in

20   that litigation?

21       A    Yes.

22       Q    Is there any other lawyer that's of record in

23   that litigation?

24       A    No.

25       Q    Please look at Category No. 5, "Copies of any

Page 14

1    all lease agreements, business leases, lease option

2    agreements, guarantees, addendums, security agreements

3    between the Debtor and CannaMed Pharmaceuticals, LLC."

4            What, if anything, did you do to ascertain

5    whether any responsive documents exist to that

6    request?

7        A    I didn't have to do anything, because I know

8    that there are none.

9        Q    How do you know that?

10       A    Because I know that.  Because I operated

11   Chance & Anthem, which, as I said, was the company

12   that did business, and I know for a fact that there

13   are no records which would fall under that category.

14       Q    Did Chance & Anthem have an agreement with

15   CannaMED Pharmaceuticals that memorialized the way

16   that the two entities did business?

17       A    Yes.  A one-page funding agreement, which I

18   already gave to you.

19       Q    Please take a look at Paragraph No. 6.

20            What, if anything, did you do to ascertain

21   whether responsive documents to Category No. 6

22   existed?

23       A    Hmm.  Nothing.  I know that I don't have that

24   information.

25       Q    And how is it that you know that?

1      A    Because although I maintained it properly at

2   the time, my records were taken.

3      Q    Is it your contention that any documents

4   responsive to Category No. 6 would fall in the traunch

5   of documents that you claim Robert Gibson stole from

6   you?

7      A    Robert Gibson took all my files.

8      Q    What documents would have existed responsive

9   to Category No. 6 that you claim are no longer in your

10  possession?

11     A    Well, let's go through it.  There were

12  ledgers, which pertained to the employees.  There were

13  reconciliations.  There were no trading and savings

14  account statements from any financial, investment

15  and/or lending institution.  There were no QuickBooks

16  or other accounting program materials.  There were no

17  cancelled checks.  There were no operating trusts

18  and/or escrow accounts.  Check books, other than the

19  one I gave you.  Drafts, cash receipts, deposit slips,

20  wire transfers, statements of account, those only

21  would have been online, and, of course, you had a

22  subpoena duces tecum to the banks to get that for

23  yourselves.  There were no account summaries, no stock

24  statements, summaries or reports.  Nothing that was

25  responsive, other than what I did mention.

Page 16

1          I also objected, I think, to that request, so
2    far as it didn't relate directly either to the debtor
3    of CannaMED.
4          Q    Have you withheld any documents that are in
5    your possession on the basis of that objection?
6          A    No.
7          Q    With respect to Category No. 7, what, if
8    anything, did you do to ascertain whether any
9    documents existed responsive to Category No. 7?
10         A    On Category No. 7, I already gave you
11   everything I have on that.
12         Q    Is that the folder you handed me in court?
13         A    I remember handing you the folder.  I don't
14   remember where I handed it to you.  Were we in court
15   or maybe sitting in a conference rooms outside?  I
16   don't remember, but, yes, I remember handing you a
17   folder.
18         Q    Would there be any other documents
19   responsive?
20         A    Not that I recall, no.
21         Q    How about No. 8, "All operating agreements,
22   including all versions and amendments of CannaMed
23   Pharmaceuticals, LLC"?
24         A    Well, wait, before we move on to No. 8,
25   remember we never really purchased that real estate.

1    It was a lease purchase that we defaulted on.  You

2    know that, right?

3        Q    Sir, you're an attorney, correct?

4        A    Yeah, had to be.

5        Q    Do you believe CannaMED or Chance & Anthem

6    have any claims against 27120 Ocean Gateway, LLC

7    arising out of that transaction?

8        A    No.  I mean, there's one attenuated claim,

9    but I don't think it would succeed.

10       Q    And what would that be?

11       A    The only claim that I could possibly imagine

12   being brought is something which would -- well, I'd be

13   taking a flyer on that explanation.  I once thought

14   there was a claim for what was really a loan that

15   could arguably be disguised as a lease purchase, if

16   the lender could be proved to have made numerous

17   loans, and, therefore, wasn't properly licensed.  But

18   I decided that it wouldn't be worth bringing, because

19   the likelihood of success on it would be very slim,

20   and because it really would be, I believe, less than

21   forthcoming to do something like that.  Because,

22   remember, the group that put up the money to allow us

23   to have an option on that building did so in good

24   faith, and I believe that we should act in good faith

25   in response and not play that -- what I thought would

1    be sort of a game.

2        Q    And please remind me who that group was?

3        A    I don't remember the exact name of the group.

4    It may have been in the name the Alan Bias'

5    (phonetic).  Oh, no, strike that, because that's an

6    incorrect response.

7            The gentleman that I dealt with, and he is a

8    gentleman, is a fellow by the name of Alan Bias, and

9    he was kind enough to provide funds to permit Chance &

10   Anthem to have an option on that building at 27120

11   Gateway, but the entity that he created to do it was

12   27120 Ocean Gateway, LLC.

13       Q    Let's move on to Category No. 8, please.

14           What, if anything, did you do to ascertain

15   whether documents responsive to Category No. 8 exist?

16       A    I sent that to you.

17       Q    You sent me an operating agreement?

18       A    Yeah.  Isn't that what you asked for?

19       Q    Were there any amendments to the operating

20   agreement?

21       A    There was one amendment that I was not able

22   to find that dealt with stakeholders who did things

23   that could be damaging to CannaMED's chances of

24   obtaining licensure.  In fact, I relied on that

25   amendment once to forfeit the one stakeholder's claim.

1    Q    And who was that stakeholder?

2    A    I don't see why that would be in the scope of

3    this examination.  That's confidential.  That has

4    nothing to do with the shares owned by Chance &

5    Anthem, the debtor.

6    Q    Remind me, what percentage of Chance & Anthem

7    you claim --

8    A    CannaMED has --

9    Q    The other way around.

10    A    Yeah, 70 percent.

11    Q    Seventy percent?

12    A    (Witness nods his head.)

13    Q    So there was a stakeholder that was

14    terminated?

15    A    Correct.  I forfeited that stakeholder's

16    shares, because that individual did things, which I

17    believed endangered CannaMED's chance of obtaining a

18    license.

19    Q    Based on an amendment to the operating

20    agreement that you're unable to locate?

21    A    Correct.

22    Q    Would you be able to tell me the name of that

23    stakeholder?

24    A    No.  I already said no.  I think that's

25    confidential.  I don't want to embarrass that person

Page 20

1   or reveal what I believe would be confidential

2   information.

3       Q    How is that information confidential?

4       A    Because it's CannaMED's information, not --

5       Q    And this is a 2004 Examination of CannaMED --

6       A    I understand that.

7       Q    -- and the debtor owns 70 percent of

8   CannaMED?

9       A    Correct.  But the debtor has no right to

10  manage CannaMED.

11      Q    Are you claiming that the debtor has no right

12  to know why there was a stakeholder in CannaMED that

13  was terminated based on an operating agreement -- an

14  amendment to the operating agreement that you're

15  unable to produce?

16      A    Yes, that's my position.

17           MR. SUAREZ:  We'll certify the question on

18  that one.

19  BY MR. SUAREZ:

20      Q    Or you can just tell me who it is, you don't

21  have to make this difficult.

22      A    I don't want to do that to the individual or

23  release information which I believe may be

24  confidential.

25      Q    Would you be willing to tell me that off the

1   record?

2       A    No.  If I was willing to tell you off the

3   record, I'd be willing to tell you on the record.

4       Q    All right.  So we'll take that one up with

5   the Court.  All membership agreements of CannaMED

6   Pharmaceuticals, LLC.

7            What, if anything, did you do to ascertain

8   whether there were any membership agreements with

9   respect to CannaMED Pharmaceuticals?

10      A    I knew that I didn't have any, because

11  although I had some in my files, I no longer have my

12  files.

13      Q    Those are the ones you claim --

14      A    Which number are we on?

15      Q    Number 9.

16      A    No, and I also objected based on

17  confidentiality and attorney/client privilege.

18      Q    What document have you withheld on the basis

19  of that privilege?

20      A    I don't think I withheld any, because I

21  couldn't find any, because I know all my files were

22  taken.  When you first asked for records, I did a

23  really exhaustive search, and then I did it again.

24  And then I thought maybe there were boxes in this

25  trailer, where I had a lot of furniture stored, but

1   there's nothing in there.  No records came -- the only

2   boxes that came out to the storage house, which were

3   then placed in the storage trailer, were boxes of

4   books.

5        Q    Was there ever a valuation of CannaMED

6   Pharmaceuticals performed?

7        A    Yes.

8        Q    And has that been produced?

9        A    Yes.

10       Q    And where was that valuation maintained?

11       A    What do you mean?

12       Q    How did you get it?  Who did it?

13       A    I did it.

14       Q    You did it?

15       A    Yeah.

16       Q    What qualifications, if any, do you have to

17  value businesses?

18       A    What of qualifications do I need?  I'm going

19  to answer your question with a question.

20            I did that valuation based on my own

21  perception of what the entity is worth, and I think

22  it's been proved by what similar entities that were

23  licensed are selling for.  If you remember, I

24  evaluated the company based on its income stream, and

25  then set that against the probability of being

Page 23

1    successful in getting the license by litigating it in

2    Maryland, which I think, I think, I recall was 50

3    percent.  I don't remember now.

4        Q    And how would you value of the likelihood of

5    that litigation being successful today?

6        A    Not at all now.

7        Q    Why not?

8        A    I really can't proceed with it at this point.

9    I've got to do other things to make a living.

10       Q    Paragraph 11 or Request No. 11.

11            What, if anything, did you do to ascertain

12   whether there were responsive documents to Category

13   No. 11?

14       A    Category 11, I didn't need to do anything,

15   because I know there was that singular document that I

16   had already given you, and there were no other

17   documents.

18       Q    Which document is that?

19       A    The funding letter.

20       Q    Okay.  How about No. 12, the membership table

21   of CannaMED Pharmaceuticals?

22       A    That was too heavy to transport.

23       Q    How is that?

24       A    I'm teasing.  We never had a membership

25   table, per se.  That would be a document I would have

Page 24

1    to create, and I think I objected to No. 12 based on

2    confidentiality.

3        Q    How can you object based on confidentiality

4    if the document doesn't exist?

5        A    I can object to any request you might

6    follow-up with to prepare one.

7        Q    I'm not asking you to prepare one.

8            Is there a document that you withheld that

9    would otherwise be responsive to Request No. 12 on the

10   basis of any objection or privilege?

11       A    No.  No, I know who the people are, but

12   there's no writing to evidence that.

13       Q    And who are the members of CannaMED

14   Pharmaceuticals?

15       A    Again, I'm objecting based on

16   confidentiality.

17           MR. SUAREZ:  Certified the question.

18           (Thereupon, a document was marked as Exhibit

19   No. 2 for identification by Mr. Suarez.)

20   BY MR. SUAREZ:

21       Q    Please take a second to review the exhibit

22   marked No. 2.

23       A    Yes.

24       Q    What is this document?

25       A    That appears to be the LLC operating

Page 25

1    agreement for CannaMED which I sent to you.

2        Q    Has this document ever been amended?

3        A    Yes.

4        Q    What is the title of the amendment?

5        A    Amendment to Operating Agreement, as I

6    recall.

7        Q    And is that the copy of the amendment that

8    you were unable to locate?

9        A    Yes.

10       Q    Was there a resolution that authorized that

11   amendment?

12       A    Yes, because I was the only person who had

13   the resolve to do it.  There were no other decision

14   makers for CannaMED, except for me.

15       Q    What's your membership interest in CannaMED

16   Pharmaceuticals?

17       A    As I said before, I was the managing member.

18       Q    I understand that you were the managing

19   member, but how many membership interests did you have

20   in CannaMED?  What was your percentage of the

21   membership interests in CannaMED?

22       A    Five percent.

23       Q    Were the other 95 percent of the members of

24   CannaMED consulted when you resolved to amend the

25   operating agreement?

Page 26

1      A    No.

2      Q    Why not?

3      A    I didn't think I needed to.

4      Q    What was the basis of that belief?

5      A    I was the sole managing member.

6      Q    Is it your testimony that as the sole

7   managing member you believed you could amend the

8   operating agreement of CannaMED at will?

9      A    Yes.

10     Q    Was the amendment to the operating agreement

11  ever transmitted to anybody?

12     A    I don't recall.

13     Q    Was it a secret amendment to the operating

14  agreement?

15     A    No, there were no secrets.  I may have sent

16  the individual that I terminated a copy of the

17  amendment.

18     Q    Okay.  Section 2.01 of the operating

19  agreement refers to an advisory board.

20     A    One or more advisory boards, yeah.

21     Q    Was there an advisory board ever created at

22  CannaMED Pharmaceuticals?

23     A    No, I don't believe so.  We made initial

24  moves to create two of them, as I remember, but we

25  never formally did.

1        Q     Section 2.02 states that, "Operating
2   decisions shall be executed by the senior management
3   team following mission and policy directives of a
4   Managing Director."
5        A     Right.
6        Q     Who was the senior management team?
7        A     We never established a senior management
8   team.
9        Q     Who was the managing director?
10       A     I was the managing member, and I think I was
11  also referred to as the managing director.
12       Q     How were you appointed managing director?
13       A     When I formed the company, I made myself the
14  managing member.  But I think in the application to
15  the State of Maryland, I was described as the managing
16  director.  Don't quote me on that, because I'm not a
17  hundred percent sure.
18       Q     Section --
19       A     By the way, remember, I think I might have
20  just confused one of your earlier questions between
21  the debtor and between CannaMED.  I don't know if you
22  want to ask me those questions again or not, but --
23       Q     No, if you feel you need to clarify --
24       A     I don't even remember the question at this
25  point.  It was two or three questions ago.

1        But, remember, I was the managing member of

2   both Chance & Anthem and CannaMED.  I might have

3   confused myself with that answer, if you want to read

4   back a few questions, but -- or I can clarify it

5   later.  I'll read, and then if I think I didn't answer

6   correctly, I'll let you know.

7        Q    All right.  Moving to Section 2.03, which

8   refers to company oversight, "The Chief Executive

9   Officer who shall hold ultimate operational oversight

10  of the corporation shall report directly to the

11  Managing Director."

12       Who was the chief executive officer of

13  CannaMED Pharmaceuticals, LLC?

14     A    Well, again, we never got into business, but

15  it would have been by a woman by the Angeline Nanni

16  who lives in Maryland, who is a health care executive

17  that we chose.

18     Q    Section 2.04 of the operating agreement

19  refers to, "Fiscal control shall be maintained in

20  order to ensure proper record keeping of accounts and

21  funds," and then it goes on.

22     A    Absolutely.

23     Q    Were fiscal controls ever implemented in

24  CannaMED Pharmaceuticals?

25     A    No, because CannaMED Pharmaceuticals never

1    had one dollar to control.

2        Q    Section 2.05 provides that, "The number of

3    advisory board members may vary, but shall not be less

4    than one (1) nor more than seven (7), except by action

5    of majority vote by Members."

6        A    Right.

7        Q    Was an advisory board member ever appointed?

8        A    I already told you that the advisory boards

9    weren't created.  The advisory boards, now that I

10   start thinking about it, I believe there were going to

11   be two.  One was a business advisory board and the

12   other was a scientific advisory board, and we had a

13   slate of prospects that we either were going to or did

14   contact to try to form those boards.  But the

15   intention wasn't to form them until we got into

16   operation.

17       Q    What compensation, if any, did you receive

18   from CannaMED Pharmaceuticals?

19       A    Nothing.  CannaMED Pharmaceuticals never had

20   one dollar.  Let me rephrase that, never had one penny

21   or even a tenth of a penny.  There was no money in

22   CannaMED Pharmaceuticals.

23       Q    Other than yourself, were any officers or

24   directors ever appointed for CannaMED Pharmaceuticals?

25       A    Well, I just told you that there would have

1  been officers.  Angeline would have been the chief

2  executive officer and president, and I believe we had

3  a portion of the offices among the people who worked

4  for Chance & Anthem.  Yes, the officers would have

5  been Bruce Lowe.  I think he was going to be a vice

6  president.  Matt Huffman (phonetic), who was our

7  grower, was going to be an officer.  Jessie, whose

8  last name I can't think of, who was our security

9  person, was going to be an officer, and Hal -- Hal, I

10 can't think of his last name, would have also been an

11 officer, and I'm probably forgetting somebody.  But,

12 again, since we never were licensed and could never

13 get into business, there were no active officers.

14     Q    Was Carl Stone ever an investor in CannaMED

15 Pharmaceuticals?

16     A    No.

17     Q    How about David Fiore?

18     A    No.

19          Ah, you do have more files.

20          (Thereupon, a document was marked as Exhibit

21 No. 3 for identification by Mr. Suarez.)

22 BY MR. SUAREZ:

23     Q    Please review the document I've marked as

24 Exhibit 3.

25     A    Oh, yeah, I remember this.

1    Q    Please identify the document I've marked as

2  Exhibit 3.

3    A    This was a document prepared by -- ah, an

4  individual who was trying to obtain money for us.

5  It's labeled Executive Summary Debt Offering, and I

6  think this person was a -- a -- I don't know.  I don't

7  know how to describe him.  Jonathan Mayer, right, he

8  had a company called Wharton, and they were money

9  scouts, I guess, is the best way to -- he was a

10  venture capitalist agent, how about that, for the best

11  way to describe it.  I really never knew exactly what

12  he did, because he didn't do anything for us other

13  than write up this summary for his own use.

14    Q    The exhibit to the e-mail reads, "CannaMED

15  Pharmaceuticals, Executive Summary:  Debt Offering,

16  Confidential, February 2016, For Informational

17  Purposes Only."

18    A    Right.

19    Q    Who prepared this document?

20    A    We did not prepare this document.  I believe

21  it was prepared by Jonathan Mayer or someone on his

22  staff.

23    Q    And how did Mr. Mayer acquire the information

24  to prepare this document?

25    A    Well, by way of information, do you mean the

1    pictures that he's got in here of the site?

2        Q   How did he get the facts he put in this

3    document?

4            How did he become familiar with CannaMED's

5    business so as to allow him to prepare this document?

6        A   I don't remember.  I talked to him, but so

7    would other people have talked to him.

8        Q   The first line says, on Page 1 of the

9    document, "The Executive Summary prepared by Chance &

10   Anthem, LLC dba CannaMED Pharmaceuticals, LLC" --

11       A   Where are you looking?

12       Q   Page 1 of the attachment --

13       A   Oh, I see --

14       Q   -- all the way at the top.

15       A   -- all the way at the beginning.

16           Yeah, I can't be responsible for his

17   presentation.

18       Q   You would not have reviewed this document?

19       A   No.  I recall seeing this, but I would not

20   have reviewed it closely, because he never did

21   anything.  Actually, I think we paid him a couple

22   thousand dollars to prepare this document.

23       Q   Well, turning to the second Page 1 of the

24   document, in the second column, second paragraph from

25   the top, it says, "The founder of the company, Jeffrey

1    Siskind, has a proven track record in this space,

2    having procured a license and built a fully

3    operational Location Grower Facility in California."

4         Is that an accurate statement?

5    A    Yes.

6    Q    What license did you procure?

7    A    A agricultural license and business license.

8    Actually, maybe it was one in the same, an

9    agricultural business license, correct.

10   Q    And how would Mr. Mayer have come to know

11   that?

12   A    He probably interviewed either me or Bruce

13   Lowe who ran the California operation for me.

14   Q    What was the name of the California

15   operation?

16   A    Well, there were two.  The management company

17   was called Collective Management Associates.  It was a

18   Florida LLC --

19   Q    Mm-hmm.

20   A    -- and then there was a not-for-profit

21   collective called the Riverside Collective, which had

22   members and was the vehicle which permitted us to grow

23   a certain number of plants for each member that the

24   collective, which was not-for-profit, had.

25   Q    And that grower is or was at some point fully

Page 34

1   operational?

2       A    Yep.

3       Q    Generated revenue?

4       A    Yeah.

5       Q    What happened to that grower?

6       A    It was shut down by an individual, who I

7   think his name was Cooley (phonetic), who was under

8   the misapprehension that he could shut down

9   approximately 400 cannabis related businesses as part

10  of his quest to move from Los Angeles County district

11  attorney to California attorney general, but he lost

12  that election because of the -- partly, I imagine,

13  because he went after legitimate enterprises, as well

14  as the illegitimate ones.

15      Q    Neither the Riverside Collective, nor CMA

16  currently operates; is that correct?

17      A    Correct.  I don't think you need the

18  not-for-profit anymore to do business out there, now

19  that they've gone to full recreational.

20      Q    I apologize, Mr. Siskind, but it appears

21  there are multiple page ones in this document.

22  Apparently, Mr. Mayer didn't do a very good job in

23  putting this together for you.  But if you could turn

24  to the page that's second to last --

25      A    Oh, I see.

Page 35

1      Q    -- also marked No. 1 --

2      A    Right.

3      Q    -- there's a section there named Site

4  Financing.

5      A    Right.

6      Q    "CannaMED Pharmaceuticals, LLC is the

7  third-party beneficiary of Chance & Anthem, LLC's

8  assignment of a purchase option contract."

9      A    Correct.

10     Q    Is that an accurate statement?

11     A    I think so.

12     Q    "Which was entered into by Sovereign Gaming &

13 Entertainment, LLC."

14     A    Correct.

15     Q    Is that an accurate statement?

16     A    Yes.

17     Q    A Florida limited liability company --

18     A    Oh, wait a minute, maybe that's not a hundred

19 percent correct.  Sovereign Gaming & Entertainment had

20 the original contract on the building, and then, I

21 believe, assigned it to Chance & Anthem.

22     Q    And how was CannaMED Pharmaceuticals the

23 third-party beneficiary of that assignment?

24     A    Well, because the intent was to utilize the

25 building for CannaMED Pharmaceuticals, LLC, solely for

1    CannaMED.

2         Q    All right.  It goes on to say, "SG&E,"

3    Sovereign Gaming & Entertainment, LLC --

4         A    Correct.

5         Q    -- "has funded approximately $300,000 to the

6    purchase to date."

7         A    I believe that's a correct statement.

8         Q    And how was that funding accomplished?

9         A    I don't remember, but that went into the

10   purchase of the building.  That went into what became

11   the lease option of the building, but it was expended.

12        Q    And it says there that "Sovereign Gaming &

13   Entertainment is a Florida limited liability company

14   controlled by the family of the company's managing

15   director."

16        A    That's not really a hundred percent accurate,

17   but it was a Florida LLC.

18        Q    What's inaccurate about that statement?

19        A    My father was the managing member, sole

20   managing member, I believe, of Sovereign Gaming.

21        Q    And what is the current status of Sovereign

22   Gaming?

23        A    It's lapsed.  It doesn't do business any

24   more, and my father has passed away, so I don't think

25   you'll see anything happening in Sovereign Gaming.

1    Q    Who currently owns the membership interests

2  of Sovereign Gaming?

3    A    I wouldn't know.  Not me.

4    Q    All right.  This site financing section says,

5  in the last sentence, "While SG&E has funded

6  approximately 300,000 toward the purchase to date,

7  C&A," Chance & Anthem, "is obtaining additional

8  capital in the amount of 1.35 million by obtaining

9  finances against the building, which will be used to

10  close and build out the facility."

11    A    At that time I believe that was the plan.  I

12  don't know that the 1.3 million is correct, but that

13  was before Alan Bias' group got involved.

14    Q    And how did that change once Mr. Bias' group

15  got involved?

16    A    Well, we weren't working with Mr. Mayer any

17  longer.  The people that he wanted to get involved

18  didn't come to fruition, and actually I do remember he

19  did have somebody interested, but they wanted to big a

20  participation interest.  So we didn't go forward with

21  his candidate.

22    Q    Did Mr. Mayer ever raise any funds for either

23  Chance & Anthem or CannaMED?

24    A    No.

25        (Thereupon, a document was marked as Exhibit

Page 38

1   No. 4 for identification by Mr. Suarez.)

2   BY MR. SUAREZ:

3       Q   Please review the document I've marked as

4   Exhibit 4.

5       A   Oh, wow, the appraisal.

6           Okay.

7       Q   Who is jjbttrm@aol.com?

8       A   I don't know for certain, but I have a

9   feeling it's this Mr. Butrum.  B-T-R-M -- B-T-T,

10  Butrum, I don't know.

11      Q   Is this an e-mail you sent on February 4,

12  2016?

13      A   Looks like it is, yeah.

14      Q   The e-mail reads, "Mr. Butrum, I am

15  forwarding the attached files at the behest of Mike

16  Buckingham."

17      A   Yes.

18      Q   Who is Mike Buckingham?

19      A   My sister's former husband, who was

20  attempting to try to raise money for us.

21      Q   "Us" being CannaMED Pharmaceuticals?

22      A   Well, for the CannaMED Pharmaceuticals

23  operation.

24      Q   If it wasn't for --

25      A   At this point it looks like it was Sovereign,

Page 39

1    if you look at the next page.

2        Q    The next page is an Executive Summary.

3        A    Looks like it says that, but I don't know if

4    it really is.  Looks a little light for an executive

5    summary to me.

6        Q    Who prepared the executive --

7        A    I have no idea.

8        Q    -- summary document?

9        A    I have no idea.

10       Q    Was it you?

11       A    I don't remember preparing this.

12       Q    Was it Mr. Buckingham?

13       A    I don't think so.

14       Q    Who else might have prepared a document like

15   this?

16       A    Could have been Bruce Lowe in my office,

17   could have been Willy Russell in my office.

18       Q    When you say "in my office," do you mean your

19   law firm or at CannaMED?

20       A    No, no.  In our offices in West Palm Beach,

21   part of which was occupied by my law firm.

22       Q    Who would have employed Bruce Lowe?

23       A    Chance & Anthem.

24       Q    Who would have employed -- I'm sorry, you

25   said his name was Willy?

Page 40

1    A    Willy, yeah, a British guy who would edit

2    things that were written.  His grammatical skills were

3    superior to everyone else's.  I don't remember what

4    entity Willy worked for.  He didn't work for the law

5    office.  I don't remember what entity owned the floor,

6    but he was the receptionist.

7    Q    The third paragraph from the bottom states,

8    "SGE plans to lease the property to CannaMED

9    Pharmaceuticals, LLC, a related Maryland limited

10   liability company formed to apply for a license to

11   operate one of 15 medical marijuana cultivation

12   facilities, which license may be awarded in May 2016."

13   A    Yeah.  That's odd, because I thought the

14   licenses were supposed to be awarded in January of

15   2016.

16   Q    Okay.  It says in the event that CannaMED is

17   not successful in obtaining a Maryland medical

18   marijuana cultivation center license, SGE plans to

19   leave (sic) the property to another successful

20   applicant."

21   A    Lease it.  Yeah.

22   Q    Did that ever happen?

23   A    No.

24   Q    Why not?

25   A    Nobody won it.

Page 41

1      Q    The following paragraph reads, "SGE is

2   operated by Jeffrey Siskind, a West Palm Beach real

3   estate attorney, whose resume accompanies this

4   executive summary."  Is that accurate?

5      A    No.

6      Q    Why not?

7      A    Well, as I told you, William Siskind was the

8   managing member of Sovereign Gaming & Entertainment.

9      Q    Was the elder Mr. Siskind the operator of

10  Sovereign Gaming & Entertainment or was it you?

11     A    The elder Siskind was the managing member.  I

12  don't know what you mean by "operator."

13     Q    Who had authority to sign checks?

14     A    I signed a lot of checks for that company on

15  behalf of my father.

16     Q    Who had the authority to bind that company?

17     A    The managing member.

18     Q    Did you ever bind that company independently?

19     A    I can't remember doing that.  I may have.

20     Q    Did you review this document prior to sending

21  it to Mr. Butrum?

22     A    Probably not closely.  I don't know that I

23  sent this to Mr. Butrum.

24     Q    It's attached to the e-mail.

25     A    "I am forwarding the attached files at the

Page 42

1    behest of Mike Buckingham."

2          So, no, I probably would have caught that

3    inaccuracy had I reviewed it closely.  I'm more

4    concerned with these -- oh, I see what this is.  They

5    are expenditures.  I didn't understand the interest

6    payments.  But I guess they were the interest payments

7    made to the seller of the property, and the square

8    footage is -- oh, no the square footage is right.

9        Q    And what was the point of sending this to

10   Mr. Butrum?

11       A    I guess he was a possible investors.

12       Q    Did he ever invest?

13       A    No.

14       Q    The next attachment is an appraisal report of

15   real property identified as --

16       A    Yeah, see that.  I didn't even remember we

17   had this, but now that I see it, I remember the

18   appraiser doing it.

19       Q    And that was an appraisal on the building?

20       A    Yes.

21       Q    All right.  The following is a purchase

22   option agreement, the following attachment, between

23   Machining Technologies, Inc. --

24       A    Oh, sure, this was -- that's right.

25       Q    -- and Sovereign Gaming.  Do you see that?

Page 43

1        A    Yeah.

2        Q    Is that the purchase option agreement that

3    you referred to?

4        A    No.   No.   There were two purchase option

5    agreements.   This was the original purchase option

6    between Sovereign and the seller, which is called

7    Machining Technologies, Inc.   There was a shorter name

8    but --

9        Q    Was this option agreement ever exercised?

10       A    Yes, this was concluded.   The building was

11   sold.

12       Q    Who was the building sold to?

13       A    27120 Ocean Gateway, which was the LLC

14   established by Alan Bias.

15       Q    The Ocean Gateway, LLC exercised Sovereign's

16   right in this purchase option agreement?

17       A    Correct.

18       Q    All right.   The final attachment -- actually

19   the second to last attachment, the last attachment

20   appears to be your resume, the second to last

21   attachment is a company business plan.

22       A    Oh, yeah.

23       Q    Who prepared the company business plan of

24   CannaMED Pharmaceuticals attached to this e-mail?

25       A    I have no idea.   I contributed to it.

Page 44

1      Q    Did you approve it?

2      A    What's that?

3      Q    Did you approve it?

4      A    There was no formal approval process.  I

5  think the best thing you could say is I contributed to

6  it.

7      Q    You forwarded it to --

8      A    There I am, managing director, general

9  counsel.

10     Q    You did forward it to someone that was

11  interested in investing in CannaMED Pharmaceuticals,

12  did you not?

13     A    It appears that I did, yes.  But I can't

14  vouch for whether or not it was changed after I might

15  have reviewed it.  I remember reviewing the overview

16  where we talked about the people, the procedures, and

17  the place, which was something that we transposed from

18  our application in the State of Delaware.  So I really

19  don't know if I did it for this application or if I'm

20  thinking of the application for the State of Delaware.

21     Q    Can you take a look at Section 2.3, which

22  says "Start-up Funding."

23     A    Yeah.

24     Q    It says, "The company has obtained sufficient

25  funding to accomplish its mission, as follows:

Page 45

1    CannaMED Pharmaceuticals, LLC has secured the building

2    and lands which it intends to utilize by means of a

3    related-company purchase for the sum of $950,000."

4        A    Right.

5        Q    What was the related-company purchase?

6        A    I think that was the purchase price,

7    $950,000.

8        Q    Well, my question is, what is the related

9    company referred to in that section?

10       A    Looks like it was referring to Chance &

11   Anthem.

12       Q    Did Chance & Anthem ever --

13       A    Well, it explains that, or Sovereign Gaming.

14   You have to read the rest of the paragraph.

15       Q    All right.  Walk me through it, please.

16            "Chance & Anthem, LLC, a Florida limited

17   liability company, which is solely owned by the

18   Maryland Cannabis Commission Grower Applicant's

19   Managing Director"  --

20       A    Right, probably was at that time.

21       Q    -- "Jeffrey Siskind -- Jeffrey M. Siskind, is

22   the assignee of a purchase option agreement which was

23   entered into by Sovereign Gaming & Entertainment, LLC,

24   a Florida limited liability company controlled by the

25   Siskind family."

Page 46

1      A    Seems like that was written by the same

2   person that wrote the other document --

3      Q    But not you?

4      A    -- who didn't -- no, I didn't read that.  I

5   mean, I didn't write that, that I recall, no.

6      Q    "SG&E has funded $245,000 towards the

7   purchase to date."

8      A    Okay.

9      Q    And then the next line is, "C&A is obtaining

10  additional capital in the amount of $750,000 by

11  obtaining financing against real property located in

12  Florida, which is expected to close on November 6,

13  2015, in order to enable completion of the purchase of

14  the building and lands, which the company intends to

15  utilize in Wicomico County."  And I think I said

16  "Wicomico" correctly.

17     A    You did.  Took me months to figure it out,

18  but you're right.  I always said "Wacomico," and they

19  looked at me like I wasn't not Indian enough, since

20  it's an Indian name.

21     Q    Mm-hmm.  The $750,000 referenced in that

22  section, was that financing ever obtained?

23     A    I think we did obtain that against the

24  residential house flip project in Wellington.

25     Q    Is that 3445 Santa Barbara?

Page 47

1     A    Correct.

2     Q    And how was that financing obtained?

3          Who provided that financing?

4     A    A company called New Wave Financing or New

5     Wave Loans out of Miami.

6     Q    And how were those funds used?

7     A    I don't remember, just went into the general

8     fund, general expenses, paying me.

9     Q    Of Chance & Anthem?

10    A    Mm-hmm, yes.

11         This is interesting, because I'm wondering if

12    this is elements of the application -- oh, no, you

13    know what this is, it looks like a reworking of our

14    Delaware application.  Yeah, I didn't do this.

15    Q    Was it sourced from another document?

16    A    Parts of it appear -- oh, yes, parts of it

17    definitely were sourced from our Delaware application.

18    Q    What do you mean by the "Delaware"

19    application?  And please excuse me if you've explained

20    that to me before.

21    A    Oh, well, prior to this Maryland opportunity,

22    the State of Delaware requested proposals to operate

23    cannabis growing retail locations in the State of

24    Delaware.

25    Q    The following paragraph says, "Additional

1   funds needed to underwrite the initial specific

2   purpose build-out of the facility and projected

3   working capital needed during the ramp up period of

4   operation, which are estimated to total approximately

5   $1 million, are being made available to Mr. Siskind by

6   means of a loan to Mr. Siskind based upon a client and

7   business associate's open line of credit."

8       A    That's correct.

9       Q    Was that capital ever made available?

10      A    No.  We never needed it.  It would have been

11  had we needed it.

12      Q    And who is the individual referred to in that

13  paragraph?

14      A    I'm not going to disclose that.  It's a

15  client, and it's not relevant.  You're way outside the

16  scope, way outside the scope, of this 2004.

17          MR. SUAREZ:  Please certify the question.

18  BY MR. SUAREZ:

19      Q    The following paragraph says, "Also to

20  provide reserve funding, Mr. Siskind anticipates being

21  able to obtain an additional $550,000 by securing

22  additional financing against the Florida property

23  (which amount, together with the originally obtained

24  financing, brings the financed loan-to-value to

25  approximately 50% of the property's appraised value)."

1          Is that Florida property referenced in that

2    paragraph 3445 Santa Barbara?

3          A    I don't believe that's accurate.  I think our

4    intent was to borrow additional funds against the

5    Hebron, Maryland property once it was approved.

6          Q    This statement is false?

7          A    I don't know that it's false.  It doesn't

8    appear correct to me.  We had pretty much -- no, no,

9    strike that.  I believe that that's in error.  I think

10   that the additional financing was supposed to come

11   from the Maryland property once it was improved.  I

12   can't swear to that.  I don't know that for a fact,

13   but that's my recollection.

14         Q    All right.  The following paragraph says,

15   "The attached proforma information demonstrates that

16   the above funding is sufficient to meet the company's

17   cash needs at start-up and throughout the ramp-up

18   period of operation.  Additional funding required to

19   build out and equip the remainder of the facility will

20   be obtained by means of re-invested earnings."

21         A    Right.  I'm not looking at the document now,

22   but I do remember that we had a phased operational

23   plan, where we first operated only a portion of the

24   building, the portion that would eventually be given

25   over to the research attribute, because we felt that

Page 50

1    the rollout of the Maryland cannabis program would be

2    slow, so why -- it didn't make sense to open the

3    entire 50,000-square-foot facility at one time.  So we

4    could get Phase I open, and reinvest those revenues in

5    building out the rest of the facility.  I think it was

6    even a three-stage -- I think it was a three-stage

7    ramp up.  Yeah.

8        Q    Who prepared the attached proforma?

9        A    Let's take a look at it.  Would that be --

10   let's see, 7.31, beginning at 7.31, even though it

11   comes after 7.4.  Yeah, 7.3, it says, "Please refer to

12   these sections.

13       Q    Projected --

14       A    I think I did that.  I think I did all of

15   that.  Yeah, I did all the financials based on what we

16   did over in California.

17       Q    You answered my next question.

18            All right.  The following paragraph says,

19   "Attachments to this application include the appraisal

20   on the Florida property, which indicates a value in

21   excess of 2.6 million" --

22       A    Where is that --

23       Q    We're back --

24       A    -- is there an appraisal attached.

25       Q    Yeah, we're back at 2.3.

Page 51

1      A    I don't see an appraisal.

2      Q    I don't see one either.  That's my question.

3      A    I have no idea what may have happened to that

4  appraisal.

5      Q    Please take a look at Section 2.3.

6      A    Right.

7      Q    Reference to "application."

8      A    Where?

9      Q    In the third paragraph, it says, "Attachment

10  to this application."

11     A    I don't see where you're talking about.

12  Third paragraph on which page.

13     Q    The pages are unnumbered.

14     A    Oh, okay, I had turned the page.  I'm sorry.

15     Q    Right, 2.4 -- turn the paragraph -- turn the

16  page.

17     A    Turn the page, okay.  Turn the paragraph?

18     Q    You're in the second page of Section 2.3 --

19     A    I am.

20     Q    -- prior to 2.4.

21     A    Okay.

22     Q    The third paragraph.

23     A    Okay.  "Attachments to the application

24  include" --

25     Q    This is not an application is it?

Page 52

1      A    No.

2      Q    What application is that statement making

3    reference to?

4      A    I haven't the foggiest idea.

5      Q    All right.  It says, "Attachments to this

6    application include the appraisal on the Florida

7    property, which indicates a value in excess of $2.6

8    million."

9           What Florida property is that statement

10   referring to?

11     A    The only Florida property that could be

12   related to this endeavor would be Chance & Anthem's

13   project house in Wellington.

14     Q    And was there ever an appraisal on the

15   project house valuing it in excess of $2.6 million?

16     A    Not that I recall right now.  There may have

17   been, but I don't recall it.

18     Q    A loan commitment for the approximate

19   $750,000 net funding loan expected to close on

20   November 6, 2015.

21     A    That was probably correct.

22     Q    Is that what you previously described as the

23   New Wave loan?

24     A    It would have had to have been, yeah.

25     Q    Together with a fee sheet, which indicates

1   the net available funding.

2      A   Okay.  Well, there probably was one created

3   if we were far enough along in that loan -- in

4   obtaining that loan.

5      Q   Do you know where that fee sheet would exist?

6      A   It would exist in the files that were taken

7   from my office, but where they are at this point is

8   anyone's guess.

9      Q   Would New Wave --

10     A   Oh, they would have it, if you can get in

11  touch with them, sure.  It wasn't that long ago.

12     Q   All right.  Then the next is a bank statement

13  from Mr. Siskind's client, which indicates that just

14  over one million is available by means of the line of

15  credit.

16     A   I think I do, at some point, remember seeing

17  that, but, again, I wouldn't have it now.

18     Q   And, again, what client is that referencing

19  there?

20     A   It's the client that I won't disclose to you,

21  because it's not relevant to -- within the scope of

22  this 2004.

23     Q   Mr. Siskind, you're a practicing attorney.

24  You know relevance isn't a basis to not answer a

25  question --

Page 54

1        A    Yeah, but there's a limitation to --

2        Q    -- even setting aside --

3        A    -- the 2004.  You can't just --

4        Q    So are you refusing to answer the question?

5        A    It's not something that I believe to be

6    relevant.

7        Q    Are you refusing to answer the question?

8        A    I am.

9            MR. SUAREZ:  Please certified the question.

10           THE WITNESS:  And with that I will help

11    myself to a chocolate bar.

12           MR. SUAREZ:  I will do you one better, how

13    about we take a five-minute break?

14           THE WITNESS:  Why?  I want to get out of

15    here.  Keep going.  No, if you want to break, I will.

16           MR. SUAREZ:  Thank you.

17           (Thereupon, a brief recess was taken.)

18           MR. SUAREZ:  Back on the record.

19    BY MR. SUAREZ:

20        Q    If you could please skip forward to --

21        A    I don't skip anymore.  I've gotten too heavy.

22        Q    -- Section 5.25, Sales Strategy.

23        A    Oh, wow, I'm passing through SWAT analysis.

24    This was all from the Delaware application.

25           Okay.  I'm on sales strategy.

1      Q    Was any portion of this document part of the

2   Maryland application?

3      A    I don't believe so, no.   This probably

4   predated the Maryland application.

5      Q    What was the date of the Maryland

6   application?

7      A    I don't remember.

8      Q    Was it --

9      A    You can go on the Maryland medical cannabis

10  commission's website.   They probably have all that

11  information.

12     Q    All right.   Sales Strategy, 5.25 says,

13  "CannaMED Pharmaceuticals, LLC will only sell its

14  products, consisting of various strains of medical

15  cannabis, to licensed Maryland processors and

16  dispensaries in order that they be resold to

17  patients."

18     A    Correct.   That is correct.   We were only

19  going for the grower's license.

20     Q    Did CannaMED own strains of medical cannabis?

21     A    No.   CannaMED didn't do anything --

22     Q    Did it ever --

23     A    -- it never came into being --

24     Q    Did it ever develop the --

25     A    -- it never owned anything.

1      Q    -- strains of --

2      A    No, no.  The strains of cannabis already

3  exist.

4      Q    It never possessed strains of cannabis?

5      A    No.

6      Q    What products was it referencing here in

7  Section 5.25 if it didn't have any?

8           Wouldn't it be inaccurate to say that

9  CannaMED would only sell "its products" if it didn't

10  have any?

11      A    No.

12           Have you ever started a business, Jesus?

13  This is what you would write.  Now, I'm not saying I

14  wrote this, but CannaMED "will" only sell its products

15  consisting of various strains of medical cannabis to

16  Maryland processors and dispensaries." That's an

17  accurate statement, right?  The company, once it gets

18  into business, "will do this."  It's forward looking.

19      Q    Okay.

20      A    Proforma, perhaps is the best term to use.

21      Q    5.32, if you forward a couple of pages,

22  Cultivation Program Standard Operating Procedures.

23      A    SOPs, yeah.

24      Q    It says, "CannaMED Pharmaceuticals, LLC has

25  adopted standard operating procedures" --

1      A    Correct.

2      Q    -- "to ensure the implementation of a

3  successful medical cannabis cultivation program."

4      A    Correct.

5      Q    Where are those standard operating procedures

6  located?

7      A    Next sentence, says it right there, "Specific

8  SOPs are contained within a Proprietary Cultivation

9  Handbook, which was developed by" --  and I guess that

10  should be "the" -- "company's master grower and are

11  summarized below."  There you have the summaries.

12      Q    Where is that cultivation handbook located?

13      A    I have no idea.  I don't think I've ever seen

14  it.

15      Q    What do you mean by proprietary cultivation

16  handbook?

17      A    Why do you say what do "I" mean?  I am not

18  admitting to having written this.

19      Q    Did this form part of the Delaware

20  application?

21      A    Probably, yes.

22      Q    Would you have submitted it to Delaware?

23      A    Yes, but not as CannaMED.  I forget what the

24  entity name in Delaware was.

25      Q    But you forwarded this document to a

Page 58

1   potential lender?

2       A    And your point there is, exactly?

3       Q    Was the document inaccurate at the time that

4   you forwarded it to the potential lender?

5       A    I didn't see any inaccuracies.  Tell me where

6   there's an inaccuracy.

7       Q    Well, it refers to a proprietary cultivation

8   handbook.

9            Did a proprietary cultivation handbook ever

10  exist?

11      A    I presume it did.

12      Q    And why do you presume that it did?

13      A    Because it says here that it does.  Well, let

14  me make this -- let me carefully review this.

15           Okay.  Good.  There it is, there's a

16  cultivation handbook, "which was developed by the

17  company's master grower," that would be Matt Huffman.

18  Give him a call.  He'll probably send it to you.  He's

19  a nice guy.

20      Q    That would have been a cultivation handbook

21  that the company, being CannaMED, paid to develop?

22      A    Matt wrote the SOPs, I believe.  He probably

23  took the SOPs we had in Delaware and edited them.  But

24  he was the one to do the SOPs.  He was the master

25  grower.

Page 59

1      Q    What, if anything, as the sole managing

2  member of CannaMED Pharmaceuticals, have you done to

3  preserve the value its intellectual property and the

4  cultivation handbook and other cannabis related data?

5      A    Well, I don't see that I've preserved value

6  very well if I'm giving it all over to you.

7      Q    How have you --

8      A    Unless you're going to maintain it as

9  confidential.

10     Q    Well, how is it that you've preserved it?

11          You haven't given it to us.  I don't have a

12  copy --

13     A    You have what --

14     Q    -- of the cultivation handbook.

15     A    -- you got in front of you.

16          What do you mean, the cultivation handbook?

17  I guess I'm preserving it if I haven't given it to

18  you.

19     Q    Do you have it?  Is it in your possession?

20     A    No.

21     Q    Who, other than Matt Huffman, has in their

22  possession proprietary information of CannaMED

23  Pharmaceuticals?

24     A    The only -- I'm guessing, because I don't

25  know what you would describe as "proprietary," but I

1  would say the only people who would have anything

2  that's proprietary would be Matt, Jessie, Angeline,

3  and maybe Bruce.

4          Well, I mean, it depends on what you say is

5  proprietary.  We had security plans that were

6  developed, so Hal, whose name I cannot recall right

7  now, probably had some of that.  Who else was there?

8  That's pretty much it.  The other people were

9  construction workers.  They wouldn't have anything.

10      Q    The master grower referenced in 5.3.2 is Matt

11  Huffman?

12      A    Correct.

13      Q    And it's your testimony that to the extent

14  that a proprietary cultivation handbook exists, it

15  would be in his possession?

16      A    Yes.

17      Q    And he would have been the master --

18      A    But let me tell you this, the SOPs that we

19  had are customary throughout the industry.  So if

20  you're looking for value there, you're barking up the

21  wrong tree.

22      Q    Is there anything proprietary about them?

23      A    I don't believe so, because at this point,

24  everybody's got them.  Back then they didn't, but the

25  whole industry has changed in the last three years.

Page 61

1      Q    What does the term "proprietary" mean to you?

2      A    Means "property of."

3           So let me tell you something, so let's say

4    there's an SOP, right, and the SOP is that when you're

5    using gloves while handling the plants, they are to be

6    gloves that are not powered.  They are not to have any

7    kind of a powder on them that could get on the plant,

8    the flower of the plant, which is then sold to a

9    customer who might ingest that powder, right?  That's

10   an SOP.  If I put CannaMED Pharmaceuticals, LLC on the

11   top of page that spells out that SOP, it seems to me

12   that's CannaMED's SOP, but I can tell you right now

13   that at this point in time every single growing

14   operation across the country is using that SOP.

15   Right?

16           Now, they didn't three years ago, because --

17   if you told me that three years ago, I would go "Huh,

18   whoever thought of that?"  But supposedly that was one

19   of the reasons we lost our -- we got points deducted

20   on our application, because we did not spell that out

21   at the time.

22           Now, in the cannabis industry, things are

23   pretty much shared openly, so let me say that too.

24   When we went into the business in California back

25   1996, nobody knew anything about raising marijuana,

1    much less smoking it, and everybody shared every bit

2    of information, which enabled me to go out there with

3    absolutely zero knowledge and build a successful

4    cannabis operation, mostly remotely from Florida,

5    because people shared everything.  So when you talk

6    about "proprietary," it's sort of a relative term.

7          Now, I'll tell you this, and I read this for

8    the first time last week, because everybody right now

9    is talking about the farm bill, which, if it passes,

10    may authorize the growing of industrial hemp across

11    the country, and the federal government may preempt

12    the field, preventing the states from having their own

13    rules.  Supposedly, at least in the article I read,

14    and you gotta take everything you read in cannabis

15    with a grain of salt, because you have legitimate

16    publications and those that aren't so legitimate,

17    there are a lot of carefully controlled methods and

18    SOPs relating to the processing of industrial hemp

19    into CBDs.  I don't know enough about it to tell you

20    whether that's fact or fiction, because I don't know

21    how you get CBDs out of industrial hemp.  But I've

22    never seen that prior to this.  That's my point.

23    Q    What, if anything, within the cultivation

24    handbook would have been developed by CannaMED?

25    A    Well, the entire handbook would have been

1   proprietary, but if you're asking how many of those

2   SOPs were the same as other people had, I really don't

3   know, because, remember, Matt Huffman came to us from

4   another operation either in Denver or California, and

5   a lot of them were SOPs that he had originally

6   developed for whoever he was working for prior to us.

7       Q   How much money, if anything, did CannaMED

8   invest in preparing its proprietary cultivation

9   handbook?

10      A   Just Matt's salary.

11      Q   And how much was that?

12      A   I think he made a thousand a week.

13      Q   And who paid --

14      A   Remember, CannaMED didn't pay anything,

15  though.  This was all paid by Chance & Anthem.

16      Q   Under the funding agreement, right?

17      A   Well, in accordance with the funding

18  agreement, I imagine, yeah.

19      Q   If you could please turn to Section 6.3.

20      A   Yes, sir.  Jessie Parker, that was Jessie's

21  last name.  Matt Burrows (phonetic), don't confuse him

22  with Matt Huffman, he was our security man, so we had

23  SOPs for security too, and they would have been

24  proprietary, but also would have been really just for

25  that physical property.

Page 64

1      Q    Are you at Section 6.3, Business Advisory

2   Board?

3      A    Yep.

4      Q    It states that, "In addition to a regularly

5   scheduled meeting with the company's employees, a

6   business advisory board, constituted of leading

7   business people from the Salisbury area, will be

8   consulted in order to best advise the managing

9   director as to matters which ought to be considered in

10  making decisions on conducting the business of the

11  company."

12     A    Right.

13     Q    "And to strengthen the company's ties with

14  the local community."

15     A    Correct.

16     Q    Was that business advisory board constituted?

17     A    I already told you no.

18     Q    After consulting with the Wicomico County

19  Chamber of Commence, the following individuals from

20  the Salisbury, Maryland area are being considered to

21  serve on the company's initial business advisory

22  board."

23          Were any of the individuals listed in this

24  section ever consulted by or on behalf of CannaMED

25  about serving on its business advisory board?

Page 65

1    A    I have no idea.

2    Q    Who would know?

3    A    I only know one of these guys, Bob Culver.

4    Q    Who is Bob Culver?

5    A    I know Mike Lewis, the sheriff.

6    Q    Was Mr. Culver, the Wicomico County

7    executive, ever consulted about serving on CannaMED's

8    business --

9    A    I have no idea whether they did or not.

10   Q    Did you ever consult Mr. Culver about serving

11   on CannaMED's business advisory board?

12   A    I don't remember doing that.  I do remember

13   at one point working on a letter that they wanted to

14   send out to these people, an invitation.  But whether

15   or not it ever got mailed or not, I don't know.

16   Q    How about Sheriff Michael Lewis, did you ever

17   consult him about serving on a marijuana grower's --

18   A    Yeah --

19   Q    -- board, advisory board?

20   A    -- I met with Mike a couple of times.

21   Q    And you discussed with Sheriff Lewis about

22   serving on CannaMED's business advisory board?

23   A    Yeah.  He said no.  He's a hundred percent

24   against cannabis.

25   Q    Is there a reason he was listed in a business

1    plan that was forwarded to --

2        A    I guess at this time we thought he would be a

3    good choice.  He would be, too.  He's probably changed

4    his tune now that he's stuck with medical cannabis.

5    The others ones, I don't know.  I only know Bob Culver

6    and Mike Lewis, and I met with Bob Culver, but I don't

7    remember discussing the board with him.

8        Q    Who would have developed the list of

9    individuals being considered for the CannaMED business

10   advisory board?

11       A    I have no idea.  I didn't.

12       Q    If you could turn to Section 6.4.4 labeled

13   Organizational Chart.

14       A    God, I had no idea so much work went into

15   this.  This picture graph?  I don't see a 6.4.4.  Oh,

16   there it is, Organization Chart, yep.

17       Q    Right above it, "Storage of training and

18   other company records."

19       A    Oh, okay.

20       Q    It says, "All training records will be

21   permanently stored in a fire resistant locked cabinet

22   in the safety compliance manager's office."

23       A    Truthful statement.

24       Q    Where are those training records located?

25       A    There never were any.  Again, it's proforma.

Page 67

1   Once the company gets going, all training records

2   "will be" permanently stored.

3        Q   I missed the part in this section where it

4   says, "Once the company gets going."

5        A   Come on, Jesus.  Like I said, you've

6   obviously never started a business.  But this is the

7   plan, just as though you were building a project.

8   Just like you would have your set of plans and

9   specifications.  That's essentially what this is too.

10  All the training records "will be," I don't know where

11  you're going with that, but you certainly -- you're

12  not going to get anywhere with it.

13       Q   So there were never any training records ever

14  produced?

15       A   No, there were never trainees.

16       Q   How about company records, were any company

17  records ever maintained pursuant to this section of

18  the business plan?

19       A   No, the business never got started.

20            Likewise, "All company records including

21  product laboratory testing records, financial records,

22  and records relating to distribution and sales will be

23  stored on and off property."  Those were provisions

24  within the regulations as I recall.  You had to

25  address that.  You had to promise that you would

Page 68

1    essentially operate in conformance with the

2    regulations.  So that's just a promise that we're

3    going to do that.

4         And let me say as a caveat that that may have

5    been a regulation from Delaware that was just carried

6    over into this paper.

7         Q    All right.  If you turn to Section 7.4.1,

8    Grower facility fast start phase operation, P&L.

9         A    Right, Phase I.

10        Q    Expenses --

11        A    Right.

12        Q    -- general, 200,000, what does that mean?

13        A    Are you under general building permits you

14   mean?  Where are you looking?

15        Q    Section 7.4.1.

16        A    Oh, 7.4.1.

17        Q    It appears to have a list of salaries.

18        A    Okay.  General.

19        Q    General, who would have been general?

20        A    No, general is a category.

21        Q    Facility manager --

22        A    I would have been a general, but I lost the

23   election by a landslide.

24        Q    Facility manager, who would that have been?

25        A    No sense of humor.

1           At that point, I don't know.  That may have

2    been designated to be Bruce, but at some point we

3    converted that to be CEO/president of the company,

4    which would have been Angeline.

5         Q    All right.

6         A    I'm guessing, because I don't remember for

7    certain.

8         Q    Is the compensation of the managing director

9    laid out in this section of the --

10        A    No.

11        Q    -- proforma P&L?

12        A    No.  I wasn't a salaried employee.  I don't

13   believe I was a salaried employee.

14        Q    You received no compensation for your work

15   with CannaMED Pharmaceuticals?

16        A    CannaMED Pharmaceuticals never got started.

17   Nobody ever did any work for CannaMED Pharmaceuticals.

18   I keep saying that to you.

19        Q    So you received no compensation for your work

20   on CannaMED?

21        A    I didn't say that.  I received lots of

22   compensation for my work on CannaMED, but through

23   Chance & Anthem and elsewhere.

24        Q    And how was that compensation from Chance &

25   Anthem recorded?

Page 70

1        A    I don't know what kind of transfers I took

2    from Chance & Anthem, but they are all summarized in

3    the monthly operating reports, because I was in

4    Chapter 11 bankruptcy at the time.

5        Q    Who approved your compensation at Chance &

6    Anthem on behalf of the work that you did for

7    CannaMED?

8        A    No one, other than me.

9        Q    Were any of the investors consulted in

10   connection with your compensation?

11       A    I don't know what you mean by "investors."

12   Lenders?

13       Q    Were any of the lenders ever consulted in

14   connection with your compensation at Chance & Anthem?

15       A    Yeah, I'm sure they were, not formally.  No

16   one ever objected.

17       Q    Was your compensation ever disclosed to any

18   lenders or investors in Chance & Anthem?

19       A    I don't remember disclosing it, no.

20       Q    How was your compensation --

21       A    Now, wait a minute, remember -- no, you're

22   correct.  There were investors in Chance & Anthem.  I

23   started to say that I didn't think there were any

24   investors in Chance & Anthem, but I'm wrong.

25            Go ahead, I didn't mean to cut you off.

Page 71

1    Q   How was your compensation from Chance &
2   Anthem, as a result of your involvement in CannaMED
3   Pharmaceuticals, fixed?
4    A   How was it fixed?  Chance & Anthem paid me
5   for the work I did on CannaMED, as well as the project
6   house.
7    Q   How were those amounts determined?
8    A   By me.
9    Q   And how were those amounts calculated?
10    A   By the time I put into the various
11   enterprises, and also by reimbursement to me for
12   expenditures I made on their behalf.
13    Q   Is the time that you put into the various
14   enterprises recorded anywhere?
15    A   Yes, all of it was --
16    Q   Where?
17    A   -- I kept ledgers on that.
18        In my files which, I have no access to
19   anymore.
20    Q   Are those the ones you claim were stolen by
21   Robert Gibson?
22    A   Yes.  And, remember, when you use the word
23   "stolen," I'm a little reticent about saying that,
24   because he was authorized to take the "closed files,"
25   so if he believed the CannaMED or Chance & Anthem

Page 72

1    files were "closed files," you really can't accuse him

2    of stealing.  That's why I never did a police report.

3    Whatever files he took not believing that they were

4    "closed files," I think you could assign the statement

5    "stolen" to.

6        Q    Was Mr. Gibson authorized to take any ledgers

7    relating to the time that you invested in Chance &

8    Anthem?

9        A    Specifically, no, of course not.

10       Q    And how were those records maintained?

11       A    They were in files, and I maintained them.

12   Any business records I maintained.  Any of the non-law

13   office business records, I maintained.

14       Q    How did you record the time that you spent

15   working on Chance & Anthem or CannaMED projects?

16       A    On ledgers.  There may have been some

17   payments to me that were done under a different regime

18   at some point, but I would general equate the time

19   expended in determining the payments that I took.

20       Q    Were these ledges notebooks?  Were these

21   ledgers loose-leaf ledgers?  What did the ledgers look

22   like?

23       A    Within the files, they were in small black

24   and white --  and I don't have one with me today, but

25   I buy them for a dollar apiece at Staples or Office

Page 73

1   Depot, the things you'd buy when you went to grade

2   school.

3       Q   And how did you record the time in these

4   ledgers?

5       A   By pen.

6       Q   And in increments -- what were the increments

7   of time that these ledgers were recorded in?

8       A   It depends.  If I was making a trip to

9   Maryland, for instance, or another trip out of town on

10  behalf of the company, I would just, you know, record

11  it by the day.  Usually tenths of an hour, like I keep

12  my law office records.

13      Q   Do you keep your law office records in a

14  similar --

15      A   No, not all always.  There I use printed up

16  forms that comported with, you know, the bar rules,

17  essentially.  But I do buy -- everybody teases me

18  because I buy those little black and white -- I forget

19  what they call them, but, you know, they are little

20  books that you would get in grade school.

21      Q   And the time that you charged to Chance &

22  Anthem or CannaMED --

23      A   I never charged anything to CannaMED.

24      Q   The time that you charged to Chance & Anthem

25  for work that you did on CannaMED -- is that correct?

Page 74

1      A    Okay.

2      Q    -- at what rate would you have charged that

3   time to CannaMED?

4      A    I don't remember.  Depends on what I was

5   doing, I guess.  So if I was on a trip, I never

6   charged more than a thousand dollars a day.  But if I

7   was doing legal work, I probably charged $450 an hour,

8   at the end.  At the beginning, probably around 300.

9      Q    Was your compensation disclosed in this

10  company business plan?

11     A    I don't -- I don't understand the question,

12  because I told you I wasn't supposed to get

13  compensated by CannaMED.

14     Q    You were being compensated by Chance &

15  Anthem?

16     A    Right.  And other entities for other work.

17     Q    Who was compensating you for work done on

18  CannaMED?  Chance & Anthem?

19     A    Chance & Anthem, but maybe also Sovereign,

20  back when Sovereign was the party to the real estate

21  contract.  I think that's it.  Yeah.

22     Q    Were these arrangements ever reduced to

23  writing?

24     A    Only by notes really.  There was never a

25  formal letter from me to me.  But you could glean the

Page 75

1    arrangement by just looking at all the time sheets.

2        Q    So these were simply arrangements you made

3    with yourself?

4        A    Interesting question, you know, because I

5    wore a couple of hats.  So you could say,

6    hypothetically I guess, that, you know, I, wearing my

7    blue hat, made it with I, wearing my beige hat.  I

8    don't know, I wore different hats.  But your question

9    is best answered this way, I controlled the

10    arrangement.

11        Q    There was no other individual human being

12    that was involved in fixing or approving your

13    compensation?

14        A    Correct.  I controlled the arrangement.

15        Q    And is the arrangement for your compensation

16    disclosed anywhere in the company's business plan?

17        A    No.  Because as I told you now three times,

18    Jesus, I wasn't getting compensated by CannaMED, and

19    you're holding up the CannaMED business plan.

20        Q    So the answer is no?

21        A    The answer is no.

22        Q    Okay.

23        A    But for the reasons that I stated, and don't

24    paraphrase me when you do some kind of a motion

25    either.  Make sure you present the entire explanation.

Page 76

1      Q    The final attachment to this e-mail is your

2   resume; is that correct?  You have it in front of you.

3      A    Yes, dated 2015.

4      Q    All right.  And there you claim to be the

5   president of Chance & Anthem?

6      A    Do I?  I didn't do this resume.

7      Q    Oh, you didn't prepare this resume?

8      A    No.

9      Q    Who prepared this resume?

10      A    I have no idea.

11      Q    You did forward your own resume to a

12   potential investor in Canada?

13      A    Are you talking about this resume?

14      Q    Yes.

15      A    I guess it was part of the package, yeah.

16      Q    Mm-hmm.

17      A    Where does it say I'm president?

18      Q    Current civic and business.

19      A    Director, director, director, director,

20   president, Chance & Anthem, okay.

21      Q    All right.

22      A    President, CannaMED, hmm.  I might have been

23   the president at that time, I guess.  Well, only

24   briefly for CannaMED, because Angeline Nanni became

25   president and CEO by the time we submitted our

Page 77

1    application.

2         Q    It says that Chance & Anthem is a real

3    property holding and development company.

4         A    It was at the time, yeah.

5         Q    Right.  At the time did it make any reference

6    to Chance & Anthem's funding arrangement with CannaMED

7    Pharmaceuticals?

8         A    Well, I mean, in the rest of the package that

9    got mailed, I guess it did.  I mean, look at the

10   facts.

11             Are you picking on this explanation in what

12   purports to be my resume?

13        Q    Is this your resume or not your resume?

14        A    It looks pretty accurate.  I mean, it's not

15   totally accurate.  I see some missing things and

16   errors.  But it's substantially correct.

17        Q    Up top, above Chance & Anthem, it says --

18        A    I don't know what this means, Chair pro-bono

19   committee member, federal bar association, I mean

20   that's obviously -- that doesn't make sense to me.

21   Chair, I chaired some pro-bono committee?  Member?

22        Q    Mr. Siskind it's your resume.

23        A    Yeah, I didn't write this.  Somebody wrote it

24   for me, I guess.

25        Q    You forwarded it to an investor?

1      A    Did I?  I guess that man didn't invest,

2    though, did he?  So he wasn't an investor.  He was a

3    prospective investor, wasn't he?

4      Q    Up top it says, above Chance & Anthem, it

5    says that you were a "Director of the Florida

6    Association of Community Banks and Credit Unions" --

7      A    Okay.

8      Q    -- comma "a trade association representing

9    local banking institutions."

10     A    Okay.  Maybe I was a director.  I don't know,

11   I could look it up.  Look it up on SunBiz.

12     Q    What local banking institutions were

13   represented by the Florida Association of Community

14   Banks and Credit Unions?

15     A    If every -- well, first of all, I decline to

16   give you names, but -- and I see you smiling at me,

17   like, "Oh, we gotcha you here," but, no, the

18   association represented all community banks and credit

19   unions.

20     Q    "All" community banks and credit unions?

21     A    That's correct --

22     Q    Were any of these --

23     A    -- that was the mission.

24     Q    Were any of the community banks and credit

25   union aware that they were being represented --

Page 79

1       A    Yes.

2       Q    -- by the Florida Association of Community

3  Banks and Credit Unions?

4       A    Yes.

5       Q    Which one?

6       A    I'm not going to disclose the individual

7  institutions and what their membership association

8  was, because it's outside the scope of the 2004.

9       Q    I'm simply trying to determine whether

10  CannaMED, through you, made a misrepresentation to a

11  potential investor?

12      A    First of all, this would have been Chance &

13  Anthem's representation, not CannaMED.  CannaMED never

14  represented anything to anybody.  Your real question

15  is whether Chance & Anthem misrepresented.

16      Q    Did Chance & Anthem misrepresent?

17      A    I don't believe so.  I wish I had the files

18  from Florida Association of Community Banks and Credit

19  Unions, because I can tell you there were lists in

20  there of the various banks and the roles which we

21  assigned to them.  And, then, come to think of it, we

22  had a huge undertaking and we spent a lot of money on

23  but never did --

24      Q    Who is "we"?

25      A    The company, that's the company "we."

1    Q    Oh, the company "we."  No other individuals

2    involved in the company?

3    A    Well, yeah, a lot of other people were

4    involved.

5    Q    Like who?

6    A    People in the office that helped with this --

7    I'm about to tell you about this conference that we

8    were going to have down at Ocean Reef Club.  I can't

9    remember what year it was, but we actually did an

10   expensive mailing on it, but there weren't enough

11   people that were interested in coming, so we cancelled

12   it.  But, yeah, none of that was ever e-mailed, so --

13   but there was a legitimate business there.  You can

14   try to say otherwise.  But I don't think you'll get

15   very far.  Even though you are smirking at me.

16   Q    Mr. Siskind, I don't know what you're talking

17   about.

18   A    You're smirking.

19   Q    I'm just trying to take a deposition.

20   A    I know when you're smiling and when you're

21   smirking and when you're not.

22   Q    I've marked as Exhibit 5 a document.  Please

23   review it.

24          (Thereupon, a document was marked as Exhibit

25   No. 5 for identification by Mr. Suarez.)

1          THE WITNESS:  Okay.  Mortgage program.

2   BY MR. SUAREZ:

3        Q    Would you please identify the document marked

4   as Exhibit 5.

5        A    It looks like something involving -- oh,

6   okay.  Looks like something else that was shared or

7   created with or by Mr. Mayer at the Wharton Companies

8   again.

9        Q    Well, this is an e-mail from you to

10  Mr. Mayer.

11       A    Correct.  Okay.  Attached to which are some

12  documents that eventually found their way into the

13  application.

14       Q    Are these documents that you created?

15       A    No.

16       Q    Who would have created these documents?

17       A    Someone in the office.

18       Q    And how would they have sent you these --

19       A    Oh, no, wait a minute.  Like I said to you

20  before, the P&L I did.

21       Q    How about on the next page, the document

22  entitled Sovereign Gaming & Entertainment, LLC, did

23  you create that document?

24       A    I don't remember.

25       Q    How would you have received this document?

Page 82

1      A    Well, if I didn't create it -- now, I can
2  tell you, I've seen this before, but I don't remember
3  if I actually wrote it.
4      Q    Sir, you attached it to an e-mail and sent it
5  to Mr. Mayer and Angeline Nanni on March 21, 2016.
6           How would you have obtained this document if
7  you didn't create it?
8      A    Anybody in the office could have created it.
9  We probably worked on it jointly, but I obviously had
10  knowledge of it, because I don't think anybody would
11  have sent anything out under my e-mail.  In fact, I
12  know for a fact that if I e-mailed it, I reviewed it.
13      Q    Where would the file CannaMEDmortgage-
14  program.pdf have been stored when you attached it to
15  this e-mail?
16      A    I have no idea.  Well, on my computer, I
17  guess.  Where do you see that?
18      Q    The e-mail, it says "Attachments."
19      A    I don't see that.
20      Q    There is a  --
21      A    Oh, I do see it, yeah, yeah, yeah.
22           CannaMEDmortgageprogram.pdf, would have been
23  on the old computer.
24      Q    Which old computer is that?
25      A    The computer that I believe is now missing

Page 83

1     forever.

2          Q     How did that computer go missing again?

3          A     I have no idea.  It was left at the property,

4     I presume.

5          Q     Got it.

6          A     But I can tell you that these are the figures

7     that I worked up.  No one else worked up the proforma

8     figures except me, but this looks like it was way back

9     in the beginning where it wasn't really fleshed out.

10    Yeah, this was way back in the beginning.  So this

11    would have been sent to Mayer for approval, I would

12    imagine.  In fact, these were the pictures that I

13    believe we got from the sales brochure of the

14    building, yeah.

15         Q     The second page says, "Executive Summary" --

16         A     Second page?  Oh, yeah.

17         Q     Second attachment.

18         A     Didn't we see this before?

19         Q     Second paragraph from the bottom, it says,

20    "CannaMED is owned and operated by Jeffrey Siskind."

21         A     Yeah, it does say that.

22         Q     Is that an accurate statement?

23         A     No.  I don't know if it's accurate or not at

24    that time.

25         Q     Who owned CannaMED at that time?

Page 84

1    A   Remember, I formed CannaMED.  So I don't know

2    the date of this.  March 21, 2016.  I presume it's

3    accurate.  I don't believe I wrote this.

4        I think what you're looking at here is ideas

5    we came up with to send to John Mayer to give him

6    information as to how to go about writing his

7    executive summary.  So this was never sent to an

8    investor.  Your statement was incorrect.  This was

9    sent to the finder, okay, with which he prepare --

10   maybe he relied on this to some extent to prepare his

11   executive summary.

12   Q   And what was the finder supposed to find?

13   A   Money.

14   Q   Investments?

15   A   Well, loans or investments.

16   Q   Okay.

17   A   And, like I said, he didn't find anything.

18   Well, that's not quite true.  He did come up with

19   somebody, but the participation was objectionable.

20   Q   Who is Frank Wise?

21   A   Frank is the attorney for -- I forget the

22   name of company, 3VGen, does that -- yeah, 3VGen, LLC.

23       (Thereupon, a document was marked as Exhibit

24   No. 6 for identification by Mr. Suarez.)

25   BY MR. SUAREZ:

Page 85

1      Q    Please review the document I've marked as
2  Exhibit 6?
3      A    3Gen VC, LLC, yeah, I remember this.
4      Q    All right.  The attachment is dated August 2,
5  2016 --
6      A    Correct.
7      Q    -- and is referred to in your e-mail as a
8  subscription agreement, short-form subscription
9  agreement.
10     A    Correct, I remember this.
11     Q    Who prepare the short-form subscription
12 agreement attached to this e-mail?
13     A    I did this.
14     Q    Were there any other short-form subscription
15 agreements prepared for CannaMED?
16     A    Oh, yeah, very definitely.
17     Q    And to whom were they circulated?
18     A    The one that mirrored this one was to -- I
19 cannot remember the name of the company.  They were
20 one of mortgagees on the project house.  Mike Kamentiz
21 is the -- was the person I dealt with at that company,
22 and then there was something similar also sent to the
23 Delaware investor.
24     Q    Who was the Delaware investor?
25     A    I think that's all of our investors.

Page 86

1        I can't remember him name.

2        I think that's everybody.

3    Q    The file that's attached to this e-mail

4    3Gensubscript.docx --

5    A    This?

6    Q    Yes.

7    A    Yeah.

8    Q    Where is that file located?

9    A    I have not seen this file.  When I went

10   looking for stuff for you, I couldn't find it.

11   Q    On August 2, 2016 what computer were you

12   using?

13   A    I have no idea.  I was using three different

14   computers, home, office, and the Maryland computer.

15   Q    And were the files in any way networked?

16   A    No --

17   Q    Were they stored --

18   A    -- I'm trying to figure out how to do that.

19   I'd love to be able to do that.

20   Q    -- on a cloud?

21   A    No.  And I don't store stuff in the cloud

22   intentionally.

23   Q    Because it might be lost?

24   A    No, because I'm distrustful of the cloud.

25   You know, I'm trying to figure out how to back up my

Page 87

1    stuff on a cloud.

2        Q    Did 3Gen execute this subscription agreement?

3        A    I don't remember whether they did or not.

4    3Gen was operated by a good friend of mine, a guy by

5    the name of Richard Swirnow, who I've known for years.

6    Whether he actually signed this, I can't remember.

7        Q    That's Swirnow Capital?

8        A    Yes.

9            (Thereupon, a document was marked as Exhibit

10    No. 7 for identification by Mr. Suarez.)

11    BY MR. SUAREZ:

12        Q    Please review the document I've marked as

13    Exhibit 7.

14        A    Oh, okay, this is the other person I was

15    talking about.

16        Q    And who is this person?

17        A    I can't remember the name of the entity.

18    This is like a working document.  It doesn't have it.

19    But Mike Kamenitz, if you look at who this document

20    was sent to, Blake, Jeff, and Kamcorp are Blake, Jeff,

21    and Mike.  I think Blake and Jeff are lawyers and Mike

22    is the person on the ground more or less, and, right,

23    they put up a hundred thousand.

24        Q    And how were those hundred thousand dollars

25    funded?

Page 88

1    A    Checks, wires, I don't know --

2    Q    Where was that money --

3    A    -- probably wire.

4    Q    -- deposited?

5    A    I don't remember.

6    Q    Was it deposited in Chance & Anthem's bank

7    account?

8    A    I don't remember.

9    Q    Would it --

10   A    You're talking about years ago.

11   Q    Would it have been deposited anywhere other

12   than Chance & Anthem's bank account?

13   A    Yeah.  It could have gone into one of the

14   other entities or my trust account.  It would not have

15   gone into any CannaMED account, if that's what you're

16   looking at, because there was none.

17   Q    Well, if it had gone into your trust account

18   how would that transaction been recorded?

19   A    By me or by the bank?

20   Q    By you, sir?

21   A    Well, it would have been ledgered, obviously.

22   Q    And where are those ledgers?

23   A    That's a good question.  We've been over and

24   over that, haven't we?  Right?

25   Q    Is that part of ledgers that you contend were

1    taken by Mr. Gibson?

2        A    Yes, exactly.

3        Q    Were you ever counsel to 3Gen?

4        A    No.

5        Q    And did they engage in any transactions with

6    anyone other than Chance & Anthem, to your knowledge?

7        A    Not to my knowledge, no.

8        Q    The second -- or rather the attachment to

9    this e-mail relates to the sale by Chance & Anthem of

10   two non-dilutable units of CannaMED Pharmaceuticals.

11       A    Right, 50,000 a unit.

12       Q    Which units comprise two percent of the total

13   outstanding units of CannaMED.

14       A    Correct.

15       Q    Did Chance & Anthem, in fact, sell those two

16   non-dilutable units of CannaMED to 3Gen?

17       A    Yes, with an option for two more.

18            (Thereupon, a document was marked as Exhibit

19   No. 8 for identification by Mr. Suarez.)

20   BY MR. SUAREZ:

21       Q    Please review the document I've marked as

22   Exhibit 8.

23       A    Oh, yeah, I forgot about this.

24       Q    What is this?

25       A    This is -- I thought this was Mayer, but

Page 90

1    maybe it's a different person, I don't know.

2        Q    Meyers & Associates, L.P.

3        A    Oh, he was related to Mayer somehow.  Mayer,

4    I think, when he was getting involved with us to try

5    to raise some capital, worked with this person from

6    New York.

7        Q    Is this John Telfer?

8        A    I guess so.  I don't recognize that name, but

9    probably.

10       Q    Was this agreement ever executed?

11       A    I don't remember executing it.  It may have

12   been, but we never got any money out of these people.

13       Q    Did you ever provide them with any

14   information about CannaMED and Chance & Anthem?

15       A    I don't think so.  I can't swear to that.

16   But I would presume anything they got went through the

17   Wharton Company.

18            Oh, here, it says here that there's a working

19   relationship with Wharton Capital Partners.

20       Q    Sir, from what computer did you retrieve this

21   document?

22       A    Well, this was with the e-mails that I sent

23   you, so this would have been on my computer.

24       Q    When you refer to "my computer," where is

25   that computer located?

1      A    My home now.  It was the office computer.

2           I see you circled CannaMED Farms, by the way.

3      Q    Oh, did I give you my copy?  Yeah, I think I

4   marked my copy.

5      A    I don't know what that was.  That seems

6   familiar to me, CannaMED Farms, but I don't remember

7   ever forming CannaMED Farms.  I think maybe that was

8   something we were talking about doing in Florida.  But

9   this would have been a misnomer, because this

10  individual was never hired to obtain any money for any

11  Florida operation.  We just never went ahead with

12  anything in Florida.

13          See, he hid all those files, making me think

14  this was a going to be a quick deposition.  Are these

15  the exhibits that are going to go to the reporter?

16     Q    Typically the marked ones, yes.

17     A    So we should probably get rid of some things

18  now, before they start getting intertwined with my

19  stuff.  You know what, I'm screwing up a little on 5.

20  I only have the cover sheet.  Oh, I think this went

21  with 5.  I don't know what went with 5.  I'm presuming

22  that maybe 5 was everything with this big clip.

23     Q    Yeah, there was a big -- here, I'll tell you

24  what it is.

25     A    Oh, okay.  Well, this went with the executive

1   summary.

2       Q    No, No. 4.  Four is the one with the big

3   clip.  It's an e-mail you sent on February 4th?

4       A    Is that the next page on 4, executive

5   summary?

6       Q    The next page on 4 is the executive summary.

7       A    Then what --

8       Q    Then the appraisal.

9       A    Oh, okay, all of this.

10      Q    The appraisal, the purchase option.

11      A    Right.

12      Q    A letter from the City of Salisburg (sic) to

13  you.

14      A    Salisbury, a zoning letter.

15      Q    And then the company business plan, and your

16  resume is the last part of that exhibit.

17      A    I'm glad we said something now.  All right.

18  So there's 4, so what was 5?

19      Q    There's 3.

20      A    Three looks in tact.

21      Q    Five is an e-mail that you sent to

22  jmayer@whartoncompanies.com and Angeline Nanni on

23  March 21st.  You got it right there in front of you.

24      A    Oh, okay, that's it.  That's all there is?

25      Q    And the attachment is Sovereign Gaming &

Page 93

1    Entertainment.

2        A    Okay.  So we're good.

3        Q    Who is Ken Bortnick?

4        A    Ken Bortnick is, I think, an eye doctor in

5    Salisbury.  Ken Bortnick?  Yeah, I'm pretty sure

6    that's him.  Yeah, he was interested.  We never did

7    anything with him, luckily.

8        Q    Why do you say "luckily"?

9        A    Because I -- he was, you know -- he's just

10   another sweet guy, just like Alan Bias, who was very

11   interested, but because things didn't go successfully

12   there, I'm glad that he didn't get involved.

13            (Thereupon, a document was marked as Exhibit

14   No. 9 for identification by Mr. Suarez.)

15   BY MR. SUAREZ:

16       Q    Please review the document that I've marked

17   as Exhibit 9.

18       A    Okay.

19       Q    Is this an e-mail you sent to

20   Kenbortnick@comcast.net on October the 29th of 2015?

21       A    Yeah, it looks like it.  Oh, it's the same

22   document we sent to the other guy.

23       Q    What is C&A Holdings?

24       A    That was the entity that we were forming to

25   somehow be involved with this --

1      Q    Was it --

2      A    -- it ended up not being though.

3      Q    On the following page, there's an executive

4   summary that we've been through before.

5      A    Right.  What's it say?

6      Q    It says there at the top, "C&A Holdings, also

7   known as Chance & Anthem, LLC."

8      A    Right.

9      Q    So would C&A Holdings be the same as Chance &

10  Anthem, LLC?

11     A    I guess we didn't use the C&A Holdings

12  acronym.  We just used -- or whatever you call it --

13  we just used Chance & Anthem instead, yeah, correct.

14  Hmm, I forgot about that.

15     Q    In this version of the executive summary, if

16  you look to the bottom, second paragraph from the

17  bottom, it says "C&A was formed 2014 to function as a

18  1031 exchange intermediary."

19     A    I don't think that's correct.  I don't think

20  we formed C&A until 2016.  That's not right.  We did

21  have a 1031 intermediary, and I don't know what the

22  name of it was.

23     Q    It wasn't Chance & Anthem, LLC?

24     A    I don't think so.  Maybe it was.  I don't

25  remember.  I guess this was before we got money to get

Page 95

1    the building.    2015, so maybe I did I form Chance &

2    Anthem in 2014.  I don't remember.

3        Q    All right.  Who is Richard Bardenstein?

4        A    I have no idea.

5            (Thereupon, there is an inaudible discussion

6    off the record between Mr. Suarez and Mr. Barbee.)

7    BY MR. SUAREZ:

8        Q    When did you retain Mr. Mayer to produce

9    documents for Chance & Anthem?

10       A    I don't remember.

11       Q    Was it in 2016?

12       A    I don't remember.  I would have thought it

13   was earlier than that.  I can tell you it was after

14   Chance & Anthem purchased the project house, because

15   Jonathan Mayer came through someone who was employed

16   to work on the project house.

17           (Thereupon, a document was marked as Exhibit

18   No. 10 for identification by Mr. Suarez.)

19   BY MR. SUAREZ:

20       Q    Did I already asked you who Richard

21   Bardenstein was?

22       A    You did.

23       Q    And you said?

24       A    I said what I said.

25       Q    Who is Richard Bardenstein?

Page 96

1       A    You asked me that already.

2       Q    Would you please indulge me and answer it

3  again?

4       A    I have no idea.

5       Q    I've marked as Exhibit 10 an e-mail that you

6  sent to Richard Bardenstein.  Take a second to review

7  it.

8       A    Jerusalem.  Wow, no kidding.  I have no idea

9  who this person is.  This might have been somebody I

10  met in Israel when I went there.

11      Q    Why would you have sent Mr. Bardenstein a

12  business plan?

13      A    I have no idea.

14      Q    Do you contend that CannaMED's business plan

15  is proprietary?

16      A    I contend that CannaMED's application, which

17  contains portions or all the business plan is

18  proprietary.

19      Q    But not the actual business plan itself?

20      A    Well, I don't real really care about the

21  business plan.  I mean, you know, I think my numbers

22  should be proprietary.  As for the rest of it, it's

23  pretty much what everybody else is doing nowadays.

24      Q    Well, the numbers are numbers that are

25  attached to the debtor, Chance & Anthem's, schedules,

Page 97

1    numbers that you've attached to the --

2         A    Oh, yeah, yeah, yeah.

3         Q    -- Chance & Anthem schedules?

4         A    So what's proprietary anymore?

5              I would have to say in order to -- I guess my

6    duty is to say yes as to anything that's not otherwise

7    published.

8         Q    And who makes the decision to publish or not

9    publish CannaMED's proprietary information?

10        A    That's a good question, but I don't know how

11   to answer that.  You know, who makes the decision?

12   Different things were published at different times as

13   we've seen here.  If you --

14        Q    Was there an individual, other than yourself,

15   that was involved in publishing CannaMED's proprietary

16   information?

17        A    Oh, sure.  Sure.

18        Q    Who?

19        A    Bruce Lowe.

20        Q    Anyone else?

21        A    Angeline Nanni, and the different employees

22   that worked with us to try to establish ourselves in

23   Maryland, like, Hal.

24        Q    What would Mr. Lowe have published?

25        A    Oh, I don't know, a lot of this stuff Bruce

Page 98

1    worked on, if not, in fact, wrote.

2         Q    Did Mr. Lowe ever independently from you make

3    the decision to make any of this information public?

4         A    I don't know.

5         Q    How about Ms. Nanni?

6         A    I don't know what Angeline did.  I will say

7    this, that I'm sure anything she did was in the best

8    interest of the enterprise.

9         Q    Was Mr. Bardenstein representing an investor

10   or a potential investor in CannaMED or --

11        A    I told you already a couple of times, I don't

12   know who he is.

13        Q    How about haybenfc1@aol.com?

14        A    Can I see it?

15        Q    Sure.

16             (Thereupon, a document was marked as Exhibit

17   No. 11 for identification by Mr. Suarez.)

18   BY MR. SUAREZ:

19        Q    It's somebody that you sent the company's

20   business plan to on December 29, 2015?

21        A    Hayben, I have no idea who this is.

22   Haybenfc1, something financial consultants?  I have no

23   idea.

24        Q    Your e-mail makes reference to a website,

25   Cannamedpharmaceuticals.com.

Page 99

1          What happened to that website?

2      A   I have no idea, probably discontinued.  It

3   was a great website.  It was done by Bruce.  It was a

4   great website.

5      Q   Hayden, haydenfc1.

6      A   Haydenfc1.

7      Q   Who is haydenfc1?

8      A   I have no idea.  Now, this time I made you

9   smirk.  You didn't see that coming?  I really have no

10  idea.  So maybe the first one bounced back, you think?

11     Q   Yeah, so I take it haydenfc1 never invested

12  in CannaMED or Chance --

13     A   I don't think so --

14     Q   -- & Anthem or never --

15     A   -- send an e-mail to them and say, "Who are

16  you?"  Say, "We're investigating CannaMED and Jeff

17  Siskind, did you ever do any business with him?"

18          MR. SUAREZ:  All right.  Let's take five.

19  I'm plugging along here.  We're doing an hour at a

20  time.  We've made headway.  Let's take a five-minute

21  break.

22          (Thereupon, a brief recess was taken.)

23          MR. SUAREZ:  Back on the record.

24          (Thereupon, a document was marked as Exhibit

25  No. 12 for identification by Mr. Suarez.)

Page 100

1    BY MR. SUAREZ:

2        Q    Look at Exhibit 12, please.

3        A    Yeah.

4        Q    Is this a Chance & Anthem withdrawal slip?

5        A    Yeah.  It's not my writing, but yes.

6        Q    Whose writing is that?

7        A    I have no idea.

8        Q    Who besides you had authority to withdraw

9    money from Chance --

10       A    That's my signature.  Somebody wrote it out

11   for me, that's all.

12       Q    Why did Chance & Anthem purchase a cashier's

13   check for Mercedes Benz of Palm --

14       A    Oh, was it  --

15       Q    -- Beach?

16       A    -- for a cashier's check?  I don't know.  We

17   purchased a Mercedes SUV to replace the Lincoln that I

18   gave it Bruce to take up to Maryland to use for the

19   company.

20       Q    In whose name was the Mercedes titled?

21       A    In the trust.

22       Q    And what's the trust's name?

23       A    Second Siskind Family Trust.

24       Q    Does the Second Siskind Family Trust still

25   own that Mercedes?

Page 101

1      A    Yes, worth about $30,000.  It's got a lien on

2  it for about that amount.

3      Q    What kind of Mercedes is it?

4      A    GLE 350.

5      Q    How many miles does it have?

6      A    I have no idea.

7      Q    What year is it?

8      A    2016.

9      Q    If it was paid for with Chance & Anthem

10 funds, why does the Mercedes have a lien on it?

11     A    I borrowed against it at some point.

12     Q    And what were the funds borrowed against it

13 used for?

14     A    I don't remember, um -- I don't remember.

15     Q    Who drives the car now?

16     A    My wife.

17     Q    What is your wife's name?

18     A    Tanya.

19          (Thereupon, a document was marked as Exhibit

20 No. 13 for identification by Mr. Suarez.)

21 BY MR. SUAREZ:

22     Q    Please take a look at the document I marked

23 as Exhibit 13.

24     A    Okay.

25     Q    It's a withdrawal slip --

Page 102

1      A    Correct --

2      Q    -- in the amount of $5,000.

3      A    -- that's my writing.

4      Q    All right.  And is that your signature?

5      A    Well, I don't know about the 5,000.  But

6   Chance & Anthem is my writing.

7           Could be my signature, I don't know.  It

8   doesn't look very much like my signature, but nobody

9   would have been able to get money from SunTrust except

10  for me.

11     Q    All right.

12     A    So it's just a lousy version of my signature.

13     Q    What happened to those $5,000?

14     A    I have no idea.

15     Q    What were those $5,000 used for?

16     A    I have no idea.

17     Q    What was the purpose of withdrawing $5,000 in

18  cash from Chance & Anthem's bank account?

19     A    I would presume it was to pay some expenses

20  from Chance & Anthem, but I'm not sure.

21     Q    What expenses would you have paid on behalf

22  of Chance & Anthem in cash?

23     A    Travel expenses, probably.

24     Q    What travel expenses?

25     A    Usually I would go to Maryland and back.  I

Page 103

1    might have gone to some sort of conference.

2        Q    In November of 2015, why would you have gone

3    to Maryland?

4        A    I have no idea.

5        Q    And what --

6        A    Oh, and it could be -- actually, it could

7    have been cash to use towards to the house project

8    too.  I don't know.  I didn't realize it was back in

9    2015.

10       Q    What expenses of the house project, did you

11   pay in cash?

12       A    I have no idea.

13       Q    Did you pay any expenses of the house in

14   cash?

15       A    Sure.

16       Q    Such as?

17       A    Occasional labor.

18       Q    And who was the labor that was paid in cash?

19       A    I have no idea.  They were all Hispanic

20   names.

21       Q    How, if at all, were those labor payments

22   reported to the taxing authorities?

23       A    Why would they have been?

24       Q    How, if at all, were the payments reported to

25   the taxing authorities, is the question.

Page 104

1      A    Which taxing authorities are you talking
2  about?
3      Q    Any taxing authority.
4      A    I have no recollection.
5      Q    Did you ever, on behalf of Chance & Anthem,
6  pay taxes on wages paid to day laborers?
7      A    No, huh-uh.
8      Q    Did you issue 1099s to those day laborers?
9      A    No, never.  Nobody ever made more than $600.
10     Q    Do you recall the name of any of the day
11 laborers?
12     A    No.  That was years ago.
13     Q    Are those the ones that you described as
14 "Hispanic names"?
15     A    Mostly Hispanic, I think.
16     Q    And how do you determine that a name is a
17 Hispanic name?
18     A    Because it sounds Hispanic.  I'm a human
19 being.  I know what sounds Hispanic.
20     Q    Do all of the Hispanic names sound the same
21 to you?
22     A    Not all.  Most.
23          MR. SUAREZ:  Is this 15 or 14?
24          MR. BARBEE:  Fourteen, 13 is the one you just
25 did.

1            (Thereupon, a document was marked as Exhibit

2    No. 14 for identification by Mr. Suarez.)

3    BY MR. SUAREZ:

4        Q    On November 23, 2015 you withdrew another

5    5,000 in cash from Chance & Anthem's bank account.

6        A    Okay.

7        Q    What was the purpose of that withdrawal?

8        A    I don't remember.

9            (Thereupon, a document was marked as Exhibit

10    No. 15 for identification by Mr. Suarez.)

11    BY MR. SUAREZ:

12        Q    On April 27th of 2015, you withdrew another

13    $4,000 -- I'm sorry, $40,000 from Chance & Anthem's

14    bank account.

15            Do you know what the purpose of that

16    withdrawal was for?

17        A    No, what's that -- oh, that's my driver

18    license number.  No.  Maybe a transfer, probably a

19    transfer.  But I don't think I would have withdrawn

20    $40,000 cash.  I never remember walking out of the

21    bank with $40,000 cash.  This was probably the

22    purchase of a cashier's check.

23        Q    And what would that cashier's check have been

24    used for?

25        A    I have no idea.  Or it may have been a

1    transfer into a different account.  You'll have to

2    check that against the account records you have.  In

3    fact, all of these could have transfers.

4        Q    The document actually says "cash."

5        A    Yeah.  It would have been a cash withdrawal

6    and then a cash deposit, if we needed the money for

7    something else at that time, like if a bill would come

8    up, we were trying to get something done.  In fact, I

9    would say all these need to be -- except for the car,

10   need to be looked at in conjunction with all the other

11   account records you have to see if there's a

12   corresponding deposit.  I can't do that, because you

13   have the records and I don't.

14       Q    These are all cash withdrawals, sir.

15       A    Yeah, well, that's right.  I do remember --

16       Q    Would you have deposited it in another Chance

17   & Anthem bank account?

18       A    No.

19       Q    No.

20       A    If that were a cash withdrawal from Chance &

21   Anthem, it went into a different account.  It would've

22   either had to not gone into a different account, or

23   gone into a different account at SunTrust -- and I

24   don't know why you're smirking, because I can tell

25   you, like I started to tell you, I did not walk out of

1   the bank with $40,000.  Five thousand dollars, maybe.

2   But you need to check the other accounts for which you

3   have the records to see if there's a corresponding

4   deposit.

5           MR. BARBEE:  There's no deposits.

6           THE WITNESS:  No corresponding deposits?

7           MR. SUAREZ:  There are no corresponding

8   deposits.

9           THE WITNESS:  Well, you'll have to prove that

10  to me.

11          MR. SUAREZ:  No, actually --

12          THE WITNESS:  Because I can tell you --

13          MR. SUAREZ:  Actually, sir, I don't have to

14  prove anything to you.

15          THE WITNESS:  Well, then don't.

16  BY MR. SUAREZ:

17      Q   I'd like to know --

18      A   I can tell you this, I didn't walk out of --

19      Q   -- why you withdrew $40,000 from the debtor's

20  bank account and can't explain where it went.

21      A   Well, because it's in 2015 for one thing.

22      Q   Well, 40,000 is a pretty significant sum of

23  money.

24      A   Yeah.

25      Q   It's a notable sum of money.

Page 108

1        A    Yeah, well, I can tell you, I didn't walk out

2    of the bank with $40,000.  That would have been a big

3    roll of cash.

4        Q    So what did you do with it?

5        A    I don't remember.  But I can tell you this,

6    it was used for a business purpose.  I didn't gamble

7    it away.  I didn't buy drugs.

8        Q    What business purpose was that?

9        A    I don't remember.

10       Q    All right.

11       A    I'll tell you this, if you provide me with

12   the banking records you got, I could look and probably

13   discern what that was used for.

14       Q    That is the banking record I have, a 40 --

15       A    No, no, you have all the records from all the

16   accounts.

17       Q    You have a $40,000 cash withdrawal that you

18   can't explain where it went.

19       A    Yeah, because it was three years ago.

20       Q    Okay.

21       A    Okay.  But I can tell you --

22       Q    How frequently --

23       A    -- like I said three times --

24       Q    -- do you withdraw $40,000 from a bank?

25       A    I don't know what "frequently" means.

Page 109

1      Q    In any event, have you ever withdrawn $40,000

2   from a bank account?

3      A    Well, it looks like I did here, but I didn't

4   remember this until you showed it to me.

5      Q    Mm-hmm.

6      A    Do you think that's a bad thing to do?  It

7   was obviously needed for something.  Now, you say that

8   it wasn't re-deposited into another account.  Maybe it

9   wasn't, but then a cashier's check might have been

10  purchased with it.

11         (Thereupon, a document was marked as Exhibit

12  No. 16 for identification by Mr. Suarez.)

13  BY MR. SUAREZ:

14     Q    I have another withdrawal slip --

15     A    I can tell you one thing about that 40,000,

16  it didn't go in my personal accounts, unless it was

17  reflected on my debtor-in-possession reports.

18     Q    -- dated December 2, 2015.

19     A    Okay.  This is a series of $5,000

20  withdrawals.  Do you realize that?  Every two weeks it

21  looks like, 11/13, 11/23, and December 2nd of 2015.

22  So I don't remember what these were for, but they were

23  for something obviously.

24     Q    You don't recall why you went into the bank

25  every other week and withdrew $5,000 and can't account

1    for how it was used?

2        A    No.  But we may have had a payroll account at

3    that time, ah -- we did have a payroll account at

4    SunTrust.  These payments may have gone into the

5    payroll account.

6        Q    Who is "we"?

7        A    The company.

8        Q    Chance & Anthem?

9        A    I don't know who owned the payroll account.

10        Q    Well, CannaMED you said didn't have any bank

11    accounts.

12        A    And this was way -- no, CannaMED did not have

13    any bank accounts.  I don't need to say that again.

14    I've told you that at least five times today.

15        Q    So if it wasn't CannaMED and it wasn't Chance

16    & Anthem, whose bank accounts would have been funding

17    the payroll?

18        A    I didn't say it wasn't Chance & Anthem.  It

19    may have been Chance & Anthem.  There was a payroll

20    account at SunTrust.  I remember issuing payroll

21    checks out of a SunTrust account.  So look at that or

22    provide me with the records you got from the banks,

23    and I'll look at it.

24            (Thereupon, a document was marked as Exhibit

25    No. 16 for identification by Mr. Suarez.)

1    BY MR. SUAREZ:

2         Q    I've marked as Exhibit 16 Chance & Anthem

3    bankruptcy petition, which you signed.

4         A    Yeah.

5         Q    And I'll mark as Exhibit 17 Chance & Anthem's

6    bankruptcy schedules which you signed.

7              (Thereupon, a document was marked as Exhibit

8    No. 17 for identification by Mr. Suarez.)

9              THE WITNESS:  You gave me two copies of one

10   of them.

11             MR. SUAREZ:  You can give me one back.  You

12   only need one.

13             THE WITNESS:  You gave me three copies, and

14   they are mine now.  I'm not giving them back.

15             MR. SUAREZ:  That's okay I have more.

16             THE WITNESS:   There, two copies back.

17             MR. SUAREZ:  And I'll mark as Exhibit 18, the

18   amended schedules for Chance & Anthem that you signed.

19             (Thereupon, a document was marked as Exhibit

20   No. 18 for identification by Mr. Suarez.)

21   BY MR. SUAREZ:

22        Q    Is this alleged payroll account at SunTrust

23   Bank disclosed anywhere in the debtor's schedules

24   which you signed and filed under penalty of perjury?

25        A    No.  So maybe it wasn't a Chance & Anthem

1    account, or I forgot about it.  But I don't have to

2    look at the schedule, I remember I didn't report a

3    payroll account.  So I presume it either wasn't Chance

4    & Anthem's or I forgot about it.

5        Q    Sir, I should have asked you this at the

6    beginning of the deposition.  Is there any reason why

7    you can't testify completely and truthfully here

8    today?

9            Are you under any medications, or are you

10   being treated for any memory disorders that preclude

11   you from testifying truthfully and completely?

12       A    You want to ask one question at a time,

13   please?

14       Q    No, if you understand --

15       A    Your first question --

16       Q    -- my question, you can answer.

17       A    -- was, is there any reason that I can't

18   testify truthfully and completely?  I am testifying

19   truthfully and completely to the best of my knowledge.

20   I am not under any medication.

21       Q    Are you being treated for any memory

22   disorders?

23       A    No.  But if you ask my wife she thinks I've

24   got a thousand of them.

25       Q    Have you ever received any medical attention

Page 113

1     for any medical disorder?

2         A    For any medical disorder.

3         Q    I'm sorry, withdraw that.

4              For any memory disorder.

5         A    No.  But people tell me I forget stuff all

6     the time.  I don't think I forget more stuff than

7     anybody else my age.

8         Q    This was 16.

9         A    Hey, Jesus, on the schedules, I have a

10    question for you, where would you have reported the

11    payroll account?

12             (Inaudible discussion off the record between

13    Mr. Barbee and Mr. Suarez.)

14             THE WITNESS:  Let the record show that he

15    refuses to answer the question.

16    BY MR. SUAREZ:

17        Q    Mr. Siskind, you've been a practicing lawyer

18    long enough.  You know how depositions work --

19        A    Yeah, but I --

20        Q    -- I'm not going to explain it to you.

21        A    -- don't think there was a place to report

22    that payroll account, if there, indeed, was one.

23        Q    Mr. Siskind, you're the bankruptcy lawyer

24    that prepared those schedules, submitted them, and

25    signed them under penalty of perjury.  I leave that up

Page 114

1    to you.

2        A    Well, if you remember, we did discover some

3    inconsistencies at the 341, which you were going to

4    take care of -- or which we were going to address at

5    some point.

6            (Thereupon, a document was marked as Exhibit

7    No. 17 for identification by Mr. Suarez.)

8    BY MR. SUAREZ:

9        Q    I've marked as Exhibit 17 another $5,000

10   withdrawal from SunTrust dated December 11, 2005?

11       A    Okay.  Another in the series, every other

12   week, $5,000.

13       Q    And what were those $5,000 used for?

14       A    Like I said before, Jesus, I believe they

15   could have been transfers to the payroll account.  It

16   could have been my payment agreement at the time, I

17   have no idea.  But it does appear that it was every

18   other week.

19       Q    What's your payment agreement?

20       A    Well, I don't have that in writing.  I've

21   told you that before.

22       Q    Oh, that was the agreement you made with

23   yourself.

24       A    Look, you're making me try to guess.  I'm not

25   going to guess.

1      Q    No, please don't guess.  If you don't

2  remember what you did the $5,000 in cash that you

3  withdrew from the debtor's bank accounts every other

4  week --

5      A    Right.

6      Q    -- I understand that's your testimony.

7      A    That is my testimony.

8      Q    All right.  How about December 16, 2016, you

9  withdrew another $5,000 from Chance & Anthem's bank

10  account.

11          Do you know what those $5,000 were used for?

12      A    Nope.  This one has no date.  Oh, yes, it

13  does.  December 2nd.

14      Q    What number are you holding there?  What

15  number am I up to, 17?

16      A    You've got two 17s.

17      Q    All right.  We'll call one 17-A and 17-B?

18      A    Which one is which?  The earlier one A?

19      Q    The earlier one A, and the later one B.

20      A    All right.

21          (Thereupon, the documents referred to above

22  were marked as Exhibits No. 17-A and 17-B for

23  identification by Mr. Siskind, and a document is

24  marked as Exhibit No. 18 for identification by

25  Mr. Suarez.)

Page 116

1          MR. SUAREZ:   Thanks.

2    BY MR. SUAREZ:

3      Q    Exhibit 18 is another $5,000 withdrawal --

4      A    Okay.

5      Q    -- on December 31, 2015.

6      A    Every other week like clockwork.

7      Q    Still don't remember what you were using

8    those $5,000 for every other week?

9      A    No, I do not.

10         (Thereupon, a document was marked as Exhibit

11    No. 19 for identification by Mr. Suarez.)

12    BY MR. SUAREZ:

13     Q    Exhibit 19 is a $7,000 cash withdrawal from

14    Chance & Anthem's bank account -- I'm sorry, a $7,000

15    deposit, cash deposit, from Chance -- into Chance &

16    Anthem's bank account.

17     A    Hmm.

18     Q    Oh, I'm sorry, there's two pages to this

19    document.

20         Why would Chance & Anthem have deposited

21    $7,000 in cash into its bank account?

22     A    I have no idea.

23     Q    How would Chance & Anthem have generated cash

24    in order to deposit into its bank account?

25     A    I have no idea.

1        Q    Did Chance & Anthem ever generate any

2   revenue?

3        A    No.  I or one of the other companies may have

4   loaned Chance & Anthem $7,000, but other than that, I

5   don't know where that money came from.

6        Q    How would that loan have been documented?

7        A    In that case it may not have been documented

8   at all.  Like I said, I don't have any records, so I

9   can't tell you.  Again, you should check the other

10  accounts at SunTrust to see if came out of one of the

11  other accounts on the very same day.

12       Q    Mr. Siskind, on September --

13       A    And you should check my debtor-in-possession

14  accounts to see if I recorded these as payments to me.

15       Q    Strike that.  On July 19, 2016 --

16       A    Strike what?  Wait a minute.

17            THE WITNESS:  Don't strike the wrong thing.

18  Don't strike what I said.  Strike what he started to

19  say.

20  BY MR. SUAREZ:

21       Q    Are you done?

22       A    I think so.  Just keeping the record clear.

23            (Thereupon, a document was marked as Exhibit

24  No. 20 for identification by Mr. Suarez.)

25  BY MR. SUAREZ:

Page 118

1      Q    And July 19, 2016, there was a $25,000
2  deposit representing a cash in ticket, according to
3  the bank's records, into Chance & Anthem's bank
4  account.
5          Do you know where Chance & Anthem would
6  have --
7      A    No.
8      Q    -- attained $25,000 in cash to deposit into
9  its bank account?
10     A    No.  I don't think it's cash, though.  It
11 says "checks."
12     Q    Please take a look at the second page.
13     A    Oh, that says checking account.  This is a
14 substitute document.  So I don't know what that means.
15     Q    It says it's a "Cash In Ticket."
16     A    Well, I can tell you I never walked into
17 Chase with $25,000 cash to deposit into Chance &
18 Anthem's account.  This is not my writing, any of it.
19 Maybe someone else did, but where it came from, I have
20 no idea.
21     Q    Did anybody besides you ever have access to
22 Chance & Anthem's bank account?
23     A    For deposits, I would imagine, yes.  But not
24 for withdrawals.  You know, that went in as cash, but
25 it may have been a check from that bank.  Nobody

Page 119

1    walked in with $25,000, believe me.

2         (Thereupon, a document was marked as Exhibit

3    No. 21 for identification by Mr. Suarez.)

4    BY MR. SUAREZ:

5         Q    Exhibit 21 is a $4,000 cash withdrawal on

6    September the 9th of 2016.

7              What was the purpose of that cash withdrawal?

8         A    I have no idea.

9         Q    Chance & Anthem ever own an airplane?

10        A    No.

11        Q    Helicopter?

12        A    No.

13        Q    Anything that flies?

14        A    No.

15        Q    All right.  On November 11, 2015 Chance &

16   Anthem paid Advanced Avionics $100,000.

17        A    Right, this was a bill we paid for my father.

18        Q    Okay.

19        A    Instead of giving him the hundred thousand

20   dollars, we paid that on his behalf.

21        Q    Why did Chance & Anthem owe your father a

22   hundred thousand dollars?

23        A    Because he was originally a partner in Chance

24   & Anthem, and he did a lot of advance work for us in

25   Maryland.  That was the agreement.

Page 120

1       Q    How was that agreement memorialized?

2       A    I don't know that it was, since it was my

3    father.  You know, we just -- that was the arrangement

4    we had.

5       Q    Was that agreement ever disclosed to anybody?

6       A    No, I don't think it was.  No.  I was

7    thinking for a second that Bruce Lowe might have known

8    about or Willy.  Willy might have known about it,

9    because Willy was living with my parents at the time.

10   He was assisting my father.

11      Q    Did Chance & Anthem ever generate a profit?

12      A    No.  Chance & Anthem never had an income.

13      Q    So all the cash that Chance & Anthem obtained

14   or all the money that Chance & Anthem obtained came

15   from either lenders or investors?

16      A    Or me.

17      Q    All right.

18      A    Or my father.  My father but in a lot of

19   money.  I don't know whether he put in over a hundred

20   thousand dollars, but he put in substantial money.

21      Q    What money did your father put into Chance &

22   Anthem and how?

23      A    I don't remember.  I had a record of it at

24   one time, but it was always transfers from some

25   account that he had.

Page 121

1        Q    Transfers into where?

2        A    I don't remember, Jesus.  But a lot of what

3    he put up was used to continue to try to hold onto the

4    building.

5        Q    What building?

6        A    The building in Hebron.  It's about $7,000 a

7    month.

8        Q    Those would have been rent payments to the

9    Ocean Gateway entity?

10       A    Right.

11       Q    Who owned the plane?

12       A    What plane?

13       Q    The plane that that hundred thousand dollars

14   went --

15       A    Oh, the only airplane that -- I don't

16   remember what that was for, that hundred thousand

17   dollars.  It might have been for the helicopter or his

18   airplanes.  He had a company called Metropolitan Air,

19   Inc. that owned two airplanes, and then I owned a

20   helicopter through my law firm, LLC, even though it's

21   lapsed, called Siskind Legal Services, LLC, and this

22   company did work on both aircraft.

23       Q    Including yours?

24       A    Yeah.  Yeah, they still work on mine.

25            (Thereupon, a document was marked as Exhibit

Page 122

1    No. 22 for identification by Mr. Suarez.)

2    BY MR. SUAREZ:

3        Q    How about Air Center, Inc., Exhibit 22?

4        A    I have no idea what that is.

5        Q    You signed that check.

6        A    Oh, you know what, that was for parts for his

7    airplane.

8        Q    Whose airplane?

9        A    Metropolitan Air's, those were for the

10    air-conditioning parts, but, again, he's recontributed

11    all that money and more to Chance & Anthem --

12        Q    How did he do that?

13        A    -- that $17,000.

14            He provided money to hold on to the building,

15    I don't know exactly how many months, but I can tell

16    you that for whatever length of time we owned the

17    building, after we did not get the license, I believe

18    all that money, all those rents payments, came from

19    him, because we couldn't go out there and legitimately

20    use other people's money after that license was

21    denied.

22        Q    Would those rent payments have been funded

23    through any other names or entities other than William

24    Siskind?

25        A    They may have been.  They could have come

Page 123

1    through Sovereign.  They could have come through my

2    trust account.  They could have come through -- I

3    would say those two -- well, let me think for a

4    second.  Where would they have come from?

5           They could have come directly from one of his

6    accounts.  I don't remember.  But when you get Alan in

7    here, if he provides you with a list of payments, I

8    think anything after we were denied a license, which

9    would have been in August of 2016, would most likely

10   have come from dad.

11          MR. SUAREZ:  We're at 22?  Twenty-three.

12          (Thereupon, a document was marked as Exhibit

13   No. 23 for identification by Mr. Suarez.)

14   BY MR. SUAREZ:

15      Q    Twenty-three is a check issued by Chance &

16   Anthem and signed by you to Jeffrey M. Siskind?

17      A    Correct.

18      Q    Why did Chance & Anthem pay you $10,000 on

19   March 5, 2015?

20      A    I have no idea.  That was 2015.  I'd imagine

21   for my fees.

22      Q    For what fees?

23      A    Legal fees, the work I was doing for Chance &

24   Anthem.

25      Q    How were your legal fees billed to Chance &

Page 124

1    Anthem?

2        A    I told you I kept ledgers.

3        Q    Why invoices ever generated?

4        A    No.  There was no need to generate a physical

5    invoice.

6            (Thereupon, a document was marked as Exhibit

7    No. 24 for identification by Mr. Suarez.)

8    BY MR. SUAREZ:

9        Q    Twenty-four is a check in the amount of

10   $25,000 payable from Chance & Anthem to you.

11           What was the purpose of that check?

12       A    I have no idea.  What year was that?

13       Q    April 15, 2015.

14       A    Oh, I don't know.  Back in 2015, I have no

15   idea.  Again, I presume for my work on behalf of

16   Chance & Anthem.

17       Q    Were any invoices ever generated or submitted

18   to --

19       A    No, I already said that, no.

20       Q    Let me finish my question before you answer.

21       A    Well, it's the same question you asked

22   before.

23       Q    For the court reporter's benefit, please.

24           I'm going to ask you the same question a

25   number times about a number of different documents.

1        A    Right.

2        Q    Turning back to Exhibit 24, were any invoices

3   or statements ever generated or submitted to Chance &

4   Anthem on account of legal fees you claim may have

5   been due to you on account of this transfer?

6        A    No, the records were only ledgers.

7        Q    And those are the ledger you claim Mr. Gibson

8   took?

9        A    Yes, along with other files.

10            (Thereupon, a document was marked as Exhibit

11   No. 25 for identification by Mr. Suarez.)

12   BY MR. SUAREZ:

13        Q    Twenty-five is a $10,000 check issued by

14   Chance & Anthem to you on May 7, 2015.

15        A    Correct.

16        Q    Do you know why Chance & Anthem issued that

17   check to you in 2015?

18        A    For money due to me.

19        Q    Were any invoices or statements ever

20   generated by you to Chance & Anthem?

21        A    Are you going to ask that same question -- I

22   keep -- were there "ever" any invoices?  I already

23   answered no.  If you wanted to ask it each time, just

24   ask was there "an invoice" associated with that

25   payment?  Otherwise, why do I have to answer that same

Page 126

1    question over and over again.

2        Q    Well, I'm asking that same question as it

3    relates to different transfers.

4        A    Well, you know what, I'm going to say next

5    time, "Asked and answered."  You said, "Were there

6    ever any invoices" and I said no --

7        Q    Well, I'm --

8        A    -- so stop asking the same question.

9        Q    I'm asking on account of each individual

10    transfer.

11        A    Well, then ask it that way, "Was there an

12    invoice associated with this check?"  The answer, no.

13        Q    If you'd let me finish my question --

14        A    Well, but you -- come on, Jesus, ask the

15    correct question or don't ask it.

16            (Thereupon, a document was marked as Exhibit

17    No. 25 for identification by Mr. Suarez.)

18    BY MR. SUAREZ:

19        Q    Exhibit 25, this is a Chance & Anthem bank

20    statement that reflects a $50,000 outgoing wire on

21    November 9th of 2015.

22            Do you know what the purpose of that wire

23    was?

24        A    No.  Might have been something related to the

25    building purchase.

Page 127

1        Q    Which building purchase?

2        A    In fact, a lot of these other checks, the big

3    40,000, may have been to get cashier's checks to pay

4    them.  You gotta look at the record of payments to the

5    building.  Remember, we put, like, $300,000 up as a

6    buy-in on the building.

7        Q    Who is "we"?

8        A    The company, Chance & Anthem.  These big, big

9    payments, that's what they may have been for.

10       Q    Do you have any records related to that

11   transaction?

12       A    Yeah, you showed me the record when you gave

13   me that one document.  It had the different dates that

14   we put up the different amounts of money.  Remember,

15   at one point that number was $290,000, and I can't

16   remember what document you showed me -- oh, it was the

17   original lease option purchase agreement.  It had the

18   deadline.  Some of these might correspond to those.

19            (Thereupon, a document was marked as Exhibit

20   No. 26 for identification by Mr. Suarez.)

21   BY MR. SUAREZ:

22       Q    Twenty-six is a check dated November 13, 2015

23   in the amount of $10,000 to Jeffrey Siskind.

24            What was that check for?

25       A    I don't remember.  Don't recall.  No invoice

Page 128

1    associated with it.

2        Q    Twenty-six is a bank statement of Chance &

3    Anthem.

4        A    No.

5        Q    No?    Twenty-seven?  Did I already mark 26?

6        A    Yeah.   That was the one you just gave me.

7            (Thereupon, a document was remarked as

8    Exhibit No. 27 for identification by Mr. Suarez.)

9    BY MR. SUAREZ:

10       Q    Twenty-seven is a Chance & Anthem bank

11   statement.

12       A    Outgoing wire for sixty-one seven-nineteen

13   sixty-three.

14       Q    Do you know where that money went?

15       A    I have no idea.

16           (Thereupon, a document was marked as Exhibit

17   No. 28 for identification by Mr. Suarez.)

18   BY MR. SUAREZ:

19       Q    Twenty-eight is a check dated December 28,

20   2015 --

21       A    You know, let me say this about this one --

22       Q    I'm sorry, there's a question pending.

23       A    Well, I want to correct my answer to the

24   prior question.

25       Q    Go for it.

Page 129

1        A    Something you should investigate is whether

2   or not on the purchase of the project house, the 3445

3   Santa Barbara, this, because it's such an odd amount,

4   could have been something that was sent to the title

5   company to purchase that.  That could have been the

6   amount due from us on the amount of the purchase.

7        Q    Okay.

8        A    That was about the time that we closed on the

9   house, if not the time.

10       Q    On December 8, 2015, there was a check issued

11  by Chance & Anthem to you, signed by you, in the

12  amount of $30,000.  What was that check for?

13       A    I haven't the foggiest idea.

14       Q    That's Exhibit 28?

15       A    Correct.

16            (Thereupon, a document was marked as Exhibit

17  No. 29 for identification by Mr. Suarez.)

18  BY MR. SUAREZ:

19       Q    Exhibit 29 is a check dated December 10, 2015

20  from Chance & Anthem made payable to you in the amount

21  of $15,000.  What was that check for?

22       A    I have no idea.  I don't remember these 2015

23  checks.

24       Q    What's Reef Gallery, Incorporated?

25       A    That's a store down in Key Largo.

Page 130

1      Q    Why would Reef Gallery, Incorporated have

2   issued a check in the amount of $10,000 to Chance &

3   Anthem?

4      A    I believe that the owner purchased an option

5   for one unit.  Yes.

6      Q    One unit in what?

7      A    In Chance & Anthem.

8      Q    In Chance & Anthem, as opposed to CannaMED?

9      A    What's it say here?  Oh, it says "loan."  I

10  have no idea.  Oh, it's ten percent down on two shares

11  in Maryland.  That's what it says.

12           (Thereupon, a document was marked as Exhibit

13  No. 30 for identification by Mr. Suarez.)

14  BY MR. SUAREZ:

15     Q    Would those have been shares in CannaMED?

16     A    Geez, I've forgotten.  What were we selling?

17  Was it Chance & Anthem?  Yeah, Chance & Anthem sold

18  its shares in CannaMED.  Right, correct.  It was ten

19  percent down on two shares, which would have been

20  $50,000 each or a hundred thousand dollars.

21           MR. FURR:  Jesus, the food is here if you

22  want to eat.

23           MR. SUAREZ:  All right.  Let's take a break

24  for lunch.

25           (Thereupon, a lunch recess was taken from

Page 131

1    1:40 p.m. to 2:00 p.m.)

2           MR. SUAREZ:  Back on the record.

3           (Thereupon, a document was marked as Exhibit

4    No. 31 for identification by Mr. Suarez.)

5    BY MR. SUAREZ:

6       Q    All right.  I've marked Exhibit 31,

7    Mr. Siskind.  This is a check from Chance & Anthem to

8    the Second Siskind Family Trust.

9           What was that check for?

10      A    I have no idea.  I don't think Second Siskind

11   Family Trust ever had a bank account?

12          Hmm.  I don't know why we put money back in

13   the trust.  We may have advanced money from the trust

14   and then repaid it.

15      Q    If money was advanced from the trust, where

16   would it have been deposited?

17      A    It could have gone to my trust account, that

18   may be my old trust account number.

19      Q    If I wanted to understand all the

20   transactions between Chance & Anthem and third

21   parties, where your trust account was an

22   intermediary --

23      A    Yeah.

24      Q    -- what would be the best way to do that, in

25   your opinion, given that you don't have trust records

Page 132

1    for the applicable periods?

2        A    I would say that every disposition of funds

3    was for a valid reason, so we can start there, and

4    then toss the ball back to you and say, "Well, you're

5    going to have to prove it was for an invalid reason,"

6    and of course --

7        Q    Is there any way --

8        A    -- I'm answering in my best interest.

9        Q    No, I get your answer, and it's a genuine

10   question.  If I wanted to sit down and go through your

11   trust account records -- because several times today

12   you've told me, it may have gone through my trust

13   account.

14           How are we supposed to know what went through

15   your trust account?

16       A    You got the records, give them to me, and

17   then ask me the questions again, and I'll go through

18   them.  Just e-mail me whatever you got, and I'll see

19   if the jibes with something on the trust account.

20       Q    And how would you be able to tell if a

21   transaction involved the debtor in your trust account?

22       A    I would like at the disposition of the funds.

23   You're talking about deposits to the trust account?  I

24   only thought the debtor made one trust account deposit

25   of $5,000 at some point.  That's all I remember.

1     Q    How about funds that were deposited in your

2    trust account for the benefit of the debtor?

3     A    Oh, there were only a couple instances where

4    that could have occurred that I'm aware of.  I don't

5    know the answer to that.

6     Q    What instances were those?

7     A    Well, remember, okay, let's keep it clear,

8    the debtor did two things.  It had the cannabis deal

9    in Maryland and the house project here.  I believe

10   that David Fiore/Carl Stone's money went into the

11   trust account, that 800,000.   Fifty or 40, roughly,

12   went back to David Fiore, and the rest was probably --

13   oh, no, there were thousand-dollar payments out of

14   that that went to Steve Wilkins for working on the

15   house.  There was -- look at that state case that

16   Fiore filed.  I believe we filed, I filed, a ledger

17   for the disposition of that 800,000.  If I didn't file

18   it, I e-mailed it to Sophie Williams who is their

19   attorney, but I think it's either dollar for dollar or

20   maybe I had to put a few dollars in there to make it

21   jibe.  No, I think it was dollar for dollar.

22          MR. SUAREZ:  I'll mark that as Exhibit 36

23   (sic), I think it's the last page of this document,

24   which is an affidavit of Carl Stone.

25          (Thereupon, the document referred to was

Page 134

1    marked as Exhibit No. 32 for identification by

2    Mr. Suarez.)

3              THE WITNESS:  Ah, there it is.  I didn't even

4    remember that I typed it up to be honest with you.

5    BY MR. SUAREZ:

6         Q    How was this produced?

7         A    By me.  What do you mean how was this

8    produced?

9         Q    Yeah.

10        A    I prepared it because I wanted to give it --

11        Q    Did you type it into a Word document, or was

12   this generated by some sort of software?

13        A    No, no.  This was a Word document.  Yeah,

14   see, I had to put $31 in there from the miscellaneous

15   ledger.  Right, $42,000 went back to Fiore.

16        Q    Are there any other ledgers like this one

17   that you generated where Chance & Anthem would have

18   been a party to the transaction?  So here you've --

19        A    From the trust account?

20        Q    From the trust account.

21        A    Oh, yeah, there would have had to be one, but

22   usually handwritten for every individual that would

23   have put money into the trust account.  Now, who could

24   that have been?  That guy from Delaware may have

25   transferred that money to the trust account.

1      Q    That's 3Gen?

2      A    No.  That's the $50,000 from the guy in

3  Delaware whose name I cannot remember.  He's a finance

4  guy.  Oh, I can't remember his name.

5           Anyway, the hundred thousand from 3Gen might

6  have gone through there.  The money from Kamenitz's

7  group might have gone through there, I don't know.  I

8  don't know who else would.  That's all I can think of.

9      Q    The hundred thousand from 3Gen, how would

10 that money have been used?

11     A    I don't remember.

12          THE WITNESS:  Can I take a picture of this?

13 I just can't find it, you know, or do you have a

14 spare?

15          MR. SUAREZ:  Here, here's a copy for you.

16          THE WITNESS:  I don't think it was attached

17 to his affidavit, though, was it?

18          MR. SUAREZ:  You can keep that.

19          THE WITNESS:  Thank.  He would not have

20 attached that to his affidavit, because -- oh, well, I

21 guess he did it.  Says Exhibit 1.  Thank you for this.

22 I've been looking for it.

23 BY MR. SUAREZ:

24     Q    And the affidavit that I've marked as Exhibit

25 32, oh --

Page 136

1              MR. BARBEE:  I thought you said "36."

2              MR. SUAREZ:  I said "36," but I actually

3    meant to mark it as 32.  So let's call that 32.  May

4    the record reflect, the affidavit of Carl Stone --

5              THE WITNESS:  Right.

6              MR. SUAREZ:  -- that we referred to as

7    Exhibit 36 briefly is Exhibit 33 -- 32.

8              THE WITNESS:  Right.

9              (Thereupon, a document was marked as Exhibit

10   No. 33 for identification by Mr. Suarez.)

11   BY MR. SUAREZ:

12       Q   Now, you'll notice Exhibit 33 is a SunTrust

13   Bank record for Chance & Anthem, and this is an

14   official check sale, different than the cash

15   withdrawal records that we went through earlier --

16       A   I see that --

17       Q   -- in the amount of $90,000.

18       A   -- yeah.

19       Q   What would have been the disposition of that

20   $90,000?

21       A   I have no idea.  Back in '15, I would say

22   maybe this was a payment on the building.

23       Q   April 10, 2015?

24       A   I don't know, you gotta look at that purchase

25   agreement with Machine Technologies, because it had

Page 137

1    the schedule of payments.  This might jibe with one of

2    those.

3              (Thereupon, a document was marked as Exhibit

4    No. 34 for identification by Mr. Suarez.)

5    BY MR. SUAREZ:

6        Q    Thirty-four is an official check sale in the

7    name of Chance & Anthem, December 23, 2014 for

8    $58,000.

9        A    '14?  I have no idea.  Fifty-eight thousand?

10       Q    Fifty-eight thousand.

11            Do you know what the purpose or use of that

12   cashier's check was?

13       A    No.  This might have been a payment I made on

14   behalf of Fred Volkwein, that's a guess, because maybe

15   we were working with Chance & Anthem on some sort of a

16   1031 for him, 1031 exchange.

17       Q    And why would Chance & Anthem have owed

18   Volkwein $58,000?

19       A    I forgot now how we handled his dealings.

20            Can I get a copy of that too, because that

21   might help me explain to Richard -- what's Richard's

22   last name, Robert?

23            MR. SUAREZ:  Zaretsky.

24            THE WITNESS:  Zaretsky, yeah.  You know,

25   prove one of the payments I made.

Page 138

1              Thank you.

2              (Thereupon, a document was marked as Exhibit

3    No. 35 for identification by Mr. Suarez.)

4    BY MR. SUAREZ:

5       Q    I've marked 35, another official check sale

6    withdrawal ticket from SunTrust from Chance & Anthem's

7    bank account, dated April 24, 2015, in the amount of

8    $45,000.

9              Do you know what the disposition of that

10   cashier's check was?

11      A    No.  But, again, you gotta check all these

12   against that --

13      Q    Machining Technologies?

14      A    Yeah, yeah.

15      Q    Wendy Buckingham is your sister, correct?

16      A    Mm-hmm.

17             (Thereupon, a document was marked as Exhibit

18   No. 36 for identification by Mr. Suarez.)

19   BY MR. SUAREZ:

20      Q    There's a check from Chance & Anthem to

21   Ms. Buckingham in the amount of 16,200, which I'll

22   mark as Exhibit 36.

23      A    When was that?

24      Q    Dated November 1, 2016.

25      A    "Partial repayment" it says on it.  I don't

Page 139

1    know what that was for.

2        Q    Why would Chance & Anthem have repaid

3    Ms. Buckingham $16,200?

4        A    We, I guess, borrowed money from her.

5        Q    Who is "we"?

6        A    Well, Chance & Anthem.

7        Q    And how would Chance & Anthem have received

8    the money from --

9        A    I have no idea.

10       Q    -- Ms. Buckingham?

11       A    I have no idea.

12            THE WITNESS:  What are you looking at Alan?

13    Did you find the other side of that transactions?

14            MR. BARBEE:  (Shakes his head.)

15            THE WITNESS:  Are you going to ask me

16    anything about this Exhibit 32?

17            MR. SUAREZ:  Not anymore.

18            (Thereupon, there was an inaudible discussion

19    off the record between Mr. Barbee and Mr. Suarez,

20    during which a document was marked as Exhibit No. 37

21    for identification by Mr. Suarez.)

22    BY MR. SUAREZ:

23       Q    All right.  Thirty-seven, finally, we'll do a

24    composite for you?

25       A    What's that?

Page 140

1    Q   We'll do a composite exhibit for you here at

2    37.  I've got a number of checks, two checks that

3    total --

4    A   This looks like something involving Fred

5    Volkwein.

6    Q   -- $1,157,623.77 from First American Title

7    Insurance Company?

8    A   Yeah, that had to do with the sale of Fred

9    Volkwein's properties.

10    Q   Dated November 6, 2014.

11    A   Was it that long ago?  I guess it was, yeah.

12   I don't know the 1500.  That's weird.

13    Q   There are two checks one for 1500 and one for

14   $1,157,623.77.

15        Why would those checks have been made payable

16   to Chance & Anthem?

17    A   This must have had to do with Fred Volkwein's

18   property exchange.

19    Q   And what did Chance & Anthem do with the

20   $1,159,123 that it received from First American Title?

21    A   Well, you gotta look at the -- there's a

22   handwritten ledger that I remember I gave Fred.  Where

23   have I seen that recently?  Oh, if you look at Fred

24   Volkwein's lawsuit against me in state court, he

25   attached it as an exhibit.  That would have been for

Page 141

1  the sale of his properties in Northwood.

2        (Thereupon, a document was marked as Exhibit

3  No. 38 for identification by Mr. Suarez.)

4  BY MR. SUAREZ:

5     Q   Thirty-eight is another wire coming out of

6  Chance & Anthem in December of 2014 in the amount of

7  $135,109.92.

8     A   I think this had to do with Fred Volkwein's

9  transaction too.  I don't know who we would have sent

10  that too.  Pretty sure that has to do with the

11  Volkwein -- um -- um -- property sale transaction.

12     Q   I have an additional deposit on February 5,

13  2015 into Chance & Anthem from First American Title

14  Insurance Company in the amount of $65,092.40?

15     A   I think that was some sort of a holdback that

16  had to do with Fred Volkwein's transaction as well.

17        (Thereupon, a document was marked as Exhibit

18  No. 39 for identification by Mr. Suarez.)

19  BY MR. SUAREZ:

20     Q   I've marked that one Exhibit 39.

21     A   Okay.  Again, that handwritten ledger would

22  probably disclose whatever of -- those last few checks

23  had to do with the Volkwein transaction.

24        (Thereupon, a document was marked as Exhibit

25  No. 40 for identification by Mr. Suarez.)

1    BY MR. SUAREZ:

2        Q    Exhibit 40 is another deposit into Chance &

3    Anthem, dated December 28, 2015 in the amount of

4    $19,481.32.

5        A    Says here "Second mortgage payoff."  I don't

6    have any idea what that is.  Oh, that's from Title

7    Trust Services.  What the heck is that?  I have no

8    idea what this is.

9            West Palm Beach.  Oh, this could have been

10   somehow related to the project house purchase, because

11   I think it's in that time period, so maybe we had some

12   sort of an adjustment there.  I'm not sure.  That's

13   likely what this is, though.

14       Q    A refund from the purchase of the project

15   house or an adjustment at the closing?

16       A    I guess so.  Maybe for insurance.  Maybe we

17   paid insurance directly, I'm thinking.  That's all I

18   can think of.  That's a guess.

19           (Thereupon, a document was marked as Exhibit

20   No. 41 for identification by Mr. Suarez.)

21   BY MR. SUAREZ:

22       Q    Forty-one is another deposit dated October

23   31, 2016 in the amount of $23,243.37 from the

24   Associates.com, P.A.

25       A    Oh, yeah, yeah, the Associates.  They owed us

Page 143

1    money for something.  Oh, okay, for the Dalton Avenue

2    transaction.  That was a little house we loaned money.

3    We loaned money to a flip project up there in Stuart,

4    I guess, or Port St. Lucie or something.  That was our

5    repayment.

6         Q    Chance & Anthem ever prepare a financial

7    statement?

8         A    No.  Never had any income either, so it never

9    filed any taxes.

10        Q    Chance & Anthem ever fill out a credit

11   application?

12        A    Nuh-uh, no.

13             (Thereupon, a document was marked as Exhibit

14   No. 42 for identification by Mr. Suarez.)

15   BY MR. SUAREZ:

16        Q    Mark as Composite 42 -- I'm sorry, Exhibit 42

17   is a check from Chance & Anthem to the Ocean Reef

18   Club.

19        A    Oh, yeah.  I forget what that was for.  Oh,

20   that was to pay off two accounts down there.

21        Q    Why was Chance & Anthem paying off accounts

22   at Ocean Reef?

23        A    I don't know.  No idea.

24        Q    Did Chance & Anthem ever have a membership at

25   Ocean Reef?

Page 144

1      A    No, no.  We almost -- no, no, no, we didn't.

2    There was a William Siskind membership and a Jeffrey

3    Siskind membership.  In fact, the member numbers are

4    right there.  Those are the two account numbers.  I

5    don't know why Chance & Anthem paid that.  Although we

6    utilized the memberships to some extent in Chance &

7    Anthem's fund raising activities.

8      Q    What fund raising activities were those?

9      A    Prospecting investors.

10      Q    Such as?

11      A    Such as -- well, the $10,000 we got from the

12    owner of the jewelry store there?

13      Q    The Reef folks?

14      A    Right.

15          (Thereupon, a document was marked as Exhibit

16    No. 43 for identification by Mr. Suarez.)

17    BY MR. SUAREZ:

18      Q    Composite 43 are two checks to Tanya Siskind

19    from Chance & Anthem.

20      A    Right.  This is just money that -- instead of

21    me taking personally, I had the check made out to her

22    and deposited into her account to save time, or

23    because there was a bill that needed to be paid right

24    away.  I think there were more than two checks I gave

25    to her out of Chance & Anthem.  Both of these were in

Page 145

1    2016.   There may be one or two more.

2        Q    Who is Scarlet Siskind?

3        A    My daughter.

4        Q    Why would Chance & Anthem have paid the Palm

5    Beach Riding Academy?

6        A    Oh, we were going to do a promotional thing

7    for her riding there.   It's a riding school, and --

8    what was it a $6,000 check, as I remember?

9        Q    Twenty-five hundred, here, I'll show you the

10   check.

11       A    Oh, that's all.   I must be thinking of

12   something else.

13            (Thereupon, a document was marked as Exhibit

14   No. 44 for identification by Mr. Suarez.)

15   BY MR. SUAREZ:

16       Q    Exhibit 44, October 19, 2016.

17       A    Right.

18       Q    What business, if any, did Chance & Anthem

19   have with the Palm Beach Riding Academy?

20       A    This was -- I forget what this was for

21   involving her.   I don't know whether that was an

22   appearance, a show appearance, or whatever that was,

23   that we were sponsoring.

24       Q    "We" being Chance & Anthem?

25       A    Yeah.

1      Q    Why would Chance & Anthem have sponsored your

2   daughter's show appearance at a riding academy?

3      A    Well, these riders get sponsors.  You get

4   some advertising privileges, and with the horse crowd

5   out there, Scarlet is a pretty good rider, you get a

6   lot of attention.

7      Q    Why would Chance & Anthem have needed to

8   generate attention?

9      A    That was just after we didn't get that

10  license, and we were filing an application with the

11  federal government, and we were out of money.  We

12  needed money.

13         Well, let me say this, I don't believe we

14  ever took money from investors after we didn't get the

15  Maryland application.  But we needed to line up money

16  if we got the federal application approval, because

17  that I think had a six-month deadline to get up and

18  operating.  Did you follow that?

19     Q    Yep.

20         (Thereupon, a document was marked as Exhibit

21  No. 45 for identification by Mr. Suarez.)

22  BY MR. SUAREZ:

23     Q    Exhibit 45 is a Chance & Anthem bank

24  statement.  It reflects a $500,000 deposit from an

25  account ending 7527 on October 6, 2015.

Page 147

1      A    Oh, yeah, Richard Neff.  I'm pretty sure

2    that's Richard Neff.  He put in a half million dollars

3    originally on that house project.

4      Q    The half million dollars from Richard Neff,

5    was that a loan or an equity position in Chance &

6    Anthem?  How was that investment --

7      A    I think it was done as a loan.

8      Q    Was that loan ever --

9      A    -- repaid?

10         No, not yet.  I have to take care of him

11   myself.  I can't let him lose that money.  Both him

12   and Fred.  The rest of them -- oh, no, I can't really

13   say that, because there are a few others I have to

14   make sure get their money back too.

15     Q    How about David Merrill?

16     A    David Merrill, we all know him.

17     Q    Actually, I don't.

18     A    You don't?  Robert will give you the inside

19   scoop on David.  He's a bankruptcy lawyer.

20         (Thereupon, a document was marked as Exhibit

21   No. 46 for identification by Mr. Suarez.)

22   BY MR. SUAREZ:

23     Q    Composite 46, we've got two $10,000 checks to

24   David Merrill --

25     A    Right.

Page 148

1     Q    -- June 15, 2015 and June 19, 2015.

2     A    Correct.

3     Q    Why would -- well, the memos say, "Loan to

4    relocate," and the second memo says "Additional

5    relocation loan."

6     A    Right.  We loaned him money to relocate to my

7    office.   Twenty-thousand dollars.   Jesus.

8     Q    Why would Chance & Anthem have loaned him

9    money to relocate to your office?

10     A    I forget what the particulars were.  He

11    repaid it.  That was that 22,000 you saw.

12     Q    No, I didn't.

13     A    Yes, you did.

14     Q    Repaid it to whom?

15     A    To Chance & Anthem.

16          I forget what exhibit it was.  Let me see if

17    I can find it.

18     Q    No.  That was money from the Associates.com.

19     A    That's David.

20     Q    Okay.  So it had nothing to do with the

21    closing of a house in Dalton?

22     A    I think I loaned it to him on that house as

23    security, yeah, yeah.  I don't think I would have

24    forgotten to get that $20,000 back.  Yeah, that has to

25    be it.

Page 149

1        Q    South Properties, LLC.

2        A    Oh, that's Mike Kamenitz, I think.

3        Q    I'm sorry?

4        A    What do you have there?

5        Q    A hundred-thousand-dollar deposit into --

6        A    Yeah, that's from Mike Kamenitz.  Remember

7    the two lawyers and the other guy.

8        Q    Exhibit 47.

9             (Thereupon, a document was marked as Exhibit

10   No. 47 for identification by Mr. Suarez.)

11            THE WITNESS:  South something Properties,

12   yeah that was Mike.  ABK South that is -- the K is

13   Kamenitz.

14   BY MR. SUAREZ:

15       Q    Ah, ABK South --

16       A    Right.

17       Q    -- remind me where we came across them

18   before?

19       A    ABK?

20       Q    Yep.

21       A    They're the ones that put up a hundred

22   thousand for two points in CannaMED.  Then I think

23   they also loaned some money --

24       Q    The CannaMED purchase that we previously

25   identified at Exhibit 7?

Page 150

1          A    Maybe.

2          Q    Can you take a look at it, Mike?

3          A    Mike Kamenitz.  Yes.

4          Q    Okay.

5          A    Yes.

6               MR. SUAREZ:  What did you do with my other

7     exhibits, Alan?

8               (Inaudible discussion off the record between

9     Mr. Barbee and Mr. Suarez.)

10    BY MR. SUAREZ:

11         Q    I understand you're not here today as the

12    corporate rep of FLACC?

13         A    Correct.

14         Q    Would you like me to ask you questions about

15    FLACC, or should we do that pursuant to another

16    subpoena?

17         A    You're going to have to do that pursuant to

18    another subpoena, because I haven't prepared.

19         Q    Okay.

20         A    But you could tell me the kinds of questions

21    you're going to ask, and I can try to prepare and see

22    if I can find records for you.

23              MR. SUAREZ:  We'll get a 2004 out on that.

24              If you give me one minute, I think we're

25    close to done.  I just need to talk to Robert and Alan

1   for a second.

2          THE WITNESS:  Wasn't there some $750,000

3   check to FLACC that you found the last time we met at

4   deposition?  Did you ever --

5          MR. SUAREZ:  Let's go off the record.

6          (Thereupon, a ten-minute recess was taken.)

7   BY MR. SUAREZ:

8      Q   I just have a couple more questions.  We'll

9   go back on the record.

10     A   You were asking about how many cases I had.

11     Q   I'm --

12     A   Oh, no, I got Volkwein now too, so it's four.

13     Q   That was off the record, but we can talk

14  about it on the record.

15     A   No, no, off the record.

16     Q   I don't need to.  Let's go on, and then we'll

17  finish, and we can -- yeah.

18         Mr. Siskind, there's about a million dollars

19  from Chance & Anthem that goes to the Florida

20  Association of Community Banks and Credit Unions.

21         Why was that?

22     A   I have no idea.  I remember you told me

23  seven-fifty last time.  I have no idea.

24     Q   Yeah, we've identified about a million

25  dollars in transfers from Chance & Anthem to the

1    Florida Association of Community Banks and Credit

2    Unions, including the $750,000 transfer on October 21.

3        A    Of what year?

4        Q    Of 2015.

5        A    I don't know why we did that.  But if you can

6    just e-mail me a copy of whatever you got on that

7    account, I'll try to figure it out.

8        Q    It's almost immediately after the million-one

9    is received on behalf of Mr. Volkwein that money

10   starts coming out to the Florida Association of

11   Community Banks and Credit Unions.

12       A    Might have been somehow related to things for

13   Fred.  Somewhere there was a $400,000 payment to buy

14   an annuity for him.  I don't know where that came out

15   of, and then I have a handwritten disposition sheet

16   for all his funds.

17       Q    But there was no business relationship

18   between Chance & Anthem and the Florida Association

19   Community Banks and Credit Unions?

20       A    I don't know how you define a business

21   relationship.

22       Q    In any sense.

23       A    Well, if there were transactions between

24   them, they are both businesses, so there must have

25   been some sort of business.

Page 153

1    Q    Well, clearly there is a million dollars

2 going from Chance & Anthem to the Florida Association

3 of Community Banks and Credit Unions.

4    A    I have no idea why.  Could have been related

5 to try to structure an asset protection plan for Fred.

6    Q    Any other reason?

7    A    Not that I can think of.

8    Q    Okay.

9    A    I'm not ruling out any other reason, but

10 there's not one I can think of sitting here today.

11        MR. SUAREZ:  All right.  Reserving on the

12 questions that we've asked the court reporter certify

13 and we'll take up with the Court, I have no further

14 questions today.

15        THE WITNESS:  I'll read.

16        (Whereupon, the deposition was concluded.)

17

18                    _____
                      JEFFREY M SISKIND

    _____
19 STATE OF FLORIDA:
   COUNTY OF PALM BEACH:
20
   The foregoing instrument was acknowledged before me
21 this _____ day of _____, 2018, by
   _____, who is personally known
22 to me or who has produced _____ as
   identification and who did (did not) take an oath.
23 _____, Notary Public
   My commission expires:
24 Commission #:

25

Page 154

1                    CERTIFICATE OF OATH

2

3    STATE OF FLORIDA:
     COUNTY OF PALM BEACH:

4

5            I, Anna M. Meagher, Shorthand Reporter and

6    Notary Public, State of Florida, certify that JEFFREY

7    M SISKIND personally appeared before me on the 19th

8    day of December 2018 and was duly sworn.

9

10           Signed this 16th day of January 2019.

11

12                          _____

13   My Commission Expires:   Anna M. Meagher,
     January 9, 2021          Notary Public
14   Commission #GG060693     State of Florida

15

16

17                       Personally known:    X
                    OR Produced Identification:
18          Type of Identification Produced:

19

20

21

22

23

24

25

Page 155

1                    CERTIFICATE

2  STATE OF FLORIDA:
   COUNTY OF PALM BEACH:

3

4          I, Anna M. Meagher, Shorthand Reporter, do

5  hereby certify that I was authorized to and did

6  stenographically report the deposition of JEFFREY M

7  SISKIND, in the cause, at the time and place, and in

8  the presence of counsel as stated in the caption

9  hereto; that reading and signing of the transcript was

10 not waived, and that the foregoing pages, numbered 1

11 through 156 constitute a true record of my

12 stenographic notes.

13         I further certify that I am not of counsel, I

14 am not related to, nor employed by any attorney in

15 this case, nor am I financially interested in the

16 action.

17         Dated this 16th day of January 2019.

18

19                    _____

20                    Anna M.  Meagher,
                      Shorthand Reporter

21

22

23

24

25

Page 156

1                OUELLETTE & MAULDIN COURT REPORTERS
                      1550 South Dixie Highway
2                     Suite 205 - Riviera Plaza
                    Coral Gables, Florida  33146
3                          (305)358-8875
4
                                         January 16, 2019
5
6    MR. JEFFREY M SISKIND
     3465 Santa Barbara Drive
7    Wellington, Florida  33414
8    Re:  CHANCE & ANTHEM, DEBTOR
             CASE NO.  18-16248-MAM
9
10   Dear Mr. Siskind,
11
        Please be advised that your continued 2004
12   Examination taken by our offices on December 19,2018
     has been transcribed and is ready to be read and
13   signed by you.
14      The transcript will be filed with or without your
     signature in 30 (thirty) days or at the time of trial,
15   whichever comes first.
16      Our office hours are 9:00 a.m. to 4:30 p.m. Monday
     through Friday.
17
        If you have any questions regarding this letter,
18   please feel free to contact us at the above number.
19
                                     Yours very truly,
20
21
                                     Anna M. Meagher
22                                   Court Reporter
23   cc:  JESUS M. SUAREZ, ESQUIRE
24
25